UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

ALLIANCE FOR AUTOMOTIVE INNOVATION,

Plaintiff,

v.

MAURA HEALEY, ATTORNEY GENERAL OF
THE COMMONWEWALTH OF
MASSACHUSETTS, in her official capacity,

Defendant.

CIVIL ACTION
NO. 1:20-cv-12090-DPW

Leave to file 30-page memorandum
granted on December 17, 2020

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
ATTORNEY GENERAL MAURA HEALEY'S MOTION TO DISMISS**

MAURA HEALEY
ATTORNEY GENERAL

Robert E. Toone, BBO #663249
Eric A. Haskell, BBO #665533
Jennifer E. Greaney, BBO #643337
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
Robert.Toone@mass.gov

Dated:  December 18, 2020

# CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ......................................................................................................... 1

THE 2020 RIGHT TO REPAIR LAW .................................................................... 1

ARGUMENT ................................................................................................................. 4

I.     THE ALLIANCE'S PREEMPTION CLAIMS SHOULD BE DISMISSED FOR
       FAILURE TO STATE A CLAIM. ................................................................. 4

       A.     The Alliance's Motor Vehicle Safety Act Claim (Count 1) Fails to State a Claim.....6

              1.     A federal agency's non-binding guidance cannot preempt state law. ...............6

              2.     The Alliance does not identify any motor vehicle safety standard that
                     preempts the 2020 Right to Repair Law. ............................................................8

              3.     The "make inoperative" provision of the MVSA does not preempt the 2020
                     Right to Repair Law........................................................................................12

       B.     The Alliance's Clean Air Act Claim (Count 2) Fails to State a Claim....................13

       C.     The Alliance's Copyright, Trade Secret, Anti-Hacking, and Anti-Piracy
              Preemption Claims (Counts 3 Through 6) Fail to State Claims. .............................17

              1.     The Copyright Act does not preempt the 2020 Right to Repair Law. ..............17

              2.     The DTSA does not preempt the 2020 Right to Repair Law...........................20

              3.     The CFAA does not preempt the 2020 Right to Repair Law. .........................21

              4.     The DMCA does not preempt the 2020 Right to Repair Law. ........................22

II.    THE ALLIANCE'S TAKINGS CLAIM (COUNT 7) SHOULD BE DISMISSED
       BECAUSE THE RELIEF IT SEEKS IS UNAVAILABLE AS A MATTER OF LAW...24

III.   THE ALLIANCE'S CLAIMS SHOULD BE DISMISSED BECAUSE THE
       ALLIANCE LACKS STANDING TO BRING THEM....................................................26

Conclusion ........................................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*,
  386 F. Supp. 3d 89 (D. Mass. 2019) ...............................................................20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................7

*Arizona v. United States*, 567 U.S. 387 (2012).........................................4, 5, 12n, 14

*Ass'n of Am. Med. Colleges v. Cuomo*,
  928 F.2d 519 (2d Cir. 1991).........................................................................19

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ....................................19

*Baptiste v. Kennealy*, – F. Supp. 3d – ,
  2020 WL 5751572 (D. Mass. Sept. 25, 2020) ..........................................24n, 25

*Bay Point Prop., Inc. v. Miss. Transp. Comm'n*,
  937 F.3d 454 (5th Cir. 2019) .........................................................................26

*Cal. Coastal Comm'n v. Granite Rock Co.*,
  480 U.S. 572 (1987)...............................................................................6, 12n

*Capron v. Office of Attorney General*,
  944 F.3d 9 (1st Cir. 2019), *cert. denied*,
  2020 WL 3405992 (June 22, 2020) ...................................................4, 11, 16

*Cayon v. City of Chicopee*, 360 Mass. 606 (1971) ....................................................25n

*CDK Global LLC v. Brnovich*,
  461 F. Supp. 3d 906 (D. Ariz. 2020) ......................................20, 21, 22, 23, 24

*Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011)..........................................5, 15

*Chamberlain Grp. v. Skylink Techs., Inc.*,
  381 F.3d 1178 (Fed. Cir. 2004).....................................................................23

*Chrysler Corp. v. Dep't of Transp.*,
  472 F.2d 659 (6th Cir. 1972) .........................................................................10

*Clarke v. TRW, Inc.*, 921 F. Supp. 927 (N.D.N.Y. 1996) .............................................13

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
  541 U.S. 246 (2004).....................................................................................14

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ...........................................................18

*Fox Film Corp. v. Doyal*, 286 U.S. 123 (1932) ...........................................................20

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ...........................................5, 8, 9

*Georgia Cemetery Ass'n, Inc. v. Cox*,
  353 F.3d 1319 (11th Cir. 2003) ...........................................................30n

*Good v. Altria Group*, 501 F.3d 29 (1st Cir. 2007),
  *aff'd*, 555 U.S. 70 (2008) ...........................................................6

*Green v. Mansour*, 474 U.S. 64 (1985)...........................................................26

*Greene v. Rhode Island*, 398 F.3d 45 (1st Cir. 2005) ...........................................................7n

*Ground Zero Museum Workshop v. Wilson*,
  813 F. Supp. 2d 678 (D. Md. 2011) ...........................................................23

*HAPCO v. City of Philadelphia*, – F. Supp. 3d –,
  2020 WL 5095496 (E.D. Penn. Aug. 28, 2020) ...........................................................25

*Hillsborough Cty. v. Automated Med. Labs., Inc.*,
  471 U.S. 707 (1985)...........................................................5

*Holk v. Snapple Beverage Corp.*, 575 F.3d 329 (3d Cir. 2009)...........................................................6

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977)...........................................................27, 28, 30

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  582 F.3d 156 (1st Cir. 2009) ...........................................................4

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods.
  Liab. Litig.*, 959 F.3d 1201 (9th Cir. 2020)...........................................................14, 15

*Jensen Family Farms, Inc. v. Monterey Bay
  Unified Air Pollution Control Dist.*,
  644 F.3d 934 (9th Cir. 2011) ...........................................................14

*Kansas v. Garcia*, 140 S. Ct. 791 (2020) ...........................................................5, 6, 10

*Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and
  Rehab. Servs.*, 958 F.2d 1018 (10th Cir. 1992)...........................................................29n

*Kentucky v. Graham*, 473 U.S. 159 (1985)...................................................................26

*Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162 (2019)..................................24, 25, 26

*Koenig v. Boulder Brands, Inc.*,
    995 F. Supp. 2d 274 (S.D.N.Y. 2014).............................................................6

*Koufos v. U.S. Bank, N.A.*, 939 F. Supp. 2d 40 (D. Mass. 2013)...................................1n

*Labor Relations Div. of Constr. Indus. of Mass. v. Healey*,
    No. CV 15-10116-RWZ, 2015 WL 4508646
    (D. Mass. July 9, 2015)...........................................................................26, 27

*Lopes v. City of Peabody*, 430 Mass. 305 (1999) .................................................. 24n-25n

*Maine Educ. Ass'n v. Cioppa*,
    695 F.3d 145 (1st Cir. 2012)...........................................................................25

*Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*,
    471 F.3d 277 (1st Cir. 2006).............................................................................27

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ...............................................................4

*Merck Sharp & Dohme Corp. v. Albrecht*,
    139 S. Ct. 1668 (2019)...................................................................................8

*N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66 (1st Cir. 2006) ...........................27, 29

*Nat'l Ass'n of Gov't Employees v. Mulligan*,
    914 F. Supp. 2d 10 (D. Mass. 2012)...................................................28, 29, 30

*Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*,
    280 F.3d 278 (3d Cir. 2002)........................................................................ 25-26

*Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005) .........................28, 29

*Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66,
    (1st Cir. 2001), *aff'd*, 538 U.S. 644 (2003)................................5, 6, 12n, 16, 19

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982).......................................................11

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947).....................................................4

*Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894 (2019).........................................4, 10, 11

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ............................................................... 5-6

*Williams v. Utah Dept. of Corrections*,
    928 F.3d 1209 (10th Cir. 2019) ............................................. 26

*Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323 (2011) ............................................. 9, 14

*Willowbrook Apartment Assocs., LLC v. Mayor &*
    *City Council of Baltimore*, No. CV SAG-20-1818,
    2020 WL 3639991 (D. Md. July 6, 2020) .......................... 25

*Wright's Case*, 486 Mass. 98 (2020) .......................................... 12n

*Wyeth v. Levine*, 555 U.S. 555 (2009) ........................................ 4

## **Statutes**

17 U.S.C. § 101 *et seq.* (Copyright Act) ............................... 17, 18, 19, 20

17 U.S.C. § 102(a)1 ............................................................... 17

17 U.S.C. § 106 ..................................................................... 20

17 U.S.C. § 106(1)-(3) .......................................................... 17

17 U.S.C. § 107 ..................................................................... 19

17 U.S.C. § 301(a) ................................................................ 18

17 U.S.C. § 1201 *et seq.* (Digital Millennium Copyright Act) ................... 17, 22, 23, 24

17 U.S.C. § 1201(a)(1)(A) ..................................................... 22

17 U.S.C. 1201(a)(3)(A) ........................................................ 23

18 U.S.C. § 1030 (Computer Fraud and Abuse Act) ................... 17, 21, 22, 23

18 U.S.C. § 1030(a)(2)(C) ..................................................... 21

18 U.S.C. § 1831-1832 .......................................................... 20

28 U.S.C. § 1839 ................................................................... 20

18 U.S.C. § 1836 *et seq.* (Defend Trade Secrets Act) ................... 17, 20, 21

v

42 U.S.C. § 7521(m)(5) .................................................................16, 17

42 U.S.C. § 7522(a)(3)(A) ............................................................15, 16

42 U.S.C. § 7401 *et seq.* (Clean Air Act) ...............................13, 14, 15, 16, 17

42 U.S.C. § 7543(a) ...........................................................................13

42 U.S.C. § 7543(d) ...........................................................................14

49 U.S.C. § 30101 *et seq.* (Motor Vehicle Safety Act) ...............6, 9n, 10, 12, 13, 15, 16

49 U.S.C. § 30102(a) .........................................................................13

49 U.S.C. § 30102(a)(10) ...................................................................10

49 U.S.C. § 30103(b)(1) ...................................................................9n

49 U.S.C. § 30111(a) ....................................................................10, 13

49 U.S.C. § 30122 ..............................................................................13

49 U.S.C. § 30122(b) .....................................................................12, 13

Mass. Gen. Laws ch. 79, § 10 ........................................................24n

Mass. Gen. Laws ch. 93A ....................................................................3

Mass. Gen. Laws ch. 93K .......................................................... *passim*

Mass. Gen. Laws ch. 93K, § 2 ........................................................2, 3

Mass. Gen. Laws ch. 93K, § 2(d)(1) ...............................................18

Mass. Gen. Laws ch. 93K, § 3 ....................................................20, 31

Mass. Gen. Laws ch. 93K, § 6 ...........................................................3

Mass. Gen. Laws ch. 140, § 59 .........................................................3

**Constitutional Provisions**

U.S. Const. amend. XI ....................................................................................1, 26

Mass. Const., Decl. of Rights, Art. 10 ...............................................................24n

**Rules and Regulations**

40 C.F.R. § 86.1808-01(f)(2)(i) ...........................................................................16

49 C.F.R. § 571.105 ..........................................................................................9, 10

49 C.F.R. § 571.121 ........................................................................................9, 10n

49 C.F.R. § 571.124 ...............................................................................................9

49 C.F.R. § 571.126 ...............................................................................................9

49 C.F.R. § 571.135 ........................................................................................9, 10n

310 Mass. Code Regs. § 60.02(23) .......................................................................15

Fed. R. Civ. P. 12(b) .............................................................................................7n

Fed. R. Civ. P. 12(b)(1).........................................................................1, 26, 27, 30

Fed. R. Civ. P. 12(b)(6).............................................................................1, 24, 26

**Miscellaneous**

Executive Order No. 13891, § 1, 84 Fed. Reg. 55,235 (2019) ......................................8n

Letter from James C. Owens, Deputy Administrator, National
    Highway Traffic Safety Administration, to Tackey Chan
    and Paul R. Feeney, Massachusetts Legislature Joint
    Committee on Consumer Protection and Professional
    Licensure (July 20, 2020) ......................................................................7, 9, 11

National Highway Traffic Safety Administration, *Cybersecurity
    Best Practices for Modern Vehicles* (Report No. DOT HS
    812 333) (2016), available at
    https://www.nhtsa.gov/es/staticfiles/nvs/pdf/812333_Cyber
    securityForModernVehicles.pdf (last visited Dec. 18, 2020).........................7, 13

National Highway Traffic Safety Administration, *Guidance Documents*, available at https://www.nhtsa.gov/es/laws-regulations/guidance-documents (last visited Dec. 18, 2020) ...................................................................................................................7

## INTRODUCTION

This lawsuit is an attempt by the Alliance for Automotive Innovation (the "Alliance"), a trade association for the automotive industry, to undo an initiative petition recently approved by the Massachusetts voters, based in large part on the same cybersecurity policy arguments that the voters rejected at the ballot box.  All of the Alliance's claims should be dismissed under Fed. R. Civ. P. 12(b)(6).  The Alliance asserts six claims for implied conflict preemption, *see* Compl. ¶¶ 94-159 (Counts 1 through 6), but none is viable as a matter of law.  Its primary claim, under the Motor Vehicle Safety Act, relies on non-binding agency guidance, which is insufficient to preempt state law.  Neither it nor any of the Alliance's other preemption claims establishes an actual conflict between state and federal law, much less satisfies the heavy burden required for facial, pre-enforcement challenges established by the Supreme Court and First Circuit.  The Alliance's Takings Clause claim, *see* Compl. ¶¶ 160-70 (Count 7), similarly requires dismissal under Rule 12(b)(6) because the relief it seeks is unavailable as a matter of law (and any claim the Alliance or its members may have to other relief is barred by the Eleventh Amendment from adjudication in this court).[1]  In addition, the complaint should be dismissed under Rule 12(b)(1) because the Alliance lacks standing to bring it.

### THE 2020 RIGHT TO REPAIR LAW

On November 6, 2012, Massachusetts voters approved a ballot initiative that was ultimately enacted as Chapter 93K of the General Laws and is colloquially known as the "2013

---

[1] The Alliance also asserts a claim, *see* Compl. ¶¶ 171-80 (Count 8), for "preliminary and permanent injunction."  Because an injunction is not an independent cause of action, but a remedy that might be available if some other cause of action is proved, it should be dismissed for the same reasons as the Alliance's other seven counts.  *See Koufos v. U.S. Bank, N.A.*, 939 F. Supp. 2d 40, 46 (D. Mass. 2013) ("An injunction is not a cause of action, but a remedy.").

Right to Repair" law.  That law gives motor vehicle owners and independent repair facilities access to certain data generated by motor vehicles, data that had previously been available only to manufacturers and licensed dealerships.

On November 3, 2020, Massachusetts voters approved Ballot Question 1, titled "An Initiative Law to Enhance, Update and Protect the 2013 Motor Vehicle Right to Repair Law." The new law (herein referred to as the "2020 Right to Repair Law") amends Chapter 93K to allow vehicle owners greater access to mechanical data on account of advances in data transmission technology.  Section 1 adds two new definitions to the 2013 law:  "Mechanical data" and "Telematics system."[2]  Section 2 amends Mass. Gen. Laws ch. 93K, § 2, which currently requires manufacturers to provide access to vehicle onboard diagnostic and repair information systems.  The new law adds a paragraph requiring that access to onboard diagnostic systems by motor vehicle owners and independent repair facilities be standardized and not require any prior authorization from the manufacturer, unless such authorization is standardized across all makes and models and administered by an independent entity.

Section 3 of the new law further amends Mass. Gen. Laws ch. 93K, § 2, by replacing subparagraph (f), which exempted certain telematics systems data, with a new subparagraph (f), which provides for owner and independent-repair-facility access to mechanical data in cars with telematics systems.  Section 3 requires manufacturers to equip motor vehicles – starting with

---

[2] "Mechanical data" is defined as "any vehicle-specific data, including telematics system data, generated, stored in or transmitted by a motor vehicle used for or otherwise related to the diagnosis, repair or maintenance of the vehicle."  "Telematics system" is defined as "any system in a motor vehicle that collects information generated by the operation of the vehicle and transmits such information, in this chapter referred to as 'telematics system data,' utilizing wireless communications to a remote receiving point where it is stored."

model year 2022 – with an "inter-operable, standardized and open access platform" for vehicles that have a telematics system and are sold in Massachusetts, which "shall be capable of securely communicating" mechanical data from the vehicle "via direct data connection to the platform." Vehicle owners will have access to this platform through a mobile device application, and independent repair facilities and new car dealerships will have access to the vehicle's mechanical data to perform maintenance and repairs, with the owner's authorization, limited to the time needed to complete the repair or another period of time agreed to by the owner for the purposes of maintaining, diagnosing and repairing the motor vehicle.  During this period, independent repair facilities and new car dealerships will also be able to send commands to the vehicle if needed for the purposes of maintenance, diagnostics, and repair.

Section 4 of the new law further amends Mass. Gen. Laws ch. 93K, § 2, by adding two new subparagraphs (g) and (h), which describe the notice provisions relative to the law. Subparagraph (g) requires the Attorney General to prepare a standard form notice for prospective motor vehicle owners that would describe telematics systems and mechanical data, and the prospective owner's ability to access the vehicle's mechanical data and authorize independent repair facilities to access that data.  Subparagraph (h) requires new and used car dealerships to provide the notice to prospective owners and obtain the prospective owner's signed certification that he or she has read the notice before purchasing a vehicle.  A dealer that fails to comply with these notice requirements will be subject to sanction by the applicable licensing authority, including license revocation as provided for in Mass. Gen. Laws ch. 140, § 59.

Finally, Section 5 of the new law amends Mass. Gen. Laws ch. 93K, § 6, by adding a new section granting owners and independent repair facilities a civil enforcement remedy for violations of the law, including remedies authorized by Chapter 93A.

**ARGUMENT**

**I.    THE ALLIANCE'S PREEMPTION CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.**

Facial preemption claims like the ones made here raise questions of law, and can be appropriately decided upon a motion to dismiss for failure to state a claim.  *See, e.g.*, *Capron v. Office of Attorney General*, 944 F.3d 9, 13, 20 n.4 (1st Cir. 2019) (affirming dismissal of implied field and conflict preemption claims against state worker protection laws), *cert. denied*, 2020 WL 3405992 (June 22, 2020).

As plaintiff, the Alliance has the burden to prove preemption.  *Id.* at 21 (citation omitted). Further, courts must presume in implied preemption cases like this one that "the historic police powers of the States" are not superseded "unless that was the clear and manifest purpose of Congress."  *Arizona v. United States*, 567 U.S. 387, 400 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  This presumption against preemption and "clear and manifest" requirement reflect the fact that "the States are independent sovereigns in our federal system," as well as "the historic primacy of state regulation of matters of health and safety." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted); *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 178 (1st Cir. 2009) (presumption against preemption "applies in any field in which there is a history of state law regulation, even if there is also a history of federal regulation") (citing *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009)).

As such, federal policy preferences and "brooding federal interest[s]" are insufficient to preempt state law.  *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (lead opinion of Gorsuch, J.).  Rather, "only federal laws 'made in pursuance' of the Constitution, through its prescribed processes of bicameralism and presentment, are entitled to preemptive effect," and any evidence of preemptive purpose must be "sought in the text and structure of the statute at

issue." *Id.* at 1907; *see also Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) ("'There is no federal preemption *in vacuo*,' without a constitutional text, federal statute, or treaty made under the authority of the United States.") (citation omitted).

To proceed with an implied conflict preemption claim, the plaintiff must show that the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," or that "compliance with both federal and state regulations is a physical impossibility." *Arizona*, 567 U.S. at 399 (citations omitted); *accord Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 74-75 (1st Cir. 2001), *aff'd*, 538 U.S. 644 (2003).[3]  This analysis does not justify a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," since such an endeavor "would undercut the principle that it is Congress rather than the courts that preempts state law." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted).  Rather, plaintiffs must meet a "high threshold," *id.* (citation omitted), by making a clear showing of preemption that overcomes the presumption that state regulation "can constitutionally coexist with federal regulation." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716 (1985); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000) (courts "should not find pre-emption too readily in the absence of clear evidence of a conflict").

Finally, it is significant that the Alliance seeks to strike down the 2020 Right to Repair Law in its entirety, before it has been implemented.  Such pre-enforcement, facial challenges are generally disfavored because they are often based on speculation, contrary to principles of judicial restraint, and subversive of the democratic process. *Wash. State Grange v. Wash. State*

---

[3] Here, the Alliance asserts obstacle preemption.  Compl. ¶¶ 97, 110, 127, 132, 142, 152, 159.

*Republican Party*, 552 U.S. 442, 450-51 (2008).  Accordingly, in assessing the Alliance's preemption claims, this Court need not determine precisely how the 2020 Right to Repair Law will apply in Massachusetts.  Rather, the Alliance has "the most difficult challenge" of establishing that "no set of circumstances exists under which" this law "would be valid." *Concannon*, 249 F.3d at 77 (citation omitted).  To proceed, the Alliance must show that there is "no possible set of conditions" under which the 2020 Right to Repair Law "would not conflict with federal law."  *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987).  The Alliance cannot carry that heavy burden here.

**A.     The Alliance's Motor Vehicle Safety Act Claim (Count 1) Fails to State a Claim.**

**1.     A federal agency's non-binding guidance cannot preempt state law.**

Federal preemption requires "a constitutional text, federal statute, or treaty made under the authority of the United States."  *Garcia*, 140 S. Ct. at 801.  A federal agency's non-binding policy and guidance documents cannot preempt state law.  *See, e.g.*, *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 339-42 (3d Cir. 2009) (agency's policy statement is not entitled to preemptive effect, even if the agency enforced the policy in "isolated instances"); *Good v. Altria Group*, 501 F.3d 29, 51 (1st Cir. 2007), *aff'd*, 555 U.S. 70 (2008) (rejecting conflict preemption claim based on agency policy because "[l]imiting the preemptive power of federal agencies to exercises of formal rulemaking authority … ensures that the states will have enjoyed these protections before suffering the displacement of their laws"); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 285 (S.D.N.Y. 2014) ("As it is non-binding guidance, the FDA's Compliance Policy Guide 'is not entitled to preemptive effect.'") (citations omitted).

Here, the Alliance's claim under the Motor Vehicle Safety Act ("MVSA") rests not on the U.S. Constitution or any federal statute, but rather on two non-binding, sub-regulatory

documents issued by a federal agency, each of which lacks preemptive effect.  First, the Alliance

relies extensively (directly and indirectly) on the National Highway Traffic Safety Agency's

"Cybersecurity Best Practices for Modern Vehicles" ("NHTSA Guidance").[4]  But that document

states in its first line that its purpose is to describe the agency's "*non-binding guidance* to the

automotive industry for improving motor vehicle cybersecurity."  NHTSA Guidance at 5

(emphasis added); *see also id.* ("NHTSA believes that *the voluntary best practices described in*

*this document* provide a solid foundation for developing a risk-based approach and important

processes that can be maintained, refreshed and updated effectively over time to serve the needs

of the automotive industry.") (emphasis added).  In addition to citing the cybersecurity guidance

itself, Compl. ¶¶ 103-04, the Alliance emphasizes NHTSA's July 20, 2020 letter to the

Massachusetts Legislature ("NHTSA Letter"), making the conclusory allegation that, through

that letter, NHTSA determined that the 2020 Right to Repair Law "creates a 'direct conflict' with

federal law," Compl. ¶¶ 14, 16, 101; *see also id.* ¶¶ 13, 64-75, 102-05 & Ex. A.  But that's not

correct, and the Alliance's conclusory allegations about the legal status of the NHTSA Letter

cannot be credited.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As NHTSA explained in its

Letter, it analyzed the then-proposed 2020 Right to Repair Law for potential conflicts not with

federal statutes, but rather with its non-binding cybersecurity guidance.  NHTSA Letter at 3.

Indeed, NHTSA described this guidance as containing only "recommendations" and an effort to

---

[4] This guidance document is available at
https://www.nhtsa.gov/es/staticfiles/nvs/pdf/812333_CybersecurityForModernVehicles.pdf (last
visited Dec. 18, 2020).  Because both this document and NHTSA's letter to the Massachusetts
Legislature discussing it are public records referred to in the Alliance's complaint, they are
properly before the Court for purposes of this Rule 12(b) motion.  *See Greene v. Rhode Island*,
398 F.3d 45, 48 (1st Cir. 2005).

"encourage" manufacturers to do more "to adopt improved cybersecurity practices."  *Id.* at 3-4.

NHTSA also acknowledges that its guidance documents lack the force of law.  It makes this point not only in the cybersecurity guidance itself, but also more generally on its web page for "Guidance Documents."  There, NHTSA states that "[t]he term 'guidance document' refers to a statement of agency policy or interpretation concerning a statute, regulation, or technical matter within the jurisdiction of an agency that is intended to have general applicability and future effect, but which is *not intended to have the force or effect of law in its own right*, unless expressly authorized by law or incorporated into a contract."[5]

> **2.**   **The Alliance does not identify any motor vehicle safety standard that preempts the 2020 Right to Repair Law.**

In support of its MVSA preemption claim, the Alliance asserts in conclusory fashion that the 2020 Right to Repair Law "conflicts with several of the FMVSS [Federal Motor Vehicle Safety Standards] that NHTSA has promulgated."  Compl. ¶ 101.  NHTSA's motor vehicle safety standards are promulgated as regulations, and regulations intended to preempt state law that are promulgated by an agency under "congressionally delegated authority" may have preemptive effect.  *See Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) (citation omitted).  But even though the Alliance is required to establish "clear evidence of a conflict" between federal and state law, *Geier*, 529 U.S. at 885, it never identifies which federal vehicle safety regulations it claims to be preemptive.  Rather, the Alliance simply cites the

---

[5] *See* https://www.nhtsa.gov/es/laws-regulations/guidance-documents (last visited Dec. 18, 2020) (emphasis added).  NHTSA further states that it issues guidance documents in compliance with Executive Order 13891, which provides that a federal agency's guidance documents may not impose new, binding requirements on the public.  *Id.*; *see also* Executive Order No. 13891, § 1, 84 Fed. Reg. 55,235, 55,235 (2019) ("Agencies may impose legally binding requirements on the public only through regulations and on parties on a case-by-case basis through adjudications, and only after appropriate process, except as authorized by law or as incorporated into a contract.").

NHTSA Letter and claims, incorrectly, that NHTSA found that the 2020 Right to Repair Law "is in 'direct conflict' with federal regulations."  *See* Compl. ¶ 101.  As explained in Section I.A.1, *supra*, the NHTSA Letter assessed the law only for its consistency with the agency's non-binding cybersecurity guidance.

The only safety standards mentioned in the Alliance's complaint involve vehicle functions distinct from the data access regulated by the 2020 Right to Repair Law.  The Alliance writes that "NHTSA has, for instance, issued several FMVSS regulations designed to 'insure safe braking performance under normal and emergency conditions.' 49 C.F.R. § 571.105 (hydraulic and electric brake systems); *id.* § 571.121 (air brake system); *id.* § 571.135 (light-vehicle brake systems).  Similarly, NHTSA regulates vehicles' ability to control acceleration. *See, e.g.*, *id.* § 571.124 (accelerator control systems)."  Compl. ¶ 102; *see also id.* ¶ 103 (citing safety standard on electronic stability control systems, 49 C.F.R. § 571.126).  The Alliance, however, does not plausibly allege that those regulations preempt the 2020 Right to Repair Law.

When assessing whether a motor vehicle safety standard impliedly preempts state law, the key question is whether state law stands as an "'obstacle' to the accomplishment" of a "significant" objective of the federal regulation.  *See Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011) (quoting *Geier*, 529 U.S. at 886).[6]  The mere fact that state and federal law might "overlap to some degree" "does not even begin to make a case for conflict

---

[6] The MVSA contains an express preemption provision, 49 U.S.C. § 30103(b)(1), which provides that, when a motor vehicle safety standard is in effect, a state "may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter."  The Alliance does not suggest that this provision applies to the 2020 Right to Repair Law.  *See generally* Compl. ¶¶ 94-106.

preemption."  *Garcia*, 140 S. Ct. at 806.  Further, any "'[e]vidence of pre-emptive purpose,'

whether express or implied," must be found in the text and structure of the federal statute or

regulation at issue.  *Va. Uranium*, 139 S. Ct. at 1907 (citation omitted).

Under the MVSA, a motor vehicle safety standard is defined as "a minimum standard for

motor vehicle or motor vehicle equipment performance."  49 U.S.C. § 30102(a)(10).  Such a

standard, to be valid, must "be practicable, meet the need for motor vehicle safety, and be stated

in objective terms."  *Id.* § 30111(a).  To be "stated in objective terms" means that compliance

with the FMVSS must be measurable by instruments, and be demonstrable and replicable under

controlled conditions.  *Chrysler Corp. v. Dep't of Transp.*, 472 F.2d 659, 676 (6th Cir. 1972).

Here, each vehicle safety standard cited by the Alliance clearly sets forth its own limited scope

and purpose.  For example, 49 C.F.R. § 571.105 states that its scope is to "specif[y] requirements

for hydraulic and electric service brake systems, and associated parking brake systems," and that

its purpose is "to insure safe braking performance under normal and emergency conditions."[7]

There is nothing in the 2020 Right to Repair Law that purports to alter the requirements for

hydraulic and electric service brake systems, or to impede safe braking performance.  The same

is true for each of the purposes advanced by the other cited safety standards.

Rather than claim that the 2020 Right to Repair Law will alter any of the cited safety

standards, the Alliance posits that "[i]n light of the substantial role technology plays in all new

---

[7] Similarly, 49 C.F.R. § 571.121 states that its scope is to "establish[] performance and
equipment requirements for braking systems on vehicles equipped with air brake systems," and
its purpose is "to insure safe braking performance under normal and emergency conditions."  49
C.F.R. § 571.135 states that its scope is to "specif[y] requirements for service brake and
associated parking brake systems," and its purpose is "to ensure safe braking performance under
normal and emergency driving conditions."  And so on.

vehicles," the integrity of the vehicle features regulated by the safety standards "will necessarily be impacted" by the state law's "mandate for open vehicle system access."  Compl. ¶ 102.  The Alliance alleges that this "impact" will occur in a manner "adverse to NHTSA regulations," *see id.*; but, once again, the only authority it cites for that proposition is the agency's discussion of its non-binding cybersecurity guidance, *see id.* (citing NHTSA Letter at 2-4).  In fact, there is no federal regulation that conflicts with data access requirements in the 2020 Right to Repair Law, and the allegation that vehicle features otherwise regulated by federal law "will necessarily be impacted by" a state law falls short of what is required to state a plausible preemption claim.

Conflict preemption requires "an irreconcilable conflict between the federal and state regulatory schemes"; the "existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute."  *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).  Courts have repeatedly rejected claims like this one premised on the idea that things regulated by federal law will be "impacted" by state laws also.  *See, e.g.*, *Va. Uranium*, 139 S. Ct. at 1907 (rejecting claim that state statutory moratorium on uranium mining is preempted by Atomic Energy Act on theory that "[m]aybe the text of the AEA doesn't touch on mining in so many words, but its authority to regulate later stages of the nuclear fuel life cycle would be effectively undermined if mining laws like Virginia's were allowed"; a "sound preemption analysis cannot be as simplistic as that"); *Capron*, 944 F.3d at 38, 40 (affirming dismissal of conflict preemption claim based on what plaintiffs claimed would be "the adverse practical impact" of state law; "speculation about future impacts supplied by the plaintiffs themselves cannot satisfy their burden to show the requisite – implicit – preemptive intent").  Similarly, here, where there is no federal law or regulation that governs the data access issues addressed in the 2020 Right to Repair Law, the Alliance cannot proceed with a claim based on the theory that

the law will somehow "impact" vehicle features regulated by federal safety standards.[8]

> **3.**     **The "make inoperative" provision of the MVSA does not preempt the 2020 Right to Repair Law.**

The Alliance's last theory involving the MVSA is that the 2020 Right to Repair Law is preempted because it "conflicts directly" with the federal law's "make inoperative" provision, 49 U.S.C. § 30122(b).  Compl. ¶ 106.  This novel theory of conflict preemption does not appear to have been adopted by any court, and is unavailing here.

Section 30122(b) provides that manufacturers and others "may not knowingly make inoperative any part of a device or element of design installed on or in a motor vehicle or motor vehicle equipment in compliance with an applicable motor vehicle safety standard."  The Alliance does not and cannot plausibly allege that the 2020 Right to Repair Law requires removing or disabling safety equipment or features installed to comply with a motor vehicle safety standard.  It does not direct any party, for example, to disable a vehicle's air bags, air brake system, or accelerator control system.

---

[8] Nor can the Alliance rest its facial preemption claim on speculation about what might happen after implementation of the 2020 Right to Repair Law begins.  "In reviewing a preemption-based facial challenge, 'we do not rest our decision on consequences that, while possible, are by no means predictable.'"  *Concannon*, 249 F.3d at 78 (citation omitted).  To the contrary, our system of cooperative federalism presumes that federal and state officials will implement overlapping administrative frameworks in a way that avoids unnecessary conflict.  *See, e.g.*, *Wright's Case*, 486 Mass. 98, 108 (2020) (recognizing duty of Massachusetts courts "to avoid conflict with Federal law and possible preemption under the supremacy clause").  Thus, at a minimum, this Court should dismiss the Alliance's claim without prejudice to its right to renew it in the event that an actual, irreconcilable conflict emerges between federal law and the new state law "as applied."  *Concannon*, 249 F.3d at 78-79; *see also Granite Rock*, 480 U.S. at 594 (holding that "the barren record of this facial challenge has not demonstrated any conflict" while "not, of course, approv[ing] any future application" of state law "that in fact conflicts with federal law"); *Arizona*, 567 U.S. at 415 (to extent there is uncertainty about what state law "means and how it will be enforced," it would be inappropriate "[a]t this stage" to assume the state law "will be construed in a way that creates a conflict with federal law").

Instead, the Alliance speculates that the "inter-operable, standardized and open access platform" requirement under Section 3 of the 2020 Right to Repair Law will require manufacturers to make inoperative certain "safeguards to prevent electronic intrusion" that they have created.  Compl. ¶ 106.  The Alliance does not allege that such safeguards are themselves required by any motor vehicle safety standard, but rather that they are "built into the design" of components that are.  *See id.*  As with the rest of the Alliance's MVSA claim, those allegations do not state a plausible preemption claim.  The "make inoperative" prohibition applies only to the disablement of safety devices and elements themselves required by a federal safety standard.  *See, e.g.*, *Clarke v. TRW, Inc.*, 921 F. Supp. 927, 935 (N.D.N.Y. 1996) (plaintiff fails to state claim for violation of § 30122 "unless the 'motor vehicle safety standard[s]' are involved").  As discussed in Section I.A.2, *supra*, vehicle safety standards are minimum standards that must meet the need for motor vehicle safety and be stated in objective terms.  49 U.S.C. §§ 30111(a), 30102(a).  It would do violence to the plain language of these statutes and § 30122(b) to expand the "make inoperative" prohibition to data-access controls that manufacturers have chosen to layer on top of the devices actually regulated by the safety standards, separate and apart from those regulated devices themselves.  Similarly, the Alliance cannot bootstrap a purported violation of NHTSA's cybersecurity guidance into a § 30122 violation because, again, that guidance is non-binding, has no preemptive value, and is not incorporated into any binding safety standard.

### B.   The Alliance's Clean Air Act Claim (Count 2) Fails to State a Claim.

The Alliance's preemption claim under the Clean Air Act also warrants dismissal.  The Alliance first cites the statute's express preemption provision, 42 U.S.C. § 7543(a).  *See* Compl. ¶ 112.  By its own terms, however, that provision does not apply here.  Section 7543(a) provides

that no state "shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part," and the term "standard" means "that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.'"  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252-53 (2004).  Because the plain language of the 2020 Right to Repair Law "has nothing to do with emissions standards or the control of emissions" for any vehicle, it is not expressly preempted by the Clean Air Act.  *See Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 939 (9th Cir. 2011).

Further, even if the 2020 Right to Repair Law had comprised such a "standard," the Clean Air Act expressly preserves the right of states "to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles."  42 U.S.C. § 7543(d).  The plain language of this "saving clause" preserves state authority to regulate anything that "affects the vehicle's 'quality' and 'method' of functioning (*i.e.*, operation)."  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 959 F.3d 1201, 1216 (9th Cir. 2020) (citation omitted).  The 2020 Right to Repair Law, which seeks to ensure access to vehicles' onboard diagnostic systems and other information generated during their operation, falls well within the Act's defined sphere of non-preempted state regulation.

Insofar as the Alliance contends that the 2020 Right to Repair Law is impliedly preempted by the Clean Air Act, this Court must take the federal Act's broad saving clause into consideration, as well as the presumption "that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"  *In re Volkswagen*, 959 F.3d at 1219 (quoting *Arizona*, 567 U.S. at 400); *see also Williamson*, 562 U.S. at 335 (inference that NHTSA "intends to bar States from imposing stricter standards" cannot be

reconciled with MVSA's "statutory saving clause that foresees the likelihood of a continued meaningful role for state tort law"); *Whiting*, 563 U.S. at 600-01 ("Given that Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority.").  The Clean Air Act's text and structure, the presumption against preemption, and the fact that consumer protection and data-access regulation are not "uniquely federal" areas of enforcement weigh against finding an implied preemption claim here.  *In re Volkswagen*, 959 F.3d at 1221.

The Alliance further contends that the state law "conflicts directly" with the Clean Air Act's anti-tampering prohibition.  Compl. ¶¶ 113-15.  That provision makes it unlawful for "any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter …"  42 U.S.C. § 7522(a)(3)(A).  Again, however, that statute does not apply by its own terms.  There is nothing in the 2020 Right to Repair Law that requires anyone to disable or tamper with an emissions-control device, much less install a "defeat device" on a vehicle.  Nor does the plaintiff's complaint identify any "regulation[] under [the Clean Air Act]" that the 2020 Right to Repair Law allegedly offends.  To the contrary, the new state law can and should be read harmoniously with the provisions of both federal and state law that prohibit such tampering with emission control devices.  *In re Volkswagen*, 959 F.3d at 1216-17 (citing 42 U.S.C. § 7522(a)(3)(A), (B)); 310 Mass. Code Regs. § 60.02(23) ("All persons are prohibited from tampering with any vehicle emissions control device or system").

The Alliance speculates that, by requiring standardized and secure access by vehicle owners and independent repair facilities to vehicles' onboard diagnostic systems and other information generated during their operation, the 2020 Right to Repair Law could indirectly

facilitate violations of the Clean Air Act by allowing persons to "disable emissions control systems through the use of software designed for that purpose." *See* Compl. ¶ 114.  That is an implausible interpretation of the 2020 Right to Repair Law's provision requiring that access be provided to vehicle telematics systems securely and "for purposes of maintenance, diagnostics and repair."  Further, such speculation about future harmful or unlawful acts by third parties is insufficient to state a conflict preemption claim, particularly in a facial pre-enforcement challenge like this one.  *See, e.g.*, *Capron*, 944 F.3d at 39-40; *Concannon*, 249 F.3d at 77-78. The Alliance's argument is also contradicted by the provision of the Clean Air Act that requires open access to onboard diagnostics and other data to facilitate vehicle maintenance.  *See* 42 U.S.C. § 7521(m)(5) (directing EPA to require manufacturers to provide to "any person engaged in the repairing or servicing of motor vehicles or motor vehicle engines … any and all information needed to make use of the [vehicle's] emission control diagnostic system … and such other information including instructions for making emission-related diagnoses and repairs"); *see also, e.g.*, 40 C.F.R. § 86.1808-01(f)(2)(i) (maintenance instructions requiring access to emission control diagnostic service information).  In other words, the Act and its regulations *favor* a policy of open access to emissions-control data, rather than suggest (as the Alliance contends here) that such access is problematic because it might facilitate tampering.

Lastly, the Alliance makes the same flawed argument it did with the MVSA (*see* Section I.A.3, *supra*):  *i.e.*, because manufacturers have added "safeguards to prevent electronic intrusion" to devices installed to control emissions, the federal law that prohibits tampering with emission-control devices must necessarily apply to these additional safeguards as well.  *See* Compl. ¶ 115.  That argument disregards both the plain text of § 7522(a)(3)(A) and the structure of the Clean Air Act.  Section 7522(a)(3)(A) prohibits manufacturers from "rendering

inoperative" devices or elements that are themselves required by the Act's emissions standards. No federal standards require additional "safeguards to prevent electronic intrusion" as part of the design of emission-control devices. To the contrary, § 7521(m)(5) mandates that "any and all" information needed to use an emission-control diagnostic system be made available to "any person engaged in the repairing or servicing of motor vehicles or motor vehicle engines." The Alliance should not be permitted to proceed with a conflict preemption claim based on an interpretation of the Clean Air Act's anti-tampering prohibition that itself conflicts with what the Act requires.

      **C.**      **The Alliance's Copyright, Trade Secret, Anti-Hacking, and Anti-Piracy Preemption Claims (Counts 3 Through 6) Fail to State Claims.**

The Alliance further contends that the 2020 Right to Repair Law is preempted by four separate federal statutes that involve intellectual property rights, trade secrets, or computer hacking. *See* Compl. ¶¶ 116-28 (Copyright Act); ¶¶ 129-38 (Defend Trade Secrets Act ("DTSA")); ¶¶ 139-47 (Computer Fraud and Abuse Act ("CFAA")); ¶¶ 148-59 (Digital Millennium Copyright Act ("DMCA")). Because these claims are improper bases for a facial preemption challenge, they should be dismissed.

      **1.**      **The Copyright Act does not preempt the 2020 Right to Repair Law.**

The Copyright Act affords copyright protection, including exclusive rights to reproduce, distribute copies of, and prepare derivative works based upon the owner's copyrighted work, 17 U.S.C. § 106(1)-(3), to "original works of authorship fixed in any tangible medium of expression," *id.* § 102(a). Nothing on the face of the 2020 Right to Repair Law conflicts with or stands as an obstacle to those rights. The law does not authorize any third party to reproduce, copy, or prepare derivative works based upon any copyrighted materials. It does not seek to establish any remedies that are "equivalent to any of the exclusive rights within the general scope

of copyright," in violation of the Copyright Act's express preemption provision, 17 U.S.C.

§ 301(a).  Instead, the 2020 Right to Repair Law seeks to ensure the access of independent repair

facilities and vehicle owners to their vehicles' onboard diagnostic systems and other information

generated during their operation.  That goal does not conflict with the objective of Congress,

through the Copyright act, "to encourage the production of original literary, artistic, and musical

expression for the good of the public."  *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 524 (1994).

The Alliance does not claim that its members have exclusive rights over data available

through vehicles' onboard diagnostic systems or otherwise generated during vehicles' operation.

For example, under the 2013 Right to Repair Law manufacturers have been required to provide

independent repair facilities and vehicle owners with access to vehicles' "onboard diagnostic and

repair information system," Mass. Gen. Laws ch. 93K, § 2(d)(1), and the automotive industry has

never claimed that this access mandate violates the Copyright Law.  Section 2 of the new law

merely updates that guarantee of access to the onboard diagnostics system to ensure that any

authorization system imposed by a manufacturer be standardized and administered by an

unaffiliated entity.  Section 3 provides that, for vehicles with telematics systems, manufacturers

must equip them with an "inter-operable, standardized and open access platform" that is "capable

of securely communicating all mechanical data emanating directly from the motor vehicle" for

the purpose of "maintaining, diagnosing and repairing the motor vehicle."

The Alliance makes no claim to the data for which access is guaranteed by these

provisions, but instead alleges that the vehicles manufactured by its members contain

"copyrighted and copyrightable material" including "their source and object code; distinctive

screen layouts; graphical content; text arrangement, organization, and display of information;

and dynamic user experience," Compl. ¶ 121, and that it violates the Copyright Law to require

manufacturers to allow independent repair facilities and vehicle owners "with no authorization from [the Alliance's] members to access and use those members' copyrighted systems, firmware, software, and related components," *id.* ¶ 122. As a trade association, however, the Alliance does not have standing "to seek an injunction for copyright infringement on [its] members' behalf," *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94 (2d Cir. 2014) (citations omitted), and the vague and conclusory allegations in its complaint fail to establish a plausible facial preemption challenge to the 2020 Right to Repair Law. It does not explain why, for example, the new law, which only requires access to data, will necessarily infringe the Alliance's members' copyrights in their "distinctive screen layouts" or "dynamic user experience." *See Concannon*, 249 F.3d at 77. The state law does not even mention those features. The Alliance similarly fails to explain why any supposed infringement of its members' copyrights that incidentally occur during implementation of the new state law would not constitute "fair use" – an integral part of the Copyright Act. *See* 17 U.S.C. § 107 (fair use "is not an infringement of copyright"); *Ass'n of Am. Med. Colleges v. Cuomo*, 928 F.2d 519, 523 (2d Cir. 1991) (if a state statute authorizes fair use, it does not conflict with the Copyright Act).

In its complaint, the Alliance identifies only one specific potential act of infringement, which it asserts happens "often" – in other words, not always. *See* Compl. ¶ 124. Under this scenario, "when a user accesses a vehicle's system to read or write data, that process creates a new fixed copy of the original computer program code in the computer's random access memory." *Id.*; *see also id.* ¶ 126 (alleging that the law "encourages the unauthorized creation of derivative works in members' systems"). There is no basis to conclude such copying is required by the 2020 Right to Repair Law, or that it would incidentally occur as a result of the law's implementation, or that (if bothered by it) manufacturers could not design vehicular telematics

systems to avoid it.  More generally, the right conferred by the Copyright Act is the right to exclude others.  *See* 17 U.S.C. § 106; *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) (copyright holder has "the right to exclude others from using his property").  Thus, even if the new state law were somehow applied to require certain Alliance members to make internal copies of program code in their own computer systems' memory, that would still not infringe on the members' right to exclude others.  There is no basis for a facial preemption claim.

### 2.    The DTSA does not preempt the 2020 Right to Repair Law.

The Court should also dismiss the Alliance's claim under the DTSA.  The Alliance contends that the 2020 Right to Repair Law compels its members "to disseminate the very trade secrets that Congress sought to protect" through the DTSA, *id.* at ¶ 134, but that is incorrect.  By its terms, the law does not "require a manufacturer to divulge a trade secret."  Mass. Gen. Laws ch. 93K, § 3.  And the Alliance does not allege that the mechanical data that must be provided is a trade secret.  Moreover, the DTSA imposes criminal and civil liability only on individuals who access protected information "without authorization" or by "improper means"; information that is accessed by "any other lawful means of acquisition" is exempted.  18 U.S.C. §§ 1831-1832, 1839.  In fact, Congress borrowed heavily from the states' trade secrets law in drafting the DTSA, *CDK Global LLC v. Brnovich*, 461 F. Supp. 3d 906, 918 (D. Ariz. 2020) (citation omitted), and Massachusetts's trade secret law "is nearly equivalent to the DTSA," *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 386 F. Supp. 3d 89, 94-95 (D. Mass. 2019).  Because the DTSA relies on state law to determine what "other lawful means of acquisition" are, it does not preempt state laws like the 2020 Right to Repair Law "that provide other lawful means of access."  *CDK Global*, 461 F. Supp. 3d at 918.

The 2020 Right to Repair Law sets forth the lawful means by which independent repair

facilities and vehicle owners may access their vehicles' onboard diagnostic systems and other information generated during their operation.  It also leaves intact the section in the underlying law that provides that "[n]othing in this chapter shall be construed to require a manufacturer to divulge a trade secret."  Mass. Gen. Laws ch. 93K, § 3.  In its complaint, the Alliance acknowledges this provision, but nevertheless speculates that the 2020 Right to Repair Law might "be read to do just that … by mandating open access to the proprietary vehicles systems of [its] members without allowing members to deny authorization or else contracting with a third party to provide a uniform system for access across all vehicle platforms."  Compl. ¶ 138.  It is improper for a plaintiff to base its preemption claim on the supposition that a state law will be enforced in a manner contrary to its own terms.  Because there is nothing in "the DTSA or its legislative history indicating that Congress intended this statute to prevent states from authorizing lawful transfers of otherwise protected information," *CDK Global*, 461 F. Supp. 3d at 918, this facial preemption claim fails as a matter of law.

### 3.    The CFAA does not preempt the 2020 Right to Repair Law.

The Alliance also contends that the 2020 Right to Repair Law is entirely preempted by the anti-hacking prohibition of the CFAA, 18 U.S.C. § 1030(a)(2)(C), which imposes liability on anyone who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer."  *See* Compl. ¶ 143.  In particular, the Alliance contends that the CFAA gives its members "exclusive discretion" to decide who may access the computer systems in the vehicles they manufacture, including "systems for recording vehicle data," and that the new state law frustrates congressional purpose by eliminating their right to determine "who is an authorized user or for what purpose third parties may use their vehicle system."  *See id.* ¶¶ 144-46.

The Alliance's theory has no basis in law.  The CFAA does not limit how access to protected computers may be authorized.  Rather, the statute "leaves it to authority external to the statute itself – such as state law – to determine what is authorized or not."  *CDK Global*, 461 F. Supp. 3d at 915.  Here, the 2020 Right to Repair Law specifically authorizes the standardized and secure access that vehicle owners and independent repair facilities shall have to vehicles' onboard diagnostic systems and other information generated during vehicles' operation.  The Alliance not only disregards the authorization provided by this state law, but in fact interprets the CFAA to *prohibit* Massachusetts and other states from authorizing access to computer data in such a manner.  Under its theory, states would be prohibited from enacting consumer-protection laws that require companies to provide customers access to their online data.  Indeed, their theory would invalidate the 2013 Right to Repair Law itself, which already requires that repair shops and owners be given access to vehicles' onboard computer-based diagnostic systems.

No court has ever held that the CFAA preempts state laws that authorize access to information held in computers or on servers.  Indeed, it does not appear that the CFAA has "preempted any state statute in its 35-year history."  *CDK Global*, 461 F. Supp. 3d at 916.  The Alliance's claim would improperly expand the statute far "beyond its 'narrow' aim of 'deter[ing] and punish[ing] certain "high-tech" crimes' and targeting 'hackers who accessed computers to steal information or to disrupt or destroy computer functionality.'"  *Id.* at 915 (citations omitted).  It should be dismissed.

### 4.    The DMCA does not preempt the 2020 Right to Repair Law.

To protect copyright owners against Internet piracy, the DMCA makes it unlawful to "circumvent a technological measure that effectively controls access to" a copyrighted work.  17 U.S.C. § 1201(a)(1)(A).  In this context, "circumvent" means "to descramble a scrambled work,

to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure." *Id.* § 1201(a)(3)(A).

The 2020 Right to Repair Law does not conflict with the DMCA. "[L]ike the CFAA, the DMCA does not address the issue of state statutes requiring those who hold" particular data "to provide access to it." *CDK Global*, 461 F. Supp. 3d at 918. In other words, the DMCA requires plaintiffs to "prove that the defendant's access was unauthorized," *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 691 (D. Md. 2011) (quoting *Chamberlain Grp. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004)), but it leaves it to other authority, such as state law, to determine what is authorized or not, *CDK Global*, 461 F. Supp. 3d at 918.

For its part, the 2020 Right to Repair Law does not enable any circumvention of technological measures by unauthorized parties. Rather, it requires that vehicle owners and independent repair facilities have standardized and secure access to vehicles' onboard diagnostic systems and other information generated during their operation. For vehicle onboard diagnostic systems, manufactures may require authorization for access, but such authorization must be "standardized across all makes and models sold in the Commonwealth" and "administered by an entity unaffiliated with a manufacturer." For vehicles with telematics systems, manufacturers must equip them with an "inter-operable, standardized and open access platform" that is "capable of securely communicating all mechanical data emanating from directly from the motor vehicle." Such access shall be provided for the stated purposes of "maintaining, diagnosing and repairing the motor vehicle." None of these provisions stands in conflict with the DMCA's prohibition against circumventing technological measures that control access to a copyrighted work. If manufacturers were able to show that somebody actually was "pirating or otherwise fraudulently using their copyrighted material," the DMCA might "provide them with a private right of action

against such persons" – but that does not mean that the DMCA categorically preempts the 2020

Right to Repair Law.  *See CDK Global*, 461 F. Supp. 3d at 918.

## II. THE ALLIANCE'S TAKINGS CLAIM (COUNT 7) SHOULD BE DISMISSED BECAUSE THE RELIEF IT SEEKS IS UNAVAILABLE AS A MATTER OF LAW.

Count 7 of the Alliance's complaint seeks a declaration that the 2020 Right to Repair

Law is "unenforceable because it works an unconstitutional taking under the U.S. Constitution."

*See* Compl. ¶ 161; *see also id.* at 54, ¶ G.  Because no such declaration is available on a takings

theory, and the Alliance's claim cannot be reasonably construed as seeking any other available

relief, Count 7 should be dismissed under Rule 12(b)(6).

The Supreme Court's decision in *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162 (2019),

clearly bars injunctive relief against the government on a takings theory.  In *Knick*, the Court

reviewed historical precedent on the issuance of injunctive relief in takings cases, explaining that

injunctions were once available as a response to takings at a time when the government did not

provide compensation for takings.  *Id.* at 2175-76.  "Today," however, "because the federal and

nearly all state governments provide just compensation remedies to property owners who have

suffered a taking, equitable relief is generally unavailable."  *Id.* at 2176.

Like most states, Massachusetts "provide[s] just compensation remedies to property

owners who have suffered a taking."  *Knick*, 139 S. Ct. at 2176.[9]  "As long as an adequate

---

[9] The right against confiscation of private property for public use without "just compensation" is enumerated not only in the United States Constitution but also in the Commonwealth's Declaration of Rights.  *See* Art. 10, Mass. Const.  Further, "Massachusetts law provides a means for a property owner to obtain just compensation in state court for property that is taken by the state." *Baptiste v. Kennealy*, – F. Supp. 3d – , 2020 WL 5751572, at *22 (D. Mass. Sept. 25, 2020) (citing Mass. Gen. Laws ch. 79, § 10).  This statute applies not only to physical takings, but also to regulatory takings – whether categorical or partial.  *See Lopes v. City of Peabody*, 430

24

provision for obtaining just compensation exists, there is no basis to enjoin the government's

action effecting a taking."  *Id.* at 2175-76; *see also Maine Educ. Ass'n v. Cioppa*, 695 F.3d 145,

152 n.3 (1st Cir. 2012) ("[O]rdinarily, injunctive relief is not available under the Takings

Clause.").  Accordingly, to the extent the Alliance impliedly seeks an injunction on its takings

claim, such relief is unavailable.  *See, e.g.*, *HAPCO v. City of Philadelphia*, – F. Supp. 3d –,

2020 WL 5095496, at *12 (E.D. Penn. Aug. 28, 2020) (citing *Knick* and denying motion for

injunctive relief based on takings claim); *Willowbrook Apartment Assocs., LLC v. Mayor & City

Council of Baltimore*, No. CV SAG-20-1818, 2020 WL 3639991, at *3 (D. Md. July 6, 2020)

("[A]s multiple courts have explained, the proper remedy for a Takings violation is not

injunctive relief, but rather monetary damages.").

    The Alliance cannot avoid the rule described in *Knick* by disguising its request for an

injunction as one for declaratory judgment.  *See Baptiste*, 2020 WL 5751572, at *22-23 (plaintiff

not entitled to declaration that statute violates takings clause where "such a declaration would be

the functional equivalent of an unwarranted injunction against enforcement"); *HAPCO*, 2020

WL 5095496, at *12 n.112.  Here, the Alliance seeks a declaration that the 2020 Right to Repair

Law "is unenforceable" by virtue of the Takings Clause.  *See* Compl. ¶ 161.  Such a declaration

could not be meaningfully distinguished from an injunction, since its purpose– to prevent

enforcement of the state law – would be the same.

    Nor can Count 7 be construed as a claim for money damages.  First, the Alliance has not

and cannot plausibly allege that it has suffered any direct injury from the 2020 Right to Repair

Law.  *See, e.g.*, *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278,

---

Mass. 305, 312 (1999); *Cayon v. City of Chicopee*, 360 Mass. 606, 609 (1971).

284 (3d Cir. 2002) ("Because claims for monetary relief usually require individual participation, courts have held associations cannot generally raise these claims on behalf of their members."). Second, any such ploy would be barred by the Eleventh Amendment, which "bars a damages action against a State in federal court." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *see also Green v. Mansour*, 474 U.S. 64, 73 (1985) (Eleventh Amendment bars "end run" whereby party seek declaratory judgment in federal court to establish *res judicata* in state court action seeking monetary relief against state). This is true in the context of a takings claim after *Knick*. *See Williams v. Utah Dept. of Corrections*, 928 F.3d 1209, 1214 (10th Cir. 2019); *Bay Point Prop., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456-57 (5th Cir. 2019). Because the declaration the Alliance seeks would function either as an injunction barred by *Knick* or as a violation of the Eleventh Amendment, Count 7 should be dismissed.

## III.   THE ALLIANCE'S CLAIMS SHOULD BE DISMISSED BECAUSE THE ALLIANCE LACKS STANDING TO BRING THEM.

As discussed *supra*, all of the Alliance's preemption claims fail as a matter of law and should be dismissed under Rule 12(b)(6). If this Court determines that dismissal of any claim is premature because certain factual issues require resolution through trial, it should nevertheless dismiss that claim under Rule 12(b)(1) for lack of associational standing.

In Article III courts, there are "two breeds of standing requirements, one constitutional and the other prudential." *Labor Relations Div. of Constr. Indus. of Mass. v. Healey*, No. CV 15-10116-RWZ, 2015 WL 4508646, at *4 (D. Mass. July 9, 2015). Among other constitutional requirements, a petitioner in a declaratory judgment action "must allege that it has suffered or imminently will suffer an injury …" *Id.* Among other prudential requirements, "a party generally may assert only his or her own rights and cannot raise the claims of third parties not

before the court." *Id.* Here, the Alliance does not claim that it has suffered or will suffer any injury. Instead, it purports to bring suit on behalf of its members, and asserts *their* injuries as its basis of standing. *See* Compl. ¶ 25.[10] As such, the Alliance lacks standing to proceed unless it can establish "associational standing." Because the Alliance does not meet the requirements for associational standing, this matter should be dismissed under Rule 12(b)(1).

"In order to ground a claim of associational standing (that is, standing to bring suit on behalf of its membership), an association must show three things: (i) that individual members would have standing to sue in their own right; (ii) that the interests at stake are related to the organization's core purposes; and (iii) that both the asserted claim and the requested relief can be adjudicated without the participation of individual members as named plaintiffs." *Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006); *see also N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 71 (1st Cir. 2006) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). The first two elements are considered constitutional, and the third is prudential. *Labor Relations Div.*, 2015 WL 4508646, at *4.

Although some cases for injunctive or declaratory relief pose pure questions of law that do not require the participation of an associational plaintiff's members, "representational standing is inappropriate if adjudicating the merits of an association's claim requires the court to engage in a 'fact-intensive-individual inquiry.'" *N.H. Motor Transp. Ass'n*, 448 F.3d at 72 (citation omitted). Indeed, the First Circuit has explicitly rejected the proposition that "the

---

[10] Those members include at least 17 motor vehicle manufacturers whose cars are sold in the United States, including Massachusetts. Compl. ¶ 23. According to the complaint, the Alliance's members "produce nearly 99 percent of the cars and light trucks sold in the United States today." *Id.* ¶ 17.

third *Hunt* factor is always satisfied where an association seeks injunctive relief on behalf of all of its members." *Id.* That is particularly so in "injunction cases where member circumstances differ and proof of them is important." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 314 (1st Cir. 2005); *Nat'l Ass'n of Gov't Employees v. Mulligan*, 914 F. Supp. 2d 10, 13–14 (D. Mass. 2012).

Here, the Alliance's complaint makes clear that any trial of material facts will require participation by its individual members. The Alliance's members "have made substantial investments to design and put in place access controls that guard the security and performance of vehicle systems." Compl. ¶ 19. Additionally, "most members will be incurring substantial costs immediately in an attempt to comply with the law," and "if an automaker cannot research, develop, and implement the open-access, bi-directional platform required by the Data Law for its MY2022 vehicles, then it could be subject to significant penalties for its vehicles sold in Massachusetts, whether directly through dealers or in the aftermarket." *Id.* ¶ 21. The Alliance's members "maintain, own, and operate proprietary vehicle systems that generate 'mechanical data,'" and those systems "operate through proprietary source code displayed in the software used to access and modify vehicle data." *Id.* ¶ 28. By definition, "proprietary vehicle systems" and "proprietary source code" are unique to each manufacturer – as are any features that are allegedly protected by intellectual property rights owned by the Alliance's members.

These differences between the Alliance's members are particularly salient insofar as the Alliance appears to suggest the telematics systems addressed by Section 3 of the 2020 Right to Repair Law are somehow inextricably intertwined with vehicle components whose functions are regulated by federal safety standards. *See, e.g.*, Compl. ¶ 57 ("Vital vehicle components are controlled by vehicle systems affected by the Massachusetts law."); ¶ 106 ("nearly all" of

components installed by the Alliance's members "to comply with various" safety standards "are now controlled electronically" and have "safeguards to prevent electronic intrusion" installed "as part of their designs").  If this Court rejects the Attorney General's argument that such vague and conclusory allegations are insufficient to establish an actual conflict between the state law and federal safety regulations, *see* Section I.A.2, *supra*, the facts the Alliance will need to prove in support of that theory will implicate not only the functioning of different vehicle's vehicular braking, acceleration, airbag, and other safety-related systems, but also the various ways in which telematics systems may (or may not) be intertwined with those systems.  Such facts will go to the particular inner workings of the electronics systems for each model sold by each manufacturer.  These allegations, and many others that allege circumstances pertaining to "many," "most," "some," or "several" of the Alliance's members, *see, e.g.*, Compl. ¶¶ 29-30, 33-34, 41-42, 46-47, 77-79, 88, 91, demonstrate that the Alliance's members are not similarly situated in relation to the 2020 Right to Repair Law and that extensive detail as to facts related to individual Alliance members' telematics systems will be necessary to try this case.

As Judge Gorton has explained, "[i]t is … resolved that an association may bring a claim that requires *some* participation by some of its members.  How much participation is the crucial question.  The Supreme Court has left unresolved when member participation becomes so 'extensive' and an inquiry sufficiently 'fact-intensive' to defeat associational standing."  *Nat'l Ass'n of Gov't Employees*, 914 F. Supp. 2d at 12 (emphasis supplied).  However, "plenty of injunction cases have been dismissed because of the need for individualized proof."  *Pharm. Care Mgmt.*, 429 F.3d at 314.[11]  Here, it is clear that the participation of the Alliance's members

---

[11] For example, in *Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and Rehab. Servs.*, 958 F.2d 1018 (10th Cir. 1992), the Tenth Circuit vacated a preliminary injunction for lack of

at trial will be so "extensive" as to require their presence as parties.  *See Nat'l Ass'n of Gov't Employees*, 914 F. Supp. 2d at 12.  This is because "[u]nlike most cases in which associational standing has been upheld … this case does not turn on a pure question of law but rather on the application of law to a series of different factual scenarios."  *Id.* at 14.  Further, representational standing could make the work of the Court and the Attorney General "more difficult" by allowing business interests to "control[] discovery and access to information," including with respect to the Alliance's selection of any representative members to present testimony at trial.  *See N.H. Motor Transp. Ass'n*, 448 F.3d at 73 n.9.  For these reasons, in the event that this Court does not dismiss the Alliance's preemption claims for the reasons set forth in Sections I and II, *supra*, it should dismiss the case pursuant to Rule 12(b)(1) on the ground that the Alliance lacks standing under the third prong of *Hunt*.

## CONCLUSION

For the foregoing reasons, the Alliance's complaint should be dismissed in its entirety.

---

standing where the plaintiffs were health care associations challenging a state's Medicaid reimbursement rate freeze and reimbursement schedule.  The court emphasized that "[u]nder the *Hunt* test, an association has standing only if 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit,'" and in that case the court was required to "examine evidence particular to individual [medical] providers" in order to resolve the plaintiffs' claims.  *Id.* at 1022 (quoting *Hunt,* 432 U.S. at 343).  Similarly, in *Georgia Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319 (11th Cir. 2003), an association of for-profit cemeteries challenged a state law that exempted churches, fraternal and community cemeteries from rules and regulations imposed on its members.  353 F.3d at 1320.  The court held that the association lacked standing on the takings claim "because the economic impact of these provisions will vary depending upon the economic circumstances of each of its members."  *Id.* at 1322.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL,


/s/ Robert E. Toone
Robert E. Toone, BBO #663249
Eric A. Haskell, BBO #665533
Jennifer E. Greaney, BBO #643337
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617-963-2178
Robert.Toone@mass.gov

Dated:  December 18, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on December 18, 2020.

/s/ Robert E. Toone

31