```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                              )
ALLIANCE FOR AUTOMOTIVE        )    Civil Action
INNOVATION,                    )    No. 20-12090-DPW
                               )
            Plaintiff,         )
                               )
vs.                            )
                               )
MAURA HEALEY, ATTORNEY         )
GENERAL OF THE COMMONWEALTH    )
OF MASSACHUSETTS, in her       )
official capacity,            )
                               )
            Defendant.         )




             BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
                   UNITED STATES DISTRICT JUDGE



                     VIDEOCONFERENCE HEARING


                       January 27, 2021
                         11:04 a.m.



            John J. Moakley United States Courthouse
                      One Courthouse Way
                  Boston, Massachusetts  02210




                          Kelly Mortellite, RMR, CRR
                          Official Court Reporter
                          One Courthouse Way, Room 3200
                          Boston, Massachusetts  02210
                          mortellite@gmail.com
```

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiff:
      Laurence A. Schoen
 3    Elissa A. Flynn-Poppey
      Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC
 4    One Financial Center, 42nd Flr.
      Boston, MA 02111
 5    617-542-6000

 6    Erika Z. Jones
      Mayer Brown, LLP
 7    1999 K Street, N.W.
      Washington, DC 20006
 8    202-263-3000

 9    John Nadolenco
      Mayer Brown, LLP
10    350 South Grand Avenue
      Suite 2500
11    Los Angeles, CA 90071
      213-229 9500
12
      Jessica L. Simmons
13    Alliance for Automotive Innovation
      1050 K St. NW, Suite 650
14    Washington, DC 20001
      202-326-5586
15
      Counsel on behalf of Defendant:
16    Eric A. Haskell
      Robert E. Toone, Jr.
17    Office of the Attorney General (MA)
      One Ashburton Place
18    20th Flr.
      Boston, MA 02108
19    617-963-2178

20

21

22

23

24

25
```

PROCEEDINGS

1
2          COURTROOM CLERK:  For counsel and members of the
3    public, if you can please mute your devices.  And for the
4    attorneys, if you can make sure to unmute your device before
5    speaking.  I also want to remind everyone about Local Rule
6    83.3, which does not allow any photography, recording or
7    broadcasting of these proceedings.  I'm just waiting for the
8    judge and then we'll start.  Okay.
9          Civil Action No. 20-12090, *Alliance For Automotive*
10   *Innovation v. Maura Healey*.
11         THE COURT:  Well, I want to focus us a bit more if I
12   can.  I tried to do that with that little procedural order
13   earlier this week to focus us just on Counts 1 and 2 and
14   standing.  And at the risk of spending too much time talking
15   about what I'm thinking about, it may be helpful for you to
16   understand my perspective here and more broadly in this case.
17   I've alluded to it before.
18         I have some reservations about doing this in the sense
19   of being concerned that identifying things that are shaping my
20   views in a background sort of way will end up meaning that two
21   cases in particular get decided all the time and there will be
22   an effort in briefing somehow to fit everything into the
23   procrustean bed of what I'm about to outline.
24         But I should tell you that there is a book that I go
25   back to every couple of years that deals with the question of,

1  among other things, the question of state police power and what

2  it means.  It's called the <u>Vagaries and Varieties in</u>

3  <u>Constitutional Interpretation</u>.  It's a series of lectures that

4  were given by Professor Thomas Reed Powell back in the 50s.  He

5  passed away before he could finish it, so it was finished by

6  Paul Fruend and Ernest Brown who were his colleagues at Harvard

7  Law School.

8         There's a chapter that's particularly pertinent here

9  on the general issue.  It's Chapter 5, which deals with

10  Federalism:  State Powers Affecting the National Economy; State

11  Police Power.  I say "pertinent."  It's not directly on point.

12  It doesn't even cite any of the cases that we're talking about,

13  but it shapes my view I think about this and in this way -- two

14  ways.

15         Number one, I view these preemption cases as probably

16  the most important set of constitutional questions that are

17  presented under our federalism.  I don't think there's any form

18  of litigation that comes close in the seriousness of it.  The

19  second is that it's come with an accumulation of kind of bumper

20  sticker discussions, like presumption in favor of preemption or

21  presumption against preemption, all of these things that I

22  think are not very helpful.

23         Thomas Reed Powell is a very caustic, witty fellow,

24  and if you read through that chapter and Professor Fruend's

25  introduction, you'll get a sense of that.  But at the end of

1   it, at the end of the chapter, Powell talks about or asks

2   himself whether he's been too dogmatic, too caustic, too

3   critical, because he says that, "In my many years of teaching,

4   my hope has been to induce students to think things instead of

5   words."  That's an approach that I think is very helpful in

6   this area.

7        And he comes to an uncharacteristically happy

8   conclusion at the end in which he says that, "The performance

9   in this area has to come from the judges."  And he says, "On

10  the whole it has created for us a fairly well balanced

11  constitutional federalism."  And I believe that, too.  That is,

12  the case law, which goes back and forth in a variety of

13  different ways, does that.

14       But Professor Fruend couldn't restrain himself from

15  offering what he thought was the approach that Powell really

16  took, and he did it in a hypothetical.  He said that Powell was

17  concerned about a choice between the logical and the wise,

18  which he thought was a false antithesis, resting on the

19  oversimplified premise drained of all relevant complexities of

20  the problem.

21       And he said logic of that sort he would picture in

22  this way.  He's projecting a quotation from Powell.  "Other

23  things being equal, as they never are, and in the absence of

24  special circumstances, which alone create the problem, then,"

25  and that's what we're doing.  That is, in the absence of

1    special circumstances which alone create the problem, we have

2    to deal with the special circumstances here.  And he talks

3    about it in terms of the antimonies of federalism.

4         So I raise that just so that you have some sense of

5    what I'm thinking about and what's helpful to me.  Because

6    frankly, argument is not very helpful to me unless it helps me

7    to deal with the larger problems.  That's the background

8    problem.

9         The more specific things that I've been thinking about

10   or most recent cases that I think are helpful, if not directly

11   on point but helpful in thinking this through, I've mentioned

12   them before I think, but it is Judge Barron's treatment in

13   *Capron*.  That seems to me to be perhaps overlong but very

14   helpful in thinking one's way through these issues.  And Judge

15   Akuta's decision in the Volkswagen MDL case, all of which shape

16   me, my approach in trying to fashion this as a case that was

17   going to be about things in the sense that it was about

18   developing a record adequately.

19        There are I think out there some potentially

20   dispositive approaches, but I don't think they've taken hold

21   sufficiently for me to feel comfortable in dealing with that,

22   and I think that this case provides, will provide, could

23   provide a useful circumstance to develop a record in which

24   developing the dispositive approaches might be more meaningful

25   in terms of things rather than words.

1           So let me turn to things that I don't want to talk

2    about and things that I do want you to talk about as a way of

3    advancing this.  First, with respect to the question of

4    associational standing, I'm going to deny the motion to dismiss

5    on that.  That's not to say that it may not appear again at a

6    later point.  Standing has to be maintained throughout.  But I

7    am of the view that standing in this case is almost

8    coincidental with the merits of the case.

9           I think that Judge Gorton's opinion in *Nage* was

10   particularly helpful in outlining the problems.  Of course not

11   every injunction case means that there is standing.  Of course

12   there can be disagreements within associations, and they're

13   particularly pronounced as they were in the *Nage* case with

14   First Amendment areas.

15          But the way in which at least I'm conceiving this

16   right now is that, while the members of the association are

17   competitors and consequently have different perspectives,

18   they're drawn together in this issue a little bit like the

19   prisoner's dilemma, and they share that view of avoiding the

20   adverse consequences that the prisoner is concerned about on

21   that.

22          And I tend to think that they fall generally into the

23   category of those people, to use another allusion, who share a

24   voyage through Scylla and Charybdis.  They want to avoid

25   getting swallowed up in the whirlpool of state police action

1    and they also want to avoid having their head snapped off by

2    the federal regulatory agency.

3           The short of it is I think that there is standing here

4    if there's a case on the merits.  Of course that begs the

5    question whether there's a case on the merits.  And in any

6    event, perhaps this will be developed in discovery, although I

7    think the discovery on this issue is coincident with any

8    discovery that would take place on the merits.

9           So let me then turn to the issues that I'd like to

10   hear the parties talk about.  I guess I would characterize the

11   plaintiff's general posture as being one of anxious

12   apprehension.  It is not so clearly defined what it is that

13   they are going to be facing or should be facing.  And I would

14   add that I have this generalized view that everybody likes

15   certainty.  Everybody likes to be able to do what they want to

16   do without the possibility that things are going to change.

17          But dealing with this in a preliminary injunction

18   context, I think it will be improvident of the members of the

19   association not to be thinking clearly about what they're going

20   to be doing if this initiative legislation is permitted to go

21   into effect.

22          That's what people who are in business are supposed to

23   do.  They're supposed to be nimble.  They're supposed to be

24   able to respond to developing circumstances.  Nobody likes to

25   do that on the timeline that's established by the government.

1    But I raise that not so much to say I've come to a conclusion

2    about it, except to say they better be prepared; and if they're

3    not, that's a problem that will influence the question of

4    preliminary injunction, I suppose, at the end.

5         With respect to the defendants, the problem that they

6    have is they don't appear to know what this legislation means,

7    in fact profess not to.  This, not to use too topical allusion,

8    is a case of first we'll pass it and then we'll find out what

9    it means.  I don't think I'm being too arch in describing those

10   two perspectives here.

11        So I guess I have two basic areas in which I want to

12   hear from the parties, and I'm probably going to look first to

13   the plaintiffs on these, but I want to do them in two pieces.

14        I want the plaintiffs to, for present purposes, assume

15   that I would treat Judge Howard's decision in *Good v. Altria* as

16   expressing the view within the First Circuit concerning

17   conflict preemption in a rather strict way.  That is, limiting

18   it to agency rulemaking that's been through notice and comment.

19   And if you can't show that, then you really aren't showing the

20   kind of conflict or obstruction preemption that is appropriate.

21        I recognize that that's not -- while there's some

22   other case law out there on it, it's not necessarily the

23   prevailing view, and there are other views which I'll obviously

24   press with the defendant here that I'll call more purposive,

25   but if you take a fairly rigid texturalist view here, I think

1    one could say you've got to show some sort of actual regulatory

2    direction.

3          Now, I've created my own hypothetical in doing that.

4    But there is another way of looking at it, which is, as I say,

5    purposive, although it's not really brought out, drawn out that

6    well in a number of the cases.  You can kind of see it in the

7    way in which Justice Breyer approached the issues, and

8    sometimes you can see it in things that Justice Stevens was

9    saying, kind of deflecting the question of whether or not there

10   has to be a regulatory rulemaking.

11         But that question is really, if I were to consider

12   this more broadly, what it is that the legislative initiative

13   is undertaking.  It is undertaking to displace the larger

14   purposes of both the motor vehicle safety and particularly

15   cyber security aspects of motor vehicle safety, and to a lesser

16   degree set forth I suppose by the particulars of the Clean Air

17   Act act, but aspects of the Clean Air Act act as well.

18         So that's one topic.  The parties have dealt with it

19   differently in their briefing, which by the way, in the spirit

20   of Professor Powell at the end of his lecture I think was very

21   good briefing, very helpful briefing to me in thinking this

22   through.

23         The second is this question of defeat devices.  Let's

24   call it defeat devices, okay?  From the perspective of the

25   plaintiff, I don't know why I should be thinking about it.  Are

1    you telling me you're going to violate the law and defeat

2    devices?  It's a little bit along the lines of the parricide

3    who throws himself on the mercy of the court as an orphan, and

4    particularly here, it is maybe a parricide who's engaged in

5    assisted suicide by not fully engaging the regulatory agencies

6    to clarify this.

7              So I see that there's a potential for defeat devices.

8    Okay.  Who is going to be responsible for that?  The aiders and

9    abetters, which is I think what the association is saying they

10   are, or could be, or could become in a context in which there

11   is, at least with respect to motor vehicle safety, there's an

12   interactive dimension to it.  Go talk to them.  You want

13   protection from particular things, talk to them.  That's one

14   way of looking at it.  Or trying to state this in a provocative

15   enough way to encourage discussion but also in a dispassionate,

16   disinterested way.

17             But from the perspective of the defendant, you really

18   are putting them in this box when there isn't an opportunity to

19   see clearly what it is that this is going to be likely to lead

20   to.  I suppose I could put a hypothetical saying let's assume

21   that there was initiatives that said that the disclosure of

22   data should be provided to those who are serving time in

23   federal prison for hacking into otherwise secure computer

24   systems with a view toward extorting.  Would that be something

25   that I might enjoin, even though democratically announced?

1          The point is that we all know the apprehensions.  We

2     all know the limitations of knowledge about this.  That's why

3     I've tried to shape this with a motion -- or a set of

4     scheduling orders and protective order that I thought would

5     permit full development of the information by all concerned.

6     But the motion to dismiss is not without some considerable

7     force in this area, even against my predisposition to develop a

8     record on that.

9          So I throw those two sets of topics out right away.

10    And I don't know, Mr. Nadolenco, are you going to be taking the

11    laboring oar in this for the plaintiffs?

12          MR. NADOLENCO:  I will, Your Honor, yes.

13          THE COURT:  So the question for me is, show me if I

14    were, say, Judge Howard, looking at this the way he looked at

15    *Altria*, show me what specific regulatory provision is being

16    contravened here as opposed to generalized concerns in this

17    area.

18          I really mean it quite specifically.  Maybe you say,

19    well, there's nothing like notice and comment in this area,

20    that sort of thing.  I want to head you off perhaps at the pass

21    that the FCC treatments of regulation by nonregulation I view

22    as a specialized area not directly on point here.  So it was an

23    interesting footnote, made me think about it, but there's a

24    reason why it was in a footnote or should have been in a

25    footnote.

1          So tell me what it is that really you're facing here

2     right now with regulatory requirements that are inconsistent.

3          MR. NADOLENCO:  Absolutely, Your Honor.  Thank you for

4     that guidance.

5          With regard to our claim under the Motor Vehicle

6     Safety Act, we allege very specifically that manufacturers have

7     implemented cyber and other electronic controls that are now

8     elements of design of vehicle safety, and they did that to

9     comply with the provisions of the Safety Act.

10         THE COURT:  I understand that argument broadly stated.

11    Maybe you're warming up and --

12         MR. NADOLENCO:  Just warming up.

13         THE COURT:  -- you're going to give me the pitch in a

14    minute, but what is it that you would violate here that is

15    specific as opposed to generalized guidance in this area?

16         MR. NADOLENCO:  Sure.

17         THE COURT:  The defendants make a very strong argument

18    about this is guidance; this isn't regulation.  And in fact,

19    the guidance itself says it's not meant to be rule of law.

20         MR. NADOLENCO:  So three different aspects, Your

21    Honor, to the Safety Act and to NHTSA's powers under it.

22    Number one, NHTSA can issue safety standards that themselves

23    preempt state law.  Number two, NHTSA of course has the power

24    to order recalls.  And then number three, manufacturers

25    themselves are obligated by the Safety Act to police and remedy

1    any safety-related defects.

2          And here we're alleging all three.  We rely on safety

3    standards themselves that govern things about vehicle security

4    like braking, steering, acceleration, airbags, and we allege

5    that the systems, those systems, those safety systems are

6    electronically controlled and cyber-protected.  So if you look

7    at the regulation governing accelerator control systems, that

8    which is 49 CFR Section 571.124, that encompasses, quote, "All

9    vehicle components that regulate engine speed in direct

10   response to movement of the driver-operated control," close

11   quote.

12         So key components that manufacturers use to protect

13   the accelerator and other safety systems include access

14   controls and cyber protections.  And we allege that undoing

15   those protections creates as much risk to driver safety as not

16   complying with those standards to begin with.

17         THE COURT:  It may.  Now, but go back to my -- not go

18   back, but think about the broader aspect of this that I tried

19   to raise, which is, this is all anxious apprehension.  You have

20   not identified something that you've been told to do that is

21   going to put you in violation of some specific standard.

22         And maybe another way of looking at it, I've broken it

23   into three parts.  They divided it into two parts.  But in any

24   event, you know, the recall dimension to this, put to one side

25   whether or not guidance or standards or enforcement, the recall

1    dimension to this does I think provide some insight about the

2    way in which this administrative agency works, which is to say

3    it's interactive.  You know, they can tell you to recall, but

4    they encourage you to be proactive yourself.  And what that

5    suggests is you go to them and say, "Here is what's happening

6    to us.  And we think it's a bad idea.  And maybe you ought to

7    have a rule about that," or maybe you ought to say, "You can't

8    do that."  Then we'd be in a different place.  But we're not

9    there yet.  We're not in that context.

10         And while I don't want to think in terms of, as I said

11   earlier, I don't want to talk about preemptions.  I'll get to

12   those when I have to.  And similarly, I really don't want to

13   talk about as-applied or facial or that kind of stuff.  But I'm

14   not sure issue is joined fully on this under the kind of rubric

15   that we're talking about here.

16         Yeah, there are things out there that they're

17   concerned about.  On the other hand, another way of looking at

18   it is to say they're so concerned, they better do something

19   about it, and shame on them if they don't, if they want to tee

20   up preemption.  "They" meaning the agency.

21         MR. NADOLENCO:  Well, Your Honor, the nub of the

22   issue, and Your Honor's getting to it, is that the Attorney

23   General is looking for a particular safety standard on cyber

24   security, and they don't find one, and they find the guidance

25   isn't good enough.  But the Attorney General is misinterpreting

1    our position.

2          We're not arguing that it's the guidance that preempts

3    anything.  It is the implicated safety standards themselves and

4    NHTSA's statutory ability to require recall, as well as Your

5    Honor just identified, the manufacturer's obligation to keep

6    vehicles safe.

7          So of the hundreds of recalls that have happened since

8    2016, 80 percent of them deal with safety defects, not a

9    failure to comply with an articulated particular safety

10   standard.  And in the world of the Safety Act, the safety

11   standards act as floors of what a manufacturer must do.

12         So for example, there is not a precise safety standard

13   that governs airbag humidity, but you better believe that

14   manufacturers are expected to design airbags that work in both

15   high and low humidity settings.

16         And similarly, there wasn't a cyber security safety

17   standard in 2015 when NHTSA alleged that Chrysler had cyber

18   security flaws which could lead to a remote modification of the

19   vehicle resulting in crashing.  There wasn't a standard there

20   either, but NHTSA was very quick to get involved and was acting

21   pursuant to its authority and Chrysler pursuant to its

22   requirements under the Act to keep vehicles safe and recalled

23   over a million vehicles.

24         And that is exactly the position that NHTSA takes on

25   this very law.  In their letter from last July to the

1    legislature, they make clear, and I'll quote from it, "NHTSA

2    has the authority to order vehicle recalls based on

3    unreasonable risk to safety, including those that may be caused

4    by cyber security vulnerabilities."  If the Attorney General

5    were right here, NHTSA couldn't take that position.

6              THE COURT:  I don't know why that's true.  The problem

7    of course is that they haven't yet.  Now, that goes back to

8    what I keep saying as anxious apprehension.  I don't mean to be

9    too arch about that --

10             MR. NADOLENCO:  Your Honor, we've --

11             THE COURT:  -- but --

12             MR. NADOLENCO:  -- far more than anxious apprehension.

13   We have seen our regulator act definitively with regard to the

14   same type of concerns that we say that the data log creates.

15   That's more than speculation.  It's more than anxious

16   apprehension.  There is a real world conflict that the

17   manufacturers see between their obligations under the Safety

18   Act and how the data law requires them to dismantle those

19   safety precautions.

20             THE COURT:  Well, but dismantling of the safety

21   precautions, and I'll concede that the Chrysler circumstance,

22   that is a concern about third parties with nefarious intent.

23   But it strikes me that the nature of the relationship here,

24   that is both of them, both sides, the association and its

25   members and the agency is such that the agency can start to

1   develop specific kind of regulatory provisions that are beyond

2   guidance, that provide the specificity that, you know, would

3   have satisfied Judge Howard in *Altria*.

4          And what we're dealing with now is, you know, that

5   area between the exercise of power and the actual abuse of

6   power.  That's the real issue.

7          MR. NADOLENCO:  Your Honor, we believe that those are

8   already out there.  Those are the regulations on acceleration,

9   braking and steering that I pointed to.

10          Cyber security itself doesn't necessarily lend itself

11   to a particular regulation that sets out how to protect cyber

12   security in a vehicle.

13          Number one, manufacturers approach it differently.

14   Number two, that would be a roadmap for hackers on how to

15   intrude vehicles and thereby compromise safety.  So it is

16   already embedded, the cyber protections are already embedded in

17   the vehicle design to comply with the safety standards that

18   already exist on things like braking, airbags.

19          THE COURT:  Let's take that, say, I guess it's section

20   3 of the initiative, the third party, the elusive third party

21   who I thought was already in place but apparently is not, who

22   is supposed to supervise this sort of thing.  Let's assume that

23   the agency says this can only be handled by the individual

24   manufacturers.  No third parties can be permitted to provide

25   control over that, and it can only be made available, the

1    information can only be made available to dealerships.  They

2    could narrow it.  And in ways that would not be a map to

3    hackers, they are simply saying to the industry, "Here is how

4    you protect it."  And they're also saying to the states, "You

5    can't intrude on that."  But they haven't done that.

6         And so while I understand that there are bad ways and

7    good ways -- or there are different ways to frame this, they

8    still are available here.  They haven't done it yet.  I mean,

9    what's problematic here is there are broad directives, but

10   nothing that is prescriptive in the fashion that I've been

11   alluding to, as I'll call it the classical view of the First

12   Circuit on these kinds of issues in implied preemption.

13        Now, I say "classical" because Judge Barron's decision

14   in *Capron* is looked at from a broader lens I think in getting

15   to what was the same result.  But I just don't know why, you

16   know, why this is not remediable through the agency.  That's

17   one way of looking at it, that's the kind of back end way of

18   looking at it, which is, the front end way of looking at it is

19   to say, "Until you exhaust your remedies before the agency,

20   what are you doing here?"

21        MR. NADOLENCO:  Well, because, Your Honor -- and Your

22   Honor might be describing a better law than the one that

23   exists, but the one that exists is problematic.  For one, it

24   takes immediate effect and compliance with it.

25        THE COURT:  Well, it doesn't take immediate effect

1    until August 1 right now.

2            MR. NADOLENCO:  That's enforcement.

3            THE COURT:  What is a law if it's not enforced?  We're

4    dealing with Holmes's bad man theory of the law.  He's only

5    concerned about what it is that can get him in trouble.

6            MR. NADOLENCO:  Section 2, Your Honor, of the Act

7    requires that access to onboard diagnostic systems be

8    standardized without manufacturer authorization unless a

9    standardized authorization system is created and administered

10   by some unidentified third party.  That doesn't exist right

11   now.

12           Section 3 requires the creation of some platform that

13   is inter-operable, standardized and open access and also can

14   securely communicate all mechanical data and is also available

15   through a mobile app.  That doesn't exist either.  Compliance

16   is impossible.

17           But beyond the immediacy of the Act's requirements are

18   the specific violations that we allege that the data law

19   creates a conflict with the federal safety standards.  So under

20   section 2, section 2 removes the ability of manufacturers to

21   control who is authorized to access some of their vehicle

22   functions.  This would undermine the existing safety systems

23   that I mentioned earlier because as NHTSA --

24           THE COURT:  Can I -- I'm sorry to interrupt you, but

25   let me just pause because one of the reasons I'm interested in

1    the record on this, I am at a disadvantage in understanding

2    exactly how it works now.  And of course we're here on a

3    pleading, so that causes a problem as well.

4         But right now, is it possible for a manufacturer to

5    say, "I will only disclose this to these people, this group of

6    people," and the manufacturers have different groups of people

7    that they will disclose it to?  Some might want to encourage

8    the development of independent repair shops that they like,

9    independent repair shops.  Others want to keep it part of the

10   franchise, putting to one side whether there's a conflict

11   within the association.

12        Right now they do that, and so it strikes me that the

13   agency could create a mechanism that says there shall not be

14   what's called for by section 2 and not be what's called for by

15   section 3.

16        Now, you know, this is a kind of trying to anticipate

17   something that's not fully developed.  Not fully developed

18   being the statute itself in issue.

19        MR. NADOLENCO:  Your Honor, perhaps the agency could,

20   but in the interim, there's an absolute direct conflict between

21   the Safety Act and the data law.

22        THE COURT:  So let's say that the agency -- I mean,

23   it's as if I'm batting ideas around at the agency level, but I

24   suppose I am to think about the hypothetical.  The agency says

25   for the next two years, until there is opportunity to refine

1   this further, there will be not -- the things that are called

2   for by section 2, without stating them directly, without saying

3   Massachusetts initiative, and the things that are called for by

4   section 3 cannot be implemented.

5           MR. NADOLENCO:  The issue, Your Honor, is the law

6   itself, regardless of what the agency says, has immediate

7   effect.

8           THE COURT:  Why doesn't what I've just said, which may

9   be suggesting that the agency should develop the equitable

10  remedies available to the federal court, but why isn't that

11  responsive to precisely that?  You know, here is the thing from

12  outside, I mentioned it earlier on in our discussions, which

13  is, you know, ordinarily there's a little bit of time to

14  respond to this sort of thing, you know, major initiatives,

15  emission initiatives, for instance, for the states.

16          This one kind of arose very quickly, happened very

17  quickly, and frankly nobody knows what it really means.  So

18  this seems to me to be precisely the area which an agency might

19  say, "We're not trying to interfere with states.  The states

20  should develop all their initiatives that they can, but this

21  one is so unclear that we're going to say you can't do this for

22  at least two years, and during those two years we'll have

23  agency rulemaking," and that sort of thing.

24          MR. NADOLENCO:  Your Honor, so, number one, based on

25  the law as written -- and you're correct it is ambiguous, it is

1    hard to interpret exactly what it means -- there is no

2    certainty that there is ever going to be some sort of

3    harmonious reading that resolves the conflict between what we

4    see in the data law and what the Safety Act required.

5           But what Your Honor is describing is the exact

6    untenable conflict that led us to come to court, which is being

7    pulled by what a federal agency may or may not say and who

8    knows when it will say it, if it says it, and what the Safety

9    Act requires.

10          And as we discussed earlier, the agency here has

11   actually made pretty crystal clear its view that cyber

12   protections and the other electronic-type protections can

13   create safety issues that manufacturers are obligated to

14   address.  So that conflict is very real, and it's here.

15          Let me give you a real-world example, Your Honor, that

16   easily can arise when a manufacturer has to step out of the

17   access control that you were alluding to earlier, when they can

18   direct who gets access to what particular data.  And as we

19   allege in the complaint, they're already sharing data that is

20   necessary to diagnose vehicle issues and to repair them.

21   That's already being shared under the original right to repair

22   law.  That's not an issue here.

23          What's an issue here is all the other data that the

24   data law requires be shared and the manufacturers to step out

25   of the data control access game.  So this is what would happen

1    in a hypothetical.  A driver, let's say the driver is driving a

2    GM vehicle.  The brake light goes on, and the driver takes it

3    to a third party repair shop.  And that repair shop plugs in

4    their device into the computer -- into the onboard diagnostic

5    system, and it sees, okay, there's a brake issue here.

6            Well, instead of downloading the General Motor

7    authorized fix for that particular issue, the repair shop is

8    free to get that fixed from somewhere else on the internet.

9    They think it's a better fix.  Hasn't really been vetted.  It's

10   on the internet.  But you know what?  They're going to take it.

11   They think it's better.

12           Under the data law they're fully authorized to use

13   that fix, upload it to the car, tell the car that the brake

14   issue has been resolved, except it hasn't been because that fix

15   was never authorized by GM.  And the person who developed it

16   doesn't know GM's vehicles as well as GM does.  That would

17   directly create a safety problem, and that is the type of

18   situation that this data law creates.

19           THE COURT:  This keeps bringing me back to this idea

20   that if that's such a big issue, and it strikes me that it is,

21   what's the agency up to?  You know, it wants to cast a looming

22   omnipresence over all of the activities in this area, but it

23   doesn't want to commit itself?

24           That's a problem in this area both from you, from your

25   perspective, your client's perspective, what are we supposed to

comply with, but more broadly, as a matter of governance.  And

that's what preemption is about in our federalism, some clarity

about what it is that the agency has.  The agency can't just

sit there and say -- not just sit there -- write letters I

guess is one way to say it, that, "We've got guidance out there

and this could be a real problem," but not commit itself.

          And the problem there is that the agencies are afraid

that by identifying with specificity what they have, they may

be giving up some other powers that they have, or maybe that's

the issue.  I think it is actually.  But in any event, the way

to smoke them out is to say, "Show me the regulation.  Let's

see precisely what you think you need to protect the integrity

of the statute that you administered."

          MR. NADOLENCO:  Your Honor, unless and until that

happens, it falls on the manufacturers to meet their safety

obligations under the Safety Act.  And we're here telling you

they cannot do that and comply with the data law.  They have to

pay.  And in that scenario --

          THE COURT:  I think I understand it, but what you're

saying is that -- I don't want to characterize it too broadly,

but the generalities of the statute are where I look for the

basis for rejecting the initiative here.  It's not the guidance

because the guidance is not enforceable -- they say it's not

enforceable.  It expresses their zeitgeist, I suppose.

          MR. NADOLENCO:  Not to play the bumper sticker game

 1    with Your Honor, but what I would say is you ought to look to

 2    the totality of the circumstances.  And I think a number of the

 3    cases kind of suggest that.  In trying to glean what federal

 4    policy is here, you ought to look to the regulations

 5    themselves.  We've cited them.  I won't repeat it now.  But the

 6    ones that actually apply, they all posit, they all assume

 7    driver control; where the data law requires a world where that

 8    could be abandoned.  That is a direct conflict.  So you ought

 9    to look at that.

10          You ought to look at the Chrysler recall.  That was a

11    real world circumstance when there's -- like I said before,

12    there wasn't any more of a reg then than there is now, but it

13    was a real recall and a real safety issue in NHTSA's view.  And

14    I would look to the letter that they sent to the legislature on

15    this law.  That gives you a pretty good idea of where NHTSA's

16    head is at.

17          But because under this particular statute so much of

18    the responsibility falls to the manufacturer, the manufacturers

19    have to look at compliance with their Safety Act obligations,

20    and then when they look at the data law, they see we can't do

21    both.  And that's why we're here.

22          THE COURT:  All right.  I appreciate that.  I think I

23    understand the thrust of what you have to say, and it's a segue

24    frankly into my more specific questions more of the defendant

25    on this aspect of it.

1          And I guess, Mr. Haskell, since you're the person I

2    see, whose picture I see, that you're going to be arguing this

3    aspect of it?

4          MR. TOONE:  I am, Your Honor.  I'm sorry.

5          THE COURT:  So let's just talk about it, I mean, in a

6    broader sort of way.  There is, I use it purposive as a way of

7    describing what at least some of the case law seems to talk

8    about, generally is supported by some regulation, some more

9    specific regulation.  But you don't have to be a weatherman to

10   see what it is that the agency is concerned with, and you don't

11   have to be a weatherman to understand the exposure that the

12   members of the association are under.

13          And so why is it not the case that, until there is

14   greater clarification of what the state is doing, maybe, so

15   that there can be greater clarification about what the agency

16   should be doing in response, because clearly they're concerned

17   about this issue, why isn't that enough to at least get us into

18   areas of obstruction and impossibility?  Impossibility is kind

19   of another way of saying, I suppose, "We can't conceive how

20   this can be complied with."  That is, I think, the thrust of

21   what the members of the association is saying.

22          MR. TOONE:  Well, thank you, Your Honor.  And thanks

23   for your framing --

24          THE COURT:  I'm sorry.  It's Mr. Toone.  Go ahead.

25          MR. TOONE:  Yes, Your Honor, yes.  We don't foreclose

1    a possibility that NHTSA may want to get more involved in

2    reconciling its policy guidance and this new law.  It's

3    obviously an area of great interest to the agency, and its

4    guidance is important.  We don't say it's not important.  And

5    it may well have an important role in reconciling these two

6    statutory regimes going forward.

7          But whether the Alliance's claims are presented as

8    obstacle preemption or impossibility preemption, there still

9    has to be an actual conflict with federal law.  And Your Honor

10   cited the First Circuit's decision, *Altria v. Good*.  We concede

11   that motor vehicle safety standards, they're promulgated as

12   regulation.  They can have preemptive effect, particularly

13   under the Supreme Court's rulings in *Geier* and *Williamson*.

14         The problem is that no existing federal motor vehicle

15   safety standard covers vehicle cyber security.  And that's not

16   just our argument.  That's what NHTSA itself says in its 2016

17   cyber security guidance.  It says, specifically on the first

18   page, "Vehicle cyber security," quote, "is not covered by an

19   existing federal motor vehicle safety standard at this time."

20   And nothing has changed on that since 2016.

21         Now, these guidelines -- I'm sorry.  These standards

22   are very detailed.  The first one here is the one they cite on

23   hydraulic and electric brake system.  It's 28 pages, very

24   detailed, has charts, has diagrams.  It doesn't mention data

25   access controls or vehicle cyber security at all, and that's

1    true of all --

2         THE COURT:  But let's just take the broader context

3    that Mr. Nadolenco alluded to at the end, which is, this is

4    about taking away an assumption in all the prior matters,

5    including, is it 2013 -- I forget -- legislation.  That was

6    based on the idea that the agency was -- I shouldn't use the

7    word "agency," but the autonomy lies with the driver and that

8    this can take away from the driver the ability to make those

9    kinds of important decisions about the way in which the vehicle

10   is running.  It can put it in the hands of somebody else to run

11   it.  It's anticipatory of perhaps a different regime in the way

12   in which automobiles are going to be functioning in our

13   society.  But it's clear that this is a tectonic change in the

14   way in which the federal agency is viewing -- will be viewing

15   what's happening among the manufacturers subject to the state

16   regime.

17        So, you know, I look at that and say, "Well, maybe

18   this is one of those things in which the purposive becomes

19   fairly important or the fundamental assumptions become very

20   important or at least ought to be developed sufficiently for

21   purposes of the record."

22        I mean, I see your point.  Where does it say, "Don't

23   do this"?  I can't see it.  I've tried to understand it, and

24   that may also have to do with my lack of imagination.  But it's

25   clearly the case that we don't have that kind of rule that

1    says, "Here is the rule, and this is going to make us violate

2    the rule."

3         But there's something happening here that's quite

4    fundamental that one wonders whether the office of preemption,

5    obstruction preemption might reach that, even though I don't

6    think the case law is so supportive of it and --

7         MR. TOONE:  Well, I --

8         THE COURT:  -- in that direction.

9         MR. TOONE:  I certainly see the point, Your Honor, but

10   I would fall back on the case law, which, for any preemption

11   claim, it has to be focused on the stated requirements and

12   objectives of any particular safety standard.  And cyber

13   security just isn't among those.

14        You know, if a manufacturer decided to build a car

15   today and not install any data access controls at all, that

16   decision wouldn't violate any existing safety standard.  So it

17   just isn't logical that the same safety standards can somehow

18   preempt a state law on the theory that state law impacts data

19   access controls that manufacturers have voluntarily added to

20   the car.

21        So that's the essential problem I think with the

22   reliance on the safety standard.  They just don't cover vehicle

23   cyber security.  Not that it's not an important issue, not that

24   NHTSA doesn't have important policy concerns about safety

25   issues related to vehicle cyber security, but there just isn't

1    a legal basis for a preemption claim under existing law.

2          If I could just address the recall authority issue.

3    We acknowledge that NHTSA has broad authority to issue recalls

4    that goes beyond the text of particular existing federal motor

5    vehicle safety standards.  But how NHTSA carries out that

6    enforcement authority, it's not preemptive.  And that's for two

7    reasons.

8          One, the Supreme Court has said that an agency's

9    enforcement priorities are not preemptive of state law.  It

10   held that just last year in *Kansas v. Garcia*.  And second,

11   there is a savings clause of the Motor Vehicle Safety Act which

12   specifically says that NHTSA's recall authority does not

13   preempt state law.  So to whatever extent there's hypothetical

14   future recall actions, those are important to be taken

15   seriously, but they can't be a basis for preempting a new state

16   law.

17         THE COURT:  But if we think of -- using it as an

18   analogy obviously, but if you think of the recall process as

19   being a little bit like the common law of the Motor Vehicle

20   Safety Act, it develops a set of criteria that manufacturers

21   can rely upon and can be looked to as a way of developing more

22   specifically the contours of what it is that the federal

23   government claims is its right in the preemptive way.

24         Now, I concede the issue, kind of, with *Garcia*.  I'm

25   always concerned that -- looking for neutral principles, I'm

1    always concerned that, given the various statements, it's

2    possible for someone to take a position on something that they

3    like to say it's not preemptive and then thereafter say it is

4    and something they don't like, but I'll put that to one side

5    for a moment, too.

6            It is the case that this recall is reflective of their

7    perception, that is the agency's perception, of what its powers

8    are.  And I suppose that a way of challenging it would be

9    through the manufacturers who could say, "We disagree."

10           Now, that doesn't happen.  This is an interactive kind

11   of thing, and it's too much trouble to disagree with the agency

12   on this.  They hold leverage that the manufacturer doesn't want

13   to invest time and effort and doesn't want to have an

14   association going after them.

15           On the other hand, it does provide some delineation of

16   what the respective authorities are.  And, you know,

17   alternative ways of dealing with it is for the state to sue the

18   agency and say, "You don't have power to do that.  You don't

19   have power to take away or decline to regulate."  And that goes

20   back frankly to those FCC cases that I kind of brushed to one

21   side a moment ago.  Those FCC cases are -- there is no

22   regulation.  That is the point.  But there is no regulation.

23   There's nothing specific with respect to it.

24           And so a more nuanced understanding of the way in

25   which administrative agencies work or administrative law works

1    suggests at least to me some greater humility on my part in

2    addressing that.  Again, I keep coming back to this idea that I

3    think it's important to have a record to rely upon in this

4    area.  I don't know if you want to respond.

5         There was a justice of the Supreme Court who used to

6    go on and on, and there was a famous advocate, who will remain

7    nameless here, who listened to that for a while and then when

8    the judge was through, he said, "How so," and then moved on to

9    something else.  I understand the awkwardness of this.  But I

10   don't know why I shouldn't develop that a bit.

11        MR. TOONE:  Well, I guess I just -- developing a

12   record is important.  It's also important at the outset of a

13   preemption claim to determine what federal law is actually

14   potentially preemptive.

15        And that's the problem.  We actually don't see it.  So

16   we can develop a record, but it's not clear what the record is

17   going to focus on because we don't see any motor vehicle

18   standard that governs any of these issues, and we don't know

19   what else they can rely on to establish a claim.

20        THE COURT:  Not but --

21        MR. TOONE:  Sorry.  Go ahead.

22        THE COURT:  That's the stuff of discovery.  What do

23   you say you're being forced to do that you can't do

24   consistently with the agency?  They either respond or they

25   don't, or they respond in a way that says, "We've got 28 pages

1    of braking standards, guidance."  Maybe they don't win in the

2    end on that one or things like that, but there's a record that

3    says that.  That may be putting the cart before the horse, I

4    suppose, in making my policy preferences in terms of developing

5    the record more significant, but that's really where I'm going

6    on that.

7            MR. TOONE:  Sorry, Your Honor.  Go ahead.

8            THE COURT:  Go ahead.

9            MR. TOONE:  You cited Judge Barron's decision in

10   *Capron*, and I argued that case, so I know something about it.

11   And that was developed on a 12(b)(6) record, and the court

12   thought that was a --

13           THE COURT:  Wasn't it developed also with some

14   preliminary injunction discovery, straight pleading case?

15           MR. TOONE:  Straight pleading, straight 12(b)(6).

16   Now, we cited things incorporated by reference, but it was done

17   on a 12(b)(6) basis.  And the court thought that was imperfect

18   because of the preemption issues, particularly in a facial

19   pre-enforcement context, said they could be resolved solely on

20   the basis of the state and federal statutes at issue.

21           And that's really what we see here.  This issue can be

22   resolved on the lack of any kind of clear federal authority

23   that prohibits compliance with the state law.  And so I mean,

24   developing a record is fine, but it doesn't seem like a right

25   use of the court's resources if there isn't any actually

1     articulable federal law that is violated by the state law.

2           THE COURT:  Okay.  Two things.  Number one, is that

3     how I pronounce it, *Capron*?

4           MR. TOONE:  I've always said, "*Capron*," but I think

5     *"Capron"* is fine as well.

6           THE COURT:  Well, the record just shows me saying the

7     words.  It doesn't show my mispronouncing them.  But second,

8     there still is something of a record developed in that case.

9           Now, done by this incorporation by reference and all

10    the old, you know, prior regulatory activity on the part of DOS

11    and that sort of thing, but the court has seen -- I shouldn't

12    say it that way.  You don't see there that kind of express

13    statement of, "We're happy with this record," sufficiently to

14    do with this pleading.  Maybe that's why I got misled into

15    thinking it was something more.  But it's rather fulsome, you

16    know, as a pleading record.

17          And the thing that bothers me here is, I'm back to the

18    larger question that I raised, I just don't know what this

19    initiative means.  I have no idea.  I shouldn't say "no idea."

20    I have some idea.  But that will benefit from a development I

21    suppose of the record here.  That is, discovery goes both sides

22    on this activity, I think.

23          I think we may have exhausted this aspect of this.  I

24    framed it.  As you can see, I've thought about it a good deal,

25    but I wanted to hear what you guys had to say, obviously,

1  because you've dealt with it preliminarily more fully.

2         But let me go to this second issue of, so there are

3  bad people out there who do bad things.  Why is it that the

4  agency or the association should be protected from that?  That

5  seems to me like saying to the court, you know, it's a cruel

6  world out there, and what you have to do is make sure that we

7  don't violate the law.

8         And I think the answer to that is generally courts

9  don't help those who don't help themselves, and helping

10  themselves may be -- don't violate the law, number one, by

11  being an accomplice to improvident action, and number two, back

12  to the agency on this.  Mr. Nadolenco.

13         MR. NADOLENCO:  Yeah, I'll start in.  I'm actually

14  going to try to -- let's see how nimble I am here.  I'm going

15  to try to address the second prong of our Safety Act preemption

16  claim, the make-inoperative claim and couple it in the sake of

17  efficiency with the Clean Air Act because the statutes at least

18  in this respect are very similar.

19         THE COURT:  Okay.

20         MR. NADOLENCO:  So under the Safety Act, section

21  30122, it says that, "A manufacturer may not make inoperative

22  any part of a device or element of design installed in

23  compliance with an applicable motor vehicle safety standard."

24  And under the Clean Air Act, we see something similar.  "It is

25  illegal for any person, including," and probably especially,

```
 1    "the manufacturer, to remove or render inoperative any device

 2    or element of design installed on or in a motor vehicle prior

 3    to its sale and delivery."

 4         And as I explain in the first segment of our argument,

 5    Your Honor, the vehicle systems now, whether with regard to

 6    things like safety measures like braking or the emissions

 7    systems, are ingrained, and elements of design now include

 8    cyber protection and other data protection.  And we cannot

 9    under this federal law dismantle those.  But under the data

10    law, we have to because we can't comply with it.

11         THE COURT:  So why isn't the answer to that a

12    variation on there being as applied and on its face, which is

13    to say they take some action against you or some private third

14    party takes a 93A action against you, which is something else

15    that the statute implies, to say that's the defense.  The

16    defense is we can't do it.  We cannot dismantle something

17    that's been accepted like that.

18         Now, you know, who wants to have to fight every one of

19    these cases.  But that's really what it's about when you get to

20    circumstances like this, isn't it?

21         MR. NADOLENCO:  Somewhat, Your Honor, but the entire

22    body of law that emerged around preemption is exactly so we

23    could avoid the death by a thousand cuts or being in a position

24    where we don't know which law to comply to.  We have the right

25    and ability to go to federal court and say these two things are
```

1   conflicting, and under this conflict we think the supremacy

2   clause governs.

3       THE COURT:  Well, that's really a question of how

4   specific the case in controversy is.  And so the laws that have

5   -- the doctrine that's developed on its face and as applied is

6   meant to sort through those kinds of more hypothetical, that is

7   on its face, cases that nevertheless can be treated as a case

8   or controversy.

9       Here, this doesn't quite fall into that category.

10  You've got a complete defense.  You are required to do this

11  under the particular standard that's being applied.  You can't

12  do otherwise.  And so if somebody sues you, you simply say

13  that's the defense.

14      Now, you know, preemption is frequently or is raised

15  not so frequently in those kinds of private enforcement

16  actions, but it shows up there as well.  I guess I understand

17  that death by a thousand cuts.  On the other hand, when you

18  have a massive role in the economy, then that's what happens to

19  it.  You have another dimension to your cost of doing business.

20      MR. NADOLENCO:  Understood, Your Honor.  I would just

21  reiterate that it is still our right and ability to come to

22  federal court and say there's absolute conflicts between the

23  data law and the Clean Air Act and the Safety Act, and because

24  of that, we can't comply.  And in fact, some of the reasons in

25  the preemption cases that disfavor -- why courts disfavor the

1    facial challenges is because they worry that they're deciding

2    preemption on a factually barebones record.  And as Your Honor

3    has set up the schedule, we're not going to have that issue

4    here.

5           We're going to absolutely be able to develop the

6    record.  We're going to be able to have discovery and show Your

7    Honor how the cyber and other protections are ingrained now in

8    the vehicle system such that we cannot comply with the data law

9    while complying with the federal law requirements that we don't

10   make those things inoperative.  And that's what we're beholden

11   to.  If we were to make them inoperative, we would be violating

12   federal law.

13          THE COURT:  Okay.  I think I understand the argument.

14   Mr. Toone, do you want to speak to that?  You know, part of it

15   is that you kind of -- under these circumstances I talked about

16   the agency not being or having leverage, that life is too short

17   to fight with an agency all the time, particularly one that

18   governs every aspect of your life, so we just kind of

19   accommodate them.

20          Similarly with you.  I mean, similarly with you, your

21   client.  That is, you've got a state law.  It's a major state

22   that has always had a cutting edge role in a variety of

23   different kinds of consumer protection matters.  And so they

24   look at it and say, "Why do we want to get the opportunity to

25   test the law of 93A with private parties or worry about when it

1    is that the Attorney General is going to turn on it us, State

2    Attorney General is going to turn on us."

3           And so trying to reach that earlier on as best I can

4    seems to me to be valuable.  I really mean it about the

5    parricide issue, and I really mean it about, if their business

6    planning is not including thinking about this coming into play

7    at some point, then they're whistling by the graveyard on it.

8    But there should be a full development of the record to develop

9    it.

10          MR. TOONE:  If I could just make a general point and

11   then address more specifically the two provisions that counsel

12   just raised.

13          THE COURT:  Sure.

14          MR. TOONE:  On the general point, our system of

15   federalism presumes that both parts of our government will in

16   good faith try to implement this law.  So I think it's a much

17   better approach to have specific arguments about

18   impracticability or impossibility raised in a particular 93

19   action in state court or however a manufacturer would want to

20   raise that in that particular context as opposed to this kind

21   of facial challenge that, as much as the record gets developed,

22   we're not going to possibly be able to anticipate every

23   permutation of how this law is going to apply.

24          So just, the federalism presumes that state and

25   federal governments will work in good faith and kind of work

1    out these differences and also avoid preemption whenever

2    possible.  That's a much better approach in our view than going

3    forward with a facial challenge that seems to strike down this

4    new law altogether.

5           On the specific points that Mr. Nadolenco raised, I

6    mean, we really fall back on the text of these provisions that

7    he's talking about, that make inoperative provision of the

8    Motor Vehicle Safety Act applies only to devices installed in

9    compliance with an applicable motor vehicle safety standard.

10          So if it's required by a safety standard and then

11   that's rendered inoperative, yes, that's covered by the

12   statute.  But if it's this data access control that actually

13   isn't covered by the vehicle safety standard, then the

14   make-inoperative provision doesn't apply.

15          The same goes to the Clean Air Act's anti-tampering

16   prohibition, which talks about rendering inoperative devices

17   that are themselves required by the Act's emissions standards,

18   not to data access controls that manufacturers have added on

19   top of those federally required devices.

20          And I just want to make sure before we end this

21   argument that, we again point out that the Clean Air Act claim

22   is kind of extraordinary in that there actually is a provision

23   in the law that mandates open data access for emissions control

24   devices.  This is 42 U.S.C. section 7521(m)(5).  This provision

25   requires manufacturers to provide to any person engaged in

1    repair services any and all information required for those
2    services.
3              And the implementing regulations say that no
4    information may be withheld to an independent repair shop if a
5    manufacturer provides that same information to its franchise
6    dealers or other favorable repair shops.
7              This is precisely what the new Massachusetts law seeks
8    to do, provide independent repair facilities with standardized
9    and secure access to vehicles' diagnostic systems.  And you
10   just can't have a preemption claim that is refuted by the very
11   act on which the Alliance relies.
12             THE COURT:  So maybe to end this -- but I'll give you
13   a chance, Mr. Nadolenco, to speak to that.  Because the larger
14   architecture of your argument has been that, Hey, this is
15   opening up an entirely different way of looking at it.  It's
16   making open access to this information.  And with respect to
17   the Clean Air Act, that's the way it's been.  That's the way it
18   is.  There is fully open access to this.  It leads to the
19   potential for tampering, of course.  But that seems to be the
20   thrust of that -- not "thrust."  That seems to be -- add the
21   dimension of that particular statute.
22             MR. NADOLENCO:  Your Honor, the existing law does
23   require sharing of information, as Mr. Toone correctly points
24   out.  But it is far narrower than what the data law requires.
25   It's actually very akin to what the original Right to Repair

1    Act provided for.  You have to provide information that lets

2    repair shops diagnose and fix either safety systems or emission

3    systems.

4            This is a whole new world.  This is the entire

5    treasure trove of the vehicle available on an open access

6    bidirectional database that's available through a mobile app

7    that repair shops can write to and change, and it's not limited

8    to just what is needed to fix the car.

9            THE COURT:  I want to speak to this very narrow -- I

10   say "very narrow" but narrower application of access that you

11   find in the Clean Air Act.  I mean, it's one thing to talk more

12   generally about the larger concerns of the motor vehicle safety

13   agency and the Act.  It's another thing to talk very

14   specifically about the Clean Air Act, which seems to have

15   provided for open access in this particular area, let's call it

16   the emissions control area.

17           MR. NADOLENCO:  But it's a very limited amount of

18   data, and we allege that the data law goes far beyond that.

19   And the type of open system without access control that the

20   data law requires, we allege, specifically means that the

21   manufacturers themselves would have to render inoperative the

22   cyber and other protections that they put in place to protect

23   emission systems.  That is prohibited by the Clean Air Act but

24   required by the data law.

25           THE COURT:  I think I understand that conundrum.

1          MR. TOONE:  Can I respond very quickly to that point.

2          THE COURT:  Sure.

3          MR. TOONE:  They've talked about us not proposing

4     limiting instructions of the state law.  But I can offer one

5     here because the state law expressly says, "Access is only

6     provided for the purpose of maintenance, diagnostics and

7     repair."  And that's in both section 3 and section 4.  That is

8     the stated purpose of access under the state law.

9          These arguments that, "Oh, it's going to be done for

10    all these additional purposes," it has no basis in the state

11    law, so I think we can limit the construction of the state law

12    on that basis, and that I think renders counsel's concerns

13    moot.

14         THE COURT:  Well, what happens if -- I mean, we can

15    say that, that no one will be permitted to enter Fenway Park

16    without paying a fee.  We can say that.  But we're not going to

17    have a guard at the door.  Now, what is the likely outcome of

18    that?  That people are going to walk in without paying a fee.

19         So to say that, "Our statute is clear, we're not

20    interfering with any of that sort of thing," doesn't answer the

21    practical question of does this then create a series of

22    incentives for bad actors to misuse a statute that's set up in

23    this fashion and what effect does that have on preemption, as

24    to which I don't know, to be perfectly candid.

25         That's part of why I think what I'm going to do on

1    this is I am going to deny the motion to dismiss with respect

2    to Counts 1 and 2 without, obviously, prejudice being raised on

3    merits here.  There are too many unanswered questions for me

4    here.  I think I understand the trend of the case law in this

5    area.  Maybe we'll get some more case law in this area.  I

6    think the formal position that the Commonwealth has taken has

7    significant force, but I wouldn't want to provide a disposition

8    of the case without getting into the merits, my hands on the

9    merits themselves developed by a record.  That's part of why I

10   waited to go through that process.  I'm going to -- I said I

11   would rule from the bench -- I'll rule from my chair -- in any

12   event on this so you can get going on this aspect of it.

13          I've also I think outlined my own anxious

14   apprehensions about the direction of this law.  And the last

15   thing businessmen want is some judge to say, "This is really

16   interesting."  Well, it is, it's really interesting.  On the

17   other hand, you've got a business to run and you'll make

18   choices that are shaped by the need to do that.

19          I also indicated that I didn't want to take up the

20   other counts at this point.  They all have some significance.

21   My view right now is that there may be one or more of those

22   counts that will be the subject of a final judgment after the

23   trial in this case, not because they will be developed but

24   because I will have acted on the motion to dismiss in its

25   (technical difficulty) with respect to the motion to dismiss

1    itself.

2         The takings issue seems to me to be particularly

3    problematic for reasons that have to do also with standing.

4    But what I'm going to be doing is periodically interrupting the

5    development of your cases to take up one or more of those

6    counts for the motion to dismiss itself.

7         I won't deal with the question of whether or not you

8    have a separate count for essentially relief.  I understand of

9    course that argument.  I tend to think of remedy as being

10   inextricably intertwined with liability itself, not a separate

11   freestanding opportunity to go to a judge and say, "Help us

12   out."  But none of that is interfering, I think, with your

13   ongoing discovery.

14        Now, having done that, Mr. Nadolenco, you were

15   dangerously close, are you even more dangerously close to some

16   view on the part of the agency?

17        MR. NADOLENCO:  I knew you would ask that, Your Honor.

18   And unfortunately, we're in the same place.  There's been --

19   you may have noticed, some events of interest have occurred in

20   Washington since we last chatted.  We did contact the new folks

21   given the change in administration.  They are aware of the

22   court's requests, and they're deciding how to respond to it.

23        THE COURT:  Okay.  Well, to be continued, as I

24   indicated.  It doesn't end the matter I think with me, although

25   it doesn't necessarily mean I'm going to do something

1  different.  To say that they respectfully decline to offer

2  their views here, I think as you heard from the argument that

3  we had here, you have a special interest in making sure that

4  their views are stated with definitiveness, and there are a

5  variety of ways of eliciting those kind of views, I suppose.

6          So I'll think about that.  But you guys have things to

7  do at this point, and I assume that you have your designated

8  hitters in place as witnesses in this case and are ready to go.

9  So I think what I will do then is let you go at it at this

10  point.

11          As I said, I will probably at various points, because

12  I have a feeling that I will be wanting to exercise some degree

13  of case management, active case management in the case, bring

14  you in for various things.  And one of the agenda items may be

15  one or more of these counts on the motion to dismiss so at the

16  end of the day I will have dealt with the motion to dismiss

17  matters here without opening up discovery separate from Counts

18  1 and 2.  Discovery on everything else is stayed, that is

19  uniquely related to anything else is stayed.  Is there anything

20  else that we need to take up at this point?

21          MR. TOONE:  No, Your Honor.

22          MR. NADOLENCO:  Not from our perspective.  Thank you,

23  Your Honor.

24          THE COURT:  Thank you very much.  We will be in

25  recess.  (Adjourned, 12:27 p.m.)

```
1                   CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Kelly Mortellite, Registered Merit Reporter

4   and Certified Realtime Reporter, in and for the United States

5   District Court for the District of Massachusetts, do hereby

6   certify that the foregoing transcript is a true and correct

7   transcript of the stenographically reported proceedings held in

8   the above-entitled matter to the best of my skill and ability.

9                   Dated this 1st day of February, 2021.

10

11                  /s/ Kelly Mortellite

12                  _____

13                  Kelly Mortellite, RMR, CRR

14                  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```