**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION<br><br>       Plaintiff,<br><br>  vs.<br><br>MAURA HEALEY, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS in her official capacity,<br><br>       Defendant. | C.A. No. 1:20-cv-12090-DPW |

**MEMORANDUM OF LAW IN OPPOSITION TO ATTORNEY GENERAL'S
EMERGENCY MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 3

    I.      Scope of the Designated Members' Agreed Testimony ...................................... 3

    II.    The Parties' Discovery Requests and Responses.................................................. 4

    III.   Documents Held by TMNA's and MBUSA's Parent Companies......................... 6

    IV.   In-Person Inspection of Highly Sensitive Cybersecurity Information.................. 7

    V.    Expert Reports ...................................................................................................... 9

ARGUMENT .................................................................................................................. 10

    I.      The Court Should Require an In-Person, Secure Inspection of the
         ARXML/DBC Files ............................................................................................ 10

    II.    The Court Should Not Require the Production of Additional Documents
         from Toyota and Mercedes-Benz USA................................................................. 14

         A.     The Requested Information is Beyond the Scope of the Company
                Witnesses' Testimony.............................................................................. 15

         B.     The Requested Information is Not in the Testifying Companies'
                Possession, Custody, or Control ............................................................. 17

    III.   The Court Should Not Require Further Production of Security Reviews ........... 19

CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*,
  244 F.3d 189 (1st Cir. 2001) ...................................................................17

*FM Generator, Inc. v. MTU Onsite Energy Corp.*,
  2016 WL 8902603 (D. Mass. Aug. 25, 2016) ...............................................17, 19

*In re Facebook Biometric Privacy*,
  3:15-cv-03747 (N.D. Cal. Feb. 12, 2016) ......................................................11, 12

*Jagex Ltd. v. Impulse Software*,
  273 F.R.D. 357 (D. Mass. 2011) .................................................................11

*Judson v. Midland Credit Mgmt., Inc.*,
  2014 WL 3829082 (D. Mass. Aug. 1, 2014) .................................................20

*Lindholm v. BMW of North America, LLC*,
  2016 WL 452315 (D.S.D. Feb. 5, 2016) .........................................................19

*MasterObjects, Inc. v. Facebook, Inc.*,
  No. 6:20-cv-00087 (W.D. Tex. June 1, 2020) ...............................................11

*In re New England Compounding Pharm., Inc. Prods. Liab. Litig.*,
  2015 WL 13715287 (D. Mass. Feb. 26, 2015) ...............................................19

*Seifi v. Mercedes-Benz U.S.A., LLC*,
  2014 WL 7187111 (N.D. Cal. Dec. 16, 2014) ................................................19

*Sinceno v. Riverside Church in City of New York*,
  2020 WL 1302053 (S.D.N.Y. Mar. 18, 2020) ...............................................13

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
  2018 WL 2294281 (N.D. Cal. May 21, 2018) ................................................11

*Thomas & Betts Corp. v. New Albertson's, Inc.*,
  2012 WL 12552276 (D. Mass. July 20, 2012) ...............................................19

*Torres v. Johnson & Johnson*,
  2018 WL 4054904 (D. Mass. Aug. 24, 2018) ...............................................10

*Via Vadis Controlling GmbH v. Skype, Inc.*
  2013 WL 646236 (D. Del. Feb. 21, 2013) ......................................................11

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)............................................................................................................10

Fed. R. Civ. P. 26(b)(2)(C)(i) ...................................................................................................14

Fed. R. Civ. P. 34....................................................................................................................10

## INTRODUCTION

The Attorney General's motion to compel raises issues—purportedly on an "emergency" basis—that could have, and should have, been raised weeks ago. The motion is actually a thinly veiled attempt by the Attorney General to modify the Scheduling Order unilaterally and allot her experts more time to prepare their reports.

Indeed, it is ironic that the Attorney General complains about plaintiff Alliance for Automotive Innovation's ("Auto Innovators") discovery efforts, as discovery has been entirely one-sided. To date, Auto Innovators and the four participating members (the OEMs) have—at break-neck speed—produced tens of thousands of pages of documents, provided substantive responses to twenty interrogatories, produced a witness for deposition, and scheduled nine more. In contrast, the Attorney General has produced fewer than 150 documents, responded substantively to only *three* out of almost two dozen written discovery requests, and refused to accept service of a deposition subpoena on its own trial witness.

Despite Auto Innovators' exhaustive efforts, the Attorney General has simply refused to provide her expert reports. Even after Auto Innovators gave the Attorney General additional time to serve her expert reports—because it took Auto Innovators and the OEMs a few additional days to complete their document production substantially—the Attorney General still refuses to provide her reports. Worse, she helped herself to an additional extension of time for her experts by filing this motion only after reversing course and refusing to consider an in-person inspection of sensitive files. To help maintain the expedited schedule, Auto Innovators even proposed allowing the Attorney General to supplement her expert reports in the (unlikely) event that any of the information currently subject to dispute is produced and materially impacts the reports. The Attorney General ignored that overture and filed her motion. The Court should deny it for several reasons.

1

*First*, the Attorney General seeks to inspect extraordinarily sensitive computer files that provide a roadmap to the vehicles' source code, without any of the protections that federal courts typically impose on those kinds of inspections. As noted, the parties were seemingly on their way to stipulating to customary in-person review of these files—having discussed in-person review *for weeks* without objection to the concept—when the Attorney General abruptly changed her position, and demanded normal production of these extraordinarily sensitive files without specifying any special protections. The OEMs have legitimate concerns about turning over these files—the very keys to the kingdom protecting the security of their vehicles. The existing Confidentiality Protective Order does not address review of this kind of software materials, and the parties never contemplated when discussing the proposed protective order that roadmaps to source code could even be at issue. In any event, courts have long recognized that these types of files stand in a category by themselves given their sensitivity and are entitled to protections above other kinds of information. If review of these files must occur, this Court should require the safeguards that typically accompany review of source-code materials.

*Second*, the Attorney General misstates the obligations of the participating OEMs. Because individual OEMs are not parties to this case, their participation is voluntary. Plaintiff's Initial Disclosures, served on February 5, 2021, made clear that the four OEMs who agreed to participate in discovery would not be offering duplicative evidence. In particular, General Motors LLC ("GM") and Fiat Chrysler Automobiles ("FCA") agreed to participate more fully and have already produced significant cyber-related documents and information. In contrast, Toyota Motor North America, Inc. ("TMNA") and Mercedes-Benz USA LLC ("MBUSA") agreed to provide non-duplicative information related to more limited topics, such as the faults of the Secure Vehicle Interface and Connected Car operations. But for the ability to participate in this limited fashion,

TMNA would not have voluntarily participated in this proceeding. Notwithstanding the limited scope of their testimony and to avoid unnecessary disputes, both TMNA and MBUSA have produced documents and information beyond the stated scope of their testimony. But MBUSA cannot produce documents that are not in its possession, custody, or control, because those documents reside overseas with a nonparty parent company who is not a member of Auto Innovators and who is not participating in these proceedings. Similarly, TMNA cannot produce highly sensitive documents that are outside the scope of its agreed-upon testimony, and that are owned and controlled by its overseas nonparty parent company who is not a member of Auto Innovators and who has not participated in these proceedings.

*Third*, the Attorney General seeks to compel production of security reviews from GM and FCA beyond those already produced—because the Attorney General thinks more exist. But as Auto Innovators has explained, it already conducted an exhaustive search for documents responsive to the Attorney General's request and has produced them. And Auto Innovators has already agreed to conduct an additional search to determine whether any additional responsive documents exist. To date, it has found nothing more.

*Finally*, the Court should not condone the Attorney General's self-help by further delaying her expert reports. Her experts have had Auto Innovators' expert reports *for almost two months*. The Court should require the Attorney General to produce her expert reports no later than April 19.

## BACKGROUND

### I.    Scope of the Designated Members' Agreed Testimony

Early in the case, this Court determined that Auto Innovators could designate up to five OEMs to participate in this litigation. *See* ECF No. 79, Hr'g Tr. at 16:15-22, 5:2-9 (Dec. 18, 2020) (noting "five or so, five or less—hope springs eternal—of association representatives . . . [would]

be deposed"). Indeed, in noting that fewer than five OEMs could participate, the Court noted the twin goals of developing the factual record while avoiding needless duplication "unless someone has something new to say or there are insistent needs by a trade association to satisfy each of its constituents." ECF No. 58, Hr'g Tr. at 21:21-24 (Dec. 3, 2020).

On February 5, 2021, Auto Innovators served Initial Disclosures, identifying four OEMs to participate in various ways. GM and FCA would fully participate. MBUSA and TMNA—U.S. subsidiaries of foreign vehicle manufacturers—agreed to focus on more discrete issues. TMNA disclosed that it would testify about "compliance with Right to Repair Law/practice" and the "Shortcomings of Secure Vehicle Interface ('SVI') model."[1] And MBUSA disclosed that it could have three categories of information: (1) information related to the "[s]cope of connected-car operations, relationship with telematics systems, and related security and operational considerations"; (2) information related to "[c]ustomer and dealer interfaces with telematics systems"; and (3) the "[t]imeline for developing and implementing changes to telematics systems and connected-car operations." *Id.* Notably, the understanding that voluntary participation would be limited in scope in accordance with the Initial Disclosures was key in TMNA's decision to voluntarily participate in the current action. Norton Decl. ¶ 8.

## II.   The Parties' Discovery Requests and Responses

Consistent with the expedited discovery schedule in this case, Auto Innovators and the OEMs have worked diligently to comply and produce responsive documents:

- Document Productions. Auto Innovators has produced tens of thousands of pages of documents on behalf of itself and the participating members. Queen Decl. ¶ 3. In

---

[1]     Declaration of Daniel D. Queen ("Queen Decl.") Ex. A at 4.  The other declarations cited herein include the accompanying Declaration of Dwayne Norton ("Norton Decl."), the Declaration of Kevin Baltes ("Baltes Decl."), the Declaration of James Bielenda ("Bielenda Decl."), and the Declaration of Thomas Grycz ("Grycz Decl.").

addition to producing Bates-stamped materials, GM, TMNA, and MBUSA have each provided the Attorney General and its experts with access to thousands of additional documents detailing their vehicles' technical features, architectures, and repair procedures. *Id.* ¶ 3.

- Interrogatories. Auto Innovators has provided fulsome, substantive responses to 20 of the Attorney General's 23 interrogatories, after working extensively with FCA, GM, TMNA, and MBUSA to do so. *Id.* ¶ 4. Auto Innovators objected to the remaining three because they called for irrelevant information outside the scope of the information designated in the Initial Disclosures and responding would have been unduly burdensome and disproportionate to the needs of the case. *Id.*

- Depositions. Auto Innovators has accepted deposition notices for, and worked cooperatively with the Attorney General's office to schedule the depositions of, *ten* different individuals. *Id.* ¶ 5. At the Attorney General's request, Auto Innovators has scheduled eight of these depositions to take place over a span of just two weeks (April 9 to April 23). *Id.*

In contrast, the Attorney General has produced only *143* documents, totaling only 1,111 pages. *Id.* ¶ 6. The Attorney General provided substantive responses to only two of Auto Innovators' seventeen requests for admission, and to only one of Auto Innovators' five interrogatories. *Id.* ¶ 7. Likewise, the Attorney General has not produced any documents on behalf of the two witnesses to testify at trial; instead, Auto Innovators had to subpoena those two witnesses, who have not yet provided any documents. *Id.* ¶¶ 9, 10. Amazingly, the Attorney General even refused to accept service of the subpoena on behalf of one of its witnesses—a witness whom the Attorney General had stated should be contacted through her office—forcing Auto

5

Innovators to track down the witness' home address and make five different service attempts before service could be completed. *Id.* ¶ 10.

## III.    Documents Held by TMNA's and MBUSA's Parent Companies

TMNA is a separate and distinct entity from its ultimate parent company, Toyota Motor Company ("TMC"), which is incorporated and headquartered in Japan and which is primarily responsible for the design and developmental testing of Toyota vehicles. Norton Decl. ¶ 2. Similarly, MBUSA is a separate and distinct entity from its ultimate parent company, Daimler AG ("Daimler"), which is incorporated and headquartered in Germany and which is primarily responsible for the design and developmental testing of Mercedes-Benz vehicles. Grycz Decl. ¶¶ 2-5. Neither TMC nor Daimler are members of Auto Innovators. Norton Decl. ¶ 6; Grycz Decl. ¶ 7. And neither TMNA nor MBUSA have possession, custody, or control of documents and information held by their parent companies, including certain documents and information related to technical aspects of their vehicles. Norton Decl. ¶¶ 4, 5; Grycz Decl. ¶¶ 9-10.

Thus, in its interrogatory responses, Auto Innovators did not, and could not, provide certain information regarding Mercedes-Benz vehicles because that information fell outside MBUSA's possession, custody, and control, and is instead owned by Daimler AG. Queen Decl. ¶ 11. When the Attorney General's office asked about this information on a meet-and-confer call on March 10, 2021, Auto Innovators' counsel pointed out that it could not produce documents held by other entities within a member's corporate structure, as such documents are outside the members' possession, custody, or control. *Id.* ¶12.

Consistent with this straightforward concept, Auto Innovators and its members have only produced documents and information that are actually within their possession, custody, or control, and have never suggested otherwise. *See, e.g.*, *id.* Ex. D (noting that GM, FCA, and TMNA had produced documents within their "possession, custody, or control").

Moreover, it was never the expectation that each witness would testify about every aspect of the case. *Id.* Ex. A (Auto Innovators' Initial Disclosures). In essence, the Attorney General is asking the Court to put these companies to a choice: either open themselves up to broad discovery well beyond what they are going to testify about in the case or relinquish the right to participate in the case at all. This type of all-or-nothing approach was certainly never contemplated when the parties were discussing the scheduling order.

## IV.    In-Person Inspection of Highly Sensitive Cybersecurity Information

As the Confidentiality Protective Order entered by the Court contemplated, this case was always going to involve the production of some sensitive information. But the DBC and ARXML files that the Attorney General now seeks—which define communications among vehicle component parts, are connected to the vehicles' source codes, and thus are gateways to the vehicles' internal systems—go well beyond that. They are extremely sensitive and they require the highest security protections that can be provided. Bielenda Decl. ¶ 5; Baltes Decl. ¶ 6. Manufacturers go to great lengths to secure these types of files because any leak would make a cybersecurity attack much easier. Baltes Decl. ¶ 5. Any disclosure of these files outside of the members' computer systems dramatically increases the chances that such files could be publicly disclosed, including because any one of the many parties who receive such files—including each parties' counsel, their experts, court personnel, and so forth—could accidentally disclose those files, and any of those parties' computer systems could be subject to a security breach. Bielenda Decl. ¶ 5;  Baltes Decl. ¶ 5. The resulting disclosures would be devastating.

Thus, Auto Innovators flagged its concerns almost immediately upon receiving the Attorney General's request for these files. At the parties' meet and confer on March 10, 2021, Auto Innovators raised that these documents were extremely sensitive and that the Attorney

General's request was overly broad, particularly when it was unclear whether much of the data was even necessary. *See* Queen Decl. ¶ 12.

On March 22, 2021, counsel for Auto Innovators reiterated that certain documents—primarily ARXML/DBC files and "security architecture diagrams"—were too sensitive to produce wholesale because doing so "would create major security issues across broad swaths of members' vehicle fleets." Queen Decl. Ex. C. Auto Innovators therefore proposed making these documents "available for inspection at the members' facilities here in the U.S." and, in one instance, "via a remote review portal." *Id.* On March 23, Auto Innovators' counsel conferred with the Attorney General's counsel, who did not oppose this proposal but asked for more details—noting, for instance, that the proposal would be more feasible if it only required a single visit to Detroit, as opposed to visits to multiple locations around the country. Queen Decl. ¶ 16. Based on this discussion, Auto Innovators worked with its members to solidify plans for reading rooms and to prepare a protocol for the use of such reading rooms. *Id.* ¶ 17.

On April 2, 2021, Auto Innovators' counsel sent a letter to the Attorney General describing the precise procedures for in-person reading rooms for FCA and GM documents in the Detroit area, and for an electronic, "remote" reading room of MBUSA documents. Queen Decl. Ex D. With respect to the in-person reading rooms, Auto Innovators proposed that COVID-19 protocols be followed. *Id.* at 2. The following week, the Attorney General's counsel asked for a meet-and-confer regarding Auto Innovators' proposal (as well as other issues raised in the instant motion to compel). Queen Decl. ¶ 24. On that April 6 meet-and-confer call, the Attorney General's counsel informed Auto Innovators for the first time that it would not consider in-person inspections due to COVID-19. *Id.* ¶ 25. The Attorney General's counsel initially suggested that the discovery schedule could be delayed until all relevant persons had the opportunity to be vaccinated, but then

stated that an inspection (whether in-person or remote) would not work in any event because its experts wished to analyze documents using their own software. *Id* ¶ 26. When Auto Innovators' counsel asked the Attorney General's counsel to explain what software their experts planned to use, they refused to provide such information, and said that they would not consider any possibility except for regular production of these documents. *Id.*

## V.    Expert Reports

Auto Innovators' experts provided their reports on February 18, 2021—well before the bulk of the information described above was produced. Queen Decl. ¶ 18. During a meet-and-confer call on March 29, 2021, the parties discussed that it might take Auto Innovators some additional time to comply with the Attorney General's document requests and that the Attorney General's experts did not need to provide their reports on April 2, 2021, as the schedule initially provided. Instead, Auto Innovators agreed that the Attorney General's experts could provide their reports seven days after Auto Innovators had substantially completed its production. Queen Decl. ¶ 19.

On April 2, 2021, Auto Innovators informed the Attorney General that—aside from the DBC and ARXML files, which it would make available immediately via the reading rooms—its production of documents that the Attorney General requested for its expert reports was substantially complete. Queen Decl. Ex. D. Thus, consistent with the parties' prior agreement, Auto Innovators asked that the Attorney General produce its expert reports by April 9, 2021. *Id.* at 4. On the parties' April 6, 2021, meet-and-confer call, the Attorney General's counsel did not state that they would not produce their expert reports; but after that call, they sent an email to Auto Innovators' counsel stating that they would not produce their expert reports until, in their view, "a full and proper production of documents in response to the Attorney General's Second Set of Requests" was complete. *Id.* Ex. E at 5. In response, Auto Innovators asked again that the Attorney

General produce their reports, noting that it would "make reasonable accommodations" if the Attorney General needed additional time. *Id.* at 1. Auto Innovators further stated that it would be willing to discuss permitting the Attorney General's experts to supplement their expert reports in the unlikely event that Auto Innovators' production was somehow insufficient and required supplementing. *Id.* The Attorney General did not respond to these proposals, but instead filed its motion to compel.

## ARGUMENT

The party seeking an order to compel production must show that the information is relevant. *Torres v. Johnson & Johnson*, 2018 WL 4054904, at *2 (D. Mass. Aug. 24, 2018). And to be discoverable, information must not only be relevant but also "proportional to the needs of the case" and not unduly burdensome. Fed. R. Civ. P. 26(b)(1).

The Attorney General's requests are disproportionate to the needs of this case. Some of the requested documents require significant security protections that the current Protective Order is unable to affirm; some are not in the possession, custody, or control of the manufacturer representatives; and still other documents are far beyond the scope of individual manufacturer testimony and available from alternative sources. The Court should deny the Attorney General's motion to compel in its entirety and, in all circumstances, require the Attorney General to serve its expert reports no later than April 19, 2021.

## I.     The Court Should Require an In-Person, Secure Inspection of the ARXML/DBC Files

The extremely sensitive files at issue here are not traditional subjects of discovery. Contrary to the Attorney General's assertion, *see* Mot. 8, Rule 34 does not require that an opposing party's counsel or experts be permitted to copy the types of computer files at issue here, which provide a roadmap to the source code of vehicles. Bielenda Decl. ¶ 4; Baltes Decl. ¶ ¶ 4-5.

Although the documents the Attorney General seeks may be relevant in a general sense, permitting the Attorney General to access, search, and copy ARXML/DBC files and "security architecture diagrams" without sufficient security protections is disproportionate to the needs of the case and risks grievous harm to the participating non-parties. The Court should deny production of these files without the security restrictions necessary to preserve confidentiality and prevent unauthorized access.

It is oft-observed by courts that "[s]ource codes are the most sensitive and confidential property," and that "[w]hen disclosed in U.S. litigation, extreme measures are ordered to protect their confidentiality." *Via Vadis Controlling GmbH v. Skype, Inc.*, 2013 WL 646236, at *3 (D. Del. Feb. 21, 2013). Courts have thus routinely approved secure viewing locations for source code information that do not allow experts or counsel for the opposing party to manipulate or copy the data. *See, e.g.*, *Jagex Ltd. v. Impulse Software*, 273 F.R.D. 357, 358-59 (D. Mass. 2011) (allowing code to be viewed on three-day's notice "on a secure, non-networked computer" at outside counsel's office in Massachusetts); *MasterObjects, Inc. v. Facebook, Inc.*, No. 6:20-cv-00087 at ECF 35 (W.D. Tex. June 1, 2020) (ordering Facebook "to take the source code to one location for review," where MasterObjects would be allowed to take notes but not to copy the code); *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 2018 WL 2294281, at *2-3 (N.D. Cal. May 21, 2018) (denying request to print code and allowing for inspection at outside counsel's offices); *In re Facebook Biometric Privacy*, 3:15-cv-03747 at ECF 87, 88 (N.D. Cal. Feb. 12, 2016) (adopting protective order that required remote viewing of code with prohibition on copying or removing code).

In light of this reality, the OEMs here proposed a similar arrangement to provide the Attorney General (and her expert) sufficient access to the extremely sensitive source code information while ensuring that that code is appropriately protected. Auto Innovators offered to

make the requested files "available on a secured computer in a secured room without Internet access or network access to other computers." Queen Decl. Ex. D at 2. Although not permitted to copy or remove the documents for obvious reasons, the Attorney General's representatives would be permitted to view, search, and take notes about the files so that they could fully understand and analyze their contents.

After counsel for the Attorney General expressed a willingness to consider in-person inspections provided the details could be worked out, Auto Innovators worked diligently on the logistical details for just such an inspection. Queen Decl. ¶ 16. Right up to the very moment that the Attorney General announced its intention to file this motion, the Attorney General never conveyed an objection to the idea of that kind of inspection. *Id.* ¶ 19. The Attorney General's late-hour rejection and newfound insistence on treating this code as if it were ordinary discovery—a concept flatly rejected by federals courts—renders her request disproportionate to the needs of the case considering the highly sensitive nature of these files and the harm that would result from their dissemination.

The existing Protective Order was not designed to protect this type of code, since the parties did not contemplate the production of that type of software. Indeed, Auto Innovators' experts did not rely on these files for their opinions. In any event, other federal courts have imposed protective orders with special provisions when dealing with source code information. *See, e.g.*, Queen Decl. Ex. H at 14 (Protective Order from *In re Facebook Biometric Information Privacy Litigation*, providing reading room protocol). These additional protections exist because unfortunately data hacks, breaches, and inadvertent disclosures are now common—with even the largest companies and law firms falling victim. *See, e.g.*, Queen Decl. Ex. I (Chris Opfer, *Jones Day Hit by Data Breach as Vendor Accellion Hack Widens*, Bloomberg Law (Feb. 16, 2021),

https://news.bloomberglaw.com/business-and-practice/jones-day-hit-by-data-breach-as-vendor-accellion-hacks-widen; Alex Scroxton, *Security Firm Stormshield Loses Source Code in Cyber Attack*, Computer Weekly (Feb. 5, 2021), https://www.computerweekly.com/news/252495912/Security-firm-Stormshield-loses-source-code-in-cyber-attack).

Here, just having the files on the various computers of users still allowed to receive "Highly Confidential" documents pursuant to the Confidentiality Protective Order—including the Attorney General's office, the parties' various experts, Auto Innovators' external counsel, court personnel, and others—puts them at risk of hacking or inadvertent disclosure, transfer or access. In fact, just this past week, the Attorney General's counsel violated the Protective Order by sending a document designated as "Highly Confidential" to Auto Innovators' internal counsel, which is explicitly prohibited from viewing such documents. Queen Decl. ¶ 30. Although Auto Innovators' external counsel immediately informed the Attorney General's counsel of this issue (and instructed its client to delete the relevant document), the Attorney General's counsel sent the same "Highly Confidential" document to Auto Innovators' internal counsel again the very next day. *Id.* ¶ G. Mistakes happen. And when it comes to these files, the consequences would be devastating to the security of the Auto Innovator members' vehicles. *See* Baltes Decl. ¶¶ 4-5; FCA Decl. ¶ 5.

Moreover, the Attorney General's last-minute cutoff of any negotiation on this issue shows that the Attorney General's purported objections are unfounded. The COVID-19 pandemic is undoubtedly a significant public health concern, but it is not any more so now than it was weeks ago when Auto Innovators began discussing this idea with the Attorney General. Queen Decl. ¶ 16. As Auto Innovators explained at the time, all appropriate COVID-appropriate measures would be taken to ensure the safety of anyone present in the reading room. Queen Decl. ¶ 21. Further, consistent with parties' obligations to make reasonable accommodations, *see, e.g.*, *Sinceno v.*

13

*Riverside Church in City of N.Y.*, 2020 WL 1302053, at *1 (S.D.N.Y. Mar. 18, 2020), once the Attorney General objected, Auto Innovators attempted to work with her counsel to come up with a potentially viable alternative, all to no avail. Queen Decl. ¶ 25. The Attorney General rejected, for instance, MBUSA's proposal to have an electronic database that would be available remotely. *Id.* ¶ 26. Likewise, the Attorney General refused to provide any information about the software that its experts intend to use to search these files—software that the Auto Innovators members potentially could have made available for the experts to use in the proposed reading rooms. *Id.*

In short, the Auto Innovators members have legitimate concerns about the highly sensitive nature of their source code and the devastating consequences if that information is leaked. The Attorney General cannot simply disregard those concerns without explanation or justification. Accordingly, the Court should deny the Attorney General's motion to compel with respect to these documents. At most, the Court should require the parties to continue to work toward an appropriate secure inspection, and allow the Attorney General to supplement its expert reports after such in-person inspections are complete, rather than allowing the Attorney General to delay its expert reports indefinitely.

## II.     The Court Should Not Require the Production of Additional Documents from Toyota and Mercedes-Benz USA

Even discovery otherwise relevant is properly denied when it "is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). From TMNA, the Attorney General requests DBC/ARXML files, "security architecture diagrams, certificate policies, threat models, and reports from previous security reviews." Mot. 10. From MBUSA, the Attorney General requests "threat models, reports from previous security reviews, and possibly other documents that plaintiff's counsel is unable to identify." *Id.*

For starters, the Court should deny these requests because, as discussed, they are duplicative of information provided by other OEMs. In addition, the information is beyond the scope of the information that Toyota and Mercedes agreed to provide. And the Attorney General cannot compel production of any information that is controlled by their overseas parent companies.

### A.     The Requested Information is Beyond the Scope of the Company Witnesses' Testimony

OEM participation in this suit has always been voluntary, and the group of OEMs selected were meant to be a representative sample of Auto Innovators' members. At the outset of this case, the Court advised the parties of its view that information from a few manufacturers would be sufficient to develop the factual record, *see* Dec. 18, 2020 Hr'g Tr. at 17:3-7, and that the participation of more manufacturers would be unlikely to add new information, *see* Dec. 3, 2020 Hr'g Tr. 21:21–24 ("At a certain point I'd say, 'Give me your best three,' or something like that, unless someone has something new to say or there are insistent needs by a trade association to satisfy each of its constituents."). That is, the idea was never to have every manufacturer affected by the Data Law participate in every aspect of this challenge. Reflecting that guidance, Auto Innovators has endeavored to limit duplication of fact-witness testimony by designating particular manufacturers to speak to particular aspects of this case. And TMNA's and MBUSA's role in this case has been limited from the outset. Queen Decl. Ex. A (Auto Innovators' Initial Disclosures).

Given the much greater role that GM and FCA are taking in this case, and their fulsome productions on all aspects of vehicle cybersecurity, in comparison to the limited role for TMNA and MBUSA, the Attorney General's discovery requests from the latter are cumulative and disproportionate. The Attorney General has not attempted to explain why it needs sensitive cybersecurity information from either TMNA or MBUSA. And GM and FCA have already produced cybersecurity documents, including documents related to security architecture and

security reviews and analyses. Queen Decl. ¶ D. Likewise, GM, FCA, and MBUSA have all offered to make even more information available through a secure, "eyes only" review process that adequately accounts for the security concerns inherent with that information. Queen Decl. ¶20. The Attorney General has made no showing of why it needs additional information from TMNA or MBUSA. Moreover, Auto Innovators is not relying on information outside the enumerated scope of testimony offered by TMNA and MBUSA for purposes of trial in this matter.

With respect to TMNA, upon the Court's advice to streamline the case, TMNA conscientiously considered whether and how it would voluntarily participate in this case. Norton Decl. ¶ 8. But for the understanding that the scope of TMNA's involvement would be limited in accordance with the description of TMNA witness David Stovall in the Auto Innovators' Initial Disclosures, TMNA would not have voluntarily participated, in part precisely anticipating some of the issue in dispute today. *Id.* The Attorney General's superfluous requests to Toyota implicate highly sensitive, confidential, and proprietary information owned and controlled by TMNA's foreign parent TMC. *Id.* ¶ 5. TMC is not a member of the Auto Innovators; TMNA is; and TMC is not a party or consenting participant in this litigation. *Id.* ¶¶ 6, 7. Changing the scope of TMNA's voluntary participation at this stage would require TMNA to re-assess its voluntary participation in these proceedings. *Id.* ¶ 8.

It should not come to that—it is important to note that separate from the information that the Attorney General seeks to compel TMNA to produce, TMNA has provided ample discovery in accordance with the scope of the Initial Disclosures, and indeed, the Attorney General will depose TMNA's witness on April 13. Queen Decl. ¶ 5. As such, despite the Attorney General's current Motion, TMNA's participation adds a perspective on an important aspect of the case, apart from the duplicate discovery the current Motion seeks to extract.

Thus, the Court should deny the Attorney General's request as cumulative and permit TMNA's and MBUSA's participation in accordance with the scope of the Initial Disclosures. *See, e.g.*, *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 244 F.3d 189 (1st Cir. 2001) (denying deposition requests for additional company representatives when the requesting party had not shown that the additional representatives would contradict testimony from the two company representatives already deposed).

**B.     The Requested Information is Not in the Testifying Companies' Possession, Custody, or Control**

The Attorney General is not entitled to documents that TMNA and MBUSA have repeatedly informed her are not within their possession, custody, or control because they reside abroad in or are owned and controlled by foreign parent corporations—which are not members of Auto Innovators. Queen Decl. ¶¶ 11-12; Norton Decl. ¶¶ 4, 5-6; Grycz Decl. ¶ 7.

Although the Attorney General may not think so, *see* Mot. 13, corporate structure matters when it comes to discovery. A subsidiary is required to produce documents from a parent company only if the subsidiary has possession, custody, or control of that information. And a subsidiary has possession, custody, or control over its parent company's documents only if it has "the legal right to obtain the documents requested upon demand." *FM Generator, Inc. v. MTU Onsite Energy Corp.*, 2016 WL 8902603, at *3 (D. Mass. Aug. 25, 2016) (rejecting motion to compel domestic subsidiary to produce foreign parent company's documents because it did not have control over them) (quotation marks and citation omitted). Control is determined with reference to "the specific nature of the transactional relationship between the subsidiary and the parent company." *Id.* This includes whether the subsidiary and parent are alter egos, whether the subsidiary was acting as the parent's agent in the conduct giving rise to the lawsuit, whether the subsidiary "can secure documents of the principal-parent to meet its own business needs and documents helpful for use

in litigation," whether the subsidiary has "access to documents when the need arises in the ordinary course of business," and whether the "subsidiary was marketer and servicer of parent's product . . . in the United States." *Id.* It is the Attorney General's burden to make "a prima facie showing that" TMNA and MBUSA have control of their parent corporations' documents. *Id.* She has not even tried to do so.

Indeed, the Attorney General offers little more than conclusory claims that TMNA and MBUSA must have access to the requested documents. *See* Mot. 13-14. As to TMNA, the Attorney General says that TMNA is a subsidiary company that directs marketing, sales, engineering, and manufacturing in North America. *See id.* at 13. She also points to TMNA's affidavit in support of Auto Innovators' motion for preliminary injunction propositions that have nothing to do with what corporate entity has control over what documents. ECF No. 43 ¶¶ 4, 11.

TMNA does not own and control the documents the Attorney General has requested. TMNA does not control TMC's documents in the ordinary course of business, and TMC has not participated in this case to make these documents available itself. Norton Decl. ¶¶ 5, 7. Thus, the Attorney General's Motion seeks a remedy that TMNA cannot provide, and that, in effect, would force TMNA to reassess its voluntary participation in this case. *Id.* ¶ 8. Given the duplicative and cumulative nature of the Attorney General's request and TMNA's compliance in accordance with the scope of its disclosed witness in the Initial Disclosures, the Motion should be denied.

With respect to MBUSA, the Attorney General offers even less reason to think that MBUSA has possession, custody, or control of Daimler AG's documents in Germany. The Attorney General relies only on "common sense" that similar arguments apply to MBUSA. *See* Mot. 13 n.7. These unsupported claims are insufficient; the Attorney General has not met her burden of showing that MBUSA has possession, custody, or control over its parent company's

documents. *See Thomas & Betts Corp. v. New Albertson's, Inc.*, 2012 WL 12552276, at *3 (D. Mass. July 20, 2012) (denying motion to compel documents from plaintiff's subcontractor because defendant had provided "[b]are assertions without citations to factual or legal support").

MBUSA is an indirect subsidiary of Daimler AG. Grycz Decl. ¶ 3. MBUSA distributes and markets Mercedes-Benz vehicles in the United States, but Daimler AG is responsible for the vehicles' production. *Id.* ¶¶ 4, 5. There is no basis to require MBUSA to produce another corporation's documents. *See FM Generator*, 2016 WL 8902603, at *3 (noting that subsidiary corporations "have no right to order the parent corporation to turn over documents" and a finding of control over the documents is required). In fact, courts have found just such facts to be insufficient support for finding that an indirect subsidiary controls its indirect parent company's documents. *See Lindholm v. BMW of North America, LLC*, 2016 WL 452315, at *3-4 (D.S.D. Feb. 5, 2016) (finding that BMW of North America, LLC, an indirect subsidiary, did not have control over its parent's documents because the two companies lacked a sufficiently close relationship); *Seifi v. Mercedes-Benz U.S.A., LLC*, 2014 WL 7187111, at *3 (N.D. Cal. Dec. 16, 2014) (finding that MBUSA did not have a legal right to compel production of documents from Daimler). Thus, the Court should deny the Attorney General's demand that the subsidiary OEMs produce their parent corporation's documents.

## III.    The Court Should Not Require Further Production of Security Reviews

Finally, the Attorney General asks to compel production of additional security reviews that it thinks exist. Mot. 15. The Attorney General offers only unfounded speculation that GM and FCA have responsive security reviews that they have not produced. *Cf. In re New England Compounding Pharm., Inc. Prods. Liab. Litig.*, 2015 WL 13715287, at *2 (D. Mass. Feb. 26, 2015) ("Parties must disclose some relevant factual basis for their claim before requested discovery will be allowed.").

GM and FCA have worked diligently to respond to all of the Attorney General's discovery requests, and they have already produced—or offered to make available via the reading rooms— all the responsive documents they have located related to security reviews. *See also, e.g.*, *Judson v. Midland Credit Mgmt., Inc.*, 2014 WL 3829082, at *2 (D. Mass. Aug. 1, 2014) (noting that a party "cannot produce documents that it does not have or that do not exist"). Moreover, when the Attorney General's counsel raised concerns about the scope of their production, Auto Innovators' counsel agreed to conduct an additional search to determine whether additional responsive documents exist. Queen Decl. ¶ 27.

Instead of permitting Auto Innovators that additional time, the Attorney General filed this motion. But the Attorney General has not made any showing that any such documents have been inappropriately withheld. The Court should therefore deny the motion.

## CONCLUSION

For the foregoing reasons, Plaintiff Auto Innovators respectfully requests that the Court: (1) deny the Attorney General's Motion to Compel in its entirety; and (2) order the Attorney General to serve her expert witness disclosures by April 19, 2021.

Dated: April 13, 2021

Respectfully submitted,

ALLIANCE FOR AUTOMOTIVE INNOVATION

By its attorneys,

 /s/ Laurence A. Schoen
Laurence A. Schoen, BBO # 633002
Elissa Flynn-Poppey, BBO# 647189
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY, AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000

lschoen@mintz.com
eflynn-poppey@mintz.com

John Nadolenco (*pro hac vice*)
Daniel D. Queen (*pro hac vice*)
Erika Z. Jones (*pro hac vice*)
Eric A. White (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3000
jnadolenco@mayerbrown.com
dqueen@mayerbrown.com
ejones@mayerbrown.com
eawhite@mayerbrown.com

Charles H. Haake (*pro hac vice*)
Jessica L. Simmons (*pro hac vice*)
ALLIANCE FOR AUTOMOTIVE INNOVATION
1050 K Street, NW
Suite 650
Washington, DC 20001
Tel: (202) 326-5500
chaake@autosinnovate.org
jsimmons@autosinnovate.org

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on April 13, 2021.

/s/ Laurence A. Schoen
Laurence A. Schoen