UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION, <br><br> Plaintiff, <br><br> vs. <br><br> MAURA HEALEY, Attorney General of the Commonwealth of Massachusetts, in her official capacity, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) )   C.A. No. 20-12090-DPW |

NOTICE REGARDING
AMERICAN LAW INSTITUTE
ADOPTION OF PRINCIPLES
<u>REGARDING DATA RIGHTS</u>
May 24, 2021

At its ongoing virtual 2021 Annual Meeting this Spring, the membership of the American Law Institute earlier this month approved Tentative Draft No. 2 (April 28, 2021) of the "ALI-ELI Principles for a Data Economy – Data Rights and Transactions."  The project is a joint undertaking of the ALI and the European Law Institute ("ELI"), which is described in the May 18, 2021 ALI press release announcing ALI approval as, "much like the ALI, [] a membership-based independent nonprofit organization with the mission of providing guidance on legal developments."  The overall project is described in the press release as proposing "a set of principles that might be implemented in any kind of legal environment, and are designed to work in conjunction with any kind of data privacy/data protection law, intellectual property law, or trade

secret law, without addressing or seeking to change any of the substantive rules of these bodies of law."

The approval by the ALI membership at the annual meeting results in treatment of Tentative Draft No. 2 as expressing the position of the ALI, subject to the editorial prerogative of the Reporters to revise, update and correct any non-substantive matters not agreed to by the Membership. The Tentative Draft may be cited in opinions or briefs as the most current statement of the ALI's position on the subject in accordance with Bluebook rule 12.9.4. Under ALI protocols the Reporters, subject to oversight by the ALI Executive Director, now will prepare the ALI's official text for publication. According to the press release "[t]he ELI is scheduled to vote on this project later this year. We hope that a single draft will be approved on both sides of the Atlantic. But for any Principles for which agreement of this sort cannot be reached, there will be different ALI and ELI versions."

The attention of the parties is directed to Principle 24, "Justification for data rights and obligations," together with its commentary and reporter's notes appearing at pages 166-174 of Tentative Draft No. 2, a copy of which is attached hereto as Exhibit A. The Reporters note that "[d]ata rights for the public interest have not developed extensively in the United States," identifying as an exception federal legislation "mandating some form of public access to governmental data." *Id.* at 170. The Reporters further note that "[l]egislation mandating data rights with respect to private data has been less common. One exception relates to auto repair data," referencing Massachusetts General Laws

Chapter 93K.  *Id.*  The Reporters then set forth the Secretary of State's summary of the 2020 ballot initiative at issue in this case, observing that the "new law is the subject of a lawsuit by the 'Alliance for Automotive Innovation' seeking to enjoin enforcement on preemption and takings grounds."  *Id.* at 171.

          ***/s/ Douglas P. Woodlock*_____**
          DOUGLAS P. WOODLOCK
          UNITED STATES DISTRICT JUDGE

27         **Chapter C: Data Rights for the Public Interest and Similar Interests**

28         **Principle 24: Justification for data rights and obligations**

29   **(1) The law should afford data rights for the public interest, and for similar reasons**
30   **independent of the share that the party to whom the rights are afforded had in the**
31   **generation of the data, only if the encroachment on the controller's or any third party's**
32   **legitimate interests is necessary and proportionate to the public interest, or similar**
33   **interest, pursued.**

34   **(2) Paragraph (1) is not intended to address intergovernmental relations.**

35   **(3) The proportionality test referred to in paragraph (1) should apply also for determining**
36   **the specifications or restrictions of data rights, such as concerning data formats, timing,**

© 2017-2021 by the American Law Institute and the European Law Institute
Tentative Draft – not approved

**data security, further support required for exercise of the right to be fully effective, and remuneration to be paid.**

**(4) If the law does not afford a data right but imposes a functionally equivalent data sharing obligation, the Principles under this Chapter apply with appropriate adjustments.**

**Comment**: *a. Data rights motivated by the public interest.* Principle 24 refers to data rights that are not based on the share that a party had in the generation of the data. A data right, in particular a data access right, is conferred on a person that has no specific relationship with the way the data was generated (i.e., the person is not the subject of the information and has not produced or assembled the data). The type of data right addressed in Principles 24 to 27 is, therefore, of a very different nature from the rights addressed under Chapter B. While the rights provided in Chapter B are clearly of a private law nature and follow something like a 'property logic', the rights addressed in Chapter C are more of a public law nature. In practice, they are almost exclusively about data sharing, i.e. data rights within the meaning of Principle 16(1)(a), but could theoretically also include other types of data rights.

**Illustration:**

109. Farmer F has purchased a connected tractor, manufactured by M. After an engine breakdown, F wants to have his tractor repaired at independent repair shop R. To repair the tractor, R needs access both to data generated by the tractor while it was used by F and to other data held by M to adjust the engine correctly. F himself would definitely have a right under Chapter B to access the former data as it has been co-generated by F (cf. Principle 20(1)(a)), and arguably also a right to access the latter data, taking into account that this is further support required to make access to the co-generated data fully effective (cf. Principle 19(3)). However, in order for independent repair shops like R to fulfil their function properly it is not sufficient to give just F an individual right to access data relating to F's tractor—rather, R needs more general access to such data held by M, e.g. in order to train and prepare for such types of repair. If the law affords such access to R, this access is governed by the Principles under Chapter C, because R did not share in the generation of the data.

© 2017-2021 by the American Law Institute and the European Law Institute
Tentative Draft – not approved

*Chapter C: Data Rights for the Public Interest and Similar Interests*

Data rights within the meaning of Chapter C frequently overlap with competition law, which primarily serves the purpose of ensuring undistorted competition for the benefit of everyone, and may result in particular private parties having a data right against, for example, another party with a dominant market position. There may be many other public interest considerations that can lead a legislator to afford data rights of the sort addressed in this Chapter, such as enhancement of research and development, more efficient use of research money and reduction of unnecessary testing by imposing an obligation to share research data and results. There is also a growing debate about the extent to which controllers of data can be forced to share certain data with actors in the public services sector, such as in the health, mobility and energy sectors. Given the variety of public interests potentially at stake, these Principles do not give specific guidance as to the circumstances under which such data sharing obligations may be imposed. Rather, these Principles restrict themselves to guidance concerning some core aspects which need to be taken into account when a decision to impose such data sharing obligations or similar obligations has been made. In order to avoid any unnecessary debate as to what constitutes a 'genuinely public' interest and what kind of public interest decisions that also tend to protect particular private parties are covered, these Principles clarify that they apply also to data rights afforded to 'similar interests'.

*b. Justification for encroachment.* The main purpose of Principle 24 is to clarify that the affording of such data rights and the imposition of such data obligations amounts to an interference with the interests of private parties and is thus in need of justification. In contrast, data rights and data obligations under Chapter B may be seen simply as an attempt by the law to strike the right balance between competing private interests. In deciding whether to afford data rights under Principle 24, the public interest needs to be carefully weighed against the interests of the controller, which may even be protected by fundamental rights. Data rights for the public interest may not only encroach on the rights of the controller but also affect the protected interests of other parties, such as data subjects (in the case of personal data) or the holders of IP rights (where the data is IP protected). Their interests must also be duly taken into account when granting data rights for the public interest. In the light of all these conflicting interests, the data right must be necessary to achieve the objective and must be a proportionate means.

© 2017-2021 by the American Law Institute and the European Law Institute
Tentative Draft – not approved

*c. Limited need for justification for open data in the public sector.* The considerations in paragraph (1) relate primarily to governmental decisions to afford data rights against controllers in the private sector. In the light of the complexities of intergovernmental relationships, paragraph (2) provides that paragraph (1) does not address data rights as against a controller in the public sector. A governmental decision to afford data rights against a data controller in the public sector raises fewer issues than a decision to afford such rights against a data controller in the private sector because, in the latter case, there is interference with economic rights of the controller while there may not be such interference with economic rights in the case of public entities. It is often a purely political consideration whether making public sector data freely available is a reasonable way of helping the economy and spending the taxpayers' money. Of course, if the controller is a public entity and the data it controls are personal data or other data affecting legitimate interests of third parties (such as those referred to in Principle 28), these third party interests still need to be fully protected.

*d. Application of the proportionality test to modalities.* In line with Principle 19(3), Principle 24(3) clarifies that the proportionality test applies not only to whether or not a right should be afforded and/or an obligation imposed, but also to any specifications or restrictions, such as concerning data formats, mode of access, timing, data security, further support required for exercise of the right to be fully effective, and remuneration to be paid. In particular, remuneration of the controller or other affected parties may be needed to make the imposition of an obligation a proportionate measure.

**Illustration:**

> 110. Assume that the law grants independent repair shops, such as R in Illustration no. 109, a data access right against the controllers of vehicle data such as M. In granting the right, the law should make adequate provision for M's legitimate interests, such as concerning protection of trade secrets, as well as the legitimate interests of third parties, such as the trade secrets of any suppliers of components or, if the aggregated vehicle data allows inferences with regard to other customers, the privacy and secrecy concerns of other customers. This may mean that R should not be afforded a right to access all tractor-related data on M's servers, but only to data that is necessary for R to fulfil its functions, and data may need to be pre-processed so as not to allow inferences on other customers or disclosure

© 2017-2021 by the American Law Institute and the European Law Institute
Tentative Draft – not approved

of trade secrets. Given also that R is acting for commercial purposes it may be appropriate for the law to allow M to charge a reasonable fee.

*e. Functionally equivalent data sharing obligations.* Data rights afforded without regard to a party's share in the generation of the data are mostly data rights afforded for the public interest. Nothing in Principle 24 excludes the possibility that such data rights are afforded also with a view to the protection or promotion of private interests, but it is much more common that private parties are just the incidental beneficiaries of data rights, while the data rights were primarily afforded for the public interest. This becomes all the more apparent in cases where the law primarily imposes an obligation on the controller of data to share data with a particular class of parties, should these parties be interested in the data, or even with the general public. Paragraph (4) therefore states that the Principles under Chapter C apply with appropriate adjustments where the law does not focus on the right, but instead on a functionally equivalent obligation.

**Illustration:**

111. In order to aid independent repair shops like R in Illustration no. 109 in fulfilling their function, the law may either give repair shops like R an individual access right against data controllers like M, or impose an obligation on M to make tractor data available on some kind of platform, usually for a specific class of parties (i.e. independent repair shops like R), with failure to comply with this obligation triggering primarily sanctions under administrative law.

**REPORTERS' NOTES:**

**U.S.:**

Data rights for the public interest have not developed extensively in the United States. One exception to this generalization is legislation mandating some form of public access to governmental data. On the federal level, see the Open, Public, Electronic, and Necessary Government Data Act, Pub.L. 115–435, Title II, Jan. 14, 2019, 132 Stat. 5534. On the local level, see, e.g., New York City Local Law 11 of 2012 and subsequent implementing legislation.

Legislation mandating data rights with respect to private data has been less common. One exception relates to auto repair data. See Mass. General Laws 93K, § 2 (providing for access by owners of motor vehicles and by independent repair facilities to motor vehicle manufacturer diagnostic and repair information and diagnostic repair tools otherwise made available to dealers). More recently, by ballot initiative in 2020, Massachusetts voters approved Question 1, which augments Chapter 93K. The summary of the initiative provided in part that:

© 2017-2021 by the American Law Institute and the European Law Institute
Tentative Draft – not approved

This proposed law would require that motor vehicle owners and independent repair facilities be provided with expanded access to mechanical data related to vehicle maintenance and repair.

Starting with model year 2022, the proposed law would require manufacturers of motor vehicles sold in Massachusetts to equip any such vehicles that use telematics systems –- systems that collect and wirelessly transmit mechanical data to a remote server –- with a standardized open access data platform. Owners of motor vehicles with telematics systems would get access to mechanical data through a mobile device application. With vehicle owner authorization, independent repair facilities (those not affiliated with a manufacturer) and independent dealerships would be able to retrieve mechanical data from, and send commands to, the vehicle for repair, maintenance, and diagnostic testing.

Under the proposed law, manufacturers would not be allowed to require authorization before owners or repair facilities could access mechanical data stored in a motor vehicle's onboard diagnostic system, except through an authorization process standardized across all makes and models and administered by an entity unaffiliated with the manufacturer.

The proposed law would require the Attorney General to prepare a notice for prospective motor vehicle owners and lessees explaining telematics systems and the proposed law's requirements concerning access to the vehicle's mechanical data. Under the proposed law, dealers would have to provide prospective owners with, and prospective owners would have to acknowledge receipt of, the notice before buying or leasing a vehicle. Failure to comply with these notice requirements would subject motor vehicle dealers to sanctions by the applicable licensing authority.

Massachusetts Secretary of State, "2020 Voter Guide."

The new law is the subject of a lawsuit by the "Alliance for Automotive Innovation" seeking to enjoin enforcement on preemption and takings grounds. See United States District Court for the District of Massachusetts, Case 1:20-cv-12090 Document 1 Filed 11/20/20.    See also https://www.vice.com/en/article/93wy8v/newly-passed-right-to-repair-law-will-fundamentally-change-tesla-repair;   https://www.eff.org/deeplinks/2015/01/who-will-own-internet-things-hint-not-users

**Europe:**

The European Union has already introduced several sector-specific instruments that grant access rights to parties who have not contributed to the generation of the data. Since these access rights need to be not only justified by a public interest but also necessary and proportionate, they are limited to certain situations where the European legislator deemed the public interest to outweigh the interest of the controller, and only cover data that is necessary to achieve the objective pursued. Political consensus may develop for the adoption of additional data rights for the public interest.

One of the most prominent examples for an access right against the controller by a party that has not contributed to the generation of the data, is in the Type Approval Regulation (Regulation (EU) 2018/858). Article 61 obligates car manufactures to grant independent

© 2017-2021 by the American Law Institute and the European Law Institute
Tentative Draft – not approved

maintenance and repair service providers access to the technical information necessary to perform their services in a non-discriminatory way for fees that are reasonable and proportionate. The rationale of this access right is that, due to the complexity of today's vehicles, independent repair service providers, as well as spare part producers, can only offer their services and products if they have access to the necessary technical information. Since the access right of the independent service providers interferes with the contractual freedom of car manufacturers as well as their freedom to conduct business (Article 16 Charter of Fundamental Rights), it needs to be justified by a legitimate public interest. In this case, the public interest is to prevent a market failure on the aftermarket, which would lead to higher prices, lower quality of services, less innovation, and less choice for consumers. The market failure tendencies in the aftermarket in the automotive sector have been a longstanding issue. Car manufactures try to forestall effective competition by denying access to brand-specific technical information in order to promote authorized dealers and repairers, which have proven to be very profitable for the manufacturers. However, by allowing the manufacturers to charge a reasonable fee for the access, the Type Approval Regulation also takes into account the legitimate interest of manufacturers to receive a fair return on their investment. The Type Approval Regulation serves as an example for an instrument that primarily aims at promoting a public interest (functioning aftermarket), although the access right is afforded only to a handful of the private parties (independent repair and maintenance service providers), who thus of course also benefit from the access right.

The public interest that justifies an access right may be something other than a functioning market, as demonstrated by the REACH Regulation (Regulation (EC) No 1907/2006). Article 27 gives a manufacturer seeking to register a chemical substance (registrant) a right against manufacturers, who have already registered such a substance to access their testing data for tests of the substance on animals. The rationale is to avoid unnecessary duplication of tests that have a significant impact on our environment and cause unnecessary harm to animals (Recital 40). The initial registrants shall receive a fair, transparent and non-discriminatory compensation for making the testing data available to the potential registrant.

Data access rights may also follow from general doctrines of competition law. The basic line of reasoning is that the aggregation of large datasets in the hands of a single market player may constitute an abuse of a dominant position and would thus justify an interference with the rights of the data holder for the benefit of the general public. In Europe, there is an extensive debate as to whether this result can be achieved with the existing doctrines of competition law (for an overview see Wolfgang Kerber, Updating Competition Policy for the Digital Economy?, 2019). The most promising candidate is the so called 'essential facilities doctrine' (EFD), as it is designed to address cases where a dominant market player refuses without objective justification to grant access to a resource that is essential for a downstream market and thereby eliminates effective competition. As the name suggests, the test was originally developed for cases of denied access to physical facilities, such as ports. Later, the notion was expanded to cases where access to information was denied based on IP- rights. With data being digitized information, the EFD seems to be very fitting for cases of denied access to data. However, a closer look reveals that the requirements which have been developed by the CJEU cannot easily be applied to situations of denied access (Heike Schweitzer, Justus Haucap, Wolfgang Kerber and Robert Welker, Modernisierung der Missbrauchsaufsicht für marktmächtige Unternehmen, 2018, p. 131 ff.; Jacques Crémer, Yves-Alexandre de Montjoye and Heike Schweitzer, Competition policy for the digital era, 2019, p. 98 ff.; Furmann et al., Unlocking digital competition, Report for the Digital Competition Expert Panel, 2019, pp. 55 ff). Thus, some authors argue for a 'fresh' balancing of interests without regard to the established confines of the EFD (Jacques Crémer, Yves-Alexandre de Montjoye and Heike

© 2017-2021 by the American Law Institute and the European Law Institute
Tentative Draft – not approved

Schweitzer, Competition policy for the digital era, 2019, p. 98 ff). However, the main weaknesses of competition law are its intervention threshold and intervention time. It is even in highly concentrated markets, such as the markets for cloud service providers or B2C market platforms, very difficult to prove the existence of a dominant market position under Article 102 TFEU. Furthermore competition law enforcement is time consuming and the relevant market would be fundamentally transformed or potential innovative business models would have disappeared before an ad-hoc competition case decision is validly taken and implemented (see Dirk Staudenmayer, Towards a European Private Law of the Digital Economy?, in André Janssen and Hans Schulte-Nölke (eds.), Researches in European Private Law and Beyond, 2020, p. 65, 84 ff). This is why it has been argued that ex post competition law enforcement should be complemented with ex ante regulation to prevent market tipping, ensure market contestability and stimulate innovation (see Bertin Martens et al, JRC Digital Economy Working Paper 2020-05, Business-to-Business data sharing: An economic and legal analysis, 2020, p. 35 ff).

Public interests play an even more significant role in B2G data sharing relationships. Access to data is crucial when dealing with the growing number of societal challenges such as climate, change, natural disaster, urban planning or pandemics. One of the objectives the European Commission plans to take forward in its Data Act (2021) is – besides the support of B2B data sharing – to foster B2G data sharing for the public interest, especially in the light of the recommendations of the report of the Expert Group on B2G Data Sharing (COM(2020) 66 final, p. 12). In its final report, the Expert Group recommended the creation of an EU regulatory framework providing a minimum level of harmonisation for B2G data-sharing processes (High-Level Expert Group on Business-to-Government Data Sharing, Towards a European strategy on business-to-government data sharing for the public interest – final report, 2020, p. 41 ff.). The Expert Group's proposed data-sharing requirements have some significant overlaps with the approach chosen in Principles 24 ff. One of the main features the two approaches have in common is their flexibility. The framework of the Expert Group should also apply without prejudice to the applicable legal frameworks, e.g. for personal and non-personal data, and should further allow Member States to choose rules compatible with their legislation or applicable to the specific sector.

The obligation to share data in the public sector is also discussed under 'open government data' or 'public-sector information'. The sharing of data between public bodies and private enterprises (open government data) is regulated in the Open Data Directive (Directive (EU) 2019/1024) for EU institutions. Regarding research data, the OECD stated in 2006 that openness means 'access on equal terms for the international research community at the lowest possible cost, preferably at no more than the marginal cost of dissemination' (see OECD, Recommendation of the Council concerning Access to Research Data from Public Funding, 2006, III.B.). Most definitions of open data beyond research data include non-discriminatory access, costs of access, and – in some cases –redistribution (see OECD, Enhancing Access to and Sharing of Data: Reconciling Risks and Benefits for Data Re-use across Societies, 2019, p. 41 f.). A prominent example of a definition of open data can be found in the International Open Data Charter, which defines open data as 'digital data that is made available with the technical and legal characteristics necessary for it to be freely used, re-used and redistributed by anyone, anytime, anywhere' (International Open Data Charter, https://opendatacharter.net/principles/). See further Reporters' Notes to Principle 25.

Justification plays a completely different role with regard to open government data. Rather than look for a justification why open government data should be shared, governments need to justify why data should not be shared (see Principle 1 of the International Open Data Charter, https://opendatacharter.net/principles/). This is often simply expressed with the term 'open by

© 2017-2021 by the American Law Institute and the European Law Institute
Tentative Draft – not approved

1 default', which is a general recognised principle of open government data (see Principles 1 and 3
2 of the G8 Open Data Charter signed at the G8 Summit on 18 June 2013; Recital 16 of Directive
3 (EU) 2019/1024). Typical exemptions to this rule are security or data protection concerns. See
4 further Reporters' Notes to Principle 26.

© 2017-2021 by the American Law Institute and the European Law Institute
Tentative Draft – not approved