**PROPOSED FINDINGS OF FACT DESIGNATED AS CONFIDENTIAL**
**WITH PORTIONS DESIGNATED HIGHLY CONFIDENTIAL (AS HIGHLIGHTED)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION<br><br>        Plaintiff,<br><br>    vs.<br><br>MAURA HEALEY, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS in her official capacity,<br><br>        Defendant. | C.A. No. 1:20-cv-12090-DPW |

**PLAINTIFF'S SUPPLEMENTAL PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

**Marked Response filed by**
**Defendant AG Healey:**

May 27, 2021

/s/ Eric A. Haskell
Robert E. Toone, BBO No. 663249
Eric A. Haskell, BBO No. 665533
Phoebe Fischer-Groban, BBO No. 687068
    Assistant Attorneys General
Christine Fimognari, BBO No. 703410
    Special Assistant Attorney General
One Ashburton Place
Boston, Mass.  02108
(617) 963-2855
eric.haskell@mass.gov

# **FINDINGS OF FACT**

6.



14.

19.



20. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████

   ██   █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

   ██   █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

23 











46.

52. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

    █   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

    █   ████████████████████████████████████████████

████████████████████████████████████████████████

    █   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

    █   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

57. 



























## CONCLUSIONS OF LAW

### Jurisdiction and Venue

1.    The Court has jurisdiction over the subject matter of the litigation pursuant to 28 U.S.C. §§ 1331 and 2201(a) because the claims at issue at trial (counts I and II of the Complaint) arise under (a) the National Traffic and Motor Vehicle Safety Act ("Vehicle Safety Act"), 49 U.S.C. § 30101 *et seq.*; (b) the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; and (c) the Supremacy Clause, U.S. Const. art. VI.

2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c).

### Associational Standing

3.    Auto Innovators has standing to bring this action on behalf of manufacturers.  "An association has standing to sue on behalf of its members [if]: (1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals." *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992) (discussing *Hunt v. Wash. State Apple Advert. Comm.*, 432 U.S. 333, 343 (1977)).

4.    It is undisputed between the parties that the first two factors for associational standing are met.  Auto Innovators' members, as manufacturers subject to the Data Law, have standing to sue in their own right to challenge that law.  *See, e.g.*, Data Law §§ 2, 3 (codified at Mass. Gen. L. §§ 2(d)(1), (f)) (discussing new "manufacturer" obligations); Findings of Fact ¶¶ 3-4 (discussing vehicle sales in Massachusetts).  And the interest that this suit seeks to vindicate is pertinent to the objectives for which Auto Innovators was formed.  Findings of Fact ¶¶ 1, 4; *see also, e.g.*, https://www.autosinnovate.org/about (discussing Auto Innovators' core purpose to

support cleaner, safer and smarter personal transportation that helps transform the U.S. economy, and sustain American ingenuity and freedom of movement).

5.  The third prong of associational standing is a prudential prong.  *United Food & Com. Workers Union Local 571 v. Brown Grp., Inc.*, 571 U.S. 544, 555-58 (1996).

6.  The third prong of standing is also satisfied here.  As the First Circuit has recognized, "just because a claim may require proof specific to individual members of an association does not mean the members are required to participate as parties in the lawsuit." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 306 (1st Cir. 2005).  This is particularly true when, as here, the remedy sought would "inure to the benefit" of all the association's members. *Id.*  Auto Innovators' members are aligned in their inability to comply with both the Data Law and federal law as well as in their cybersecurity concerns about harm that would come from an attempt to implement the Data Law.  *See, e.g.*, Findings of Fact ¶¶ 2-4, 5-16, 19-29, 33-37, 44-45, 52-63, 65-66, 73-80, 81-84, 91-95, 100, 102, 104-09, 111-14, 118-24, 126, 130; *see also Coll. of Dental Surgeons of Puerto Rico v. Conn. Gen. Life Ins. Co.*, 585 F.3d 33, 41 (1st Cir. 2009) (holding that there was associational standing even where adjudicating the claims "require[d] . . . evidence from individual" members, because the relief, if granted, would inure to the benefit of all members).

7.  The type of relief that Auto Innovators seeks on behalf of its members provides further support for associational standing.  Actions for "declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 261 F. Supp. 3d 99, 110 (D. Mass. 2017) (quoting *Camel Hair & Cashmere Inst. of Am. v. Associated Dry Goods Corp.*, 799 F.2d 6, 10 (1st Cir. 1986)), *aff'd* 980 F.3d 157 (1st Cir. 2020)).

**Burden of Proof**

8.     "The burden to prove preemption rests with [the p]laintiff."  *Consumer Data Indus.*

*Ass'n v. Frey*, 495 F. Supp. 3d 10 (D. Maine Oct. 8, 2020) (citing *Capron v. Office of Attorney*

*General of Mass.*, 944 F.3d 9, 21 (1st Cir. 2019)).

9.     There is no presumption against preemption for the claims that Auto Innovators

asserts.  The Supreme Court has held that preemption claims based on the Vehicle Safety Act are

to be considered under "ordinary pre-emption principles," without imposing any "special burden"

on a preemption claim.  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870 (2000); *see also, e.g.*,

*id.* at 888 (Stevens, J., dissenting) (taking issue with the majority's "rejection" of a "presumption

against pre-emption").  So, too, for preemption claims under the Clean Air Act and its

implementing regulations.  *In re Volkswagen "Clean Diesel" Mktg, Sales Practices, & Prods.*

*Liab. Litig.*, 959 F.3d 1201, 1213 (9th Cir. 2020) (applying "ordinary pre-emption principles" to

Clean Air Act preemption claim) (quoting *Geier*, 529 U.S. at 869), *petition for cert. pending*, No.

20-994 (U.S.).

**The Data Law**

10.     Under Massachusetts law prior to enactment of the Data Law, auto manufacturers

were already required to "provide access to their onboard diagnostic and repair information

system[s]" and that, to the extent any proprietary device were necessary to access the data on those

systems, to make that device "available to independent repair facilities upon fair and reasonable

terms."  Mass. Gen. L. ch. 93K, § 2(d)(1) (the 2013 so-called "Right to Repair Law").

11.     The Data Law goes well beyond those requirements through a series of

amendments, revisions, and additions to Chapter 93K of the Massachusetts General Laws.  *See*

*generally* Data Law (codified at Mass. Gen. L. ch. 93K, §§ 1, 2(d)(1), 2(f)-(h), 6).

A.      **New Definitions**

12.     Section 1 of the Data Law adds a new definition—"[m]echanical data"—that it defines to include "any vehicle specific data, including telematics system data, generated, stored in or transmitted by a motor vehicle used for or otherwise related to the diagnosis, repair or maintenance of the vehicle."  Data Law § 1 (codified at Mass. Gen. L. ch. 93K, § 1).

13.     "Mechanical data" includes some subset of vehicle "telematics" data (Data Law § 1 (codified at Mass. Gen. L. ch. 93K, § 1)) because that data is referenced directly in the law.  *See, e.g.*, *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, at 145 (D.C. Cir. 2006) (when words are used in the law itself, that "settle[s] the question" of the law's reach).

14.     "Mechanical data" also includes data beyond that necessary for vehicle diagnosis, repair, or maintenance by applying to data "*otherwise related to* the diagnosis, repair or maintenance of the vehicle."  Data Law § 1 (codified at Mass. Gen. L. ch. 93K, § 1) (emphasis added).  Courts confronted with the terminology "otherwise related to" in other contexts have observed that the effect is to create a "broadly worded" obligation that extends beyond the terms modified by that language.  *See, e.g.*, *Khan v. Parsons Global Servs.*, Ltd., 521 F.3d 421, 423 (D.C. Cir. 2008) (discussing an "otherwise related to" arbitration clause). The plain language of the definition of "[m]echanical data" is directed at data other than merely diagnosis data, repair data, or maintenance data, and must be read as such.  *See, e.g.*, *In re Rudler*, 576 F.3d 37, 44 (1st Cir. 2009) ("If the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (internal quotations omitted).

15.     Section 1 of the Data Law also introduces another definition to Massachusetts law—"[t]elematics system"—which it defines as "any system in a motor vehicle that collects information generated by the operation of the vehicle and transmits such information, in this

chapter referred to as 'telematics system data,' utilizing wireless communications to a remote receiving point where it is stored."  Data Law § 1 (codified at Mass. Gen. L. ch. 93K, § 1).

### B.    New Substantive Requirements

16.    Section 2 of the Data Law amends existing Massachusetts law to remove manufacturers' ability to control who is authorized to access their vehicle systems.  It mandates that "on-board diagnostic systems"—a term it does not define—"shall be standardized and not require any authorization by the manufacturer, directly or indirectly, unless the authorization system for access to vehicle networks and their on-board diagnostic systems is standardized across all makes and models sold in the Commonwealth and is administered by an entity unaffiliated with a manufacturer."  Data Law § 2 (codified at Mass. Gen. L. ch. 93K, § 2(d)(1)).

17.    By proscribing "*any* authorization by the manufacturer, *directly or indirectly*," Section 2 of the Data Law eliminates manufacturers from the process of authorizing access to vehicle diagnostic systems.  Data Law § 2 (codified at Mass. Gen. L. ch. 93K, § 2(d)(1)) (emphasis added).  The phrase "directly or indirectly" is yet another signal of a "broad" prohibition.  *Burley v. Comets Cmty Youth Ctr., Inc.*, 75 Mass. App. Ct. 818, 821 (2009) (quoting *N. Am. Expositions Co. Ltd. P'ship v. Corcoran*, 452 Mass. 852, 862 (2009)); *accord Manning v. Zuckerman*, 388 Mass. 8, 14 (1983) (describing "directly or indirectly" as "broad language") (internal quotations omitted).

18.    Section 2 of the Data Law also imposes a uniform standardization requirement for access to certain vehicle systems.  Data Law § 2 (codified at Mass. Gen. L. ch. 93K, § 2(d)(1)) (requiring either that "on-board diagnostic systems shall be standardized and not require any authorization by the manufacturer, directly or indirectly" *or* the "authorization system for access to vehicle networks and their on-board diagnostic systems is standardized across all makes and models sold in the Commonwealth").

19.     The Data Law is silent, however, on how such standardization across manufacturers (*i.e.* all makes and models in the entire motor vehicle industry) is to be achieved, as the Data Law neither references any such uniform standards nor establishes any process for such standards to be created.  *See generally* Data Law.

20.     "[V]ehicle networks" is not defined in the Data Law itself or in Chapter 93K.  *See generally* Mass. Gen. L. ch. 93K.  The term does not mean simply "on-board diagnostic systems," because it is referred to in the statute independently of those systems.  To conflate the two would run afoul of the rule to "avoid interpretations that render statutory language mere surplusage." *Maine Pooled Disability Tr. v. Hamilton*, 927 F.3d 52, 58 (1st Cir. 2019) (quoting *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 23 (1st Cir. 2018)); *Flemings v. Contributory Retirement Appeal Bd.*, 727 Mass. 374, 375 (2000) ("In interpreting statutes, none of the words of a statute is to be regarded as superfluous, but each is to be given its ordinary meaning without overemphasizing its effect upon the other terms appearing in the statute . . . .") (internal quotations and brackets omitted).

21.     The requirements in Section 2 of the Data Law apply retroactively to model year 2018 vehicles.  *See* Mass. Gen. L. ch. 93K, § 2(d)(1).

22.     The requirements in Section 2 of the Data Law became effective in December 2020. *See* Mass. Const. amends. art. 48, pt. V, § 1; *see also* Mass. Gen. L. ch. 54, § 112 (describing election-result certification process).

23.     Despite the Data Law's effective date, the parties agree that no means for compliance with Section 2 currently exists.  Findings of Fact ¶¶ 46, 90; Def.'s 2d Suppl. Resps. to Pl.'s 1st Set of Requests for Admission, at 3 (April 30, 2021) ("[T]he Attorney General further states that she is not aware of any existing 'authorization system for access to vehicle networks

and their on-board diagnostic systems' that is 'standardized across all makes and models sold in the Commonwealth and is administered by an entity unaffiliated with a manufacturer.'").

24.     Section 3 of the Data Law requires each manufacturer that "utilizes a telematics system" in any of its vehicles to equip any vehicle sold in Massachusetts with a novel "open access" vehicle telematics platform.  Data Law § 3 (codified at Mass. Gen. L. ch. 93K, § 2(f)). Vehicles using those systems must be equipped with "an inter-operable, standardized and open access platform across all . . . makes and models" "[c]ommencing in model year 2022." *Id.*

25.     An "open access platform" is not defined in the Data Law.  As commonly understood in the technical field, "open access" denotes without restriction.  *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1100-01 (N.D. Cal. 2015) (quoting *Opperman v. Path, Inc.*, No. C13–0453– JST, 2014 WL 1973378, at *21 (N.D. Cal. May 14, 2014)).

26.     Under Section 3, the "inter-operable, standardized and open access platform" required must be "directly accessible" by the vehicle owner through an (undefined) "mobile-based application" as well as by independent repair facilities.  Data Law § 3 (codified at Mass. Gen. L. ch. 93K, § 2(f)).

27.     The platform must also allow those parties "to send commands to in-vehicle components if needed for purposes of maintenance, diagnostics and repair."  Data Law § 3 (codified at Mass. Gen. L. ch. 93K, § 2(f)).

28.     Further, the platform must be "capable of securely communicating all mechanical data emanating directly from the motor vehicle via direct data connection to the platform," Data Law § 3 (codified at Mass. Gen. L. ch. 93K, § 2(f))—with "[m]echanical data" defined separately, as discussed above, to include any data "otherwise related to the diagnosis, repair or maintenance of the vehicle," including "telematics data," *id.* § 1 (codified at Mass. Gen. L. ch. 93K, § 1).

44

29.     The Data Law's reference to "a manufacturer of motor vehicles sold in the Commonwealth" (Data Law § 3 (codified at Mass. Gen. L. ch. 93K, § 2(f))) requires a nexus between the manufacturer and the sale in the Commonwealth.  A reading of the law that would impose on manufacturers regulatory obligations (and penalties) for vehicles later sold by third parties in the Commonwealth would require them to follow Massachusetts law for vehicles they sell, through dealerships, in other states.  That reading would raise serious constitutional concerns.  *See, e.g.*, *Oregon Waste Systems, Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994) ("Although phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to . . . burden the interstate flow of articles of commerce.").  Massachusetts law cannot "directly regulate[] . . . interstate commerce"  *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 578 (1986); *accord Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 69-70 (1st Cir. 1999) ("Massachusetts may not regulate conduct wholly beyond its borders."), *aff'd sub. nom.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).  To avoid that constitutional infirmity, the Data Law should be read to apply only to an initial sale of a vehicle from a manufacturer or its affiliated dealers to a consumer.  *See, e.g.*, *Commonwealth v. Gustafsson*, 370 Mass. 181, 190 (1976) ("It is well settled that a statute must be read so as to avoid constitutional doubts.").

30.     Despite the requirements in Section 3 "[c]ommencing in model year 2022," Data Law § 3 (codified at Mass. Gen. L. ch. 93K, § 2(f)), the parties agree that no means for compliance with Section 3 currently exist.  Findings of Fact ¶¶ 46, 101; Def.'s 2d Suppl. Resps. to Pl.'s 1st Set of Requests for Admission, at 3 (April 30, 2021) ("[T]the Attorney General further states that . . .

she is not aware of any platforms that meet the requirements of Section 3 of the 2020 Right to Repair Law that are currently commercially available . . . .").

31.     While an automaker may in theory be able to avoid falling under the scope of Section 3 of the Data Law by disabling the telematics systems of vehicles sold in the Commonwealth, doing so would not resolve the preemption issues created by Section 3.  By its plain terms, Section 3 requires manufacturers to deploy "an inter-operable, standardized and open access platform across all . . . makes and models" "[c]ommencing in model year 2022."  Data Law § 3 (codified at Mass. Gen. L. ch. 93K, § 2(f)).  And Section 3 then applies that requirement to "a manufacturer of motor vehicles sold in the Commonwealth . . . that utilizes a telematics system."  *Id.*  Manufacturers that utilize a telematics system thus constitute the regulated entities under the Data Law.  It is well-established that, in assessing whether state law requirements are preempted, a regulated entity's ability to avoid the state law's requirements by ceasing the business operations that make it a regulated entity under that law in the first place play no part in the preemption analysis.  *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 487-88 (2013) (holding that an "actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability").  "Indeed," the Court observed, "if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be all but meaningless."  *Id.* (citation omitted).

### C.     Enforcement Provisions and Other Requirements

32.     Section 4 of the Data Law directs the Attorney General "to establish for prospective vehicle owners a motor vehicle telematics system notice" that certain classes of dealerships would have to provide to prospective owners.  Data Law § 4 (codified at Mass. Gen. L. ch. 93K § 2(g)). The Attorney General has not yet issued the notice required under Section 4, and has informed the

Court that she does not intend to do so until after the Court rules on the preemption claims now before the Court.

33.     Section 5 of the Data Law imposes a broad range of penalties for violators.  It permits vehicle owners and independent repair shops to sue auto manufacturers for violations of the statute and recover treble damages or a minimum penalty of $10,000 per event.  Data Law § 5 (codified at Mass. Gen. L. ch. 93K § 6(e)).

34.     It also grants the Attorney General of the Commonwealth broad enforcement authority, subjecting manufacturers to "any remedy authorized by chapter 93A" of the Massachusetts General Laws.  Data Law § 5 (codified at Mass. Gen. L. ch. 93K § 6(e)).  That means that if an auto manufacturer were to be unable to develop the data access systems required by the Data Law, the Commonwealth could seek injunctive relief against it, *see id.* ch. 93A, § 2(c), up to and including exclusion from the Massachusetts auto market entirely, *id.* § 8.

### Conflict Preemption

35.     The U.S. Constitution's Supremacy Clause "makes the laws of the United States 'the supreme Law of the Land; any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'"  *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1297 (2016) (quoting U.S. Const. art. VI, cl. 2).  In other words, "[p]ut simply, federal law preempts contrary state law." *Id.*

36.     The concept of preemption rests on the notion of federal supremacy in our federalist system.  Despite solicitude for certain "state complementary action," matters impacting interstate commerce are lodged decidedly in the federal domain.  Thomas Reed Powell, *Vagaries & Varieties in Constitutional Interpretations* 176 (2002); *see also id.* at 164 ("[I]t is well to remember that in our constitutional federalism it is Congress and not the states which have power over interstate commerce because it is interstate commerce.  Such powers as the states enjoy over such commerce

derive *aliunde*, and the fact that interstate commerce is thereby regulated is a hurdle or a barrier rather than a justification.  The judgment as to the height of the barrier and as to the desirability of being permitted to surmount it is not a judgment that the state is free to make as it chooses.").

37.     Given the regulatory environment at issue here, the burden is on the Attorney General to point to a particular law that authorizes the Commonwealth to regulate the electronic architecture the country's automotive industry uses to protective safety- and emissions-critical vehicle systems.  *See, e.g.*, Powell, *supra* at 163-64 (discussing the interplay between federal and state regulation).  It is difficult to imagine a more national project.  After all, as courts have observed in other contexts, "motor vehicles are the quintessential instrumentalities of interstate commerce."  *United States v. Bishop*, 66 F.3d 569, 588 (3d Cir. 1995); *accord United States v. McHenry*, 97 F.3d 125, 126 (6th Cir. 1996).

38.     It is "beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights."  *Shaw v. Delta Airlines*, 463 U.S. 85, 96 n.14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."); *accord Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 642 (2002) ("We have no doubt that federal courts have jurisdiction under § 1331 to entertain [preemption suits]."); *Local Union No. 12004 United Steelworkers of Am. v. Massachusetts*, 377 F.3d 64, 74-75 (1st Cir. 2004) (discussing the continuing vitality of *Shaw*).

39.     One species of preemption is conflict preemption.  *Hughes*, 136 S. Ct. at 1297.  Conflict preemption occurs when "compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment of the full purposes and objectives

of Congress." *Town of Acton v. W.R. Grace & Co.*, No. 13–12376–DPW, 2014 WL 7721850, at *9 (D. Mass Sept. 22, 2014) (quoting *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 472 (1st Cir. 2009)).

40.     The Court in *Geier* set forth the standard for analyzing conflict preemption.  529 U.S. at 870.  It looks to whether, "under the circumstances of th[e] particular case," the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress—whether that 'obstacle' goes by the name of 'conflict to; contrary to; . . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference,' or the like." *Id.* at 873 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

41.     Conflict preemption analysis looks beyond express statutory language to the "purposes and intended effects" of federal law.  *Comm'ns Imp. Exp. S.A. v. Rep. of the Congo*, 757 F.3d 321, 326 (D.C. Cir. 2014) (internal citations omitted).

42.     Thus, "federal law may preempt state law even if the conflict between the two is not facially apparent—as when, for example, the federal and state laws govern different subject matters." *Comm'ns Imp.*, 757 F.3d at 326.  The critical question is whether the state law serves "as an obstacle to the accomplishment and execution" of important "federal objectives," *Geier*, 529 U.S. at 881, or renders it impossible to comply with both state and federal law, *see, e.g.*, *Weaver's Cove*, 589 F.3d at 472.

43.     Plaintiff has demonstrated by a preponderance of the evidence two independent bases through which the Data Law is preempted by the Vehicle Safety Act.

**The Data Law Conflicts with the Purposes and Objectives of the Vehicle Safety Act**

44.     The Data Law conflicts with the purposes and objectives of the Vehicle Safety Act.

45.     Under the authority of the Motor Vehicle Safety Act, the Secretary of Transportation, acting through NHTSA, acts to safeguard the public through education, research, safety standards, and enforcement.  49 U.S.C. § 30101, *et seq.*

46.     The Vehicle Safety Act confers twin authorities on NHTSA for the purpose of protecting the safety of motor vehicles.  One is the authority to issue and enforce FMVSSs for new vehicles and equipment.  49 U.S.C. § 30111.  FMVSSs issued pursuant to that section expressly preempt inconsistent state or local laws.  *Id.* at 30103(b).  But the statute also directs NHTSA to require manufacturers to issue notification and remedy campaigns—commonly called recalls—to address and remediate safety-related defects arising in vehicles.  *Id.* §§ 30118-120.  The Act requires manufacturers to initiate recalls when either NHTSA or the manufacturer identify a defect, *id.* §§ 30118(a), 30120(a), and also authorizes NHTSA to order a recall if the manufacturer does not commence one, *id.* § 30118(b)(2).

47.     <u>NHTSA achieves its agency objectives through its exercise of these twin authorities.</u>  As NHTSA recently noted, the "[Vehicle] Safety Act defines 'motor vehicle safety' as 'the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle.'"  85 Fed. Reg. 83143, 83150 (Dec. 21, 2020) (quoting 49 U.S.C. 30102(a)(9)).  That "common term"—vehicle safety—"is the driving force behind both FMVSS-setting and defect determinations, act[ing] to link NHTSA's execution of its authorities against unreasonable safety risks inherently, both in setting FMVSS and in overseeing the safety of vehicle design, construction, and performance."  *Id.*

48.     An important part of NHTSA's oversight authority is ensuring that any safety-related defects are remedied, through vehicle recalls if necessary.  49 U.S.C. § 30118-120. Manufacturers also have a statutory obligation to monitor safety and notify NHTSA of any safety-related defects.  *E.g.*, *id.* § 30118(c).  If NHTSA determines that a recall is required to remedy a condition under the Vehicle Safety Act, a state is preempted from requiring the manufacturer to create or maintain the vehicle condition giving rise to the recall because, under such circumstances, it would be impossible to comply with both the Vehicle Safety Act and the state law.  *See, e.g.*, *id.* § 30118(b) (lodging in the Secretary of the U.S. Department of Transportation—and through him or her, NHTSA—the authority to "decide" whether a "defect" is "related to motor vehicle," and providing that the Secretary "shall order the manufacturer" to remedy any such defect).

49.     Put simply, if NHTSA concludes that a particular condition is a "defect related to motor vehicle safety," 49 U.S.C. 30118(b)(1), federal law requires the manufacturer to conduct a recall to fix the condition giving rise to that defect, *see id.* §§ 30119-120.

50.     NHTSA buttresses its oversight authority by taking proactive steps to prevent the need for recalls in the first place.  To that end, NHTSA occasionally publishes guidance for the automotive industry that it regulates on the agency's interpretation of the term "defect related to motor vehicle safety," 49 U.S.C. § 30118(b)(1), as that term applies in particular contexts or to particular conditions.  A few years ago, for example, NHTSA issued guidance confirming that, if an aftermarket software update creates or introduces an unreasonable safety risk to motor vehicle systems, "then that safety risk constitutes a defect compelling a recall."  NHTSA, *Enforcement Guidance Bulletin*, 81 Fed. Reg. 65705, 65709 (Sept. 23, 2016).

51.     Following on the heels of NHTSA's September 2016 notice to the industry that it considers software problems as potentially constituting defects that would need to be remedied

under the Vehicle Safety Act, NHTSA released its October 2016 *Cybersecurity Best Practices for Modern Vehicles* to provide further guidance in this burgeoning area.  *See* NHTSA Cybersecurity Best Practices 5 (discussing NHTSA's intent to encourage "proactively adopting and using available guidance such as this document and existing standards and best practices).

52.     Guidance like this allows NHTSA to react nimbly to the evolution of cybersecurity threats and buttresses NHTSA's promulgation of formal safety standards, which recognize that vehicles increasingly depend on sophisticated technology to control essential functions.  *See, e.g.*, 49 C.F.R. § 571.126 (mandating minimum safety standards for electronic stability control systems in lightweight passenger vehicles, which controls among other things vehicle steering, braking, and speed by computer means).

53.     Although agency guidance does not itself have preemptive effect, the Supreme Court has recognized that an agency's views are highly probative in determining preemption because the agency "is likely to have a thorough understanding of its own regulation and its objectives and is uniquely qualified to comprehend the likely impact of state requirements." *Geier*, 529 U.S. at 883.  And agency guidance provides insight into what an agency views its purposes and objectives to be.  *See, e.g.*, *Altra Grp., Inc. v. Good*, 555 U.S. 70, 89 (2008) (considering FTC policy guidance but after reviewing it concluding that "the FTC has no longstanding policy authorizing collateral representations").

54.     NHTSA has enforced its view that manufacturers must install and maintain appropriate cybersecurity controls to avoid the exercise of NHTSA's recall authority under 49 U.S.C. §§ 30118-120.  In 2015, NHTSA found that some Chrysler vehicles had a flaw in their radio software security that could allow unauthorized third-party access to some networked vehicle control systems   Specifically, NHTSA determined that third-party exploitation of the software

security vulnerabilities could lead to exposing the driver, the vehicle occupants or any other individual or vehicle with proximity to the affected vehicle to a potential risk of injury. Ultimately, Chrysler worked with NHTSA to issue a voluntary recall of 1,410,000 vehicles to repair the software vulnerability and avoid a finding of a statutory violation. *See* Findings of Fact ¶¶ 67-71.

55.     And NHTSA has observed that the Data Law implicates these motor vehicle safety concerns. Although manufacturers retain some flexibility in precisely *how* to safeguard safety-critical vehicle systems, the agency has made clear that those systems must be protected in ways that are antithetical to the requirements of the Data Law—*e.g.*, through manufacturers controlling access to firmware that executes core vehicle functions like acceleration, braking, and steering; isolating vehicle systems from one another; and maintaining non-standardized approaches across the industry to prevent large-scale hacking. *See* Findings of Fact ¶¶ 64-79, 110-29.

56.     NHTSA has thus made clear both that (a) failure to maintain adequate cybersecurity controls would give rise to a safety-related defect, and hence recall obligations under the Vehicle Safety Act; and (b) the Data Law's requirements cannot be satisfied by manufacturers without removing current cybersecurity controls that are critical for maintaining vehicle safety. Findings of Fact ¶¶ 64-79, 110-29.

57.     Based on the evidence introduced at trial, the Data Law would require manufacturers to take steps counter to the purposes and objectives of the Vehicle Safety Act. Findings of Fact ¶¶ 64-79. Because compliance with the Data Law would present an obstacle to the purposes and objectives of the Vehicle Safety Act and the Data Law, there is a clear conflict between federal and state law and the state law must yield. U.S. Const. art. VI. Accordingly, the Data Law is preempted by the Vehicle Safety Act and thus void and unenforceable.

**The Data Law Directly Conflicts with the Vehicle Safety Act**

58.    The Data Law directly conflicts with, and is consequently preempted by, Section 30122(b) of the Vehicle Safety Act.  49 U.S.C. § 30122(b).

59.    The Data Law requires automobile manufacturers to remove cybersecurity controls and degrade cybersecurity protection.  Findings of Fact ¶¶ 48-63, 91-95, 111-30.

60.    The Vehicle Safety Act prohibits auto manufacturers from removing or otherwise degrading critical safety features like cybersecurity controls.   49 U.S.C. § 30122(b).   A "manufacturer . . . may not knowingly make inoperative any part of a device or element of design installed on or in a motor vehicle or motor vehicle equipment in compliance with an applicable motor vehicle safety standard prescribed under this chapter."  *Id.*

61.    Section 30122(b) of the Vehicle Safety Act applies not only to features specifically identified as required in a motor vehicle safety standard.  By its plain terms, the statute applies to "*any* . . . element of design" that the manufacturer "installed on or in a motor vehicle" to comply with a safety standard.  49 U.S.C. § 30122(b) (emphasis added).

62.    Manufacturers have installed a variety of cybersecurity protections around regulated vehicle functions to help prevent threat actors (or others) from taking control of core vehicle functions and, ultimately, the vehicle itself.  Findings of Fact ¶¶ 14-45, 52-53, 55-56, 58-59, 61-62.  These cybersecurity protections are key "part[s]" of the "device or element of design" of vehicles, which allow them to comply with federal motor vehicle standards.  49 U.S.C. § 30122(b).

63.    Specifically, manufacturers' cybersecurity design elements protect core vehicle functions like acceleration, braking, steering, and air bags.  Several "motor vehicle safety standard[s]" are "applicable."  49 U.S.C. § 30122(b).  NHTSA regulates extensively in the areas of acceleration, braking, steering, and air bags.  *See* 49 C.F.R. § 571.124 (acceleration control

devices); *id.* § 571.126 (light-vehicle braking systems); *id.* § 571.135 (electronic stability control—including steering and anti-lock braking systems ("ABS")); *id.* § 571.208 (occupant crash protection—including air bags).

64.     FMVSS 124 regulates acceleration control systems. *See* 49 C.F.R § 571.124. The standard encompasses nearly anything related to how the accelerator functions—"all vehicle components, except the fuel metering device, that regulate engine speed in direct response to movement of the driver-operated control and that returning the throttle to the idle position upon release of the actuating force." *Id.* And the standard presupposes that *the driver*—not some threat actor—will be in control of a vehicle's acceleration. It describes the feature it covers as a "*[d]river*-operated accelerator control system" and "establishes the requirement for the return of a vehicle's throttle to the idle position when *the driver* removes the actuating force from the accelerator control." *Id.* (emphasis added). Manufacturers have installed cybersecurity protections over accelerator functions that are key "parts" of the "device or element of design" of vehicles, which allow them to comply with federal motor vehicle standards. 49 U.S.C. § 30122(b).

65.     The FMVSS for light vehicle brake systems has the broad purpose of insuring "safe braking performance under normal and emergency conditions." 49 C.F.R. § 571.135 (FMVSS 135). As with acceleration control devices, this FMVSS necessarily presupposes that *the driver*— not some threat actor—remains in control of braking. *See, e.g.*, *id.* (stating that any brake power assist unit must ensure that while "reduc[ing] the amount of muscular force that *a driver* must apply to actuate the system" it "does not prevent *the driver* from braking the vehicle by a continued application of muscular force"); *id.* (discussing a brake power unit as involving the "*driver* action . . . of modulating the energy application level"); *id.* (discussing brake testing conditions to include "[p]edal force . . . applied and controlled by *the vehicle driver*) (emphases added). Manufacturers

have installed cybersecurity protections over braking functions that are key "parts" of the "device or element of design" of vehicles, which allow them to comply with federal motor vehicle standards.  49 U.S.C. § 30122(b).

66.    Much the same is true for steering and ABS.  Vehicle electronic stability control ("ESC") systems are "computer-controlled with the computer using a closed-loop algorithm to limit vehicle oversteer and to limit vehicle understeer."  49 C.F.R. § 571.126 (FMVSS 126).  The safe and approved operation of these systems relies on manufacturers to ensure that electronic inputs come from the driver, and that the driver remain in control.  *See, e.g.*, *id.* (describing the approved system as a "means to monitor *driver* steering inputs"); *id.* (requiring the "algorithm to determine the need, and a means to modify engine torque, as necessary, to assist *the driver* in maintaining control of the vehicle"); *id.* (discussing *the driver*'s ability "disable[] the ESC" system) (emphases added).  Manufacturers have installed cybersecurity protections over steering and ABS functions that are key "parts" of the "device or element of design" of vehicles, which allow them to comply with federal motor vehicle standards.  49 U.S.C. § 30122(b).

67.    The FMVSS for occupant crash protection contemplates that the air bags will deploy only in the event of a triggering collision.  49 C.F.R. § 571.208 (air bags) (contemplating that the "vehicle is in a crash severe enough to cause the air bag to inflate").  Manufacturers have installed cybersecurity protections over air bag functions that are key "parts" of the "device or element of design" of vehicles, which allow them to comply with federal motor vehicle standards. 49 U.S.C. § 30122(b).

68.    Based on the evidence adduced at trial, the Data Law would require manufacturers to make inoperative cybersecurity design elements that they installed on vehicles to meet the requirements of FMVSSs 124, 126, 135, and 208.  Findings of Fact ¶ 14-45, 52-53, 55-56, 58-59,

61-62; *see also id.* at ¶¶ 46, 90, 101 (discussing how no technology presently exists that would allow manufacturers to comply with both the Vehicle Safety Act and the Data Law). Because manufacturers cannot comply with both the Vehicle Safety Act and the Data Law, there is a clear conflict between federal and state law and the state law must yield. U.S. Const. art. VI. Accordingly, the Data Law is preempted by the Vehicle Safety Act and thus void and unenforceable.

### The Data Law is Preempted by the Clean Air Act

69.     Through the Clean Air Act, Congress has established a comprehensive statutory scheme to control air pollution from all sources throughout the nation. 42 U.S.C. §§ 7401, *et seq.*

70.     The Clean Air Act carefully delineates responsibilities between the federal government and the states. Title I of the Act, 42 U.S.C. §§ 7401-7515, vests the states, under EPA's supervision, with the authority to regulate stationary sources (*e.g.,* factories and power plants) located within their borders. *Motor Vehicle Mfrs. Ass'n v. N.Y. Dep't of Envtl. Conservation*, 17 F.3d 521, 525 (2d Cir. 1994). With certain limited exceptions not applicable here, Title II of the Act, 42 U.S.C. §§ 7521-90, vests the federal government, acting through EPA, with exclusive authority to regulate mobile sources (*e.g.*, cars, trucks, buses, aircraft, locomotives, farm and construction equipment, and ships). *Id.* §§ 7521, 7547, and 7543.

71.     For reasons similar to the Vehicle Safety Act, Plaintiff has demonstrated by a preponderance of the evidence that the Data Law is preempted by the Clean Air Act. Plaintiff's members cannot "comply with both state and federal requirements," and the Data Law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the Clean Air Act. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015).

72.     The Clean Air Act imposes stringent vehicle emissions requirements on manufacturers including warranting the emission control system of their vehicles for the "useful

life" of the vehicle—either 10 years or 100,000 miles.  42 U.S.C. § 7521(d), 7541(a)(1).  As part of this obligation, manufacturers must perform in-use verification testing on post-sale vehicles at regular mileage intervals prescribed by federal regulation.  42 C.F.R. § 86.1845-04.  In addition, the Environmental Protection Agency ("EPA") may require manufacturers to make changes to the configuration of vehicles, including changes to the vehicle's software, to ensure that vehicles continue to meet federal emissions-control limits.  *See id.* § 86.1842-01(b).

73.     Under the Clean Air Act, it is a violation of federal law for "any person to remove or render inoperative any device or element of design installed on or in a motor vehicle engine in compliance with regulations under [the Act] prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser."  42 U.S.C. § 7522(a)(3)(A).

74.     The language of the Clean Air Act broadly encompasses "*any . . .* element of design." *See* 42 U.S.C. § 7522(a)(3)(A) (emphasis added).  The element of design need not itself be explicitly required by applicable regulations, but merely one "installed . . . in compliance with regulations." *Id.*

75.     Federal EPA regulations confirm the broad nature of design elements, as used in the Clean Air Act.  They provide that an "element of design" includes "any control system (*i.e.*, computer, software, electronic control system, emission control system, computer logic)" in the vehicle.  40 C.F.R. § 86.1803-01.

76.     Manufacturers have installed cybersecurity protections around the engine control module that are key "element[s] of design" of vehicles, which allow them to comply with federal motor vehicle standards.  49 U.S.C. § 30122(b).

77.     The Data Law's requirements (and timeline to meet those requirements) mean that manufacturers would have to eliminate or thoroughly degrade existing cybersecurity controls—elements of design that manufacturers install in vehicles to protect against cyber intrusion of emissions-related vehicle components.  Findings of Fact ¶¶ 72-80.

78.     The evidence adduced at trial demonstrates that these required changes to cybersecurity protections would more readily allow vehicle owners or third parties access to a vehicle's engine control module to disable emissions control systems via aftermarket software designed for that purpose.  Findings of Fact ¶¶ 76-80.

79.     Based on the evidence adduced at trial, the Data Law would require manufacturers to render inoperative cybersecurity design elements that they installed on vehicles to meet the requirements of the Clean Air Act and EPA regulations regarding vehicle emissions.  Because manufacturers cannot comply with both the Clean Air Act and the Data Law, there is a clear conflict between the federal and state law and the state law must yield.  U.S. Const. art. VI.  Accordingly, the Data Law is preempted by the Clean Air Act and thus void and unenforceable.

### Severability

80.     The Data Law's provisions are not severable.  As one cohesive ballot initiative, the Data Law necessarily addresses "subjects which are related or which are mutually dependent." Mass. Const. amends. art. LXXIV.

81.     Because of this requirement, even a ballot initiative that contains a severability clause would raise a "challenging" issue as to its effect.  *Mass. Teachers Ass'n v. Sec'y of Com.*, 384 Mass. 209, 233 (1981) ("The concept that subjects that have to be 'related' may nevertheless be severable is a challenging one.").  The Supreme Judicial Court declined to decide the severability issue in that case only because it found the entire statute constitutional.  *Id.*; *see also Anderson v. Attorney General*, 479 Mass. 780, 785 (2018) ("The mandate that an initiative petition

contain a single 'common purpose' arises because a voter, unlike a legislator, 'has no opportunity to modify, amend, or negotiate the sections of a law proposed by popular imitative.'   A voter cannot 'sever the unobjectionable from the objectionable,' and must vote to approve or reject an initiative petition in its entirety.") (internal citations omitted); *Abdow v. Attorney General.*, 468 Mass. 478, 509 (2014) (reserving judgment on the "legal effect of the severability language" itself in a ballot initiative).

82.     The ballot initiative that gave rise to the Data Law does not contain a severability clause.  *See generally* Data Law.

### **Relief**

83.     The Plaintiff properly seeks declaratory and injunctive relief.  *See, e.g.*, *Algonquin Gas Transmission, LLC v. Weymouth, Mass.*, 919 F.3d 54, 65-66 (1st Cir. 2019) (affirming declaratory judgment finding state statute preempted by federal law); *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 536 (1st Cir. 2007) (affirming declaratory judgment holding state law preempted by federal law); *De Jesus v. Am. Airlines, Inc.*, 532 F. Supp.. 2d 345, 355 (D. Puerto Rico 2007) (granting declaratory relief and permanent injunction in preemption case); *United Parcel Serv., Inc. v. Flores-Galarza*, 210 F. Supp. 2d 33, 44 (D. Puerto Rico 2002) (granting permanent injunction based on preemption of territorial law by federal law).

84.     The Plaintiff has shown that its manufacturer members (1) will suffer "irreparable injury; that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Global NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 13 (1st Cir. 2013)

(quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)) (brackets omitted).

Accordingly:

      85.    <u>The Court rules that the Data Law is unenforceable because it is preempted by the</u>

<u>Vehicle Safety Act.</u>

      86.    <u>The Courts rules that the Data Law is unenforceable because it is preempted by the</u>

<u>Clean Air Act.</u>

      87.    <u>Enforcement of the Data Law is permanently enjoined.</u>

Dated: May 24, 2021

Respectfully submitted,

ALLIANCE FOR AUTOMOTIVE INNOVATION

By its attorneys,

John Nadolenco (*pro hac vice*)
Erika Z. Jones (*pro hac vice*)
Jason D. Linder (*pro hac vice*)
Daniel D. Queen (*pro hac vice*)
Eric A. White (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3000
jnadolenco@mayerbrown.com
ejones@mayerbrown.com
jlinder@mayebrown.com
dqueen@mayerbrown.com
eawhite@mayerbrown.com

Laurence A. Schoen, BBO # 633002
Elissa Flynn-Poppey, BBO# 647189
Andrew N. Nathanson, BBO#548684
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY, AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000

lschoen@mintz.com
eflynn-poppey@mintz.com
annathanson@mintz.com

Charles H. Haake (*pro hac vice*)
Jessica L. Simmons (*pro hac vice*)
ALLIANCE FOR AUTOMOTIVE INNOVATION
1050 K Street, NW
Suite 650
Washington, DC 20001
Tel: (202) 326-5500
chaake@autosinnovate.org
jsimmons@autosinnovate.org

## CERTIFICATE OF SERVICE

The foregoing document was served on counsel for the defendant by electronic mail.


*/s/ Eric A. White*