**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION | |
| Plaintiff, | |
| vs. | C.A. No. 1:20-cv-12090-DPW |
| MAURA HEALEY, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS in her official capacity, | |
| Defendant. | |

**Revised Affidavit of Steven Douglas**

1.    My name is Steven Douglas.  I am 56 years old and reside in Carmichael, California.

2.    I am currently employed by the Alliance for Automotive Innovation ("Auto Innovators") as Vice President, Energy & Environment.  I have worked for Auto Innovators or predecessor entities, including the Alliance of Automobile Manufacturers and American Automobile Manufacturers Association, since September 1995.  This affidavit is based on my personal knowledge.

2.    Formed by the 2020 merger of the Alliance of Automobile Manufacturers and the Association of Global Automakers, Auto Innovators is a trade association representing the makers of nearly 99% of new cars and light trucks sold in the United States, as well as original equipment suppliers, technology and other automotive-related companies and trade associations.  Its members include FCA US, LLC (now under parent company Stellantis N.V.) and General Motors Co., as well as BMW of North America, LLC; Ford Motor Co.; Honda North America, Inc.; Hyundai Motor America; Jaguar-Land Rover North America, LLC; Kia Motors America, Inc.; Mazda North

America; Mercedes-Benz USA, LLC; Mitsubishi Motors of North America, Inc.; Nissan North America, Inc.; Porsche Cars North America, Inc.; Subaru of America, Inc.; Toyota Motor North America, Inc.; Volkswagen Group of Americas; and Volvo Cars USA.

3.     Auto Innovators brings together these manufacturers to advocate on behalf of the industry as a whole.  The core purpose of Auto Innovators is to promote policies that support cleaner, safer, and smarter personal transportation to help transform the U.S. economy and sustain American ingenuity and freedom of movement.

**Right to Repair**

4.     In November 2020, Massachusetts passed the ballot initiative that is the subject of this suit (the "Data Law"), which took effect in December 2020.  Supporters of the Data Law have asserted that it provides greater access to vehicle data in order to level the playing field between independent repair shops and dealerships for vehicle diagnosis, maintenance, and repair.

5.     Independent repair shops already enjoy a "right to repair" vehicles.  That is, those shops have access to vehicle data necessary to diagnose, maintain, and repair vehicles on the same terms as dealerships.

6.     I have been heavily involved in the process of making that so.  I was, for instance, involved with drafting a 2002 letter from the Alliance of Automobile Manufacturers, Inc. and the Association of Global Automobile Manufacturers (along with the Automotive Service Association, which represents repair shops) to Senator Byron Dorgan, the then-Chairman of the U.S. Senate Subcommittee on Consumer Affairs, Foreign Commerce and Tourism.  Attached hereto as Trial Exhibit 69 is a true and correct copy of that letter (AAI-AAI-0002613).  In the 2002 letter, manufacturers' trade associations agreed "to make available, by August 31, 2003, emission and non-emission-related service information, training information, and diagnostic tools in the

same manner and to the same extent as specified by California Air Resources Board (CARB) regulations for emission-related systems and components." *Id.*  California is unique among states in having a special exemption under the Clean Air Act that allows it to adopt more stringent emissions regulations than provided under federal law, because California had adopted standards for the control of emissions before March 30, 1966.  *See* 42 U.S.C. § 7543(b).

7.     The 2002 commitment required that "the same service and training information related to vehicle repair will be made available to independent repair shops either via the Internet, or in the same manner and extent as it is made available to franchised dealerships" and that "the same diagnostic tools related to vehicle repair that are made available to the franchised dealers will be made available to the independent repair shops."  Trial Exhibit 69.

8.     Manufacturer members of the Alliance of Automobile Manufacturers, Inc. and the Association of Global Automobile Manufacturer signed individual letters of endorsement in favor of the 2002 commitment letter to Senator Dorgan.  All manufacturers that are current members of Auto Innovators did so.

9.     A 2013 Massachusetts "right to repair" law required manufacturers to commit to similar requirements as those included in the letter to Senator Dorgan.  The 2013 Massachusetts law required that manufacturers make available to independent repair shops diagnostic and repair information for all vehicles model year 2002 and later, the same manufacturer service and repair information and diagnostic tools that dealerships have, as well as the tool information needed for aftermarket tool companies to develop a tool with the same functionality as the manufacturer's diagnostic tools.  This was largely already required for emission-related service information and tools under the Environmental Protection Agency ("EPA") and California Air Resources Board

("CARB") Service Information regulations.   Manufacturers voluntarily provided the non-emission-related service information and tools as described in the Senator Dorgan letter.

10.      The 2013 Massachusetts law also required that model year 2018 and later vehicles allow the use of a non-proprietary tool meeting the requirements of SAE J2534 or ISO 22900 (referred to herein as a "J2534 device") and a personal computer for onboard diagnostics.  The J2534 device acts as an interpreter between the vehicle and the personal computer.  The intent of this requirement in the 2013 Massachusetts law was to allow an independent repair shop to diagnose and repair any make or model 2018 model year or newer vehicle using only a J2534 device and a personal computer.  Therefore, this requirement was intended to eliminate the need for independent repair shops to purchase multiple diagnostic scan tools (either aftermarket or manufacturer) to work on different makes and models of vehicles.

11.      The Alliance of Automobile Manufacturers supported the 2013 Massachusetts law. The 2013 law allowed four years for manufacturers to implement the vehicle changes, and the requirements did not implicate cybersecurity concerns.

12.      Indeed, manufacturers have gone above and beyond the requirements of the 2013 Massachusetts law by ensuring that independent repair facilities have a right equal to that of any dealerships to access vehicle data necessary for vehicle diagnosis, maintenance, or repair across the country.   Manufacturers memorialized that arrangement in a 2014 memorandum of understanding ("MOU").  All manufacturers that are current members of Auto Innovators agreed to that MOU.  The MOU effectively extended the 2013 Massachusetts law to all fifty states and the District of Columbia.  Attached hereto as Trial Exhibit 1 is a true and correct copy of the 2014 MOU (AAI-AAI-0002635).

**Auto Manufacturers and Aftermarket Interaction**

13.     Auto manufacturers and the aftermarket—independent technicians and shop owners, part manufacturers, aftermarket service providers, and tool and equipment companies— meet on occasion to discuss topics related to vehicle maintenance, including availability of service information, diagnostic tools and tool information, and training on how to make repairs.

14.     One organization that facilitates dialogue between the aftermarket and manufacturers is the National Automotive Service Task Force ("NASTF").

15.     I have served on the Board of NASTF since it was founded.  The NASTF Board comprises automakers, parts makers, new car dealers, tool companies, independent repair shop owners, technicians, locksmiths, and service information providers.

16.     NASTF runs the secure data release model ("SDRM"), a voluntary program developed by manufacturers, new car dealers, independent repair shops, and locksmiths.  The purpose of the SDRM is to allow manufacturers to verify that a party (e.g., locksmith, repair shop, etc.) seeking vehicle security information, such as key codes or immobilizer codes, meets minimum criteria to establish the requester is a legitimate business with appropriate credentials and not a "bad actor" that could steal the vehicle.

17.     Under SDRM, the manufacturer always maintains ownership and control of vehicle security information such as information to duplicate a key or reset an engine immobilizer intended to prevent vehicle theft.  For example, some vehicles use a key fob that works by sending a random code to the vehicle.  The random code has been stored on the key fob and the vehicle.  The vehicle computer verifies that this random code is correct, and then unlocks or locks the car, starts the engine, etc.  Both the key fob and the vehicle computer then generate and store a new random code that is synchronized between them.  But new key fobs must be "programmed" to work with the

vehicle.  The key code is used to put the vehicle computer into "programming mode" so that a new key fob can be programmed and synchronized.

18.     Locksmiths and independent repair technicians can register as a vehicle security professional ("VSP") in SDRM.  SDRM registration involves NASTF conducting a background check of the VSP, and verifying the VSP has appropriate insurance, bonding, and a business license.

19.     Once this information is verified and a background check completed, NASTF issues the VSP a registration and SDRM UserID.  This registration is valid for two years provided insurance, licensing, and bonding requirements are maintained.  The VSP must update his or her registration every two years.

20.     At the time of service, the locksmith or repair shop then must verify that the individual requesting the key is the vehicle's owner (rather than a thief trying to steal the vehicle) and obtain the appropriate identification and authorization from the owner.  The SDRM also specifies how long the documentation must be maintained.

21.     The SDRM only verifies the legitimacy of the VSP to the manufacturer.  It does not maintain or store any vehicle security information (key code, immobilizer reset code, etc.). The vehicle security information comes from the auto manufacturer.

22.     Beyond the initial registration and biennial updates in the SDRM, the VSP does not need to interact with NASTF or the SDRM.  Instead, the VSP interacts with the manufacturers' website to obtain vehicle security information, all of which is maintained by the manufacturer.

23.     When a VSP has a legitimate need for a key code or an immobilizer reset code and has verified the owner, the VSP logs onto the manufacturer's website using the SDRM username

and password issued by the manufacturer.  The VSP then enters her or his NASTF-issued SDRM UserID.  The manufacturer verifies the VSP is registered with the SDRM and in good standing.

24.     NASTF began working on the SDRM program in the early 2000s and launched the SDRM in the 2008 timeframe.  The Alliance of Automobile Manufacturers—a predecessor of Auto Innovators—along with independent locksmiths, repair shops, and new car dealers were involved in the development of the SDRM process from the beginning.

25.     Despite the limited nature of SDRM (key codes and immobilizer reset codes), the considerable amount of time that manufacturers and the aftermarket have had to make the system run better, and a role for manufacturers in the process, that third-party entity solution has had its share of problems.

26.     For example, around 2016, NASTF discovered some security concerns that led it to relaunch SDRM, requiring for example, two-factor authentication, stronger passwords, VSP notification when their SDRM UserID is used, and algorithms to look for suspicious activity— such as a single locksmith making thousands of keys every month, or locksmiths producing keys for vehicles in other states.

27.     But even after this relaunch, SDRM has run into security problems.  For instance, SDRM-registered VSPs have provided their login information to others who could then use that information to receive a manufacturer's authorization to make duplicate keys.

**Clean Air Act and On-Board Diagnostic Systems**

28.     Auto manufacturers have myriad obligations under the Clean Air Act and regulations implemented by EPA and CARB.  I work on issues related to those regulations.

29.     Among other things, the Clean Air Act, 42 U.S.C. § 7401 *et seq*., sets limits on vehicle emissions.  *See id.* § 7521.  To ensure compliance with the Clean Air Act, EPA and CARB

require extensive testing of vehicles, including the in-use verification program after vehicles are on the road.  The in-use verification program tests whether tailpipe emissions are under the legal limit.  There is also testing of evaporative emissions, emissions that the manufacturers control.

30.     To facilitate compliance with the Clean Air Act, EPA and CARB have mandated since 1996 that manufacturers use an updated version of on-board diagnostic ("OBD") systems called OBD-II.  OBD software monitors every component on the vehicle that could cause emissions to increase.  OBD systems alert the owner to a malfunction, identify the component or system with a malfunction, provide additional information to assist the repair technician, and finally help inspection and maintenance facilities detect tampering with the emissions system.

31.     Repair technicians connect to the OBD system with diagnostic tool via a standardized diagnostic port (or "OBD port").  By connecting the diagnostic tool to the OBD port, technicians can receive codes that identify potential malfunctions and the conditions at the time of the malfunction.  If a malfunction occurs—for instance, if a vehicle's oxygen sensor is not working correctly—the OBD code will indicate which oxygen sensor is not working as well as transmit information about the vehicle conditions at the time of the malfunction, such as the vehicle speed, engine load, and warmup status.  These conditions are prescribed by regulation.

32.     Regulations also require a standardized OBD port meeting the requirements of SAE J1962 on all vehicles.  Auto manufacturers produce diagnostic tools, but independent companies do as well.  The Equipment and Tool Institute ("ETI"), which represents aftermarket tool companies, consolidates information from manufacturers that allow aftermarket tool companies to produce diagnostic tools with the same functionality as auto-manufacturer-produced diagnostic tools.

33.     The OBD port is also used to "reprogram" the vehicle or change the vehicle's calibration.  Manufacturers sometimes change a vehicle's calibration to resolve unforeseen issues that appear after the vehicles are launched.  For example, an engine might stall under heavy load during an acceleration in hot summer temperatures.  After testing and validation, manufacturers might find that a new calibration resolves this issue and prevents a stall.  The manufacturer would then issue the new calibration, and vehicles would be reprogrammed to install the new calibration.

34.     There are many ways to tamper with vehicle emission controls.  For example, when catalytic converters were first introduced in the 1970s, owners and technicians simply removed the catalyst.  Another way to do so is through computer hacking.  An individual could use the OBD port to reprogram the vehicle and change the vehicle calibration in way that increases the vehicle's emissions.  For example, a new calibration could provide more power or increase fuel economy, but result in higher emissions.

35.     If a manufacturer does not comply with the Clean Air Act emissions limits, EPA and/or CARB may bring an enforcement action against it.  For example, EPA and CARB brought an action against Volkswagen for installing emissions defeat devices that changed the vehicle calibration so that it met the emission requirements during testing but then exceeded the requirements on the road.

36.     Also attached to this affidavit are true and correct copies of the following Trial Exhibits, which were produced from Auto Innovators' records:

- Trial Exhibit 4, a September 18, 2017 letter from SAE International to various recipients, including William Hanvey, President and CEO of the Auto Care Association (ACA), and Greg Potter, Executive Manager of the Engine and Tool Institute (ETI).

- Trial Exhibit 14, a July 31, 2017 letter from Auto Alliance and Global Automakers to Mr. Hanvey and Ray Pohlman, President of the Coalition for Auto Repair Equality.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: June 10, 2021

 /s/ *Steven Douglas*
Steven Douglas