UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION, | ) ) ) | Civil Action No. 20-12090-DPW |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| MAURA HEALEY, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS, in her official capacity, | ) ) ) ) ) | |
| Defendant. | ) ) | |

* CONTAINS CONFIDENTIAL MATERIAL

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

BENCH TRIAL DAY THREE

June 16, 2021

John J. Moakley United States Courthouse
Courtroom One
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Debra Joyce, RMR, CRR
Official Court Reporters
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiff:
      Laurence A. Schoen
 3    Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC
      One Financial Center, 42nd Flr.
 4    Boston, MA 02111
      617-542-6000
 5
      Erika Z. Jones
 6    Mayer Brown, LLP
      1999 K Street, N.W.
 7    Washington, DC 20006
      202-263-3000
 8
      John Nadolenco
 9    Daniel D. Queen
      Jason Linder
10    Mayer Brown, LLP
      350 South Grand Avenue
11    Suite 2500
      Los Angeles, CA 90071
12    213-229 9500

13    Counsel on behalf of Defendant:
      Eric A. Haskell
14    Robert E. Toone, Jr.
      Julia Kobick
15    Phoebe Fischer-Groban
      Christine Fimognari
16    Office of the Attorney General (MA)
      One Ashburton Place
17    20th Flr.
      Boston, MA 02108
18    617-963-2178

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2     (Case called to order.)
 3              THE COURT:  So Ms. Beatty tells me that the parties
 4     are satisfied at least as to this portion of the proceeding
 5     being open and not compromising any confidentiality.  I think
 6     that's probably right, that is, to set the rules of engagement
 7     for this hot tub.
 8              As I think you've all come to expect, I begin
 9     proceedings with readings of the day.  So there are a couple
10     that I want to bring to your attention.  As I was thinking
11     about this last night, there's a speech of Justice Holmes back
12     in 1886 when he was on the SJC about what's called the
13     profession of the law.  And there's a haunting kind of
14     reflection about what it is to be a lawyer thinking about grand
15     thoughts that I'll share with you and try to tie together in a
16     meaningful sort of way.  He said, "Only when you've worked
17     alone, when you've felt around you a black gulf of solitude
18     more isolating than that which surrounds the dying man, and in
19     hope and in despair have trusted to your own unshakable will,
20     then only will you have achieved.  Thus only can you gain the
21     secret isolated joy of the thinker, who knows that, a hundred
22     years after he is dead and forgotten, men who never heard of
23     him will be moving to the measure of his thoughts.  The subtle
24     rapture of a postponed power, which the world knows not because
25     it has no external trappings but which to his prophetic vision
```

1   is more real than that which commands an Army."

2          Now, why would I mention that?  The reason I mention

3   it is I think I told you all that I learned about this hot tub

4   process through a fellow by the name of Peter Heerey, who was a

5   justice on the Federal Court in Australia.  And if you

6   recall -- maybe you don't -- reading the article that I

7   suggested to you outlines this process, it is quoted

8   extensively in the article, and I think of him as the

9   popularizer, I suppose, of this.  There are a number of people

10  in Australia who are active in it.  He passed away just two or

11  three weeks ago now, but was conscious and aware of his role,

12  larger role more generally, so I've been thinking a good deal

13  about the way in which I found myself marching to his drum in

14  all of this.

15         And that raises a second question, which is, this

16  isn't about me.  The other set of thoughts that I'd like you to

17  think about, or at least I'll raise with you, is the idea -- I

18  suppose it goes back to or first voiced by Jeremy Benton that

19  the law is judge and company.  It's not just the single judge

20  making these kinds of determinations.  It's the judge and

21  company.  That is, every one of us performing our respective

22  functions.  There's a terrific speech that Learned Hand gave to

23  Yale law graduates in maybe the '20s or so in which he talks

24  about this being something like the bees in a form of

25  honeymaking.  We're all in it together, working together to try

1    to organize all of this.  The judge takes a strong role,

2    obviously, but can't do it without the lawyers.  On the other

3    hand, we do have different roles, and I want to see these guys,

4    that is the experts, out of role.  That's why I have it here.

5         There's a third writing -- reading.  Generally we only

6    have two, but maybe even just one, but it's a special occasion,

7    so let me talk about the other one.

8         I've raised this question of does the initiative turn

9    into a pumpkin if it's not capable of realization as of

10   December 3 or maybe the date on which it was put on the ballot

11   or maybe right now but, in any event, this time focused

12   dimension of that.  And so I'm going to be inquiring about that

13   a little bit as well.  But right now there are two things that

14   I'm kind of thinking about so you get always to perhaps be

15   burdened but in any event, exposed to what I'm thinking about,

16   and if I were to say anything about this, this case and what

17   I'm going to do, it is that I want to anticipate all of the

18   potential ways in which this case could be evaluated by a

19   review panel so that there's a fully developed record that, to

20   the degree that what I think about it, either in terms of

21   findings of fact or conclusions of law will be fully

22   ventilated, and we can go from there.  Or someone else can go

23   from there.  You can go from there.  Judge and company can

24   decide that the company wants a new judge or judges.

25        An order that I would enter in this case will address

1    the question of stay pending appeal, and that, it seems to me,

2    to be something that you should be thinking about.  I'm

3    thinking about formulating.  I haven't decided what the

4    judgment is that I'm going to be entering, but there will be a

5    judgment.  And if, for instance, we think of it the way the two

6    elderly gentlemen in the New Yorker cartoon from the 1920s

7    thought about it, they get it about right.  There were two

8    gentlemen.  They're sitting in a men's club.  One turns to the

9    other and says, "You know, money is life's report card."

10          So what's life's report card been here?  Over $50

11   million spent by two different competing kinds of economic

12   interests.  So I suspect that people will pursue this, at least

13   that seems to be the interest.  So let's assume that I say

14   something along the lines of, I can't really tell whether or

15   not there can be compliance within a particular period of time,

16   and so I go back to the speech of President Kennedy, 1962.

17   It's the speech he gave at Berkeley.

18          He said, "I'm reminded of the story of the great

19   French Marshal Lyautey" -- I mispronounce his name too -- "who

20   once asked his gardener to plant a tree.  The gardener objected

21   that the tree was slow growing and would not reach maturity for

22   100 years.  The marshal replied, 'In that case there is no time

23   to lose.  Plant it this afternoon.'"

24          So let's assume that we don't know specifically what

25   is possible.  We're in a fast-changing area.  I can conceive of

1    saying I'll stay this pending appeal.  And to use another of

2    the metaphors that I've used here, if, for example, that means

3    that the plaintiffs want to continue whistling past the

4    graveyard, that is, that their directions of public policy that

5    are blowing in favor of Right to Repair, whatever that means,

6    and however much that's simply a label or convenient marketing

7    tool from one of the interests here, they better get on it

8    because the outcome may well be that what seems to be a revenue

9    source, telematics, for them that they've kept control of, in

10   fact, they even argue that they're going to be deprived of

11   property if they are forced to do this, that they get it

12   straight because it may be that they can't offer it at all,

13   that is to say no telematics.  That's the way in which this has

14   to be dealt with.

15          Now, I raise that so everybody is thinking about the

16   same thing.  That now gets me to the choreography of all of

17   this.  As I think I indicated yesterday, it's probably best

18   that the lawyers be in the spectator section.  I'll permit

19   other people to be in the jury box if for social distancing or

20   other reasons people want to be in the -- or just the three

21   being in the jury box -- that people want to be in the jury

22   box, but I'd like the four individuals to be at the ends of

23   each of the tables so that they're kind of talking to each

24   other and we can see them.  There's always a sightline problem

25   in a courtroom.  I won't burden you too much with my views

1    about designing courtrooms, but my own view has always been

2    that the finder of fact should have the best view of the

3    witness.  That's why at least generally this courtroom and

4    courtrooms in this building were designed with the jury box

5    over there and the witness box over there.  That's generally

6    the witness box now.  The sidebar can be used for a witness

7    box, too.  And a number of judges, particularly ones who have

8    been in the superior court, like that one as well.  But that's

9    the sightline idea of this.

10          But now we've got the speakers right in the middle.

11   So where do we get the best sightlines for the people who will

12   have to engage with them?  That's me and you.  And that means I

13   think you're back -- you, the lawyers, who will be following up

14   on this would be back there.  You will have to do the

15   examination from the podium over there.  I've discussed this a

16   bit with the court reporters just to make sure that I got what

17   works for them, which is, as far as I'm concerned, perhaps the

18   most important thing that we do but, in any event, the most

19   difficult one.  So that will be the way I'd set it up.

20          Then I hope to be able to -- because, as I've said, my

21   model is to be the fly on the wall in a peer-reviewed

22   publications discussions of concepts that are presented by

23   papers, is to look to each one of these individuals to kind of

24   take up a topic.  Not that they're not all going to talk about

25   the topic but to take up a topic that, you know, perhaps

1    Mr. Bort will scare the hell out of us with his reports of the

2    parade of horribles or blocking of bridges that interfere with

3    the Army Reserve being able to go to Ukraine that could be

4    caused by all of this.  It may be, you know, Mr. Romansky will

5    talk about open source as the embodiment of the American way,

6    and then people can talk their way through.  But I just want to

7    get somebody to start the conversation.  I think there will be

8    cross discussions all the way through, but I'm interested in

9    your views about this.

10            I do think I want to start with, but I'm not exactly

11   sure whether this is really disputed, start with the basic

12   proposition that on December 3, 2020, even now, it can't be

13   done.  What's called for by the initiative is impossible of a

14   performance, right now.  If you said, "Today we're going to

15   turn it on," or, "December 3, 2020 we're going to turn it on,"

16   now, maybe someone will say, "Well, you know, ETI could scale

17   up overnight and go from three hardworking individuals to 8,000

18   to be able to handle all of this stuff," I don't think

19   anybody -- well, maybe someone will say it and you can watch

20   your nose grow long like Pinnochio if you do, but it just

21   doesn't seem to me to be real here.

22            Now, maybe somebody's going to argue about that.  I do

23   want to hear, obviously, if that's the case, and I will put it

24   out, my view is to put it out to the individuals at the time,

25   say, "Does any one of you" -- because I don't think they do --

1   "Does any one of you say that it can be done immediately?"  And

2   I think they'll all say, "No, not immediately, but, you know,

3   we can function like the gardener from Marshal Lyautey and

4   we'll start right now."

5           Then I want to move on to, so what's right now?  And I

6   think the structure I've found most helpful is Mr. Smith's

7   approach reflected in his affidavit kind of talking about short

8   term, which is shut it off, can't do it; medium term, call it a

9   year or so or whatever, which is a kind of dongle technology;

10  and then longer term, which is modification of the architecture

11  is a useful way, anyway, to think about this.  Whether I adopt

12  any of it, I don't know.  So that's how and the kind of

13  chronology I might go through it.  As I said, I hope there will

14  be discussions that go back and forth on these kinds of things,

15  but I do want to explore fully with them what is possible short

16  term and long term.

17          Now, framing all of this, frankly, is the open texture

18  character of what this language really means.  It's why I've

19  asked the Attorney General to give us some sense of their

20  approach, their larger approach to all of this without turning

21  it into a notice of rulemaking, but at least for purposes of

22  trying to come to grips with the issues in this case, it seems

23  to me to be important to provide us with definitions of what

24  diagnostics are and that sort of thing, which may or may not

25  overlap with telematics, but I think my general view is in this

1    context that telematics and diagnostics amount to about the

2    same thing.

3         And so I start with this proposition:  We've got

4    telematics.  If there's exposure, if this is dangerous, it's

5    already exposed and it's already dangerous.  It's just that the

6    people who are providing the danger are the people who are

7    offering the telematics, which is the OEMs.  So the question is

8    are we increasing the amount of danger by creating a different

9    mechanism for administering this and how might that different

10   mechanism minimize the dangers?  That's an issue that I think I

11   will want to expose and confront because, as I've said, there

12   are two layers of this.  One of this is these are people who

13   are willing to spend lots of money on both sides for a balance

14   of advantage to have access to the markets for diagnostics and

15   repair broadly conceived and perhaps are not fully concerned or

16   at least focused on the questions of cybersecurity or at least

17   they've made their own tradeoffs about what cybersecurity would

18   make, and the companies have done that, the OEMs have done

19   that, and in their own way, call them auto care entities have

20   done that.  And they're indifferent to the dormant commerce

21   clause and anything like that.  They just want to get their

22   hands on that share of the market.

23        Now, that's what brings it here, but I analyze it in

24   terms of the constitutional questions, and this is a way of

25   developing that.  There is no question that NHTSA has anxious

1    concerns about it, but they haven't yet acted on it.  I suppose

2    if there's some crisis of hacking that they will come down hard

3    on whichever of the OEMs does it, and it will be an unpleasant

4    experience for the OEM who is at the receiving end of that in

5    the way that it was to some degree with Chrysler, but they

6    haven't done it yet.  They hold that as a possibility of

7    enforcement.  What this means is that this is a complex statute

8    or complex ecosystem of regulation that looks first to the OEMs

9    to make determinations, and I hope to have that developed a

10   little bit in this, how they do it.

11          So I put it in a broader context.  Whatever the

12   success of the claim that this is a Clean Air Act violation or

13   preemption problem, that is the model, that is to say the EPA

14   finally got more specific with respect to the question of

15   emissions and provided great detail and that's perhaps a model

16   of how you deal with it, but there's not such a model in the

17   Safety Act.  At least I don't see it, but maybe you'll, as you

18   think about this -- of course this is a way of educating you of

19   things I'm thinking about so that you can respond at the

20   appropriate time.  But it may be that it has to be specified.

21   Can it be specified by the Attorney General of Massachusetts in

22   the same way that CARB would exercise the kind of control that

23   it does under a particular statute?  I doubt it, but I don't

24   know.  Maybe it could.

25          I am concerned about precisely what the commerce

1    clause is concerned about.  Fifty or more little laboratories

2    out there making independent determinations that have the

3    effect of great conflict with the national policy, the national

4    policy being safety.

5         So we'll think about that.  That will be informed on

6    this, but I will be listening very carefully to what they have

7    to say about practical sorts of ways of dealing with the

8    potential need for transferring to some degree the authority to

9    exercise control over the data.  That is why I call it a data

10   access rule, rather than Right to Repair, which I think goes

11   back to EPA initiatives in the '90s.

12        So that's a short way of saying what the framework is

13   going to be.  Of course the first thing I'm going to say to

14   them is, "Did you talk to anybody about this?"  And I'm also

15   going to tell them what will be significant to me, that while

16   they are engaged by individuals who were paying money to them

17   to offer reports, that credibility is what counts for me, and

18   if I get the sense that somebody's in the tank or simply

19   responds with party line or stays on message, to that degree,

20   they become less than persuasive.

21        Now, it may be that I'm not the audience they're

22   trying to persuade.  They're trying to persuade their current

23   employers and perhaps future employers who might want to take

24   advantage of their forensic capacities.  That's fine, but the

25   audience here -- I mean, it's not fine, but that's the way life

1    is.  But the audience here is me, and so I'm going to tell

2    them, you know, I'm going to be listening very carefully, and

3    if I think that you're pulling your punches in this discussion,

4    I just want you to know that you're going to be less persuasive

5    there, and maybe a goal is to be persuasive to me, but maybe

6    that's a subordinate goal in terms of career development.  But

7    I'm going to be fairly candid with them.  I don't think they

8    will have to think too much about what I'm saying about their

9    role because I want to get them unfiltered.  That's what the

10   purpose of this exercise is.  I'm going to permit you, as I

11   said, after this is done, after I've asked whatever questions

12   I've had to ask, ask some questions of your own there.  But I

13   will say a version of what I'm saying to them, which is it's

14   helpful to me if I have an unfiltered understanding of what

15   people -- all of whom, by the way, I view as capable based on

16   what I've seen.  I mean, these are not -- I date myself, but

17   there was -- maybe I've said this before,

18   Dr. Paul who used to -- I think he was a doctor, I don't know,

19   but he had some affiliation with MIT, and he used to show up at

20   every possible case to offer opinions because he had gone to

21   MIT and he had some engineering background, and so he could

22   testify about toasters and stents and just about anything

23   possible, and under the old regime it used to be, so

24   cross-examine him.  I think his last appearance was actually a

25   case of mine after Daubert had come in.  He was not prepared

1    for Daubert.  And he was in failing health as well, and he had

2    to leave the courtroom, couldn't complete his testimony.  None

3    of them fall in Dr. Paul's category.  They are the modern

4    versions of experts here, so I think that they've got the

5    capacity.  The question is whether or not they're pulling their

6    punches for me, and your examination or trying to clean up

7    afterwards will undoubtedly reflect that understanding to the

8    degree that you want to be persuasive with me here.

9         Now, timing, I have a change of plea at 1:00.  I've kind

10   of talked to the court reporters, although I haven't fine tuned

11   this aspect of it because they have to go in and out to be able

12   to do all the various things that they have to do, but I would

13   think that we would finish this by 1:00, finish it.  And then

14   you'd be on your way thinking more, but this is just a step in

15   the process.  And so I'm going to try to control that a bit.

16   We will start at 10:00, probably take a break at 11:00, I think

17   that's agreeable to Ms. Mortellite, and then take maybe ten

18   minutes or so during which you're not going to discuss anything

19   with the experts and then come back and go to, say, 12:45,

20   something like that, and I'll try to organize this to do that.

21        So what I'd like to do at this point is get a sense from

22   you how you think this could proceed most effectively, assuming

23   that I'm going to take kind of four sessions or four separate

24   topics broadly conceived and turn to one or the other of the

25   experts.  I'll let each one of them take the lead on some topic

1    to start the discussions, and then I'll just kind of break the

2    discussions up.  I may inquire as well, but I really do want to

3    hear them talk to each other about this kind of thing.

4        But I'll start with this basic idea:  Is there any dispute

5    that this was impossible and is still impossible now, that is,

6    compliance with the words of the statute?

7            MR. HASKELL:  I can speak to that, Your Honor.  Our

8    view and the evidence we've put on indicates that there is a

9    way to comply immediately with section 2 of the law by not

10   requiring authorization to access an onboard diagnostic system,

11   and there was testimony by Mr. Smith that a number of OEMs,

12   including Toyota, do that currently.

13           THE COURT:  Okay.  But "compliance" means just taking

14   yourself out of the game.

15           MR. HASKELL:  And that goes to section 3, again, our

16   view of prompt compliance, if not immediate compliance, with

17   section 3 is this idea of turning off the telematics.  If the

18   question is limited to can you implement this open access

19   standardized interoperable platform, no, we don't dispute.

20           THE COURT:  Well, I don't know if that's the view -- I

21   think it's the view of the plaintiff here.  So I think I may

22   just raise that at the outset just to hear what they have to

23   say about this because they've danced around a little bit on

24   that issue of compliance is concerted willful blindness as to

25   the obligations of the statute, and so we just don't do what

1   the statute talks about.  So we were in compliance because

2   we're not doing anything out of compliance.  That is a

3   definition, I suppose, but not one I find altogether helpful in

4   thinking about it.  But I'll ask at the outset whether any of

5   them disagree with that way of looking at it, and I'll phrase

6   it in some fashion.

7          Then I move on to say, okay, let's use the kind of

8   outline that Mr. Smith had of short term or medium term and

9   long term.  Medium term being dongle technology essentially as

10  a form of compliance, something that can be done, let's say, in

11  a year or so perhaps.  I will want them to talk about how long

12  that's going to be.  And I would look to, I think, Mr. Smith to

13  kind of start that discussion and perhaps under the

14  circumstances kind of think that Mr. Garrie would be the first

15  person to respond to them because I do want to tease out this

16  idea that we're really talking about who it is who is going to

17  create the dangers of cybersecurity.  Right now it is whoever

18  does this sort of thing.

19         The OEMs, they're the ones who are creating the

20  cybersecurity problem by creating the telematics or various

21  kinds of diagnostics.  So Mr. Garrie, who talked in terms of

22  all or nothing, that applies equally to the goose and the

23  gander here, assuming that the OEMs can be called the goose and

24  the auto care people can be called the gander.  So I'll see if

25  that teases those two things out, that is to talk about dongle

1    technology first from discussion that's started by Mr. Smith

2    and then rephrased as to Mr. Garrie as the framing of the issue

3    and being able to respond to it.  I won't tell them ahead of

4    time that's what I'm going to do, but that's what I'm going to,

5    what I think I'm going to do, but I want to be shaped by your

6    views about this as well.

7         Then I'll go to longer term kinds of things.  As I

8    said, I think Mr. Romansky is very useful as someone talking

9    through the idea of open source.  I think he would say, Look,

10   the things you're concerned about you can close off.  It's

11   not -- no problem about doing it.  This can be open source

12   easily and should be as a matter of policy, and that's the

13   policy that is implicit in the statute.  Okay.

14        So I'll develop that discussion about whether or not

15   it can be contained in some fashion or contained in a fashion

16   that does no more harm than the OEMs are doing now in their

17   exposure of this information.  And then to turn to Mr. Bort to,

18   as I said, scare the hell out of us with his war college game

19   theory of what might happen under various kinds of

20   circumstances and the exposures that might be involved in that,

21   all of which would, of course, elicit from me an inquiry of how

22   is that any different from what exists right now?  The OEMs

23   have got this, some of them anyway, most of them, as far as I

24   can understand, have this exposure.  So it happens in a -- it

25   happens anyway.

1          So what does that mean?  Now, missing from this

2     discussion as I've outlined it, is, you know, how do you scale

3     up to provide independent operations as I archly referred to

4     the people at ETI being able to do this realistically.  I'll be

5     interested to hear what they say about it.  I've always thought

6     that if there's a market, people will come to the market and

7     offer their services.  So if there's more of a market, they'll

8     offer more services.  And there are various people out there,

9     including people that Mr. Smith worked for, who tried to do

10    that, and they did.  But even the best of them exposes the

11    encryption that they have to being intruded on, and Mr. Smith

12    has candidly reported that as well.

13         So, I want to know if it can be done.  I think it can.

14    Is it more safe, any less safe than what we have right now in

15    terms of cybersecurity?  Which is I think the issue that I'm

16    concerned about here.  That's the national policy that I'm

17    concerned about.  I'm not concerned about -- I don't think I

18    should be concerned about, except to note it as a source of

19    incentives that might lead to greater or lesser cybersecurity,

20    I'm not concerned with who is making money off this now and who

21    wants to make money off it, that is, the two competitors whose

22    cat's paws were the committees that advanced and opposed the

23    initiative.  So I think that's what I hope to be able to deal

24    with and, as I said, interested in what the parties have to say

25    about how you want to deal with it.

1          Mr. Haskell leaps up fast.  You've got to be faster on

2     your feet.  Mr. Haskell is always up faster than everybody

3     else.

4          MR. LINDER:  I think he practices, Your Honor.

5          MR. HASKELL:  Thank you, Your Honor.  That's helpful

6     and gratifying for us to hear.  We gave some thought overnight

7     to some suggestions that we might make about how to focus and

8     moderate this discussion, and you've hit on nearly all of them.

9          A couple of things I did want to mention.  First of

10    all, the layout of topics that you just suggested, beginning

11    with dongles and then into the kind of a broader platform

12    architecture, I just wanted to make sure that our witness,

13    Brian Romansky -- Craig Smith is our architecture guy.  So

14    absolutely please do ask Mr. Romansky those questions, but they

15    may be more in Mr. Smith's wheelhouse.

16          THE COURT:  It may be -- I'm sorry to interrupt, but,

17    of course, yes, they were designed to tap particular drums,

18    that is, that's how you pick your experts and so did the

19    plaintiffs.  But I buy into the idea that this is a

20    collaborative undertaking and that one way of looking at what

21    GM does is there's a balance of advantage within the

22    organization between eager beaver engineers and people who are

23    concerned about what does the bottom line look like in the next

24    quarter in terms of money that we take in, and I have a pretty

25    clear understanding of who has got the balance of advantage

1    under those circumstances.  But if this is something that's

2    supposed to be thought about, it's thought about in a

3    collaborative sort of way, and that's why, you know, I'm

4    picking out one person to talk about it, but I expect they'll

5    talk about all sorts of things.

6           MR. HASKELL:  Absolutely.  That sounds good.

7           In addition, as we were thinking about this last night

8    and this morning, the point we started from were the questions

9    that the court has been asking throughout the trial, which is

10   can it be done and when can it be done?  And in terms of can it

11   be done, you know, it occurred to us, frankly, that there isn't

12   a lot of dispute about whether this platform can be implemented

13   immediately.  There's also not a lot of dispute about whether

14   it could be implemented eventually if the OEMs were to devote

15   the resources and manpower to it.

16          So one way that occurred to us that might be helpful

17   to kind of test the -- or get a conversation going about the

18   experts' understanding of can it be done is to talk about what

19   the law actually requires and their understandings of the

20   definitions in the law.

21          To that point, Your Honor, you've asked about the

22   Attorney General's interpretations.  We're happy to brief those

23   and argue them next week.  We will plan to do so.  But if it's

24   helpful to the court today, you'll actually find many of them

25   in the record already.  The proposed conclusions of law that we

1  served on the plaintiff, filed, it's docket 174, beginning at

2  paragraph 35 of our conclusions, already sets forth the way

3  that we interpret the law, and if that's a helpful hook for

4  this conversation we're about to have, I wanted to make sure

5  that the court is aware of that.

6           Going over to the when-can-it-be-done question, you

7  know, I already mentioned the reasons that we feel it can be

8  done immediately, the disabled telematics, some OEMs don't

9  require authorization, and that's perfectly okay under section

10  2.

11          In terms of the longer term, building out this

12  platform, let me throw this out there.  This is a thought that

13  has occurred to us that we're going to be developing over the

14  next week or so.  The court has spoken about thinking about the

15  law's timeframe and when can it be done in terms of

16  severability.  It occurred to us that it might also be thought

17  of in terms of the court's equitable powers.  That is to say if

18  the court does find, and we don't think the court should find,

19  but if the court does find that it's impossible to do this in

20  compliance with federal law for a period of time, is that

21  something that the court can use to fashion an equitable remedy

22  pertaining to that period of time.

23          So within that framework, the estimates that we've

24  heard from the various witnesses, both the expert witnesses

25  and, frankly, the manufacturer witnesses, you know, may become

significant.  I think we've heard that, you know, I think Craig

Smith testified that it could take two to three years to design

and build one of these platforms that section 3 calls for.

Kevin Tierney said it will take maybe as long as eight years.

I think Bryson Bort testified it will take about five years,

and it occurred to us that that might also be a fruitful topic

for conversation that we're about to have, the assumptions and

the views underlying those estimates.

THE COURT:  Okay.  Those are helpful for me to frame

what I think I want from them today.  The first is, I'm not

really looking for them to tell me about a careful

deconstruction of the statute and what the statute provides.  I

just want to hear a bunch of engineers talk about what they

think can be done generally.  And then you'll have the

opportunity to tailor conclusions and findings perhaps in light

of that.  So I'm likely to say, "Here are the words that you

are going to have to deal with."  I just want to hear how you

deal with it.  If they go off the rails on this, I'll perhaps

interfere.

The second is this question of timing, equitable

powers.  You didn't say it, but let me.  I'm not going to

design automobiles.  And this is an area that is fast-moving,

that four years from now it's not going to look like it looks

now.  If I were, in my kind of moderately informed, maybe

somewhat informed view, we're going to be talking about

1   electric cars in maybe not five years but ten years as being

2   dominant.  We're not even going to be talking about internal

3   combustion engines that deal with emissions and that sort of

4   thing.  Maybe, I don't know.

5         What I do know is that really smart people are

6   thinking about this, and they're a lot smarter than I am.  And,

7   by the way, Article III didn't give me the power to do that

8   sort of thing.  I didn't get hired to administer prisons or to

9   desegregate school systems or anything like that.  I just

10   decide cases and controversies and try to assist in the

11   resolution of those.  So I think I'm not going to get into the

12   specifics of it.  You didn't invite me to do that, I

13   understand.

14         But then the question is time, and the timing that I

15   was talking about -- and that's what's going to shape my

16   inquiry, is really here is the best I can do.  Here is my

17   findings of fact and conclusions of law about these issues.

18   Now, First Circuit, it's up to you on it, and I'm not going to

19   impose some obligation for -- I stay the implementation of

20   whatever I say until X time period, which will be sufficient

21   time period for the case to be developed for appeal, if that's

22   what goes on.  At least that's the instrumental view that I'm

23   taking about this.

24         So let's just assume that I say, I strike down the

25   statute.  It's no longer applicable here.  Well, I may be

1     right.  I may be wrong.  It's not struck down.  It's simply

2     that it's not going to be enforced during that time period, and

3     I probably have to extend it to 93A because that's a private

4     right of action that's included in 93K to deal with that.

5     That's kind of on my mind.  That's what I would do.  And then

6     the Court of Appeals will say, Oh, there's a likelihood of

7     success on the merits, if not a likelihood of success on the

8     merits, there's no danger.  You can go chase them for

9     modifications of the stay pending appeal.  But that's the

10    equitable activity I think I would undertake in response to the

11    questions, but it's very helpful because it permits me to

12    refine what I was going to say.  Mr. Linder.

13         MR. LINDER:  Your Honor, if I may on behalf of the

14    plaintiff, we just have two suggestions to help frame your

15    discussion with the experts and the hot tub.

16         One is, it may be analytically helpful for

17    particularly your first two topics about impossibility and sort

18    of the path to compliance to think of them separately for

19    section 2 and section 3.  I agree it might not be helpful for

20    the experts to focus on the niceties of the language, but

21    they're separate engineering problems.  Telematics is in

22    section 3.  It's a different engineering problem for section 2.

23         THE COURT:  If I can just ask, do we really think

24    there is that kind of distinction, that it's a meaningful kind

25    of distinction here?

1          MR. LINDER:  Yes, Your Honor, we do, and I think it's

2     something that might be fruitful to explore with the experts.

3          THE COURT:  Okay.

4          MR. LINDER:  So, for example, the sort of three-step

5     solution you laid out for Mr. Smith is only as to section 3.

6     It doesn't have anything to do with section 2.

7          And then the second sort of suggestion from the

8     plaintiffs is that I'm not sure we agree with Mr Haskell's

9     characterization.  We agree that everyone agrees we can't do it

10    now.  I'm not sure we agree that everyone agrees we can do it

11    at some point, but the question you have to decide, the

12    question that NHTSA has framed as of Friday is can it be done

13    safely.  And I think that's really the question that might be

14    fruitful to explore with the experts since ultimately it is at

15    least a substantial part of what the preemption question --

16         THE COURT:  Let me just ask a little bit about that

17    because I've touched on it, which is, safely compared to what?

18    We have a present condition.  If I view my role here as the

19    judicial equivalent of the Hippocratic oath, first do no harm,

20    I have to identify what the harm is that's being done now.

21    That is to say that the exposure that the OEM control of this

22    provides, and I suppose I will be asking along those lines.

23         MR. LINDER:  Yes, Your Honor, and you should.  We

24    agree.

25         THE COURT:  All right.  So I think perhaps this is the

1    point to bring the experts in, but I think this is -- I'm

2    sorry, Mr. Haskell, go ahead.

3           MR. HASKELL:  I don't mean to interrupt but one more

4    thing before we bring the experts in, and that is procedurally

5    whether the conversation with the experts ought to be impounded

6    from the public.

7           THE COURT:  That is what I was going to take up now.

8    I look to you on that.  I would, to avoid interrupting at

9    various times, I would prefer to, for present purposes to do

10   this in a sealed courtroom with the view that you'll get to see

11   the transcript and you can suggest or not suggest things that

12   might be confidential here.  As you know, I take a much

13   narrower view of what's confidential under any of these

14   circumstances.  Embarrassments about the cost of the initiative

15   being an example of something that I don't view as so important

16   or subject to confidentiality, the engineering, I don't know so

17   much about that.  So I'll have to think about it and listen to

18   the parties.

19          MR. LINDER:  Your Honor, it seems like the

20   confidential information that may be most at issue with the

21   experts will be ours, and so we agree with that approach.  We

22   would just ask if you would consider letting the participants

23   who are -- the audience that's joined by Zoom that are within

24   the bounds of the confidentiality order, so there are some from

25   both sides that have signed that or are a part of the parties,

1   we ask that they be able to stay.

2          THE COURT:  I talked about that because Ms. Beatty

3   raised it ahead of time.  She tells me she thinks that can be

4   done promptly.  That's what I will do.  That is to say, I will

5   say this hearing is closed both in this courtroom and on Zoom

6   except for those persons who are subject to the confidentiality

7   orders, and I think it -- I don't know if it's going to deal

8   with highly confidential material, and there's a differential,

9   of course, on that.  Do you have a view about that?

10         MR. LINDER:  Your Honor, that's almost entirely up to

11  you.  So I would just ask that if you think you're treading

12  into particularly sensitive areas of --

13         THE COURT:  I think if you -- somebody's going to have

14  to -- this is me kind of wandering in the forest on that.  I'm

15  not sure when I'm going to --

16         MR. LINDER:  We'll make sure -- we'll police that as

17  well, Your Honor.

18         THE COURT:  So anybody who is capable of understanding

19  who is subject to the confidentiality order is going to be

20  permitted to be in here, and you'll call to my attention if you

21  think that I'm treading into areas or the conversation is

22  treading into areas that are highly confidential, which I, as a

23  rule of thumb, am viewing as intra-OEM or inter-OEM kinds of

24  information that's available to particularly OEMs but not

25  necessarily to others in the industry.

1              MR. LINDER:  Yes, Your Honor.

2              THE COURT:  Okay.  So Barbara, can you do that

3      relatively quickly?

4              (Discussion off the record.)

5              THE COURT:  So Ms. Beatty suggests that it might be

6      useful to take a five-minute break, in which there will be no

7      conversation with the experts, so she can set up the courtroom

8      and deal with that, and we'll get launched into this

9      undertaking.

10             MR. LINDER:  Perfect, Your Honor.

11             THE COURT:  Thank you.

12             (Recess taken 10:04 a.m. - 10:20 a.m.)

13             THE COURT:  So gentlemen, as we discussed, I want to

14     conduct this aspect of the proceedings in a way that has been

15     referred to as a hot tub.  I'm sure you've had some discussions

16     with counsel, but let me explain to you what my hope and

17     expectation is.

18             The ideal for me, I think, with experts, particularly

19     experts with your degree of experience, background and

20     training, is to be exposed to information in an unfiltered

21     fashion in the manner of someone who would be a fly on the wall

22     in the meeting of a peer-reviewed editorial board discussing

23     topics that would be of potential publishability.  And having

24     had some experience not in the technical area but with

25     editorial boards, the discussions can frequently be robust and

1    wide open and directive, and I look forward to that.  That's

2    what I want.

3         But the conduct of litigation is a kabuki dance.  It's

4    quite formalized, and frequently people who are engaged as

5    experts are expected to perform in a formal sort of way, highly

6    scripted by counsel and clients who have particular goals in

7    mind, which may or may not be coincident with the truth-finding

8    process, at least in my experience, or at least helpful in my

9    experience.

10        So for reasons that I don't have to go into too

11   deeply, but early on in my career as a judge, I was introduced

12   to this idea of a hot tub as a way of dealing with it.  It's

13   something that's done in Australia all the time, in fact, in a

14   very formal way, also like a kabuki dance kind of way.  But

15   I've used it in a variety of different cases over the years.

16   From questions of sentencing to questions of redistricting,

17   just as a useful way for me, has been for me, and when I've sat

18   on three-judge courts that -- I've had to deal with three-judge

19   courts to do this.

20        But forewarned is forearmed.  At this point I'm

21   looking for help, hoping that you'll provide it.  But the

22   degree to which you provide help is the degree to which you're

23   unfiltered.  I'm the audience here, I think, for this.  But you

24   may have other audiences that you think that you have to

25   satisfy in various ways.  And that may, without in any way

1    suggesting something nefarious, that may be career development.

2           This is an area in which you have developed a niche,

3    forensic expertise, and people who buy forensic expertise

4    generally like to be confirmed in their views or they wouldn't

5    pay for it.

6           Now, in traditional kind of analysis by lawyers or

7    examination by lawyers, they frequently ask questions like, Do

8    you always appear for plaintiffs in medical malpractice cases?

9    And that tends to undermine, if you say yes, tends to undermine

10   your credibility.  Or, You said this in this setting, you said

11   that in that setting.  You're available for hire, right?

12          I'm not going to ask those kinds of questions.  I'll

13   let the lawyers do whatever they want, but I want you to

14   understand that I bear this view that I'm the audience.  You're

15   going to persuade me to the degree that I get any sense, any

16   smell, any aroma that you're in the tank for the parties here

17   or looking ahead to career development in the forensic

18   expertise niche market, it will undermine your credibility.

19          Maybe me as an audience is not sufficiently compelling

20   to make the choice that I think you should under these

21   circumstances and, of course, that raises this larger issue

22   that we have here.  I don't for a moment believe that we're not

23   talking about relative risks.  There's not an either/or kind of

24   thing involved.

25          You've got choices that you are going to be making

1    about the way in which you will try to be persuasive.  I'm sure

2    you'll try to be persuasive within the constraints of other

3    considerations, and I'm evaluating an underlying issue of a set

4    of technologies that, it seems to me, are not either/or, that

5    you can start by talking about this and saying, Well, it's

6    complicated.  I recognize that, and I want to be helped to

7    understand the complications and undo those complications.

8            I said that you were sequestered as of yesterday.  I

9    assume that you've dealt with the lawyers and so on.  But I

10   want to be sure.  Did any of you have any conversations of any

11   kind with anyone, even among yourselves, about what was going

12   to transpire here after I said that you were sequestered?

13           MR. BORT:  No.

14           MR. SMITH:  No.

15           THE COURT:  So I treat that as the individuals saying

16   that they have not had that.  So let me tell you how I think I

17   want to proceed so that each of you has a monologue, maybe -- I

18   don't want it to be a monologue, but each of you has an opening

19   in this drama.  I'm going to be identifying for each of you a

20   responsibility to open the discussion, but I hope it's a

21   discussion.  That is, people asking probing questions of, You

22   say that, but what about this?  Have you considered this?  Is

23   this a factor that should be considered?  And I'll outline for

24   you what I think I'm going to do in that general area.

25           I found, just by way of organization, that Mr. Smith's

1    affidavit was a helpful structure, and I'm going to be kind of

2    following that, as you will see, in setting this up.  That's

3    not an embrace of Mr. Smith's positions but just as a way of

4    structuring this.

5         But I'll tell you that there are four things that I

6    want to talk about, and I'm sure that they will overlap in the

7    course of the discussions as well.  And I don't mean to

8    suppress that in any way.  But the first one on which I think

9    there's agreement, but I'm going to ask the question of each of

10   you individually, is whether as of now, or perhaps more

11   importantly as a legal issue as of the date of enactment of the

12   initiative, I call it the Data Access Law simply because that

13   seems to me to be less partisan in its character, if there's

14   any way that the OEMs could comply with what's demanded of

15   them.

16        Now, when I say "comply," I don't mean they can comply

17   by picking up all their toys and disappearing from the

18   telematics market.  That's not compliance.  That's simply

19   conscious avoidance of it.  I'm really saying if they want to

20   comply with the statute by doing what the statute directs, is

21   there any way they could do it, I'll say as of today, but if

22   there's any difference about any of these, as of the date of

23   effectiveness, which is December 3, 2020, or perhaps the fall

24   of 2020, when it was being argued through the initiative

25   process up to the vote, is there any way that they could comply

1    with the statute as I've defined it?  That's a generalized

2    question.  I think -- I say "I think," listening to what you've

3    had to say, I don't think that anybody says, Yeah, we could

4    turn the switch and off we go with compliance with the statute

5    or the Data Access Law, the initiative statute, I guess I'll

6    say.

7           Then to go to the more specific aspects of it, under

8    the outline that Mr. Smith has provided, then we go to what

9    I'll call the medium-term solution or what he calls the

10   medium-term solution, and as just a shorthand for dealing with

11   that, it is, I think, let's call it the dongle solution, but

12   it's the use of the J1962 connector and telematic dongle.  Two

13   parts of that are both -- is that an interim solution and to

14   get toward compliance with the statute and how long is that

15   really going to be effective or how long, more accurately, how

16   long does it take to get up to speed to do that?

17          Then the next layer of issue is the longer term

18   adjustment which, again for shorthand purposes I'll call

19   network architecture, changing the network architecture.  You

20   may disagree, and, of course, I want to have that teased out,

21   that among inter-OEM there are different kinds of network

22   architectures that they have.  The statute seems to me to call

23   for at least some degree of uniformity for compliance purposes

24   among all of the OEMs.  How long is it going to take to get to

25   that if that's undertaken?

1          Now, there's a subtext in this.  I'm dealing simply

2     with the question of compliance with that statute and whether

3     that statute complies with the Constitution.  There are at play

4     here, we would be blind not to recognize it, well-funded

5     economic interests who are concerned with their ability to have

6     access to data for purposes of meeting market needs.  And

7     roughly stated from the perspective of the OEMs, they've got

8     it.  They prefer that they keep it.  There's inter-OEM conflict

9     over architecture because they want to keep it themselves and

10    even not disclose it to their colleagues in the broadest

11    industry.  So what are the incentives to make them do it

12    otherwise, if there are any?

13         Now, some of you are somewhat familiar with some of

14    the past history in this area, and maybe you'll want to talk to

15    that.  I'm not asking you to prognosticate, except to say in

16    this context how long would it take, which may be forever,

17    until somebody actually orders them directly to do something.

18    But in any event, you're familiar with the industry.  You can

19    speak to that in this context.

20         I'm proceeding on the assumption that I'm not asking

21    you to make determinations about the precise language and how

22    the language works.  You have the statute.  You interpret it

23    your own way.  To the degree that your interpretation and the

24    way in which you interpret it is something I want to be sure I

25    understand, I'll ask you questions about that, but I want you

1    to think about this, as I think you have, all of you have, I

2    want you to think about it in terms of this is an engineering

3    problem.  How do we solve the engineering problem?

4         But it's an engineering problem that takes place in

5    the context of complex bureaucratic and economically concerned

6    entities, and so you've got to think about who all the

7    collaborators are and how the collaborators are going to be

8    successful in reaching a conclusion, if they are, on getting to

9    yes on this.

10        Then I want to think about this larger set of issues

11   stepping back in a broader sort of sense about how long that's

12   going to take, how long you really think it's going to take.  I

13   mean, you know, I've got a set of suggestions that are in the

14   ballpark, but some show up with a hockey stick and others with

15   a lacrosse stick, and that's not what happens at ballparks.  So

16   I've got to decide questions of what the bat should be.

17        But I recognize it's uncertain, and we're dealing with

18   an area in which lots and lots of development is taking place

19   certainly beyond me and maybe even beyond you, but it's a

20   yeasty time, maybe it's always a yeasty time for the automobile

21   industry.  But, you know, without embracing, because I know

22   Mr. Bort picked up on it and played with it a little bit, the

23   idea of, we put a man on the moon, we can do this.

24        I do recognize that I guess from 1943 to 1945 there

25   were no automobiles made in Detroit.  It was all devoted to

1    wartime production.  And then the war was over, and then we

2    went from zero to a very large number of cars very quickly

3    because this was a chance for the automobile industry to

4    respond.  So if the incentives are in place, then it's possible

5    to put a man on the moon a little bit more promptly than might

6    otherwise take place.  But I want you to be thinking in those

7    terms.

8           Finally, I want you to be thinking, and I may not do

9    this back and forth, it may be a little bit like the outside

10   question of does anybody suggest there's any way that it could

11   be done right now or as of December 3, 2020, what really are

12   the capabilities and risks that are provided by a third party

13   here.

14          I mean, you know, I can be mocking or snarky in saying

15   how long will it take for ETI to scale up to handle this.

16   That's not really what I mean.  I'm really talking about are

17   there entities that would find this attractive enough so they

18   would be drawn into the idea of doing this.  I assume they'll

19   do it for money.  And then people have to make judgments about

20   that, but, in any event, can it be scaled up and how long is it

21   going to take and what are the risks?

22          I keep, without excluding everybody else's affidavits,

23   all of which I've read and all of which would have been helpful

24   to me, I go back to Mr. Smith's affidavit about even those

25   entities that are designed to provide advice about extra

1   security find themselves subject to hacks, too, and now we're

2   talking about a third party who is not necessarily engaged by

3   the process of maintaining their reputation for selling cars to

4   people who will be skittish about a variety of issues of use of

5   access, policing it.  Now we're talking about a third party who

6   could simply say, Well, let's move on to some other market here

7   and leave cars all by themselves.  So I'm interested in that.

8        Now, I start with the basic idea here that I've got

9   that open question of effectiveness right now.  I want to hear

10   briefly what you have to say.  I'm not going to choreograph

11   that much more, except to ask each of you if you disagree with

12   that basic proposition that it can't be done right now,

13   couldn't turn the switch and do it.

14        Then I think I want to turn to this kind of

15   medium-term solution issue in which I would first, I think, ask

16   Mr. Smith to start the discussion and you can respond to the

17   discussion there.  I would then turn to Mr. Garrie for the next

18   part of this.  I understand Mr. Garrie to be saying something

19   like, and he will, of course, refine my understanding of what

20   he's saying as it's all or nothing.  Once you make the

21   disclosure here, then the cat is out of the bag, and the issue

22   I guess is, isn't the cat already out of the bag by OEM having

23   this?  But that's this second kind of topic that may illuminate

24   this issue.

25        Then I want to turn to the question of architecture

 1    here, and then I will be turning, I think first to Mr. Romansky
 2    and then to Mr. Bort.  In the case of Mr. Romansky, I don't
 3    want to characterize what you have to say, but just as a
 4    shorthand, my takeaway is that you are the voice of open source
 5    as the American way, maybe, I'd say.  But, in any event, the
 6    idea that, Hey, look, we can do this.  There's no reason why we
 7    can't do this kind of thing, but there can be mechanisms that
 8    control the dangers of the kinds of things that the Safety Act
 9    is concerned about.  And the Safety Act, I emphasize, is
10    concerned about safety.  It's not concerned about can you turn
11    the car on as a general proposition.
12          On the other hand, if you've got a mechanism of
13    turning the car on that makes it possible for people to
14    interfere with the safety of the automobile, then, of course,
15    that's an issue.  But I just want to understand more fully and
16    have you present as open source as a mechanism that can deal
17    with that sort of thing.
18          Then I want to turn to Mr. Bort.  And not, again, to
19    overstate it, but Mr. Bort's role I think sometimes is to scare
20    the hell out of everybody about what can happen, under even the
21    most mundane kind of circumstances.  A person leaves their car
22    unlocked and, therefore, makes it possible for someone to block
23    the bridge that permits the Army Reserve to mount the return or
24    deployment in the Ukraine.  I certainly want to think about
25    risk and return and what the chances are of things like that

1    and, of course, I've overstated it simply to outline the kind

2    of issue that we'll deal with.

3           Then I do want to talk about, and without going back

4    and forth, and it may come out in the course of these

5    discussions, but I do want to talk about the capabilities of

6    third parties, real capabilities of third parties.  What's the

7    likelihood, based on your understanding, and you all have

8    different understandings but great experience in this general

9    area, of third parties getting involved in this and performing

10   a function that we can -- that could be relied on or at least

11   doesn't have undo risk?  Because I start with the proposition

12   that there's always risk, and now we're talking about

13   mitigating the risk in a fashion that serves a public policy,

14   and the public policy is broadly conceived as right of repair

15   or at least data access generally.

16          So that's the way I want to go on it.  What's going to

17   happen at the end is I will afford the lawyers an opportunity

18   to ask questions at the end.  And the way in which I've set

19   this up, the seating arrangements, is I've got you set up that

20   way, the way we have you here so that I can see you as well as

21   possible and the lawyers can see you as well as possible.  It's

22   a little different from having them in the witness box or in

23   the jury box because they'd see the backs of Mr. Garrie's and

24   Mr. Romansky's heads, and that's not being able to see

25   everything, but that's what we're going to try and do.

1          And they'll have, I'm sure, their own questions, but

2     I've told them the same thing I've told you.  Scripted

3     responses are not helpful.  The judge who is on the right-hand

4     side, my right-hand side, Judge Garrity who frequently responds

5     to various initiatives by lawyers like me in his courtroom

6     would say, "That's not very helpful."  So understand it's not

7     very helpful if you seem to be scripted, and it's not going to

8     be very helpful, as I've told the lawyers, if they keep on

9     message as opposed to trying to develop this case in the way in

10    which I've talked about.

11         So let me start with this question.  Does any one of

12    you, and I'll ask each one of you, think that right now or on

13    December 3, 2020 or in the fall of 2020, although I think they

14    overlap, that what is called for by the so-called Data Access

15    Law could be provided by the OEMs?  Not that they can take

16    their toys and walk off the field, but could be provided by the

17    OEMs, that they could provide the kinds of platforms that are

18    talked about here?

19         Mr. Smith, do you think so?

20         MR. SMITH:  Definitely not right away -- this seems

21    loud.  Definitely not right away.

22         THE COURT:  That's what I'm talking about.

23         MR. SMITH:  Yeah.  Fall, maybe, depending on what we

24    end up agreeing to, but not right away.

25         THE COURT:  Okay.  Mr. Romansky?

1          MR. ROMANSKY:  Yeah, so as I've said, I think the

2     elements of a solution are available, but they're not

3     assembled, and that has not been proven to all work together.

4     It would take some engineering work, problem-solving to bring

5     them together and make it work.

6          THE COURT:  And Mr. Bort, how about you?

7          MR. BORT:  I agree with both the other experts.  I

8     don't think we can do that right now.

9          THE COURT:  And Mr. Garrie?

10         MR. GARRIE:  I agree with my colleagues.

11         THE COURT:  Okay.  So let's then turn to what's framed

12    as the medium-term solution.  I'm not suggesting that it's the

13    only potential solution or the only element that could bring

14    this together in a shorter term or provide a vehicle for

15    pursuing on a shorter term, and that's the J1962 connector with

16    the appropriate telematic dongle.  And I do want to, or hope

17    that you'll talk to this question about -- there are two

18    sections of this statute, but are we really talking about

19    anything different here between the two here?  Isn't telematics

20    the name of the game right now?  Is it really any different if

21    we're talking about telematics and some sort of, except that

22    it's a different way of delivering it, diagnostic kind of tools

23    that amounts to the same thing?  It amounts to the same kind of

24    exposure here.

25              You may say, No, these are two siloed kinds of things,

1       and you've got think about them separately.  I look at them and

2       say, "I'm not sure that they're so separate."  I just want to

3       know.  So Mr. Smith, maybe you want to start the discussion.

4               MR. SMITH:  Yeah.  Actually, there was a piece that

5       the gentleman yesterday morning talked about the telematics

6       that I didn't really spend a lot of time thinking about until

7       he mentioned it, but I thought it was a really good point about

8       with the electric vehicles not requiring an OBD port anymore,

9       that there isn't a standard for doing diagnostics, period.

10      We've just been using OBD just because it's been there, and it

11      became a thing, but it's not officially a requirement.

12              So the need to have telematics for diagnostics just

13      makes a lot of sense, and I do think, because of that, that

14      does tie 2 and 3 together, because if you don't have a J1962

15      eventually, that's the solution that they're really looking for

16      and trying to get ahead of that, which makes sense.

17              THE COURT:  So before I hear from the rest of you, it

18      is this, that let's assume that ten years from now it's all

19      electric cars.  What you've talked about, what the statute

20      talks about doesn't seem directly to have that in mind here.

21      That is, the statute -- this is like a statute that governs

22      horses and buggies ten years from now.  It just doesn't mean

23      anything.  Unless you read it broadly enough to say, Look,

24      we're talking about how it is that access is provided to

25      consumers for diagnostics, for them to direct as to diagnostics

1    and repair sorts of things.  I think I understand that, and, of

2    course, I want to hear what everybody else has to say, as an

3    engineering problem.

4         I'm not talking about the kind of literary

5    deconstruction that lawyers and judges and, at a certain point,

6    members of the English departments of great universities do.

7    I'm talking about, you know, we've got a problem here, how are

8    we going to solve that, and does this problem redefine itself

9    at some later point with some other technology.

10        So Mr. Romansky, I'm not saying everybody go around

11   the room, but if there's something more that you want to say in

12   response.

13        MR. ROMANSKY:  I think there's a couple of questions

14   that have been raised.  On the pieces of the law, section 2,

15   section 3, I think they build on each other.  I think section 2

16   establishes a common authentication authorization mechanism,

17   then section 3 takes advantage of that and says it's extended

18   to telematics.  I think they are separable, logically, but they

19   build on each other in terms of they're logical connections.

20        On the OBD-II port, electric vehicles, my

21   understanding is that the law should apply to vehicles in

22   general, and it's just a convenience that for existing

23   combustion engine vehicles, you have this thing that's evolved

24   for emissions purposes that we can take advantage of.

25        I don't see a near-term problem with doing that or

1   limitations that says you can't do that.  I do think that there

2   needs -- the law says that there ought to be a solution that

3   extends to electric vehicles.  It would presumably be

4   different.  It wouldn't rely -- we're not saying electric

5   vehicles need an OBD-II port.  We're saying they need a

6   telematics diagnostic and repair capability.

7        THE COURT:  Let me follow up on that response, which

8   is the "that," that is to say a template for dealing with this

9   is in fact emissions and emissions evolved or developed with

10  very specific directions by Congress and in a context in which,

11  if you didn't play ball in California, you weren't selling

12  cars, so there was a deference to California specifics about

13  what they needed for these purposes.

14        Is there sufficient information here to decide what it

15  is that we're talking about, the "that" that we're talking

16  about that should be available to the consumer or that the

17  consumer would want that deals with diagnostics and repair as

18  opposed to maybe larger offerings that the OEMs want to make,

19  or maybe things that are in the crosshairs, more directly in

20  the crosshairs of safety.

21        Do you know enough -- I'm sure you have some thoughts,

22  but do you know enough about what this is calling for in terms

23  of the diagnostics that would be relevant or the pins that need

24  to be developed on the 1962?

25        MR. ROMANSKY:  So for myself I'll say certainly the

1    types of diagnostic information you would expect to get and

2    would get from an electric vehicle would be substantially

3    different from what you see in a conventional combustion engine

4    vehicle.  There's some overlap, but no doubt substantial

5    differences.

6          It appears that the law was written with a historical

7    reference to combustion engines and an assumption, but I'm not

8    aware of any language in it that specifically calls that out,

9    so I don't see a problem with extending it.

10         You raise a very good question.  The law does not

11   specify exactly what data needs to be there or what purpose it

12   will be used for, if anything beyond diagnostic and repair,

13   that's what it calls to.  But that's a pretty broad category,

14   particularly again when you start looking at electric vehicles,

15   battery life and battery usage.  It's a very different use case

16   than fixing a transmission issue in a conventional car.  So

17   where that could lead and what kind of services that could

18   enable or not enable is a fair question that the law has been

19   silent on.

20         THE COURT:  So let me ask from your perspective -- and

21   I'm not asking for your legal analysis or your view of the role

22   of administrative agencies in the administrative state

23   entirely, but is that something that, for purposes of

24   providing, we'll call it a level playing field since that's one

25   of the buzz words that's been thrown around here, for providing

1    a level playing field is that it should be identified by some

2    administrative agency to say, "Here are the things that should

3    be provided" after some discussion.  Is that an effective way

4    for engineers to be able to comply with this statute, rather

5    than people just kind of saying, "I don't know what they want"?

6         MR. ROMANSKY:  Yeah.  You know, as an engineer, it's

7    always helpful to have clear requirements, so I would say if

8    there was a follow-on layer of specificity to say, "Here is

9    what needs to be provided," that would certainly help address

10   the solution and the timing to come to a solution.

11        THE COURT:  But of course you give certain things up

12   in doing that on it.  Would you be giving too much up to

13   permit, you know, some sort of informed rulemaking or that sort

14   of thing to define these kinds of requirements?  That is, I

15   don't want to freeze the -- not that I'm doing it, but I don't

16   want to freeze the development of this by saying, "Here are the

17   ten things that you're supposed to deal with," and they didn't

18   think about the 11th and the 12th, which were the mission

19   critical ones.

20        MR. ROMANSKY:  Yeah.  I mean, maybe you specify the

21   ten things with the process to add more later on and then just

22   make it open-ended or flexible with some control process.

23        THE COURT:  Okay.  Mr. Bort, do you have some thoughts

24   about this issue?

25        MR. BORT:  Yes, sir.  So echoing what Mr. Romansky

1    said, I think this is the challenge that the four of us have

2    here with answering the questions is the specificity

3    requirements for engineering.

4         If you give us very clear requirements, I think

5    actually all four of us will most likely be, plus or minus,

6    really in agreement on all of them.  I trust the integrity and

7    expertise of the other experts to do that.  That's I think one

8    of the challenges we have in this case, is understanding

9    exactly what is the requirement.  So much of disagreement

10   really comes down to what are we trying to answer.

11        Prior to the trial, it struck me as strange that

12   electrical vehicles seemed to be out of scope.  As you've

13   phrased it, it seemed to me that this was written for a

14   horse-and-buggy mentality.  And the OEMs themselves are very

15   much following the disruption that of course Tesla did with the

16   market in creating electrical vehicles to the point that that

17   is now the future.  It is no longer a question.  It is

18   inevitable.

19        And so I think that from an engineering perspective,

20   they should be a part of whatever the conclusion is of this

21   because what we're really looking at is the societal benefit

22   and balance of open access and risk acceptance.  As much as I

23   might have presented myself as gloom and doom, I'm actually

24   very pragmatic with balancing those, and it's something I said

25   multiple times in private conversations around this trial of,

 1   it can't be all or the other.

 2         We are all consumers, we are all citizens, and we as a

 3   society are facing this problem that software is eating the

 4   world.  And particularly in electric vehicle architecture,

 5   software is even more important than it already is in today's

 6   horse and buggies.

 7         And so we're now actually finding ourselves tripping

 8   into bigger questions that I see of where Microsoft and Google

 9   and Apple have closed ecosystems to their software and have

10   been able to maintain that.  And here we're having that same

11   discussion, but there's the potential of loss of life and

12   whatever happens in practice with that vehicle.

13         THE COURT:  Are you satisfied that Google and Apple

14   and Microsoft really have closed their ecosystems, that they

15   can't be breached?

16         MR. BORT:  Sorry.  I don't mean closed in terms of

17   breach.  Based on my experience, everything is hackable.

18         THE COURT:  That's just the business model.

19         MR. BORT:  Correct, the business model which is tied

20   to that societal question of how is that allowed to persist?

21   Your PC, you have a lot of flexibility on being able to work on

22   your PC, but you have no insight into that particular operating

23   system on average.

24         And particularly, as we look at cars, like you said,

25   the horse and buggy equivalence, the complexity of the software

1    on those systems is already more complex than that operating

2    system that Microsoft has closed, and now the potential impact

3    is again loss of life or limb.  And the electrical vehicles is

4    an exponentially more complicated system where software is even

5    more a function of the performance of the car.

6        A great example of this is where Tesla pushed out an

7    update after a hurricane, allowing all of the citizens that

8    drove Teslas in that area to be able to go further and faster

9    merely because they pushed an update to allow that.  The

10   physical capability of the car is driven by the software more

11   than ever, and that's the future.

12       So if the question right now is just on the electrical

13   vehicle component, I think we need to be looking at this in the

14   context of all the vehicles really should be the scope, and as

15   I interpret the law today, electrical vehicles are out of that

16   scope.

17       THE COURT:  Okay.  So back to the more -- there is a

18   more specific question that I framed, not to constrain things,

19   but, so the suggestion is, you know, a year or so of dealing

20   with a connector and a dongle, are we into, realistically into

21   electrical vehicles -- so many electrical vehicles in the next

22   three or four years?

23       MR. BORT:  Roger.  So with respect to the dongle, my

24   first kind of concern and question is I don't understand how

25   that dongle is suddenly not the equivalent of the telematics

1    unit that we're trying to work around.  To me it's the same

2    function.  An internet connected dongle is there to provide

3    internet connected access or in a safer mechanism, RF limited

4    access going to the threat models that I listed.

5         So I don't see how -- the only thing we've done is

6    provided a third party internet access to a vehicle in a way

7    that the current design architecture was built to a physical

8    access security model.

9         The OBD-II port was built on, on the back end of the

10   security engineering, was built for somebody to go and have to

11   plug into it.  And I'm not even getting into, you know, who can

12   do that and the authentication and authorization.  Just the

13   simple design of that was one built for physical purposes,

14   which is why it has been conducive for us and security research

15   to be able to easily work with a car like that.

16        And so I don't feel confident that I can point to the

17   20 plus OEMs sold in the United States and say that simply

18   connecting an internet dongle, there's an immediate security --

19   you know, the security solution is already appropriate on the

20   back end of that.  That's my mere concern.

21        THE COURT:  Well, is it doing anything other than --

22   that is the dongle -- doing anything other than providing some

23   separation between the person who wants to hack in and the car

24   itself, but the same exposure is there.  It's just that they

25   can be doing it at home, or if it's Bluetooth, 300 feet away or

1   600 feet, whatever Bluetooth will do for you, that it's not --

2   I guess maybe I'm asking the question is it a difference in

3   kind, or is it simply degree, or is it something more

4   fundamental than that?

5           MR. BORT:  Your Honor, yeah, so I think I haven't

6   stated my point clearly.  So what I mean is a telematics and a

7   dongle that provides similar access, that's the same.  The

8   difference is that the telematics unit was designed into the

9   defense in depth architecture to be interacted with in a

10  certain way.

11          A dongle going in through another point of access, no

12  OEM would have built that -- I can't confidently tell you that

13  the OEM defense in depth structure across the industry is ready

14  to immediately meet that piece.  I mean, if we look at examples

15  where internet dongles are used, there are limited applications

16  where that thought and testing and engineering has gone into

17  like fleet-wide management of heavy vehicles, right?  There was

18  an intentional choice, and it's designed in for that.

19          So with that being the appropriate analogy that

20  Mr. Smith brought up, I think we can get there, but the

21  engineering requirement is now the look at what does that new

22  security architecture look like to something that, why are we

23  doing an internet dongle when the telematics is already the

24  built-in access point.

25          THE COURT:  Okay.  So let's assume that we are, not

1    that I am, but does that extend the one-year period that

2    Mr. Smith used just as a rule of thumb to get the industry up

3    to that?

4              MR. BORT:  If we're just looking at the question of

5    security analysis to that piece, I think that would be more

6    than one year.  And my support for that would be that, again, I

7    can't speak to what might have to change at the software --

8    more likely just software, possibly hardware -- level.  And so

9    if I were to anchor one year as optimistic, I would say more

10   realistically you're looking at three years.

11             THE COURT:  And that's simply to get the engineering

12   before you get the further development within the OEM structure

13   about how do we adjust to consumer demand for various kinds of

14   things?

15             MR. BORT:  Yes, sir.  So I have to understand, do the

16   analysis, conduct the engineering, insure that whatever needs

17   to happen through the supply chain, as much or as little as

18   that has to happen happens, and then of course the most

19   important part, testing and certification to ensure that that

20   vehicle is put on the road and will operate with safety, fit

21   and function.

22             THE COURT:  All right.  Thank you.  Mr. Garrie.

23             MR. GARRIE:  And to build on what my colleague -- all

24   that my colleagues have said is that the law also has other

25   requirements with the -- like, what is a vehicle network?  You

1    know, there's these terms.  Mechanical data is all data

2    otherwise related, right, and you factor in the electrical

3    piece and these other pieces.

4         So when you're talking about a telematics dongle to

5    solve that and then all 20 plus OEMs can't be involved in that

6    authorization piece of it, and the standardization, I think

7    those requirements, without sufficient additional details,

8    right, what is a vehicle network under the law?  What is -- how

9    are we defining mechanical data?

10        And then this dongle you're attaching, as my colleague

11   pointed out, you have to rethink the security architecture

12   that's going along with it.  Plus, what is it going to actually

13   get access to and return out data, as well as you have to

14   consider the mobile piece of it, right?  There has to also be

15   this mobile application that has to exist, which isn't a

16   trivial process to build securely because the phone itself

17   isn't a trusted device.

18        So you have to build all these tracks in parallel as

19   well as create this third party that is not clearly identified.

20   So I think best, I think optimistically, it would be three

21   years, and I think that's being pretty optimistic, just given

22   the robust testing and other things that would probably have

23   to --

24        THE COURT:  Your three years, I take it, is the same

25   as Mr. Bort's three years.  That is, the threat assessment and

1  the kind of engineering to get to the end point on that.

2          MR. GARRIE:  And that's also assuming a third party

3  entity is established properly, there's clarity around the

4  details of what networks or vehicle networks is, what

5  mechanical data, what vehicle onboard diagnostics, including

6  what can be done just by the repair shop or, you know, the fact

7  OEM has other abilities, so the question is understanding and

8  defining those terms so you can build the dongle to work

9  properly.

10         THE COURT:  Okay.  So Mr. Smith, do you want to

11 respond to all of these?

12         MR. SMITH:  Yes, please.

13         So I think part of the thing that has come up is the

14 network data piece, and there's been discussions of what that

15 defines and what that is, as well as, like, what are we

16 referring to when it comes to diagnostic data, mechanical data.

17         UDS is a standard that we use for doing diagnostics

18 currently over OBD.  It does have OEM specific pieces.  And I

19 think the -- I can't remember what we just called it, basically

20 having the level playing field I think is what we used.  That

21 term, I think if we were to say we're going to use UDS, and if

22 we had -- in my mind, if it's something the dealership does,

23 then the average consumer or repair shop should be able to do

24 it.

25         And one way you could do that is you can continue to

1    use your UDS protocol, your unified diagnostic system.  And if

2    you had something specific that you maybe said, Okay, we are

3    really using this function as a dealership, and we didn't give

4    that out, as opposed to changing any kind of or making a new

5    standard, you could simply publish what that is.  Because UDS

6    does support these proprietary calls.  So you say these three

7    proprietary calls we had used and here is how we used them,

8    that is what they do.

9            THE COURT:  So you're using what the dealer does --

10           MR. SMITH:  As your kind of baseline.  As long as

11   you're doing the same thing, I consider that fair.

12           THE COURT:  I want to hold that thought because it

13   will come out I think some more, which is kind of an

14   anthropological, I suppose, way of dealing with this sort of

15   thing.

16           What is it that you go to your dealer for?  And maybe

17   you want to go to your friendly auto repair shop to do the same

18   sort of thing as a way of defining this, but that may --

19   because people think in terms of -- use the famous quotation

20   from Justice Holmes that you have to think about the law the

21   way the bad man thinks about the law.  What's going to get me

22   in trouble?  And that then requires some definition of what it

23   is that would be wrong, rather than a lengthy dispute about

24   what do dealers do on it, but synthesizing, precipitating out

25   of what dealers do, what the standard would be under these

1   circumstances.

2        MR. SMITH:  Yeah.  That's kind of how I was thinking

3   of it, and I think that would also work for your electric

4   vehicles.  They typically will use things -- they don't have

5   to, but they could typically use UDS as well for diagnostics.

6   Even though they don't necessarily go over an OBD port, they're

7   still using them.  For Tesla, the Rangers come out and they

8   have their own tool.  It's a proprietary tool they use.

9        But if we were to apply this to electric vehicles,

10  while we maybe not even know what the cars are ten years down

11  the road, what they're going to do, you could probably use

12  these standards, or at some point in time you would have to

13  extend them.  But as long as they're publicly known, what you

14  did, you should be fine on those.

15       And I think for network data, that is really, in my

16  mind, should just be defined as the diagnostic data, the stuff

17  that is typically used for this, like the UDS type

18  communications.  And again, I would probably go -- similar to

19  the dealership thing.  If you need the diagnostic data to solve

20  a problem and maybe didn't for whatever reason use UDS, that

21  would probably fall under this umbrella.  And to be compliant,

22  you would just have to say what it is, this is the packet we

23  use.  Eventually I think you'd want the standard for it.  It

24  would be a lot easier, but I don't know that's required.  I

25  think you just have to be open about it.

1          THE COURT:  Okay.  So let me then, Mr. Garrie, turn to

2     you in a different sort of way, which is, I've characterized of

3     course, cartooned what you had to say, but I understood you to

4     be saying, Look, now you're opening it up to other people.

5     Once you open it up to other people, you've got tremendous

6     exposure.

7          Let's start with -- you'll correct me, I know.  But

8     let's assume that what Mr. Smith had to say is synthesized in

9     some fashion, and what the assumption is is OEMs are already

10    willing to let their dealers do it.  It has to do with their

11    relationships with their dealers, I suppose, and that's a

12    complex issue for the business plan as well.  But basically if

13    they let somebody do it now, why shouldn't they let somebody

14    else do it, and why shouldn't it be done in some fashion that

15    is like the dongle as opposed something else?

16         I mean, I'm not wedded to a dongle.  I don't know that

17    Mr. Smith is either.  But that's a quick and easy way to talk

18    about what they can do to provide similar access to non-dealer

19    repair operations.

20         MR. GARRIE:  So I think if you narrow -- if you start

21    applying a definition that is not as broad as the law is

22    written but you start to read into it, like my colleague just

23    indicated, it seems a lot more feasible.  I mean, cars are

24    generating anywhere between, you know, a gig of data sometimes

25    will come off one car in a day if it's driven a lot.  It could

1    be 50 megabyte, whatever you want to call it, which is much

2    different than just the dataset my colleague is defining,

3    right?

4         And the security and the controls, I think the third

5    party is still an issue because how is that third party going

6    to operate and functionally deliver it, and there's a big

7    difference between what the -- you know, the current state of

8    the law of all vehicle networks versus the limited or more

9    narrow subset that you're getting by the dealer, sort of

10   defined subset of activity.

11        So I think if you were to put that in, and maybe the

12   other big issue is what's that third party, how will it work,

13   and, you know, every consumer, right, has a direct connection

14   now to their vehicle.  So it's taking what's currently done at

15   a dealer level.  The way the law is written, this open access

16   mobile-enabled platform has to be able to transmit all of these

17   things, and this third party is going to be the one that has

18   the keys to at least some part of it.

19        Whether, you know, it's properly designed or perfectly

20   designed or not, right, you're still consolidating from 20 to

21   one.  And there's always a risk when you do that.  And if it's

22   -- as my colleague pointed out, if it's an acceptable risk, you

23   know, you have to balance the two together and figure out

24   what's appropriate.

25             THE COURT:  There are many things that are being

1   developed by that concept, your response, you know, what does

2   mobile mean, what do all of these things mean, how can they

3   handle all that data effectively.

4          And maybe if I understand the purpose, fully

5   understand the purpose of the statute as opposed to the motives

6   for enacting it, it is to empower consumers to make choices

7   about how their data is available.

8          Now, they may not understand exactly how their data is

9   available.  They may not understand exactly that the OEMs are

10  keeping control of their developing but individually big data

11  for themselves for purposes of marketing and that sort of thing

12  and also monetizing this opportunity to take money from

13  consumers, to take their data, too.

14         All that having been said, I really am back to this

15  idea of a fully informed consumer who maybe is thinking about

16  two things.  One is, I don't get my car fixed, and can I get

17  the person that I'd like to have to get my car fixed.  And the

18  second they may not have thought about, but it may come to mind

19  at a certain point, is who has access to this stuff and what

20  are they doing with it?  Where is it going?  That may be part

21  of the falloff that takes place when you're offered a year's

22  worth of OnStar and then they don't follow up on it.

23         All that having been said, how is it any different,

24  except that it's more dispersed now?

25              MR. GARRIE:  I think when you evaluate the type of

1    solution, every OEM does it, you know, OnStar will be doing

2    some effective equivalent, when you're talking about a third

3    party now all of a sudden being the entity that is tasked with

4    managing all of that information, I fully understand the

5    consumer benefit of being in control, right?  You want the guy

6    that works -- for me, I want the guy that I know that works on

7    Subarus to be the guy working on my car because they are

8    complex systems, right, and I want to comfortable and I fully

9    understand that.  But I think removing the OEMs from the entire

10   process has risks that come with it.

11           THE COURT:  Is it necessary to remove the OEM from the

12   process?  If we are saying, Look, they'll get together and

13   they'll say, Here are the important things that are diagnostic

14   here.  We all agree upon those important things.  We will

15   permit somebody else to be the gatekeeper for that, but we're

16   defining what it is, and we're defining how the gatekeeper gets

17   to those things.  Are you really displacing the OEM?

18           MR. GARRIE:  They're not -- the way I read the law,

19   the law says directly or indirectly they're not allowed to be

20   associated or affiliated with this third party so --

21           THE COURT:  Well, but if I read the statute not to

22   make it impossible but to say "indirectly" means that you don't

23   have -- you don't have their arm twisted on this but simply

24   that they have to talk to them, they have to engage with them.

25   And if "indirectly" means that engaging with them is wrong, and

1      I don't think I'd read the statute that way, but as an

2      engineering problem, I wouldn't read it that way either.

3              MR. GARRIE:  Well, the complexity of dealing with

4      20 -- first off, it's every car -- I mean, I don't think the

5      OEMs are going to just do it for vehicles sold in the state of

6      Massachusetts.  Maybe they will; maybe they won't.

7              But when you think of the scale and breadth of what

8      we're talking about, the vehicle, you know, and the OEM when

9      they repair it or they publish a repair or they push the

10     repair, they're involved in authorizing that, as was testified

11     earlier by the various folks, and they've explained it, right?

12             So you're putting another entity into that process and

13     then you're putting that entity into that process for all of

14     them.  And it's a complex system to set up, manage and operate.

15     It can be done, but there needs to be rules of operation and

16     definitions and other pieces, like, to understand what does

17     that mean, how will it work?

18             THE COURT:  But if I use -- not "I," but if one were

19     to use as a template the Clean Air Act emissions solution,

20     which was kind of worked out with a very specific sort of thing

21     involving 20 or more OEMs, at least for internal combustion

22     engines, it was doable.  Are you saying that it can't be done?

23     It just becomes exponentially more complex to do it, I guess

24     maybe that's -- is that what you're saying about it?

25             MR. GARRIE:  I'm just saying it's exponentially more

1    complex.  It can be done.  It's just a very, very -- just the

2    size and magnitude of what we're talking about will probably

3    impact most vehicles on the road in the United States.

4           THE COURT:  All right.

5           MR. GARRIE:  You're talking -- that's a very --

6    there's 280 -- I don't know how many millions of cars are

7    involved in that process, but it's a lot of data and a lot of

8    moving pieces with a lot of consolidation.  Even if it's among

9    five different entities managing it, it's still a lot of

10    pieces, but I defer to my colleagues as well.

11           THE COURT:  Okay.  So Mr. Romansky, do you want to

12    speak to this issue?

13           Hold on just a second.

14           Why don't we break for the court reporters.  I want to

15    be sure they get a chance to change.  You get all this time to

16    think about your answer, Mr. Romansky.

17           I'm not going to break now.  I'm going to sit here

18    through this.

19           (Recess, 11:20 a.m. - 11:24 a.m.)

20           THE COURT:  Okay.  So we're going to go back on with

21    the limitations that we had earlier about the issues of only

22    those people who have signed confidentiality agreements being

23    on.

24           So, Mr. Romansky.

25           MR. ROMANSKY:  So the conversation has meandered in a

1    few different directions since you phrased the last question.

2          At the risk of bringing us back a little bit, I just

3    want to reference back to we had started on the notion of a

4    dongle or an after-market device plugged into a JN62 connector.

5    I agree with Mr. Bort's statement that there's a -- technically

6    a small difference between the after-market device versus an

7    built-in telematic solution.  There are design differences,

8    but, in my view, the after-market suggestion is a convenience,

9    it's a way to deploy something quickly without doing a

10   redesign, but from a security analysis perspective, from an

11   architectural perspective, relatively small difference.

12         THE COURT:  So what's the small difference, though?

13   What is it -- I take it it's an additional security exposure;

14   is that what you're saying?

15         MR. ROMANSKY:  There is --

16         THE COURT:  It's not coincident, I understand that --

17         MR. ROMANSKY:  Yeah.

18         THE COURT:  -- but how does it increase or decrease

19   the potential security?

20         MR. ROMANSKY:  So when you add an add-on device to any

21   system, like a vehicle, certainly there's interactions that you

22   have to either account for or acknowledge that you're not

23   accounting for.

24         So that's different from a designed in, built-in

25   system that's all been tested together and evaluated together.

1          Sometimes that works in your benefit; from a security

2     perspective sometimes it's a risk.  It can be a benefit in that

3     independently developed systems plug together if they treat

4     each other as a limited trusted entity.  You actually can end

5     up with more secure defense in depth because you're

6     independently checking each other or not trusting each other;

7     whereas, if you built something in, you might make assumptions

8     that may not be true.  So that's a very broad generalization,

9     but that works in your benefit, but you can also have

10    expectations that don't play out.

11         In terms of the timing, I don't have a very specific

12    expectation of the time it would take to make an after-market

13    device.  I'll simply say that some models of devices have been

14    mentioned in previous testimony that are relatively more mature

15    than others, and I think if you were to, you know, take a

16    handful of the more mature, established telematics devices,

17    add-on devices that have been used for several years

18    successfully tracking fleet vehicles, government fleet

19    vehicles, other large corporate fleets often use these types of

20    devices with very few, if any -- no known attacks that I'm

21    aware of against them.

22         So if you started with a device of that sort and you

23    said what do I have to do to that to make it compliant with the

24    law and support the law, I suspect that time frame would be

25    different from starting something brand new from scratch, so I

1    think it would be a much shorter time frame.

2            THE COURT:  All right.  Did you want to speak to any

3    of the other issues that Mr. Garrie talked to here?

4            I understand that you were reaching back where we've

5    been to talk a little bit more about that, but is there more?

6            MR. ROMANSKY:  Two thoughts come to mind.  One is, I

7    have a strong desire to want to start to invent and create a

8    whole new solutions which don't necessarily tie to the law,

9    which to your point earlier is not helpful, so I'll try to

10   refrain from going down that path.

11           So putting all that aside, one thought that keeps

12   coming back to my mind is I hinted at this yesterday when I was

13   speaking, and I said, in my experience, automotive OEMs are

14   very large, complex organizations with many divisions that tend

15   to operate somewhat independently, almost as if they're

16   independent organizations.  So I can't help but coming back to

17   this mental image that a large OEM that has a division that's

18   handling the telematics data and a division that's designing

19   the cars is not that different from a third party administering

20   the telematics data versus the OEM administering the cars now.

21           Again, broad generalization, there are some

22   proprietary information sharing that might happen within the

23   confines of an organization, but from a practical perspective,

24   it seems to me a relatively small step to go from one

25   environment to the other.  Others may have different views on

1  the amount of reliance and information sharing, so --

2      THE COURT:  Without opening up Pandora's box, I am

3  interested in the outside-of-the-box theories that you have in

4  mind, if -- if they're, you know, achievable, I guess is really

5  what I'm asking.  I mean --

6      MR. ROMANSKY:  So a moment ago we talked about would

7  it be helpful to list out the specific things that you'd want

8  to observe and see outside the car, what diagnostic procedures.

9  The law doesn't address this, but one way to do that could be

10  to say if an OEM were to offer some sort of telematics

11  diagnostic support capability, then maybe that -- only that

12  functionality that they make available to their captive members

13  or partners, maybe that's what you need to make available to

14  third parties and limit it to that.  So now at least you have a

15  well-defined set, and as you add more advanced capabilities

16  that you share with your own internal partners you make a

17  comparable capability available to third parties.

18      THE COURT:  That's a theme of variation on that, what

19  I call the anthropological approach that --

20      MR. ROMANSKY:  Exactly.

21      THE COURT:  -- that Mr. Smith had.

22      MR. ROMANSKY:  It is.

23      THE COURT:  Okay.  All right.

24      Mr. Bort, do you want to --

25      MR. BORT:  Yes, sir.

1          THE COURT:  -- weigh in?

2          MR. BORT:  So dongle versus telematics, I think, is

3    really kind of a red herring.  We're really just talking about

4    access to the car.  And the -- so a dongle is just a solution

5    to try to fit through whatever we understand the whole of the

6    interpretation of the law is.  I think -- I think the question,

7    again, is just one of access.

8          With respect then to, okay, that access is given, then

9    there's two questions.  One is on the ecosystem around

10   authorization and authentication for that access, and then the

11   other part then is what is the scope of that access on the

12   vehicle itself.

13         UDS, as Mr. Smith noted, is a standardized protocol

14   and is perfectly adequate when we're talking about read to the

15   ECUs and write into the definition of I need to set a flag to

16   make sure that I've cleared a condition so that the software

17   has caught up to the fact that the physical device is now

18   functioning correctly.

19         My -- with that perspective, like, if that's what

20   we're talking about from a scope perspective, I'm good.

21         My interpretation of scope, though, is larger than

22   that, that that was not the limit of reading, which is just

23   understanding the diagnostics of the car and the write function

24   was not just limited to setting a flag, but that we were

25   talking about the potential to reprogram and do firmware and

 1    software development.  If that's in scope, that's a completely

 2    different ball of wax that we're talking about on the potential

 3    risk to the vehicle and the scope of the -- internally of what

 4    we're talking about.

 5          If we're talking externally, and not to pander, I

 6    really appreciated that you said, all right, Hey, Mr. Garrie,

 7    the scope of when we're talking about authorization with

 8    indirectly or without the OEMs being a part of it, they clearly

 9    have to be a part of it.  Like, that just makes sense.

10          Our interpretation prior to Your Honor saying that was

11    the OEMs literally, as the law says, cannot be a part of it,

12    which is why our testimony leading up to this moment was, well,

13    by definition they can't have any kind of authorization on the

14    vehicle because that literally means that they're doing

15    authorization.

16          So if we're going with what I would say is a more

17    pragmatic understanding of, of course they have to be involved,

18    it doesn't make sense for the law to say remove your

19    authorization systems and remove all these pieces.

20          So Mr. Romansky's suggestion of, well, we have models

21    for certificate authorities and different proven technologies

22    for establishing access and authentication -- or authentication

23    and authorization in multiple fields.  Furthermore, I think

24    where Mr. Romansky, in terms of reaching across the aisle here,

25    brings a particularly interesting perspective is the same way

1    we were talking about the future of vehicles being electrical

2    vehicles, autonomous vehicles is that other component, which is

3    why the V2X element was particularly relevant.

4         There is going to be a future state across this

5    country where the necessity to trust different levels of

6    communication between cars and anything or from cars to cars,

7    V2V, is going to be a necessity to achieve what's called level

8    5 autonomy, that a car can drive itself.  That is, again, the

9    future versus the horse-and-buggy conversation that we're

10   having today.

11        And so from that perspective, there is going to

12   continue to be additional research, and the components that

13   he's mentioned in his previous testimony and affidavits

14   indicates that growth of that field.  We haven't reached the

15   point that that is -- there's a widespread deployment, but

16   clearly there's been enough learning and we're going in that

17   direction, that is something that will happen in this country

18   at some point.

19        So I did note that there are risks to limiting where

20   the keys are going to be held.  I wouldn't say that that risk

21   overwhelms the fact that there are going -- it isn't almost

22   inevitability that this is going to be seen at some level.

23        So in terms of that side of the scope, if the OEMs are

24   allowed to be a part of that process and if the OEMs are

25   allowed to maintain the defense in depth as they've built that

1    authorization and authentication on their vehicles, and the

2    scope is limited to that kind of read/write that Mr. Smith was

3    noting, that -- that doesn't sound -- that's not far-fetched.

4            THE COURT:  So this is something that probably will

5    come up in the next range of questions, but if you assume that

6    the OEMs have no interest in sharing and they will choose as a

7    political -- not political -- maybe part political -- but, in

8    any event, as a strategy, business model strategy, to drag

9    their feet, refuse to move into this area in a pragmatic way,

10   develop alternative ways of describing this, how do we get from

11   here to compliance with what I'll call the broad purposes of

12   the statute?  I put that out, it's not -- as a response to what

13   you had to say but not to be taken up at this point, but that

14   is something I want to explore, I've indicated earlier.

15           So, Mr. Smith, do you want to respond?

16           MR. SMITH:  Yeah, I think the only thing that has

17   really kind of come up here that I actually want to support is

18   the -- there was a discussion about the difference between

19   telematic dongles and the internal telematics.  They are very

20   similar, and I think one of the options that the auto industry

21   could do is to use theirs.  The dongle was just, as Brian

22   mentioned, just a way of doing something quickly, if you

23   thought it would be hard.

24           If you want to do this yourself within your own

25   telematics system, your own entertainment center, you would

1      probably have to talk to a third party and fit the rules, but

2      you could definitely do this on your own.

3           THE COURT:  Okay.  But to speak to Mr. Garrie's point,

4      that's you in an ecosystem of 20 others, you could do it, but

5      could you do it the same way everybody else does it?  Can we

6      look to have it done the same way?  That's an architecture

7      question, I know, but it is that confounding question of

8      exponential complexity.

9           MR. SMITH:  It is a bit.  And I'm sorry, I'm getting a

10     little ahead to the architecture and the third-party risk, but,

11     you know, where it's going to get -- it's going to get a little

12     complex probably when it comes to discussions of which one is

13     better with cybersecurity, because depending on who you pick is

14     going to really determine that for your third party.

15          The auto industry isn't exactly known for great

16     cybersecurity.  They just kind of started doing this about five

17     years ago.  So if you were to say, like, who's better, like

18     Google or Detroit, it's probably going to end up a little more

19     on the, you know, the West Coast side.  But that's not

20     necessarily who you pick.  And so we can make requirements for

21     that kind of stuff, and I think that might help a bit, but

22     it's -- I don't think you're going to really run into a

23     clearcut, oh, because we make cars it's more secure.  It's not,

24     they just -- there's a lot more proprietary stuff, and that's

25     where the standards would come into play.

1          If you were to come up with here's the way we're going

2     to communicate to this third party, that's -- that's the piece

3     you really kind of need, which would be a transition layer or

4     something like that.  I think that's probably the -- that's the

5     big hurdle we'll have to get over.

6          THE COURT:  Okay.  So, Mr. Garrie, do you want to wrap

7     up this part of the --

8          MR. GARRIE:  Well, I agree.  I think -- I think you

9     hit it on the head.  I think the big hurdle is that

10    communication layer with the third party to streamline it for

11    20 OEMs, and that's assuming also that all OEMs are using

12    telematics, which is not necessarily the case today.

13          And I do think to -- my colleague said and you alluded

14    to, we're going to head eventually to a world where cars will

15    drive themselves so they will have to communicate and share

16    information with each other at a minimum just to allow for safe

17    driving, but I do agree with Mr. Smith.

18          THE COURT:  My horizons are limited.  I don't read

19    science fiction and that sort of thing, but what you're

20    describing I hadn't really thought of it this way, is there is

21    going to be a Chrysler going down the road and a Cadillac going

22    down the road, and if we're going to be talking about

23    autonomous automobiles, they have to know what they're doing.

24    Yeah, that's some degree of sharing of some sort.

25          MR. GARRIE:  Yeah, it's an inevitability, they're

1    all -- if they want to drive on the road.

2         THE COURT:  Right.  Right.  So there's a -- just -- I

3    always try to think in terms of incentive structures.  So there

4    is an incentive structure if you want pursue you, OEM, want to

5    pursue this, which is a market of real significance in the

6    future or anticipated significance, you're going to have to do

7    this sooner or later, so why not start working on it now?

8         MR. GARRIE:  Yeah, and they are, I believe.  Like,

9    autonomous, there are taxis that don't have any drivers that

10   operate in different cities in the United States now, but

11   that's just the beginning, right, I mean --

12        THE COURT:  I don't want to be the first one in one of

13   those taxies, so --

14        Okay.  All right.  So let's then turn to that longer

15   term question of architecture here.  I guess I'd turn to

16   Mr. Bort on this as well; that is, you know, what really needs

17   to be done that provides or would provide I'll call them

18   tolerable but at least minimize the risk, the risks involved,

19   I'm looking to you as particularly sensitive to risks, but also

20   to the question of how we solve this, how it can be solved

21   architecturally, if it can.

22        MR. BORT:  Yes, Your Honor.  So reiterating what I

23   said previously the question is one of scope on two sides,

24   fundamentally telematics and an internet-connected dongle are

25   just access points.  And I don't think we want to necessarily

1    be in the business of dictating those access points solely that

2    those access points exist, how and what are the expectations of

3    what they will communicate with and, you know, how you get that

4    access.  And so on one hand, we have this ecosystem question of

5    building that ecosystem to facilitate that access and then the

6    eternal question of what's in scope for what that access

7    grants.

8              And this is where I was pointing to Mr. -- what

9    Mr. Smith said, that UDS already provides a standard to the

10   level that I believe you're suggesting we should interpret the

11   law of I can read the relevant piece of information and the

12   limit of write is solely to set flags for the purposes of

13   repair and diagnostics at that level.  I'm not rewriting the

14   firmware, I am not redesigning elements of the car outside of

15   the OEMs' purview, I am not taking that level of -- no pun

16   intended -- intrusion into their intellectual property, okay.

17   If that's -- if that's what the suggestion is, then that's --

18   there's not a lot of rearchitecture that has to happen except

19   around the 20 OEMs meeting that access and ecosystem standard

20   and being a part of standing up that infrastructure.

21             If the current components are what they are, then I

22   think where it's going to probably be more of a minor level of

23   doing that risk assessment and potential rearchitecture, but I

24   wouldn't anticipate it being an exponentially burdensome piece.

25   The exponentially burdensome piece is now fitting with that

1    access requirement is really just the large task in front of

2    us.

3          THE COURT:  So let me go back to this question I keep

4    talking about of incentive structure.  As I listen to that, you

5    know, what's the real impediment to a far-sided OEM saying I've

6    seen the future and I've got to comply with it?  Is it the kind

7    of, you know, bureaucratic entity sort of thing that I've seen

8    the next quarter and that's all I'm concerned about?

9          MR. BORT:  Yes, Your Honor.  So what I think the

10   element here is, again, we're talking about scope of what's

11   being accessed in the vehicle.  In the example of V2X and V2V,

12   so a car being able to talk to anything, and to put a point on

13   it, anything is a stop sign, is a traffic light, is that

14   barrier there, so that the environment, the static environment

15   is able to be understood and provide information for a

16   multitude of functions, but we're focusing on safety of the

17   car's operation.

18         And then, as you noted, the example of OEMs that don't

19   build together still need to be able to speak to each other on

20   the road.

21         In that context, that is primarily today V2X is in

22   more of a level 2 to level 3, if we're being generous, more

23   level 2 plus perhaps autonomy, which means that physical

24   functions of the car are not altered by my interpretation of

25   that data.  We're not confident yet enough in those -- the

1    system in that negotiation where we're going to give the car

2    the power to brake or steer.  The requirement at level 2 is

3    that a human being is there to intercede and make sure that the

4    car physically functions.  The computers are just negotiating

5    information and presenting that information.

6          So my intent is using that as an analogy of, again, of

7    the limit of access of what kind of data is being presented to

8    what action.

9          If we're just talking about reading and no physical

10   action is possible from those things, well, that's a low --

11   that's a low risk.

12         Now getting more into the economic utility, car

13   manufacturers, I believe, are interested in, of course, that

14   V2V and V2X negotiation, and that is a -- beyond a state

15   problem for them to be able to do that anywhere on the road

16   that they are.

17         Having to share intellectual property on this is

18   exactly my software on this ECU and allowing you access to be

19   able to change that with no control, that's a different -- that

20   brings up different issues of how much of my business trade

21   secrets, my actual patents, and then, of course, I had to get

22   that system as is certified to be able to operate safely on the

23   road, what is the certification and assurance of somebody else

24   doing that, what is the liability of somebody else doing that,

25   and the intended or unintended consequences of that design

1    change.

2          And so, again, the question comes back to -- all of

3    these components really come down to the scope of what it means

4    on this side or that side, but the comparison of they do have

5    an economic interest on the V2X and V2V component for trying to

6    progress that to some day, and I'm not saying that it's in the

7    science fiction time frame, but some day probably in 10 to 20

8    years that autonomous driving becomes an element, where that

9    trust is built to affect physical function on the car, as to

10   how that ties to our horse-and-buggy discussion today is if the

11   scope of that access for what the law is suggesting is not

12   anywhere close to that, then the risk is lower and there is

13   less architecture that needs to be thought through.

14          THE COURT:  So let me just be sure that I had at least

15   a glimmer of understanding of what the exposure of -- I'll call

16   it proprietary information rather than necessarily trade secret

17   for various reasons, but is it really necessary for there to be

18   disclosed anything like that?  It's simply here's the standard,

19   we'll meet it, you know, and we'll do it with whatever software

20   we have, and it doesn't really have to be shared with anybody

21   else.  Am I missing something in terms of how they could

22   respond, or does it -- you know, it's -- I keep using the

23   poison pill analogy, that, oh, we do that, but of course it

24   would kill this.  And I'm not sure that it does, unless they

25   say that's how we're going to do it, we're going to do it so it

1  kills us so you can't make us do it.

2         MR. BORT:  Your Honor, so my interpretation of the law

3  with the use of the "and otherwise" and the intention to be

4  very much an unbounded use of language, that's where my concern

5  comes from that.  If we're suggesting that the limitation is, I

6  believe, as Mr. Smith was defining it, of UDS as an example

7  with read from as much as is necessary for classic repair and

8  diagnostics and write within the limitation of I need to set

9  flags as a part of very standard and known routines, then

10  that's a different scope, and I wouldn't have an issue with

11  that.

12         THE COURT:  Okay.

13         So, Mr. Smith, do you want to speak to this?

14         MR. SMITH:  Yeah, I think you're -- the definition of

15  UDS for diagnostic purposes, like, meets, like, the way the

16  dealer is using it is fine.  I think that's -- at least for me

17  that's an agreed upon scope kind of thing that we could talk

18  about.

19         When it comes to the incentive, that's something you

20  had brought up for the OEMs.  I hadn't spent a whole lot of

21  time thinking about it, even though I've had to in the past

22  when I'm trying to convince the OEMs on adding security, like

23  how does this benefit them, it's definitely a thing you do.  So

24  this is definitely unscripted.  I want to speak to it a little

25  bit even though it's formulating in my head.

1              In security, I've been in security for a long time,

2      and I think -- maybe the naivety of it.  When you go into it

3      sometimes you're, like, oh, we're in security so we're going to

4      protect people, and we're going to, you know, protect items or

5      assets, whatever, but I'm starting to see -- and not just here,

6      but across the industry -- security starting to be used more as

7      a control kind of mechanism where we're seeing -- seeing it

8      used in a way that's not so much about protection, it's

9      about -- maybe protection of themselves perhaps.

10             And so I'm a little cognizant -- a little concerned

11     with it, I guess, and, like, I see that in this case we'd have

12     to -- well, it seems like we'd have to convince them to -- to

13     be more open.  And the V2X may be a good way of doing that.

14     They do have traditionally a problem with being open.  That's

15     one of the reasons I think the timelines are so long on some of

16     these things is because it involves working together.  Like,

17     the -- talk about ISACs, and that's like the security forums,

18     and they have them in other industries, as we've mentioned and,

19     like -- and they're typically, like, for financial and aviation

20     where they -- all the security isn't a secret sauce thing; it's

21     just this is what we're doing, this is how we're protecting

22     stuff, this is the trends we're seeing, this is how the

23     products we bought, this is working for us, what's working for

24     you.  And that's usually how they work.  They do not work that

25     way in the Auto-ISAC.  It's one of the reasons that half these

1    things were confidential, even though it doesn't seem like it

2    should be, it's because of that.  They haven't gotten to that

3    cooperation yet, and maybe V2X will do it, maybe that's when

4    they're going to start doing it more.

5         I know Faye, who runs the Auto-ISAC, I know that's

6    definitely her intention where she wants to get it to, but it

7    is -- it is a complexity that we have to deal with here.  I

8    don't really know the right answer for that one yet.

9         THE COURT:  Something that kind of kicks around the

10   back of my mind, again, beyond the scope perhaps here, but

11   something I've thought about it a little bit.  When Justice

12   Douglas was chairman of the SEC, he used to describe his rule

13   as sitting there entertaining members of the industry and

14   looking from time to time at the shotgun behind the door.  He

15   never really had to take the shotgun out, but the idea that the

16   shotgun was there was enough to encourage fruitful

17   conversations about it.  And now I think you would say that the

18   financial industry really its core functions, now it's being

19   challenged in other ways, but its core functions is a

20   cooperative kind of involvement among all the stakeholders.

21   Now they've got all the stakeholders in it, you've got the

22   brokers, you've got the underwriters, you've got everybody else

23   in the -- in the thing.

24        All of which is to say, perhaps a stronger or stronger

25   assertion of agency on the part of someone who could enforce

1    those kinds of rules or encourage people to think the

2    alternative is a shotgun as a way of responding to this.

3            MR. SMITH:  Yeah, maybe.

4            THE COURT:  That's -- you know, I've been kind of

5    heavy handed with the OEMs to some degree, but some parts of

6    this remind me of what is they say about the bourbon kings,

7    they've forgotten nothing and they've learned nothing.  And

8    that it seems to me is a problem in being adaptable in the

9    future and may lead to them being not adaptable to the things

10   that are actually going to be happening to them, and more

11   generally, not my role, but something I want to think about,

12   think about how you properly implement something like that if

13   it's to be implemented.

14           I mean the idea is, you know, we live in a democracy,

15   people vote for things, and maybe they're well informed, maybe

16   they're not, maybe there are limitations, guardrails that are

17   created by the supremacy clause, but the idea is to vindicate

18   voters and their larger purposes, and foot-dragging by

19   industries doesn't necessarily do that, just as not responding

20   to the competitive environment doesn't do that.  You can

21   whistle past the graveyard only so long before you find

22   yourself in it.

23           So I think I understand that -- the view.

24           Mr. Garrie, do you want to --

25           MR. GARRIE:  I agree with what my colleagues have

said.  I think the problem is in the language of the law there

isn't this level of -- I think you hear -- I think the

proposals that Smith and, frankly, all three have made are

worthwhile, but the law as it's written is written such that

it's -- we're reading into it and -- things, but if we were to

interpret it that way --

   THE COURT:  You're too much of a lawyer, Mr. Garrie.

   MR. GARRIE:  Sorry.  But if you read into it with

those things from an engineering perspective when you look at

the security controls and you look at the amount of effort, it

becomes a lot less.  You're removing a lot of the complexity

and challenges that we'd be facing in making it much more

streamlined and effective.  But -- so I agree with what they're

saying.  I think it would be helpful in some sense to provide

that, but that, you know, isn't what's there.

   THE COURT:  Right.

   Mr. Romansky, do you want to --

   MR. ROMANSKY:  So, first of all, I appreciate and

agree with the references to V2X from Mr. Smith and Mr. Bort.

I see -- I think it's convenient and sensible to look at

diagnostic and repair as an extension of a connected vehicle

architecture that serves other purposes, and this is one

application on top of other applications that happen to be in

some cases safety critical, in other cases consumer oriented.

So I think it's a useful framework.

```
 1            In terms of, yes, but architecture, I think we've all
 2      referenced this notion that we've come to this session with
 3      very different understandings of the law and the language.  My
 4      interpretation and my assumption has been that, you know, that
 5      technological architecture that would be in the near term and
 6      the long term would be one of segmentation, meaning the
 7      technology that responds to this law and connects to the
 8      outside world and does whatever standardized translation needs
 9      to happen would be intentionally separated from whatever is
10      inside the vehicle and the actual detailed proprietary design
11      that makes the vehicle unique and special and valuable.  And
12      you'd have this notion of a, you know, translation layer, and
13      maybe a more intelligent security layer that inspects what it's
14      being asked to do, the state of the vehicle, you know, has some
15      sense of understanding of what's allowed, what's not allowed
16      based on the current state of the vehicle, and as would the
17      internal components within the vehicle have their own
18      understanding of what their role is in their current state and
19      then applies rational safety constraints, as many components do
20      today, that -- I don't agree with the assessment that the law
21      would require removing all of those layers of protection.  I
22      think you'd actually add another layer of that rational
23      protection.
24            And I'll just go one step further and say that we
25      talked a little bit about writing to the vehicle and how
```

1    extensive that should be, is it just changing registers or

2    actually changing software.  Extending on my assumption that

3    existing protections in the vehicle don't have to go away, I

4    think for vehicles that currently accept secure software

5    updates, an over-the-air update, under the law, my

6    understanding of the law is that that secure mechanism of, you

7    know, decrypting, validating, authenticating code doesn't have

8    to go away, you just give a third party the right to deliver

9    the code to the vehicle.  But they wouldn't be able to write

10   their own code, they wouldn't have all the source code to the

11   vehicle, they wouldn't have full access to all the proprietary

12   design details of the vehicle; they would just have a package,

13   a binary file delivered from the OEM that they could then

14   transmit to the vehicle and say, oh, this ECU needs an update,

15   here it is, hopefully it's the correct one and it will accept

16   it.  So I don't see the law saying all that has to go away and

17   you have to decouple all that.

18            THE COURT:  Okay.  So let me -- I'm cognizant of the

19   need to afford counsel the opportunity to do examination.  So

20   I'm going to move directly on to the question of the capacities

21   and risks of third parties here.  And maybe, Mr. Bort, you'll

22   get a chance to take the lead on this one, too.

23            And that is, you know, what is it that's necessary for

24   that third-party capacity here?  Is it available generally?

25   We've heard about the various ways to ensure, most recently

1    obviously from Mr. Romansky, how to secure this, probably

2    relying on segmentation, at least that's what he's offered as

3    the primary way of presenting that, but are there extraordinary

4    risks of third parties being involved that we haven't discussed

5    so far?  And is there a capacity out there among somebody in

6    the industry to want to be able to do this and would be able to

7    do it, in the security industry, just as, you know, here's a

8    market, I'd like to be the third-party administrator for this

9    kind of thing.

10           MR. BORT:  So in terms of are there capabilities, yes.

11   Again, from the concept that --

12           THE COURT:  That can get up to scale in a reasonable

13   amount of time.

14           MR. BORT:  Define "reasonable," Your Honor.

15           THE COURT:  Yeah, no, I try to do that all the time.

16   Generally I ask a jury to do it, but it is within that -- a

17   time frame that -- let's say four years.

18           MR. BORT:  Four years.

19           THE COURT:  We'll use that.  I mean, and, you know, it

20   goes to things like have server capacity or whatever is

21   necessary to do all of this kind of stuff, access to servers, I

22   should say.

23           MR. BORT:  Yes, sir.  Does technology exist that does

24   a function like this, yes.

25           Does this -- has this technology been implemented and

1    tested across all of the Ms, no.

2          And so when I -- when I look at that challenge

3    statement, first we need to standardize that process.

4          Just taking it out of technology and even like legal,

5    I -- I struggle from a business perspective of understanding

6    that balance of how do the OEMs get to be a part of developing

7    that standard versus how much are they just waiting for

8    something to stand up, and what is that thing, and then how do

9    they comply with it?  That's -- that's this real hypothetical I

10   don't frankly understand.

11         From a technical perspective, let's say we take that

12   off the table and this thing appears, and I think appropriately

13   we would want that to be several economic interests, right.  We

14   don't want one company that does this, just like in general

15   information technology we don't have one company that does

16   this, we have agreed a worldwide standard on certificate

17   negotiation, levels of certificate, creation, deployment,

18   expiration and revocation, those -- those would all -- that

19   system exists in terms of we understand that technically.  So

20   if that third parties start to exist, that would be the model

21   they would adopt.  We would then look at what needs to -- what

22   do the OEMs need to do to adapt to that in that setting.

23         The challenge on the OEM side when we, I feel like a

24   little bit cavalierly just sort of like, well, here's a new

25   standard.  Having been in Mr. Smith's shoes working with these

1    OEMs and understanding it is not necessarily intransigence when

2    they say that's going to take me three to five years to do that

3    because that is the length of the design of the supply chain.

4    And so it's always a question of how much are you requesting

5    that that supply chain have to change from today to what that

6    standard is.

7          And I do not like to be as is, I guess, my

8    conservative side is I'm very sensitive any time I ask a third

9    party of any type, even beyond this industry, to suddenly meet

10   a new standard and understanding the significance of what that

11   means.

12         I do agree that security, as Mr. Smith said -- I'll

13   frame it differently, that security is often used as a shield

14   to -- and I face these same issues with the way that we

15   classify different information and documents in this country.

16   The purpose of security always has to be balanced, again,

17   against societal benefit.  And so I would not -- I'm not going

18   to be Pollyannaish here in suggesting that I don't believe that

19   that is a factor at all, but I think the burden of the

20   liability of any of these decisions do rest on those companies

21   and they are the ones who have to live with that worst-case

22   scenario that there is a failure in the system.  Nobody else

23   has to, except for, of course, the customer that does in fact

24   have that catastrophe.  Hopefully it will never happen.

25         So I think, yes, those systems exist; yes, we can

1   adapt them.  We are definitely in the long-term time frame.

2   Reasonably, there are proven technologies, there are companies

3   that could adapt this from other markets; and, again, we could

4   put that man on the moon and do that.  I don't think -- I think

5   it would be simpler than putting the man on the moon to be

6   frank, but I think we should be careful in assuming that those

7   supply chains can just quickly meet what seems when you just

8   draw it on a board as a simple request.

9           THE COURT:  Okay.  So let me -- I'm going to stop this

10  portion of the discussion and permit counsel to inquire but

11  make this set of observations that are beyond my

12  responsibility, I think, probably, but to frame this a bit.

13  This strikes me as an area in which, you know, meaningful

14  administrative activity, the way administrative agencies are

15  supposed to work, whether they do or not is another matter, is

16  primary, which is, you know, to get everybody in the room, talk

17  it out, develop what's necessary.  The question of liability is

18  yet another matter.  We deal with vaccinations, make that to

19  forms of immunity, but that's even farther away.

20          But the idea is and maybe a problem or challenge of

21  the statute is it doesn't do it, it doesn't provide a mechanism

22  for it.  It puts on the Attorney Generals some

23  responsibilities, but they're not in a position do much here

24  beyond what they've done I think in a very professional manner,

25  which is defend a statute as best you can, but as statutes go,

1    this isn't very good.  And so -- and it doesn't get us from

2    point A to point B in a fashion that everybody feels

3    comfortable with, particularly those who might be intransigent

4    for various economic reasons.

5         That all having been said, perhaps the United States

6    would be interested in the interests of the Court and the

7    United States' activities that the NHTSA periodic effusions of

8    anxious concern expressed in various ways to various people

9    without taking any particular position and grasping the medal

10   is not the most successful way to serve their mission either.

11        But, in any event, I offer that for what it's worth,

12   which is sometimes how we used to treat expertise.  But I found

13   this very helpful, I have to tell you.

14        So I don't know who -- Mr. Nadolenco, are you going to

15   be going first?  Do it, if you can, from the podium there, and

16   I guess I don't really want to limit people to the person that

17   they had proposed.  If you're going to be doing it for the --

18   or both of you are going to be doing it for the plaintiff,

19   that's fine, but just so I understand, and what I will have

20   available for each side is 20 minutes.

21        MR. NADOLENCO:  Okay.  Thank you, Your Honor.

22        Mr. Smith, I'd like to start with you.

23        First of all, well done, gentlemen.  That was a

24   different experience for the lawyers in the room, I will say.

25   And I'm sure for you all as well.

1            So I would like to start -- can we put up what has

2    been marked for identification BT -- sorry, Plaintiff's Exhibit

3    BC.

4            And this is --

5            THE COURT:  You all should be able to turn your --

6            MR. NADOLENCO:  And I have copies of it, if I may hand

7    it to Mr. Smith and to the Court.

8            THE COURT:  Sure, whatever, but it may take time to

9    walk across the courtroom, and I think we can take a look at

10   this together.

11           MR. NADOLENCO:  Yes, that's it.  Oh, it is there.

12           So this is the law, including the old law and the new

13   law.

14           And what I would like, Mr. Smith, you talked about

15   some standards and processes, and I'd like to just show you

16   section (d)(1) of the 2013 law.

17           Ken, are you able to get to that?

18           And just zoom in there.

19           And, Mr. Smith, do you see -- are you able to see

20   that?

21           MR. SMITH:  Yes, I can see it.

22           MR. NADOLENCO:  Okay.  And it says there, Beginning in

23   model year 2018 -- and I'll skip a few words -- manufacturers

24   of motor vehicles sold in the commonwealth -- after a clause --

25   shall provide access to their onboard diagnostic and repair

1    information systems, as required under this section -- and then

2    we go to romanette (i).

3              Do you see that?

4              MR. SMITH:  Yes.

5              MR. NADOLENCO:  It says, a proprietary (sic.) vehicle

6    interface device that complies with the Society of Automotive

7    Engineers standard J2534, Society of Automotive Engineers

8    J1939, commonly referred to as SAE J2534 and SAE J1939, the

9    International Organization for Standardization standard 22900,

10   commonly referred to as ISO 22900 or any successor to

11   SAE J2534, SAE J1939 or ISO 22900 as may be accepted or

12   published by the Society of Automotive Engineers or the

13   International Organization for Standardization.

14             Do you see that?

15             MR. SMITH:  I do.

16             Although I think when you read it out loud, I think

17   you said a "proprietary vehicle interface" and it's a

18   "non-proprietary vehicle."

19             MR. NADOLENCO:  Thank you.  Thank you for the

20   correction.

21             The point I'm trying to make is, we see standards

22   actually identified reflected in the old law for the OEMs to

23   shoot, do we not?

24             MR. BORT:  Yes.

25             MR. NADOLENCO:  And in Section 2 and in Section 3 of

1    the new law, they don't list the standards for the OEM to shoot

2    at, do they?

3           MR. SMITH:  I do not recall seeing any of those.

4           MR. NADOLENCO:  And they don't even set up a process

5    by which the OEMs can somehow work together to somehow arrive

6    at potential standards, do they?

7           MR. SMITH:  They do not.  And I assume they were

8    assuming these, that's my assumption, because I think at least

9    when I was reading this --

10          THE COURT:  Can I just interrupt?

11          So maybe one of your colleagues can provide a copy of

12   the document to the -- to the degree you're going to be reading

13   from documents, provide a copy of the document to the court

14   reporter here.  Just one of your -- you can keep going, but --

15          MR. NADOLENCO:  Thank you, Mr. Smith.

16          Mr. Garrie, some questions for you, please.

17          Under the existing Right to Repair law, independent

18   repair technicians need to have the same ability to repair

19   motor vehicles as dealers, correct?

20          MR. GARRIE:  Correct.

21          MR. NADOLENCO:  And that includes the ability to

22   modify the software on the vehicle?

23          MR. GARRIE:  Correct.

24          MR. NADOLENCO:  And access to an OBD system for

25   purposes of repairing, diagnosing, and maintaining the vehicles

1    includes that functionality?

2          MR. GARRIE:  That's correct.

3          MR. NADOLENCO:  And so there's nothing in the new Data

4    Access Law that limits the scope of that access, is there?

5          MR. GARRIE:  That's correct.

6          MR. NADOLENCO:  And along those lines, you do work for

7    a number of OEMs, including Toyota, correct?

8          MR. GARRIE:  That's correct.

9          MR. NADOLENCO:  Through that work, you're aware that

10   in order to access Toyota's onboard diagnostic systems, repair

11   persons need to use Toyota's specific software, do they not?

12         MR. GARRIE:  That's correct.

13         MR. NADOLENCO:  And does Toyota permit third-party

14   software to be written to its ECUs?

15         MR. GARRIE:  No.

16         MR. NADOLENCO:  They have to download it from the

17   Toyota website, correct?

18         MR. GARRIE:  Yes, that's correct.

19         MR. NADOLENCO:  And they have to agree to Toyota's use

20   to do that?

21         MR. GARRIE:  Yeah, they have to click -- yes, click

22   the box and agree.

23         MR. NADOLENCO:  You were asked -- I think you all

24   discussed V2X.

25         Mr. Garrie, let's -- we'll stick with you.

1          Didn't the FCC recently reduce the amount of spectrum

2     allocated for V2X?

3          MR. GARRIE:  I believe that is correct.

4          MR. NADOLENCO:  And even before that, wasn't there

5     already concerns that the spectrum wasn't going to be providing

6     enough bandwidth?

7          MR. GARRIE:  There is quite a bit of, yes, concern and

8     dialogue on that issue.

9          MR. NADOLENCO:  And, Mr. Bort, your turn.

10         The Judge asked a couple of times if the cat isn't

11     already out of the bag with having telematics already on

12     vehicles.

13         The question for you is:  Are you aware of the ways in

14     which OEMs structure their architecture to keep the telematics

15     side, which I believe you refer to in your testimony as the

16     dirty side, away from the clean side that includes safety

17     critical functionality?

18         MR. BORT:  Yes, sir.

19         MR. NADOLENCO:  Could you just explain that, please.

20         MR. BORT:  Yes.  So as I was trying to do during the

21     hot tub was talking about the fact that telematics is currently

22     designed in as part of the defense-in-depth architecture that

23     is with that model year, and so it -- part of its function is

24     recognizing that with that increased surface area of now being

25     internet accessible, that that defense in depth accounts for

1     that and it has a lot of thought given to how do we keep the

2     clean, which is the safe functional operation of the vehicle,

3     from the dirty, which is of course anything that can touch it.

4           MR. NADOLENCO:  And does Section 2 of the Data Access

5     Law just on its own, as you understand it, raise

6     cybersecurities separate from the telematics functionality?

7     And if you can -- it happens to be --

8           MR. BORT:  Yeah, it would be nice if those were up.

9           (Pause.)

10          MR. NADOLENCO:  Thank you, Ken.

11          (Information put up on screen.)

12          MR. BORT:  Yes, sir.

13          MR. NADOLENCO:  Do you mind walking us through, I know

14     you testified about it, but just walk us through some of the

15     highlights.

16          MR. BORT:  So updating my previous statements per

17     the -- Your Honor's guidance on understanding of manufacturer

18     involvement and authorization, that I feel addresses some of

19     the previous risks, but the others that I think still lie in

20     the fact that there's a -- there is a TBD third party that is

21     bringing while established and standard best practices and

22     technologies it's hard for me to conduct an effective risk

23     assessment on a future state of something.  I can only speak to

24     what I know of the technologies and provide guidance on what I

25     would suggest how that should be implemented, but I can't -- I

1    can't with -- I can't bless it as that's going to work.

2              MR. NADOLENCO:  And with regard to standardized, a

3    similar question that we asked Mr. Smith.  Standardized in the

4    prior law at least it told you the standards.  Standardized

5    here doesn't tell you what the standard is, correct?

6              MR. BORT:  Yes, sir.

7              MR. NADOLENCO:  Okay.  I don't have anything else,

8    Your Honor.

9              THE COURT:  All right.

10             Mr. Haskell, are we -- I don't know.  Ms. Fimognari.

11             MR. HASKELL:  Yes.

12             So my first question is for Mr. Romansky, and this has

13    to do with I guess the nature of your opinion with -- with

14    relation to the SVI standards.

15             It's not your opinion, is it, that SVI is the only set

16    of standards that might fit the bill that the Data Access Law

17    is looking for; is that right?

18             MR. ROMANSKY:  It's not my opinion that's the only way

19    to comply with the law.  It's the only standard that I'm aware

20    of that comes -- that achieves that, but I'm sure there's other

21    ways that it could be done.

22             MR. HASKELL:  Got it.  Thank you.

23             I have a question that I'd like to pose to -- actually

24    both Mr. Smith and Mr. Bort.

25             Something we heard during the conversation that I have

1  to say threw me for a little bit of a loop was a question about

2  how the Data Access Law applies to electrical vehicles, and one

3  set of blow-up language that we haven't had in the courtroom

4  the past couple of days is the law's definition of telematics

5  system, so let me read that definition; and both Mr. Smith and

6  Mr. Bort, I'd like to get your views about whether electric

7  vehicles to your knowledge currently have a system that matches

8  this description.

9       The law defines telematics system as any system in a

10  motor vehicle that --

11       THE COURT:  I wonder -- I wonder if that could be

12  brought up on the screen, too, so others --

13       MR. SCHOEN:  It's Plaintiffs Exhibit BB is the Data

14  Law so that should have the --

15       MR. HASKELL:  It's Plaintiff's for identification BB.

16  Yeah, that does the trick.

17       And we can see the definition on the screen towards

18  the bottom half of the screen there.  It defines a telematics

19  system as any system in a motor vehicle that collects

20  information generated by the operation of the vehicle and

21  transmits such information, in this chapter referred to as

22  telematics system data, utilizing wireless communications to a

23  remote receiving point where it is stored.

24       Mr. Smith, to your knowledge, do current production

25  electric vehicles, do any current production electric vehicles

```
 1    have a system that matches that description?
 2              MR. SMITH:  Yes.
 3              MR. HASKELL:  Mr. Bort, do you feel differently?
 4              MR. BORT:  My interpretation was a motor vehicle at
 5    that time was defined as an internal combustion engine, and
 6    that's how the electric vehicle manufacturers have managed to
 7    stay out of its purview.
 8              MR. HASKELL:  I understand.  And is that your basis
 9    for suggesting that electric vehicles may not be subject to the
10    Data Access Law?
11              MR. BORT:  Yes, sir.
12              MR. HASKELL:  I understand.  Thank you.
13              THE COURT:  Can I -- I hadn't really thought this
14    through.
15              MR. HASKELL:  Yes, sir.
16              THE COURT:  But maybe you can respond.  Now you're in
17    the hot tub, Mr. Haskell.
18              What about Mr. Bort's response to it, that is, the
19    definition of motor vehicle here, is it your contention that
20    it's broad enough to include electric vehicles?
21              MR. HASKELL:  Our sense, Your Honor, is that it is.
22    And perhaps this is something that if there's any question
23    about that, we can address that in briefing.
24              THE COURT:  Yes, no, that's fine.  I raise it to
25    encourage further instruction on it.
```

1             MR. HASKELL:  Great.  Thank you.

2             Mr. Bort, a couple of questions for you.

3             So you spoke about the supply chain that's -- that's

4     related to changes in vehicle architecture; is that right?

5             MR. BORT:  Yes, sir.

6             MR. HASKELL:  And did I understand you correctly that

7     when you spoke about the supply chain, you were speaking about

8     the OEM's need to procure certain pieces of hardware to work

9     with suppliers to do that, and the back and forth and the time

10    that's consumed in making sure that the supplier is providing a

11    component that fits the OEM's needs; is that right?

12            MR. BORT:  Yes, sir.

13            MR. HASKELL:  Now, I have no doubt that there is a

14    similar prerollout process that applies to software changes,

15    but the supply chain issues that you were describing, is it

16    fair to say that those apply to changes to the hardware

17    components?

18            MR. BORT:  If -- if -- when I meant supply chain, I

19    meant software and hardware, sir.  So I just want to make sure

20    I answer your question correctly if you're trying to

21    distinguish between the two.

22            MR. HASKELL:  No, that's right, and that does answer

23    my question.

24            And so the process that an OEM goes through to vet,

25    test, verify, validate software before it rolls that out,

1   that's not necessarily the same as the process to vet, verify,

2   validate supply chain hardware components; is that correct?

3           MR. BORT:  I'm not following, sir.

4           So the process to vet software is different from the

5   process to vet hardware where the two are not together?

6           MR. HASKELL:  That's correct.  Is that correct?

7           MR. BORT:  I guess my initial struggle, sir, is where

8   hardware and software are separated with respect to this.  But

9   purely mechanical components undergo different testing than

10  electrical mechanical components that have software.  And the

11  software would be looked at separately as well as in

12  conjunction with the hardware in that case.

13          MR. HASKELL:  And so let's -- let's say an OEM has

14  a -- has a piece of hardware and they say, you know, we like

15  this hardware, we think it's capable of doing what we want it

16  to do, but we want to change the firmware because we want its

17  programming to be different.  Making a change like that

18  wouldn't be subject to the same supply chain issues that you

19  were describing earlier, would it?  Is that right?

20          MR. BORT:  Can you -- can you repeat the question

21  again, sir?

22          MR. HASKELL:  So -- let's see if I can repeat the

23  question.

24          Let's say an OEM has a piece of hardware that it likes

25  and it feels that the piece of hardware is fully capable of

1    doing what the OEM wants it to do, but they want to change the

2    programming, they want to change the firmware that is installed

3    on that piece of hardware.  Again, no doubt that they have to

4    vet and verify the new firmware before they put it on there,

5    but that's a different process from the supply chain process

6    that you were describing earlier; is that right?

7            MR. BORT:  I'm not following, sir.

8            So a hubcap is going to have a different testing

9    requirement than an ECU.  An ECU can even have subsystems on

10   that ECU that come from different parts of the supply chain

11   with different vendors as well as, of course, the OEM might

12   have some role in coding or design and manufacture of even some

13   of those subsystems or the system itself and somebody else

14   provides the code.

15           So I'm -- where do you want me -- where do you want me

16   to answer?

17           MR. HASKELL:  I think we're -- I think we're okay on

18   that.

19           And then a handful of questions for Mr. Smith

20   particularly having to do with the timeline for achieving this

21   kind of medium-term dongle-based solution through the --

22   through the OBD.

23           I think you testified in your direct testimony that it

24   was your view that that could be achieved in six to 12 months;

25   is that right?

1          MR. SMITH:  Yes.

2          MR. HASKELL:  And in developing that estimate of six

3    to 12 months, did you take into account the time that you

4    believed would be necessary for an OEM to make any necessary

5    modifications to the software of its vehicle to implement that?

6          MR. SMITH:  Yes, from a technical perspective.

7          MR. HASKELL:  And specifically what -- in your view,

8    what might be necessary to make those changes that would enable

9    the dongle-based OBD solution?  What might an OEM need to do?

10         MR. SMITH:  It would be merely for the secured

11   gateway, if they have one, and so if you have extra

12   authorization or certain rules for this, like, UDS or whatever

13   the diagnostics are, if you have to change those in some way,

14   you have to push those changes down.

15         For that middle one, let's see, is there anything else

16   they'd have to do?  Assume it's a dongle, like when they're not

17   doing it internally to their -- their own IDI or telematics

18   system.

19         The other part they would have to do is they would

20   have to come up with the API that communicates to that third

21   party, identify that third-party person, and then that the

22   dongle will eventually talk to, and then that communication

23   will have to be decided upon.

24         MR. HASKELL:  And the process of making those

25   decisions and conducting that verification is what you

1    considered in forming your estimate that it would take six to

2    12 months to have the solution ready to go?

3              MR. SMITH:  Yeah, if you're focused on doing it, yeah.

4              MR. HASKELL:  And -- no more questions, Your Honor.

5              THE COURT:  Okay.

6              MR. HASKELL:  Thank you.

7              THE COURT:  Thank you.

8              So let me tie this up together in this fashion.

9              I frequently use allusions, a-l-l-u-s-i-o-n, and

10   provocation to advance the discussion here, or at least I think

11   it advances the discussion.  And I did that here in perhaps an

12   archway of describing who the audience is.  I can't speak for

13   the rest of the audiences; I can speak for myself.  This is

14   precisely what I wanted.  It was very, very helpful to me, and

15   I think it's helpful to the parties to get an unscripted

16   assessment of some of these issues.  It's what struck me when I

17   first encountered Justice Heerey, who's the Australian judge

18   who introduced me to this as particularly attractive.

19              I told the lawyers I think before you were in here

20   that Justice Heerey had passed away just several weeks ago, and

21   of course it resonated with me to talk about this, and I

22   haven't communicated with his widow since that, except a quick

23   response, but this provokes me to do precisely that, which is

24   to say, you know, we're never here long enough to do all the

25   things that we want to do, and he did lots of stuff in a

1  variety of different senses.  I met him actually at a

2  conference on courthouse architecture that I chaired in San

3  Francisco 30 years ago.

4       But we do as much as we can, and we leave a mark in

5  that way, and I have to say that one of the particular

6  gratifications of knowing him is to have been introduced to

7  this, and I mean to communicate to his wife how much I miss

8  him, but how much we all learned from him, I think even you as

9  well.

10      This was a way of getting around and into some

11 important things.  It would not have been successful if you

12 didn't all respect each other.  I always am concerned that one

13 or the other of the people involved will decide that this is

14 the opportunity for the era of Perry Mason to come out and

15 cross-examine the other side.  You did what I wanted you to

16 do -- hoped you would do, and that is raise the playing field,

17 whether it's level or not, it doesn't matter, but you raised

18 the playing field for understanding this fully.  So I want to

19 thank you very much.  We're going to move on to the next stage

20 of this next week, on that in which we turn back to the role of

21 being lawyers and try to figure out what this language means

22 here.

23      But thank you again, and unless there's something

24 further, we'll be in recess.  I look forward --

25      Mr. Haskell.

1          MR. HASKELL:  There is one last thing that we can at

2     least begin to address.

3          So yesterday, Your Honor, you had asked for evidence

4     for contributions to the two respective ballot question

5     committees.

6          And so what we did since yesterday -- I'm sure you're

7     aware, all of that information is reported to the state Office

8     of Campaign and --

9          THE COURT:  Right.

10          MR. HASKELL:  -- Political Finance.  What my

11     colleagues and I did last night was went to the OCPF website

12     and downloaded and printed copies of each of the filed reports

13     for each of the two ballot question committees, pro and con,

14     where that report included some receipts.  We didn't print the

15     ones that involved only expenditures.  I have provide a copy of

16     these to plaintiff's counsel and asked if they're willing to

17     stipulate to their admissibility.  I understand they're taking

18     a look at them.  If they are, that's how we would propose to

19     introduce that.  Alternatively, we could go to OCPF and ask

20     for, you know, like authenticated notarized copies.  I'm not

21     sure how long that would take, but that's where we are on that,

22     Your Honor.

23          THE COURT:  Probably not three or four years.

24          MR. HASKELL:  I wouldn't expect.

25          THE COURT:  Right.  I guess the stipulation is

1   probably going to be okay to make.  I did not go to the

2   website.  I went to another website just to see if I could get

3   it quick and dirty.

4          Whatever you've got, I'll look at.  If it comes to

5   that, I probably am going to want certification of that, and it

6   may that be that parties will say that they want to -- the

7   plaintiffs will say that they want a fuller development or

8   whatever, I don't know.

9          Mr. Schoen, if you've got something you want to add to

10  that?

11         MR. SCHOEN:  I was just going to say I think we will

12  be able to stipulate to it, but we just got it, so we can

13  review the content, and we can certainly let the Court --

14         THE COURT:  Okay.  And as I said, I haven't looked at

15  it.  I looked for something quick and dirty that added things

16  up because I'm arithmetically challenged sometimes, but if it's

17  legible, that will do; and if it's not, I'll tell you.

18         But I don't -- I don't want to look at it right now.

19  I'm going to wait until the two of you agree on it.  And of

20  course, it is not part of my determination until it's in

21  evidence.

22         MR. HASKELL:  And if the Court does prefer to receive

23  certified copies of those exhibits, we can reach out to --

24         THE COURT:  I might, and I might even look at it and

25  say I'd like certified copies and I'd also like a summary chart

1    on it that the parties might agree on just so we can get to the

2    end quickly.

3         You know, if there's some guy in Everett who works for

4    a body shop who sent in $5, I don't want to dismiss that as not

5    important, but I'm really looking at the big players in this.

6    Okay?

7         MR. HASKELL:  That sounds good.  Thank you, Your

8    Honor.

9         THE COURT:  All right.  Anything else that we need to

10   take up here?

11        Okay.  So the next stage, as we indicated, is I'll get

12   some briefing that I'm sure talks about some of the issues.

13   I'll deal with the question of a preliminary argument on these

14   matters, and I'll have at that point the current version of the

15   substitute -- or the findings of fact and conclusions of law

16   that the parties have marked up, but I think there will be a

17   final version of it that is keyed to the transcripts that we

18   have and the admitted evidence.

19        MR. LINDER:  Your Honor, just a question on the

20   logistics for the argument.  Would it be okay with the Court if

21   we split up certain segments of it?

22        THE COURT:  Yeah.  No, I mean, whoever has been

23   thinking about those aspects of it, just so I know who I should

24   be looking at to torment in my questions.

25        MR. LINDER:  It will be Mr. Queen.

```
 1              THE COURT:  Okay.  But, in any event, that's how that
 2    would work, because there are a wide range of issues, as you
 3    know, I want to take up any colorable issue in this case so
 4    that I haven't missed something here for whoever reviews my
 5    work product to deal with it.  Okay?
 6              MR. HASKELL:  That's Wednesday at 12:00 noon or
 7    Wednesday close of business for the brief?
 8              THE COURT:  Ms. Beatty.
 9              (Discussion off the record.)
10              THE COURT:  Noon, noon for the brief.
11              MR. HASKELL:  And then we'll work with Ms. Beatty for
12    scheduling the hearing?
13              THE COURT:  Yeah, I don't know, do we have it in time?
14              (Discussion off the record.)
15              THE COURT:  Frankly, I've opened up that entire day.
16    I haven't opened up that entire day.  Silly me.
17              What do I have?
18              (Discussion off the record.)
19              THE COURT:  So I think maybe 11:00 tomorrow -- or I
20    mean, Friday next, but tomorrow next.
21              MR. HASKELL:  That suits us.  Thank you.
22              THE COURT:  The 25th, Friday the 25th, at 11:00.  I
23    don't know your travel plans, if that's a problem, it may --
24              MR. LINDER:  That's not a problem, Your Honor.
25              THE COURT:  It may extend a little bit into the
```

1    afternoon, but I don't think it's going to be like an oral

2    argument before the English Court of Appeals.  So -- okay?

3              MR. LINDER:  All right.  Thank you, Your Honor.

4              THE COURT:  Thank you very much, and I go back to

5    where my views may change on a variety of things, but I don't

6    think they're going to change on this.  This was very

7    professionally done, responsive to all the things that I was

8    concerned about when we first had our first discussion, and I

9    think, I hope anyway, will provide a more valuable evaluation

10   of what I consider to be the core question for the creation of

11   the Constitution, the balance of responsibilities for Congress

12   between the states and the federal government.

13             So thank you very much.  We'll be in recess.

14             COUNSEL IN UNISON:  Thank you, Your Honor.

15               (Court adjourned at 12:36 p.m.)

16                   - - - - - - - - - - -

17                      CERTIFICATION

18             We certify that the foregoing is a correct transcript

19   of the record of proceedings in the above-entitled matter to

20   the best of our skill and ability.

21   /s/Kelly Mortellite            June 16, 2021
     Kelly Mortellite, RMR, CRR     Date
22   Official Court Reporter

23

24   /s/Debra M. Joyce             June 16, 2021
     Debra M. Joyce, RMR, CRR, FCRR  Date
25   Official Court Reporter