```
                   UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS


                               )
ALLIANCE FOR AUTOMOTIVE         )          Civil Action
INNOVATION,                     )          No. 20-12090-DPW
                               )
            Plaintiff,          )
                               )
vs.                             )
                               )
MAURA HEALEY, ATTORNEY          )
GENERAL OF THE COMMONWEALTH     )
OF MASSACHUSETTS, in her        )
official capacity,              )
                               )
            Defendant.          )



            BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
                UNITED STATES DISTRICT JUDGE

                    BENCH TRIAL DAY 4

                     June 25, 2021
                      11:04 p.m.



        John J. Moakley United States Courthouse
                   Courtroom One
                 One Courthouse Way
              Boston, Massachusetts  02210




                            Kelly Mortellite, RMR, CRR
                            Official Court Reporter
                            One Courthouse Way, Room 3200
                            Boston, Massachusetts  02210
                            mortellite@gmail.com
```

```
 1   APPEARANCES:

 2   Counsel on behalf of Plaintiff:
     Laurence A. Schoen
 3   Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC
     One Financial Center, 42nd Flr.
 4   Boston, MA 02111
     617-542-6000
 5
     John Nadolenco
 6   Daniel D. Queen
     Jason Linder
 7   Mayer Brown, LLP
     350 South Grand Avenue
 8   Suite 2500
     Los Angeles, CA 90071
 9   213-229 9500

10   Counsel on behalf of Defendant:
     Eric A. Haskell
11   Robert E. Toone, Jr.
     Julia Kobick
12   Phoebe Fischer-Groban
     Christine Fimognari
13   Office of the Attorney General (MA)
     One Ashburton Place
14   20th Flr.
     Boston, MA 02108
15   617-963-2178

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              (The following proceedings were held in open court

 3   before the Honorable Douglas P. Woodlock, United States

 4   District Judge, United States District Court, District of

 5   Massachusetts, at the John J. Moakley United States Courthouse,

 6   One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

 7   June 25, 2021.)

 8              THE COURT:  Well, let me first do a bit of

 9   housekeeping here.  I want to be sure that we've got all the

10   evidence that's going to be presented in the case here.  I

11   don't know that we do at this point.  There was some discussion

12   about additional materials.  Of course I asked for materials

13   regarding the referendum financing as well.  But are there

14   additional things that we need to get here that will be the

15   foundation of any decision that I render, any additional

16   evidence, any exhibits, anything that hasn't been put in?  Mr.

17   Haskell?

18              MR. HASKELL:  Nothing from our side.  And just to

19   update the Court on the campaign financial materials, we have

20   arranged with our Office of Campaign and Political Finance to

21   provide those certified copies.  They should actually be ready

22   this afternoon.  I will present them to plaintiff's counsel,

23   then we'll be ready to submit those.

24              THE COURT:  Okay.  I think I mentioned even more

25   valuable than a pile of documents is a summary chart there that
```

1   indicates who it was who was making contributions there using
2   some sort of threshold for it.  So I would hope that there
3   would be a stipulation with respect to the underlying documents
4   and a summary chart.
5           MR. HASKELL:  We can certainly do that.  So the Court
6   would like to see in the summary chart just contributions over,
7   say, a thousand dollars?
8           THE COURT:  Yeah, I think that does it for me.  If the
9   reports that I had were accurate, the big players are
10  identified at that level, and a thousand dollars is not chump
11  change, so I think including it in a summary chart would be
12  helpful.
13          MR. HASKELL:  We can certainly do that.
14          THE COURT:  Okay.  So I'd like to have that -- well,
15  we'll set a date for it in just a bit, but I'd like to have it
16  before, and let me suggest a date for one final round of
17  discussion that will include the motion to dismiss of the other
18  claims.  I was going to say Wednesday, July 21st, if that's
19  agreeable to the parties.
20          It may or may not be in this courtroom.  We're still
21  going through the process of trying to make sure that we have
22  adequately set up courtrooms for all of the things that we want
23  to do.  And this courtroom is now set up for criminal jury
24  trials.
25          So is the 21st, 11:00 time period best for the

1    parties?

2           MR. NADOLENCO:  That works on plaintiff's side, Your

3    Honor.  Thank you.

4           MR. HASKELL:  That suits us.

5           THE COURT:  Okay.  So at 11:00 on July 21st, we'll be

6    taking up the motion to dismiss the other claims and a final

7    session to deal with things that are on my mind that will give

8    you a chance to talk about them.

9           It may be helpful, I think, just because I always tell

10   you what I'm reading that's pertinent, but with respect to this

11   question of referendum and so on, I am drawn into this in part

12   because of the question of severability that we'll talk about

13   in just a moment and in part because it's a unique form of

14   lawmaking.

15          I was trying to determine, and maybe the parties will

16   be able to help me a little bit about this, about exactly what

17   happened in 2013.  I guess the initiative was pretermitted at

18   that point so it became an actual statute.  I say "an actual

19   statute," but a regular statute, and that's how that was

20   introduced.

21          This is a piece of legislation by the people, and the

22   question of severability I think arises from that.  I will be

23   asking some questions in just a moment concerning it.  But what

24   I wanted to focus on, and it may be more useful for the

25   plaintiffs than the defendants, but just as to reading, there

1    are two articles.  One is, I'll call it a bible by Alex Gray

2    and Tom Kiley that was in the New England Law Review 1991.

3    It's called *The Initiative and Referendum in Massachusetts,* and

4    it goes through, in a helpful way anyway, helpful to me, to

5    remind me about what it was that was being undertaken, what the

6    review of the Attorney General is, that sort of thing.  But

7    even more interesting in the sense of being or more interesting

8    in the sense of being more provocative is an article by now

9    Justice Kafker and David Russcol, who I think clerked for Judge

10   Wolf at one point.  That's in 2012 Michigan State Law Review,

11   1279.  It's called, *The Eye of a Constitutional Storm:*

12   *Preelection Review By the State Judiciary of Initiative*

13   *Amendments to State Constitutions.*

14        And I think it's not limited actually to state

15   judiciary, although at that point Justice Kafker was on the

16   Massachusetts Appeals Court, but it does make some forays into

17   discussion of federal constitutional review.  I say

18   "provacative" because it raises a whole series of issues about

19   how the courts, state or federal, get themselves involved in

20   the review of initiative amendments.  And the focus of course

21   is -- not focus but the bulk of the information comes from

22   Justice Kafker's consideration of Massachusetts initiative

23   provisions, which is not surprising since he was Deputy Chief

24   Counsel under Governor Weld.

25        In any event, I throw those out because I'm going to

1    go back to them in just a moment to talk about what the

2    question of severability means here and also what the role of

3    the Attorney General is in rulemaking in this context.

4          The question of redaction is even more telling to me

5    now.  I've gone through this stuff, and I can't for the life of

6    me understand what needs to be redacted or why it does.  Just,

7    there's nothing there that I can see.

8          Now, that's in the untrained eye, of course, in

9    looking at it.  I recognize that many entities and individuals

10   believe that their status in life is dependent upon the idea

11   that they are the beneficiaries of some special privilege in a

12   variety of senses in life, including evidentiary privileges,

13   like the opportunity to keep confidential something that's not

14   confidential at all but to claim that they can.  I'm not

15   intrigued by that.

16         So I want a very specific timeline on the review for

17   purposes of continued redaction of any pieces of evidence that

18   I have in this case.  Maybe I'll use, just so we don't

19   proliferate dates, by no later than July 21st.  Everybody goes

20   through it, and if there's anything you think continues to need

21   to be redacted, I'd like to have a justification, specific

22   justification line by line for anything that is continued,

23   because otherwise, I think -- not otherwise -- I'm going to

24   open up everything that I have that isn't properly subject to

25   redaction in this case.  That's a question of transparency I

1    think that's necessary.

2         So I didn't hear anybody say that there are more

3    pieces of evidence other than the materials that would relate

4    to campaign finance here, and as I said, I have to get that

5    promptly.

6         So let me turn to this question, interrelated question

7    of severability as to the initiative itself and the related

8    question of what the Attorney General is required to do on the

9    administrative level here.  Reading the very helpful, actually,

10   briefing that was provided last week, it does not appear to me

11   that the Attorney General has taken the position that the

12   initiative act is severable as a matter of law.

13        There is a discussion about whatever equitable

14   authority I have to deal with this over a period of time that

15   might involve review or constitute some sort of equitable,

16   independent equitable action to resolve the case or resolve it

17   at least before me.  I'll put that off just a moment, but I do

18   want to be sure that I haven't missed something here or there's

19   not some fine-tuning that's necessary in dealing with this.

20        I have to say, my own view, reading the -- preliminary

21   view reading this is, can't sever it.  This comes as a piece of

22   legislation that is presented in a way that doesn't lend itself

23   to severability.  It would be unfair to do it that way.  People

24   get to vote.  They vote on a single act.  There's no way to

25   sever this, I don't think, unless we subcontract to people who

1    are not the people, the authority to do that sort of thing.

2         So is there any question from the Attorney General

3    about that or any refinement that you'd like me to think about,

4    putting to one side the question of whether or not I exercise

5    some sort of residual equitable power that I might have to deal

6    with timing and that sort of thing?

7         MR. HASKELL:  I think that's right, Your Honor, as to

8    the substantive requirements of law.  As to the timing, you

9    know, maybe that's viewed in a frame of equitable authority of

10   the Court.  Maybe it's viewed in a frame of severing just the

11   timeframe portion of the law.  That we believe is severable

12   because it's distinct from the substantive requirements of the

13   law.

14        THE COURT:  How do we say that?  I mean, well, of

15   course we can say anything, but what does that mean?  It is a

16   statute that speaks at a specific time.  It has an effective

17   date of a specific time, and the idea that it would move for

18   some different time suggests that the people who enacted the

19   initiative did not decide that we're ready to go for the 2022

20   model year, to use just one example.  They're inextricably

21   intertwined.  I don't understand how they could be anything

22   else.

23        MR. HASKELL:  Well, Your Honor --

24        THE COURT:  Just taking that a bit further, is there

25   any case law that develops this idea that time is different

1    from substance for purposes of initiatives?

2          MR. HASKELL:  In terms of distinguishing time from

3    substance, I'm not aware of any that I can cite right now.

4    What we would point to, though, Your Honor, is the intent of

5    the voters in voting overwhelmingly --

6          THE COURT:  Which one of them?

7          MR. HASKELL:  -- for this legislation.  Say again?

8          THE COURT:  Which one of the many voters' intent?

9    This is the legislative intent of a group of people who

10   simultaneously voted at the same time.

11         MR. HASKELL:  Well, I think the best source for that,

12   Your Honor, is the official information for voters.

13         THE COURT:  Whose intent is that?  I mean, that's the

14   intent of these pleasingly stated and decidedly confusion

15   coalitions that push this kind of legislation?  That's not

16   legislative intent, if there is such a thing as legislative

17   intent.  Legislative intent is, here is the statute, or there's

18   the act of the people.  That's it.  That's what I'm going to

19   construe, I think.

20         MR. HASKELL:  What we look to on this, Your Honor, and

21   I am sure you know this, we cited it in our brief we filed a

22   couple of days ago, it is actually California law.  Obviously

23   California has a great deal of experience with this sort of

24   thing, much more than Massachusetts.

25         THE COURT:  Is Massachusetts looking forward to

```
 1   embrace California law on questions of initiative?  Do I read
 2   the newspapers correctly?
 3             MR. NADOLENCO:  I have a lot to say on that, Your
 4   Honor.
 5             THE COURT:  Everybody does.  So do I.
 6             MR. HASKELL:  Your Honor, the Massachusetts initiative
 7   scheme is unique, and it is its own thing.  However, what's
 8   significant about that official voter publication is every
 9   voter in the state gets it.  So when a court or somebody else
10   trying to define the intent of the electorate is looking for
11   sources, that's really the best you're going to do.
12             THE COURT:  Why would I even be looking for sources,
13   is I guess what I'm getting at.  The best source is the text
14   itself, maybe the history, maybe the -- the usual kind of
15   suspects when you're construing a piece of legislation.
16             MR. HASKELL:  Well, the intent, Your Honor --
17             THE COURT:  The last recourse is to look around a
18   crowd and pick out your friends, which I believe is the
19   definition, operational definition of legislative history.
20             MR. HASKELL:  Your Honor, the intent of the
21   legislature does become important when it comes to
22   severability.  And of course the legislature in this case is
23   the electorate.  The question under state law as to
24   severability is would the legislature have enacted the statute
25   without the portion that that's found to be problematic and
```

1    that might be severable.

2           And as we argue in our brief, our view here is that

3    the thing that the people of Massachusetts voted for

4    overwhelmingly last November is the rights and abilities that

5    they would obtain under the substance of the new Data Access

6    Law.

7           THE COURT:  If they obtain that in the year 2075, I

8    mean, who gets to decide that?  Do I get to decide that?  Say,

9    "Yeah, they wanted it, but, you know, they knew it was pie in

10   the sky, and they really wanted to wait until we had autonomous

11   cars to deal with it," if that's where we are in 2070.  Really,

12   is that the argument?  I've overstated it of course.

13          And if it's not 2075, is it 2074 or '73 or '72?  The

14   point of course is to say that it's a big ball of wax, and I

15   don't think I should be melting it.

16          MR. HASKELL:  Well, I suppose that brings us into the

17   equitable considerations that in our view is kind of joined at

18   the hip with this issue.

19          THE COURT:  So let me just -- I'm pressing on this

20   because I've kind of come to rest, but rest is uncertain, that

21   I look at it as it exists right now or as it exists on the

22   effective date.  That's what I look at here, that that's going

23   to be the defining date.  I can't think of any other date that

24   I could use, except maybe the filing of the lawsuit, but that's

25   even earlier.  So we're dealing with December 3 of 2020 as a

1   way of understanding what the statute is, for purposes of

2   impossibility, of course, is really the issue that's being

3   raised, raised most effectively.

4        I will of course go back and look at California law on

5   this because this is a kind of -- and it's not just California.

6   You know, this was one of the last efflorescences of good

7   government, the idea of taking it away from the bosses and

8   having initiatives that people could undertake.  People may

9   think a little differently about that in the sense that

10  legislation is supposed to be developed by people who are

11  thinking about these sorts of things over a sustained time

12  period and making modifications.

13       Now, that may not be the way that people want to have

14  things done.  They may think that they've got better leverage,

15  to use a term of art, in the context of initiatives.  They may

16  think that the legislature is in the bag on certain things.

17  And all I do, I think, is to say this is authorized.  I'm not

18  making my judgments, and I think the Supreme Court for a very

19  long time has been of the view that it's not -- this is a

20  political question.  It's not going to be something that the

21  courts say, "That's a lousy way to make laws."  It's the way

22  they make the laws.  But now I have to know what the rules are

23  when they make the laws in that fashion.

24       And so I start with that basic proposition.  I look at

25  initiatives generally.  That's why I raise the Justice Kafker's

1    and Mr. Russcol's article as provocative there, although now

2    dated ten years, and there's been a lot more activity and

3    apparently to be a lot more activity in this area on related

4    kinds of issues.

5            So what you're tilting at I think is what basis there

6    would be -- we'll talk about equity in a minute, but what basis

7    there would be for me to find anything other than this is the

8    piece of legislation I must construe in its entirety without

9    any reference to severability as of December 3, 2020.  That's

10   the way I see it now.  And, you know, I'll hear other views

11   about that.

12           MR. HASKELL:  I guess if it's helpful, just to make

13   sure that we aren't inadvertently talking past each other here,

14   kind of our view of the analysis on this is first there has to

15   be some constitutional problem, some preemption.  If there's no

16   preemption, and we don't believe that there is for the reasons

17   that we argue in our brief and will speak about today, then we

18   never get into this issue of timeline.

19           THE COURT:  And let me just say with respect to that

20   that I'm going to get into everything.  And I have to say that

21   my own view is that this is one of those cases in which

22   standing and merits are hard to distinguish with the human eye.

23           Now, they're distinguishable of course because they

24   have different sources, but it's kind of how I'm looking at it.

25   So I'm going to be dealing with all of those things at each

1    stage.  And the first thing I am going to want to talk about is

2    standing in just a moment.

3           MR. HASKELL:  Sure.  And I'm happy to speak to that

4    when we get there.  But the first step of the analysis is is

5    there a preemption issue.  In our view, the next step is, if

6    there is an impossibility problem, is it of temporary duration?

7    And that gets us into this question of can the model year 2022

8    timeframe be severed, does the Court have the equitable

9    authority to grant relief for that limited period of time.  Our

10   view is that if the analysis gets that far, then yes, the

11   intent of the voters is such that the voters would prefer a

12   temporary extension, say, of the model year 2022 timeframe

13   entered under this Court's authority, which I think we all

14   agree is broad and flexible and it's equity.

15           THE COURT:  Well, I like the sound of that, but I have

16   to say that I don't think it's quite that broad and quite that

17   flexible.  You've been focusing on general equitable authority.

18   I've been conceiving it, because of the nature of the case, as

19   an adjunct to appellate review and based upon an appellate

20   review stay, if it comes to that.  But in any event, I think

21   we'll get to that issue in a minute.

22           But let me understand now the question of what are the

23   Attorney General's responsibilities.  And here, actually, you

24   may be familiar with it, or maybe not, because it was done by

25   Special Attorneys General David Mackey and Melissa Allison, the

1     *Blue Tarp Redevelopment* case came down on Wednesday, and it

2     dealt with what is -- I'm familiar with, and of course it's

3     written by Justice Kafker -- Auer deference, that is deference

4     to an agency that is construing its own ambiguous regulations.

5          So everybody's got the citation, it's *Blue Tarp*

6     *Redevelopment v. Wynn Resorts*.  It arises out of the Gaming

7     Commission's treatment of the blackjack statute, so it's fun to

8     read.  But it also deals with this set of circumstances.  It

9     appears that the way in which they made determinations about

10    payouts and the regulatory regime that they had for it was

11    ambiguous.  But they consistently applied it, and they had some

12    explanation for it.  And then they got called on it by people

13    who were not satisfied with the payouts that they received, not

14    surprisingly, and then they changed it while the litigation was

15    going on.

16         Now, it was sufficiently interesting, apparently, to

17    the Supreme Judicial Court that what might to others of us have

18    occurred to us to have been mootness was just blown by.  And it

19    came up in the context of *Blue Tarp*, which was a direct case, I

20    believe it's the direct case, and also a certification from one

21    of my colleagues who had something like that.

22         In any event, it's a very fulsome discussion of what

23    is the responsibility of an agency.  I think that you stand in

24    your administrative role in the shoes of the Gaming Commission.

25    And the idea of our kind of Auer kind of deference, as

1    developed I think quite accurately by Justice Kafker, is a

2    little bit of balancing, and the deference is likely to be more

3    -- the courts are likely to be more deferential in the context

4    of longstanding but not quite regularized treatment of

5    ambiguous regulations or sub-regulations, less so in the case

6    of something that pops up in the course of litigation.

7            That's not a challenge to you.  It just happens that

8    here we are, and we've got litigation over it and, second, in

9    the absence of notice and rulemaking.

10           And so part of my question is not to be answered --

11   well, you can answer it now if you'd like to, but maybe you'd

12   like to think about it.  You're going to be doing notice and

13   rulemaking in connection with this because you have an

14   administrative responsibility here, and perhaps there will

15   develop expertise regarding cybersecurity for cars in the

16   Attorney General's Office to which deference should be shown.

17   I'm not aware of it yet.  Although, it's developing; I can see

18   that.

19           MR. HASKELL:  It's been a steep learning curve, Your

20   Honor.

21           THE COURT:  Right.  Well, it is for all of us I think.

22   But I guess I'm going to want a statement from the Attorney

23   General of what it intends to do with respect to its

24   administrative responsibilities in this area.

25           That goes back, frankly, to this question of equities.

1   That is to say, it was impossible for you to get a set of

2   regulations up on December 3.  No big surprise.  But at some

3   point it has to, and it's going to be governing in this -- not

4   governing.  It's going to be the subject of some deference on

5   the part of the courts, I think.  And so I just want to know

6   what it's going to look like, if you can say what it's going to

7   look like.  It may be lots of agencies may say, "We don't need

8   notice and rulemaking on this kind of thing," and that happens

9   with distressing frequency here.

10          But I'd encourage everybody to read *Blue Tarp* because

11   I think it is an important statement of administrative law,

12   particularly state administrative law, to which I think I turn

13   on this.  I'm not applying the APA, federal APA.  I'm looking

14   to state law in making my determination.  And I'd like to know

15   that, and I think, you know, probably try to set a time for

16   that, too, but I think I'd like it before the 21st so that I

17   know what it is that you think you have to do in this area as a

18   matter of law that will shape my view about severability I

19   think as well.

20          MR. HASKELL:  That's entirely fair, and we can provide

21   that answer in the near term as the court observes.  I don't

22   think I'm in a position to give that answer right now as I

23   stand here.

24          THE COURT:  Right.

25          MR. HASKELL:  I will say, though, Your Honor, that as

1    part of this case, the Attorney General's Office did take a

2    number of positions about what the law and bits and pieces of

3    its specific terms mean, and our intention in taking those

4    positions was that they ought to be taken seriously, and they

5    ought to stand the test of time.

6           THE COURT:  Taken seriously, you got that.  Test of

7    time, time has a sign of mutability in connection with this

8    case.  I'll evaluate it from that perspective, but the question

9    is what deference and how much do I give to it.  And that -- I

10   won't say it's cobbled together for present purposes, but it's

11   certainly looking in the closet and saying, "What do we have

12   hanging here that we can stitch together?"  That's not

13   cobbling.  That's stitching.

14          But, you know, I'll go back and look at your proposed

15   findings and conclusions.  And I see the outline of what it is

16   that you want.  I just wonder what I'm supposed to do with

17   that.  That's simply -- not simply but it is not the kind of

18   rulemaking that I'm perhaps more familiar with generally, and

19   I'm not even sure that it rises to the level of dignity, that

20   such dignity as Auer would call for in these circumstances, but

21   that's open for some discussion generally.  But I think that

22   that's something that we have to bring to some sort of

23   conclusion at least on the record in this case, it's a legal

24   conclusion in the record in the case.

25          MR. HASKELL:  Yes.

1          THE COURT:  Okay.  So let me -- Mr. Nadolenco, if

2     you're going to be speaking to this --

3          MR. NADOLENCO:  Yes, Your Honor, I'm happy to address

4     any or all of it.  With regard to severance, we agree with the

5     Court's instincts.  This is one law.  It was voted on by the

6     voters as one law.  It is not severable.  They were given an up

7     or down vote on it.  The equitable --

8          THE COURT:  Let me pause with that.

9          MR. NADOLENCO:  Yeah, sure.

10          THE COURT:  So who am I looking to to be perhaps the

11     initial expositor of that?  Is it the Attorney General?  And

12     what is the format the Attorney General can do that in?

13          MR. NADOLENCO:  Well, Your Honor, in this particular

14     instance, I believe as Mr. Haskell just recognized, usually you

15     defer to an agency when they have particular technical

16     expertise.  Here that's just absent.

17          THE COURT:  Well, but, so what the people did is,

18     without as near as I can see, having any idea who would have

19     technical competence in this area because this is generally an

20     allocation of competences, said that the Attorney General is

21     going to be the person who does that.  So they are the

22     designated competent agency on that.

23          Now, if you're saying, "If they're competent, anybody

24     is competent," which I think may be the subtext of what you're

25     getting at, I'm not sure I have to accept that.  You know, we

1    all do the best we can.  They've been charged with this

2    responsibility that it is what the people say they want, and

3    they're going to gin themselves up to be able to do this at

4    some point.

5         Now the question is what do I do in the interim?  And

6    that goes to this question of equitable powers.  It may not be

7    possible to implement this statute now for several reasons,

8    including impossibility of compliance but also impossibility of

9    a regulatory regime that the enactment intends.

10        MR. NADOLENCO:  Your Honor, if I can just push on

11   that.  We don't believe that that is what the law intends.  The

12   statute or the law does not charge the Attorney General with

13   any rulemaking.  They're charged with one small section of

14   drafting a notice that is ultimately given, but it's not

15   rulemaking.

16        They don't have technical expertise.  They didn't

17   write this law.  It was, as we heard during the trial, it was

18   written for them.  If there's any agency that does have the

19   technical expertise that should be given deference here, it's

20   NHTSA.

21        THE COURT:  We'll talk about NHTSA in this context, so

22   that you're all thinking about it right now, if your argument,

23   and I think it is, is that the Attorney General is

24   irresponsible not in a normative sense but in a descriptive

25   sense as a rule-maker here, doesn't that apply equally to

```
 1    NHTSA?  You know, the galling part of all of this is that there
 2    is a kind of codependency between the automobile manufacturers
 3    and NHTSA, that in which NHTSA has this vague threatening power
 4    but doesn't have the boldness to do what EPA did.
 5         And I'll use that as the template.  That is to say,
 6    here is the statute.  You've actually said, although you don't
 7    have the support of the Solicitor General in this one or at
 8    least the federal programs branch of the Department of Justice
 9    on this one, but, you know, they cracked heads and they got
10    together and they exercised their authority, and they created a
11    mechanism for dealing with very specific kinds of provisions,
12    an administrative regime.
13         NHTSA has kind of bobbed and weaved its way through
14    this for whatever reason.  Maybe they think they have more
15    power when they can seem to be vaguely minatory, sitting out
16    there, maybe able to bring the shotgun from behind the door,
17    maybe able to say, "We want you to do a recall, but we're not
18    going to tell you ahead of time, and by the way, you have to
19    tell us."  That's not clarity.  It's irresponsibility,
20    descriptively.
21         MR. NADOLENCO:  Understand, Your Honor.  To be fair,
22    the law is relatively new.  It was passed by the voters in
23    November.
24         THE COURT:  Yes, that's true.  I think that we'll get
25    to this question of preemption in that context, but I don't
```

1    want to say that this is just kind of, here is a federal

2    agency.  The federal agency occupies the field.  That's not

3    quite the right word.  But the federal agency defines what

4    obstacles are and what the question of compliance might be, and

5    they haven't done it.  They've given us Delphic statements.

6    The most recent one being a restatement of some testimony that

7    they've given before.  It was challenged vigorously by the

8    Attorney General.  Now it's part of the record because it's the

9    statement of the United States attaching letters to members of

10   Congress.

11          But the point I guess that I'm getting back to is that

12   I don't have anything like that and don't seem to have any

13   prospect of anything like that -- I mean, they're not as nimble

14   as the Gaming Commission, that is, NHTSA isn't.  I don't expect

15   that two months from now they're going to create a set of

16   guidelines to deal with this kind of thing.  And so I'm left to

17   decide who is it that I'm deferring to, and who is it who is

18   going to instruct me on this kind of thing.

19          I start with the Attorney General.  That's why -- and

20   I think you've cabined the Attorney General's responsibilities

21   rather significantly.

22          MR. NADOLENCO:  Right.  They have an enforcement role,

23   Your Honor, to enforce the law as written, not to have the

24   court become a super voter or super legislature to start

25   excising commencing in model year 2022 and replacing it with

1    some other year.  That's not what was voted on by the voters.

2          They voted on this particular law, and we believe the

3    trial showed that this particular law is impossible to comply

4    with, and it runs headlong into preemption issues.  We agree

5    with the court that there is not rules that NHTSA has set out,

6    but they did do much more than they did in the VW case.

7          THE COURT:  I'm almost compelled to say, "Which wasn't

8    much, which was nothing."  As a matter of fact, I think I

9    checked last night to see whether or not the solicitor had

10   filed, because she has been asked to file, she wanted to drive

11   right by on this, she waived her right to reply, and the court

12   went and got it into a conference and said, "No, by the way, we

13   would like to hear from you."  And they asked for it some time

14   ago, and they still haven't heard, and yesterday was the last

15   conference before the long conference.

16         MR. NADOLENCO:  Well, the good news is Your Honor did

17   hear.  And here, the Department of Justice specifically said

18   that the Data Law requires motor vehicle manufacturers to take

19   actions that potentially pose serious cybersecurity risks by

20   opening uncontrolled access to vehicle firmware.  That's what

21   we proved during the trial.  They said if this evidence exists,

22   this would be a problem.  The vehicles would be a problem.  It

23   would be unsafe.  We would order or force a recall.  And that's

24   what the evidence showed.

25         So now we're debating with what, if anything, the

1    Court should do, other than just strike down the law.  And our

2    view is that the Court can only strike down the law.  It can't

3    start amending it.  When the voters were presented one single

4    unified --

5          THE COURT:  So let me -- I'm interrupting you, but of

6    course I want to get right to this issue.  Your theory of the

7    case is it's either successful as of December 3, 2020 or it's

8    not.  It has to be able to be implemented on that date or not.

9    And if it's not, that's it.

10         MR. NADOLENCO:  Our theory of the case is it was

11   knowingly impossible to comply with the law when it was passed.

12   It remains impossible today.

13         THE COURT:  You're going to have to answer my

14   question.  You'll get a chance to wind up, but I want the pitch

15   on my question.

16         So I've got this law that I'm supposed to make a

17   determination about.  I've been told that looming in the

18   background is some view by NHTSA not yet rendered and perhaps

19   never rendered by administrative rulings, specific

20   administrative rulings on this in the way that the EPA did with

21   emissions controls, and I understand from you that I simply

22   have to strike this down.

23         Now, another way of looking at it is to say, "Okay,

24   there's the law.  It can't be complied with, but we'll try to

25   reframe this in terms of timing."  And that's I think part of

1    what Mr. Haskell has argued, apart from -- the vehicle that I

2    would do it -- that I've suggested I might do it with, which

3    is, you know, some sort of stay-pending-appeal treatment of it.

4    But back to the pitch.

5            MR. NADOLENCO:  Yes, yes, Your Honor.  But the

6    question is why.  Because to attempt to comply with this law,

7    right, it's a law on the books.  Section 2 was effective last

8    year.  Section 3 is essentially effective now with model year

9    '22.  The automakers would have to try to comply with the law.

10   And what would that mean?

11           We heard the testimony that it's impossible to comply

12   with as written.  The only thing they could do to try to comply

13   with it is to start stripping the cybersecurity protections on

14   their vehicles so they don't violate it.  That's where we run

15   headlong into the preemption issue.

16           THE COURT:  Well, that may be, but let me give you a

17   foreshadowing of another dimension of the case.

18           Let's assume that the evidence supports the following

19   findings of fact:  that the two defendants here -- two

20   representative plaintiffs here, excuse me -- don't want to do

21   anything.  They call to mind, is it -- well, I'm not sure who

22   the fabulist is that I should look at, Aesop or someone after

23   that.  But it's the fable of the dog in the manger.  The dog

24   really doesn't want to be in the manger, but he just doesn't

25   want anybody else in it.

1          What we have here is two automobile companies who, at

2     least at the senior level, senior enough for me to receive

3     evidence from it, say, "No, we haven't done anything, not doing

4     anything, not even thinking about it."  So what they're doing

5     is saying, "This is impossible, and we will continue to make it

6     impossible because we're not going to do anything about it."

7          Now, they may win as a result of the timing issue on

8     that, but my potential reading of the evidence here is this is

9     a game of chicken, to use another set of fables, perhaps more

10    up to date, I'll call it -- well, games of chicken generally

11    don't turn out that well for at least one or the other of the

12    chickens.  So I raise that because they can run, but they can't

13    hide on this.  Sooner or later they're going to have to address

14    this kind of issue.

15         So, you say it can't be done.  They say it can't be

16    done, and they're not going to do anything to make it be done,

17    and NHTSA hasn't done anything to make it be done.  And then

18    they say, "Well, it can't be done, so consequently, nobody can

19    write a statute about this," or, "nobody can do anything about

20    this," or "no state can take any action with respect to it."

21    And I'm not sure that's where it's going to end up in terms of

22    evaluation of preemption.

23         MR. NADOLENCO:  Your Honor, we took very seriously,

24    the auto manufacturers took very seriously your metaphor during

25    the evidence phase of the case of the whistling past the

1    graveyard.  They heard you loud and clear.  At this point the

2    parties are looking to the Court's equitable powers.  And the

3    Court sits in equity and has to decide now what to do with the

4    circumstance you have laid out.

5         When you look at it from an equitable standpoint, we

6    would submit that what you see is a group who, since before the

7    ink on the 2014 MOU was dried, wanted the telematics data.

8    They were talking to the manufacturers about it.  There was

9    discussion.  At some point, and I'm not going to ascribe blame,

10   they pivoted from discussions with the manufacturer to an

11   initiative process.  And we know from Mr. Lowe, he was

12   specifically involved in picking --

13        THE COURT:  I have that in mind.  I didn't just fall

14   off the turnip truck.  But the point I guess that I'd say about

15   that is, even in initiatives, maybe more so in initiatives now,

16   at least the modern politics of initiatives or economics of

17   initiatives, you know, there are contending economic groups.

18   That happens.

19        You know, judges don't willy-nilly exercise their

20   equitable powers because legislatures enacting legislation are

21   a little bit like watching sausage be made.  And, you know, we

22   avert our eyes and so on.  And sometimes it's blood sausage.

23   Still don't do it.  I don't have a general equitable power.

24   That's my view.  That's part of what this conversation with Mr.

25   Haskell is.  And so I'm trying to figure out what is my view.

```
 1              Now, if you're thinking in a holistic way, of course
 2     you can think obviously about incentive structures and that
 3     sort of thing that can encourage the parties to get to yes in
 4     various ways.  But I'm not sure where that goes with this.
 5              I mean, that's why I refer to NHTSA as
 6     descriptively -- not normatively, I haven't taken that position
 7     yet -- but descriptively irresponsible and wanting to be
 8     irresponsible.  They haven't stepped up to bat.  They say, "You
 9     want to know what we think?  What we think is this," hazy kind
10     of thing, and, "It's up to you."  Well, I'm not sure that's
11     right and the proper exercise of the judicial function.  But
12     that's just me.  Other judges might have different views about
13     this sort of thing.  I don't.
14              So I'm back to this idea, so I have equitable powers.
15     What does that mean?
16              MR. NADOLENCO:  Our view is it certainly doesn't mean
17     rewriting the law.  It is ruling on the law as written, as
18     voted upon, not the law we wish was written or the law that
19     could have been written or the law that the Attorney General is
20     trying to rewrite.  It is this law that's before the Court, and
21     we believe we proved at trial this law is impossible to comply
22     with short of stripping cyber protections from the vehicles,
23     which means it is preempted under the Safety Act.
24              THE COURT:  I'm not sure that I or the people who
25     splashed around in the hot tub are of the view that it's
```

1    impossible.

2           MR. NADOLENCO:  Today.

3           THE COURT:  Well, today is a different issue.  Timing

4    is a different issue.  The issue that was explored, I think,

5    was, you know, it's not just putting a man on a moon.  It can

6    be done.  Agencies -- manufacturers respond, as they did in

7    connection with EPA emissions.

8           The question for me, of course, is what do I do about

9    it.  And that's a different set of issues.  But I understand

10   you to be taking the position this is not severable, got to do

11   it as of December 3, 2020.  That's the witching hour.  It

12   either turns into a pumpkin or it finds its silver slipper or

13   glass slipper.

14          MR. NADOLENCO:  The only other point I will make on

15   that, Your Honor, and I know Your Honor did not fall off the

16   turnip truck, but that date was picked on purpose by Mr. Lowe.

17   He was involved in picking "Commencing in model year 2022."

18          THE COURT:  Not the December 3 --

19          MR. NADOLENCO:  No.

20          THE COURT:  You mean the model year 2022, I

21   understand.

22          MR. NADOLENCO:  But just in general on the timing of

23   the statute, let's not forget what the evidence showed.  They

24   picked the timing.  They could have picked some reasonable

25   year.  Their consultant, after the fact to be sure, but their

1    consultant said, "Well, let's be reasonable here, let's give

2    some real timeframes to the OEMs to actually try to comply with

3    that.  They said no, they said no.  Our best value here is

4    immense knowingly unfair timing leverage on the OEMs.  That's

5    what the Court is stuck with.

6            THE COURT:  I understand that, and that's -- I think I

7    understand that.  That of course is the metaphor of the

8    chicken.  You play chicken like this, sometimes it doesn't turn

9    out so well for the chicken.  They go for broke on something

10   like that, they create leverage on something like that, they

11   create a statute like that, and it's a statute that doesn't

12   work.

13           And so what does that mean?  It means improvident

14   deployment of the initiative process is what it means, I

15   suppose.  But that's where this -- at its outset anyway, that's

16   where, from my perspective, it turns, right at the outset.

17           But as I said, I'm going to go through every part of

18   this, every colorable part of this case.  But I want from the

19   Attorney General their view about whether they do rulemaking or

20   what it is that they've undertaken.

21           They have provided me with their reading of this,

22   which is drawn from various sources that are plausible, their

23   language that's out there to treat the specific language here,

24   but I do think this is a cut-and-paste job on the part of the

25   initiative initiators to deal with that.

1          So, now let me turn, if I can, to the, let's call it

2     question of standing and the problem of standing here.  And I

3     guess, Mr. Haskell, this is not really a trick question, but

4     it's kind of one.  Is there any question that GM or FCA could

5     bring this action individually or as an entity and would have

6     standing?

7          MR. HASKELL:  It would have standing, Your Honor, but

8     of course what they need to prove is impossibility, not

9     impossibility for GM or impossibility for FCA.

10          THE COURT:  No.  I'm talking about them individually.

11     They come in here and they say, you know, they don't have an

12     organization, an association that brings in their name.  There

13     are various reasons why people might want to look to

14     associational standing.  It's always nice to be part of a

15     crowd, that sort of thing.  But if they did it on their own, GM

16     says, "We've looked at this statute.  This will kill us.  We

17     can't do it.  We want an injunction.  And by the way, if this

18     thing goes through, we want damages for various things that are

19     on the far side."

20          Now, on that issue, that is damages and so on, which

21     really goes to the other counts of the complaint, it may be a

22     standing problem for them on that, too.  It's just not ripe

23     yet.  It's not ready to be resolved.  If standing is close to

24     mootness, it's close to all the kind of prudential -- and

25     that's the word of art, "prudential" here.  That's what that

1    third prong deals with.  Prudentially, they may have a claim,

2    individual claim, I think, but I want to hear your response to

3    it.

4        And that's separate from the response to these other

5    kinds of standing issues like trade secrets and copyright and

6    all that stuff, not to mention Takings, which the chief justice

7    helped us to learn a little bit more about earlier this week.

8        MR. HASKELL:  So would an individual OEM like that

9    have standing?  Yes, probably.  Would they have a private right

10   of action?  No, for the reasons that we spoke about in our

11   pretrial brief, the *Armstrong* coupled with the fact that under

12   the Safety Act and the Clean Air Act, the enforcer is the

13   federal government, and it doesn't create private substantive

14   rights.  So would they have a right of action?  No, probably

15   not.  Moreover, even if they succeeded in meeting their burden,

16   that is an individual OEM --

17       THE COURT:  So I understand you to be saying they

18   don't have standing themselves to bring their own private right

19   of action; they have to wait until somebody sues them, like

20   NHTSA or some other entity or like the Attorney General.  They

21   just have to sit back and hope for the best.

22       MR. HASKELL:  It comes back to NHTSA, Your Honor.  It

23   comes back to the federal government because that's the entity

24   that, under the Safety Act, you know, has the substantive

25   rights.

1          THE COURT:  And if it doesn't exercise them.

2          MR. HASKELL:  I'm sorry?

3          THE COURT:  If it doesn't exercise them.  That is,

4    substantive rights, yes, that's what I was talking about

5    earlier.  I hasten to say descriptive irresponsibility as

6    opposed to normative irresponsibility, although they frequently

7    meet in the middle of the road together.  So NHTSA doesn't, and

8    so a manufacturer under those circumstances has to wait to be

9    sued by someone.

10          MR. HASKELL:  I think that's right.  It reminds me of

11    the case that was in -- you may be aware of this -- the case

12    that was in Judge Burroughs' session a couple of years ago

13    where neighbors were trying to invoke the federal Controlled

14    Substances Act to prevent a marijuana dispensary from going

15    into their neighborhood.  The fact is marijuana is illegal

16    under federal law.  Not so state law.

17          And what the Judge Burroughs found there, correctly,

18    is the enforcer of the Controlled Substances Act, the entity

19    that has the ability to file a supremacy-based complaint is the

20    Attorney General of the United States and not the neighbors.

21    And I think the analysis here is very similar --

22          THE COURT:  So let me just pause on that because

23    that's helpful in straightening this away.  So what is the

24    response here?  There is no private right of action, right?

25    This is for you, Mr. Nadolenco.

1          We've got cases out there, as the Supreme Court has

2     kind of tried to struggle through these problems, that can be

3     read to say, in the absence of a private right of action, you

4     have no right of action.  This is, maybe you can say it's a

5     1983 case but maybe not.  In any event, how do you have a right

6     of action at all here?

7          MR. LINDER:  Thank you, Your Honor.  We are not

8     seeking to enforce a federal statute.  *Armstrong* is a spending

9     clause case, where essentially a third party beneficiary said

10    the state wasn't giving them enough money and sought to enforce

11    the federal law against the state of Idaho, and so too for the

12    other cases.

13          This is not a case where we're seeking to enforce the

14    federal law like the guy who wanted the federal marijuana laws

15    enforced.  This is a case where we are asking you to preclude a

16    state from subjecting our clients --

17          THE COURT:  But ordinarily -- I'm sorry to interrupt.

18    But ordinarily I have some source of judicial power to

19    entertain a case in controversy.  There is not a free-floating

20    ability to say, "There's a provision of the Constitution, I'd

21    like to talk about that, I'm really interested in it."  It has

22    to be tied to something, it seems to me, tied to some

23    jurisdictional grant generally, rather than the common law of

24    relationships between the states and the federal government.

25    So what's the jurisdictional grant that I have here?

1          MR. LINDER:  Your Honor, it's the exact same one.  I

2     think it's a federal question of jurisdiction.  It's exactly

3     the same as was in *Geier* and in *Williamson*, the 2000 Supreme

4     Court Case and the 2015 Supreme Court case.  You're just

5     deciding whether or not the state law conflicts with federal

6     law, and that's the federal question.

7          THE COURT:  Okay.  So it's just simple federal

8     question jurisdiction.

9          MR. LINDER:  Yes.

10          THE COURT:  Okay.  Why doesn't that apply?  I

11     understand that they were reaching for spending clause cases.

12     Why doesn't it apply to the spending clause cases, too?  It's a

13     federal question.  Youth wants to know.  We would like to know,

14     does the spending clause apply under these circumstances?

15          MR. LINDER:  Your Honor, a different part of Article

16     III.  Those cases were decided on standing grounds.  Those were

17     decided under *Alexander v. Sandoval.*  Those were all standing

18     cases.  Here, as Mr. Haskell just conceded, individual OEMs

19     would have standing.

20          THE COURT:  I don't think he said that.  I think what

21     he said, and he'll tell me what he said, or he'll tell me what

22     he wished he had said before but now says, that this is a

23     circumstance in which they don't have standing at all.  That

24     is, the individuals don't have standing because they can't

25     challenge the enforcement when there's no enforcement.

1          MR. LINDER:  Different question.  So standing and

2     cause of action I think are separate.  And they actually

3     concede in their conclusions of law that we meet the first

4     prong of the associational standing test, which is that an OEM

5     would have standing individually to bring this case.

6          THE COURT:  I know.  That's why I asked them the

7     question, and I got an answer that I think comes a little bit

8     closer to what I was conceiving this to be, which is, trying to

9     understand what I do with that contention, how I distinguish

10     that contention regarding the jurisdictional grant for me to

11     deal with this kind of thing.  I understand you say standing

12     and all that.

13          MR. LINDER:  Yes.

14          THE COURT:  But the point is that I'm not sure that

15     the individual OEMs have standing to sue under these

16     circumstances if there has been no concrete harm that's been

17     visited upon them yet.  There's the prospect of harm.  There is

18     the anxious anticipation of harm, but there isn't concrete

19     harm.

20          MR. LINDER:  Your Honor, that's a question of whether

21     or not there's an Article III case or controversy, whether or

22     not the issue is ripe.  The *Armstrong* line of cases about a

23     cause of action, a private right of action, is in a posit.

24     This isn't a place where we're trying to enforce federal law.

25     We're trying to make sure that we're free from irreconcilable

1   conflict.

2          THE COURT:  But let's assume -- well, the analogies

3   are always more specific, I suppose, and consequently raise

4   their own problems.  But use the marijuana issue as a general

5   proposition.  The Commonwealth permits a sumptuary activity

6   that the federal government does not.  The way in which it

7   seems to be working out is somebody in the Department of

8   Justice either decides to go forward on this or they don't.

9          And as a matter of prudence, perhaps, or something

10  else, or don't ask, don't tell, the Attorney General of the

11  United States is not pursuing, at least in Massachusetts, some

12  of these issues that would be much more prominent.  But does

13  that mean anybody who would like to explore the distinctions

14  between state and federal regulation of sumptuary activity gets

15  to say federal question jurisdiction?

16         MR. LINDER:  No, Your Honor, for two reasons.  One,

17  that person probably doesn't have a live Article III case or

18  controversy.  And two, the statute doesn't give them, the

19  federal statute doesn't give them a private right of

20  enforcement.  But here we are in imminent harm from this law.

21         THE COURT:  Okay.  So now we're dealing with this

22  question of imminent harm.

23         MR. LINDER:  Yes.

24         THE COURT:  And it has to do -- it has to have to do

25  with the likelihood of enforcement activity here.  And what do

1   I have on the record that tells me in the absence of action by

2   this court there's going to be enforcement activity?

3           MR. LINDER:  So I think you have a few things.  You

4   have that the law took effect December 3, 2020.  You have that

5   Section 3 takes effect as cars roll off the production line

6   within the next weeks, months, and you have, but for the

7   Attorney General's agreement to stay this case before July 30,

8   not longer, they will enforce the law.

9           THE COURT:  Well, I want to understand what that means

10  because I'm not sure that they can.  That is to say I'm not

11  sure that there are regulations that permit them to do that.

12          Now, you've taken a -- for various reasons, you've

13  taken a narrow view about what those regulations are or what

14  they can do, and this of course creates perverse incentives for

15  response on the part of the Attorney General, but what are they

16  going to do?

17          MR. LINDER:  Your Honor, it's not just them.  It's

18  also, there's a private right of action under this law.

19          THE COURT:  So, private right of action, so we have to

20  deal with that in the context of the private right of action.

21  Do we wait around, that is to say you have standing or there's

22  jurisdiction because 1983 says that somebody out there can

23  bring a claim under 1983 -- excuse me -- under 93A?

24          MR. LINDER:  Yeah, I mean, they can --

25          THE COURT:  How imminent does the enforcement have to

1    be to create the sufficient basis for anticipation to bring

2    this action?

3           MR. LINDER:  The law is on the books, and the

4    preemption case law presumes compliance with the state law.  We

5    are supposed to, but for the AG's stay, be complying with this

6    today, but it's impossible and impossible to do safely.

7           THE COURT:  But we've all agreed -- maybe we haven't

8    all agreed, but it seems to me clear that there's enforcement

9    and there's enforcement.  There's desuetude.  There are a whole

10   series of -- I keep referring to them as anxious apprehensions

11   that aren't really sufficient to justify this.  And I'm trying

12   to understand whether you are prepared to agree that it has to

13   be something more than law on the books.

14          MR. LINDER:  So let me say two things.  First, we're

15   now well outside of *Armstrong* land --

16          THE COURT:  Maybe we are.  I view those cases as not

17   very, as Judge Garrity would have said, not very helpful, and

18   the result of, you know, ongoing dynamics of the court in

19   trying to deal with a certain kind of increasing awareness of

20   what the potential is for preemption.

21          And I want to think about it more thoroughly, but now

22   I'm asking you to help me, and in helping me, I think you have

23   to tell me something more than there's a law on the books and

24   consequently we're going to have to -- we've got to enforce it.

25   We've got to anticipate that there will be enforcement, and

1     that gives us the right of action.

2            MR. LINDER:  I don't think either the legislature or

3     the Massachusetts AG's Office has said they won't enforce the

4     law on the books.  If they want to commit not to enforce it,

5     we'd love to hear it.

6            THE COURT:  Okay.  Maybe they'll do that.  I don't

7     think they will.  But they have to walk a fine line on this

8     because to the degree that they say they will enforce it, they

9     are increasing the likelihood that you have a jurisdictional

10    basis for proceeding and that we have a case or controversy.

11           MR. LINDER:  Your Honor, respectfully, we already do

12    have an Article III case or controversy.  Our clients sell cars

13    in Massachusetts.  They're subject to this law.  They're

14    subject to federal regulation, the Motor Vehicle Safety Act.

15    They cannot comply with both.  That's today.  That's now.

16    That's not an anxious apprehension.  That's the state of

17    affairs.

18           THE COURT:  And in a context in which NHTSA is doing

19    nothing?  I mean, they say lots, but they're doing nothing.

20           MR. LINDER:  They've ordered a recall of 1.4 million

21    vehicles the first time they found a cybersecurity problem.

22           THE COURT:  In 2015 they did that, right?  What have

23    they done since?  What have they done to refine all of this

24    since?

25           The point I guess is that they do not have a

1    reticulated administrative program that would tell people what

2    it is that you're going to get yourself in trouble for.  It

3    could be viewed as arbitrary and capricious on their part when

4    they enforce.  And that's why I talk about this sense of

5    codependency between the automobile manufacturers and NHTSA in

6    which NHTSA keeps this authority.  On the other hand, it's not

7    exercised.  And so the automobile manufacturers are able to

8    make their choices about how open they're going to be about

9    their architecture.

10           All of that being the larger background of when is it

11   that this is triggered?  When is it that you can bring a

12   lawsuit?  The mere fact that NHTSA could do something and did

13   something in 2015 is, I'm not sure, enough.  But maybe it is,

14   maybe it is.  And similarly, look at the Attorney General.

15   What are they going to do?  And I guess -- well, of course I'm

16   going to ask Mr. Haskell, and he's going to respond in some

17   way.  But what I do know is he's not doing something now

18   because there's a stipulation, and because I was concerned that

19   I get to develop this.

20           Now I'm developing it.  Now I want to understand, you

21   know, how I deal with this set of concerns in the law about --

22   and we can call it ripeness, we can call it mootness, we can

23   call it standing.  The larger idea is prudence, and prudence is

24   in the eye of the beholder.

25           And so the question is do we have standards for

1   prudence in this area?  Because the ultimate danger, I just
2   have to say, is that this is going to be filled by some judge
3   or judges who decide, "I really don't like this policy, so I'm
4   going to find standing, I'm going to find ripeness, I'm going
5   to find that it's not moot for this one because this is the
6   kind of policy I want to get after."  Or another judge who
7   says, "Oh, there's no standing here.  You know, come on, move
8   it along people.  Nothing to look at."

9        And that's the danger here, and I want to understand
10   if you have some mechanism or some standard that I should use
11   in dealing with this other than there's a statute, and there is
12   someone who has got a badge that means they can enforce things.

13        MR. LINDER:  I mean, it is hard to imagine a riper
14   declaratory judgment action than this one.  There are two laws
15   on the books.  The AG has been parsimonious in how long it will
16   stay enforcement of the law.  We have every reason to believe
17   that once this case is done, on July 30, if our clients are out
18   of compliance, they'll enforce it.

19        THE COURT:  So let me stop.  Mr. Haskell, are you
20   going to enforce as of July 30 or August 1?

21        MR. HASKELL:  Our stipulation, Your Honor, was that --
22   as I recall, we actually stipulated not to enforce it while
23   this case is going on and reserve the right to revisit that.

24        THE COURT:  Okay.  So you reserve the right.  What are
25   you going to do?  I mean, this is cat and mouse, but that's

```
 1    kind of where some of the law is on this.  Is there a
 2    likelihood that you're going to enforce?
 3            MR. HASKELL:  What I can say, Your Honor, and I can
 4    say this with confidence, is that what our office wants to see
 5    happen here is get to the right answer.  And so if that means
 6    threatening enforcement to move things along, maybe that's what
 7    it comes to.
 8            THE COURT:  All right.  So I rule on it and say
 9    there's enough here to justify declaratory judgment, and you
10    get the right answer -- well, you may not think it's the right
11    answer, but you get an answer about this.  Does that make your
12    argument go away on Article III?
13            MR. HASKELL:  I'm sorry, I didn't follow that.
14            THE COURT:  Does that make your argument go away on
15    Article III?  If you said, "Well, it's up to you, Your Honor.
16    If you do it, that's okay.  If you don't, well, that's okay.
17    We're not taking a position about what we're going to do in
18    terms of enforcement."
19            MR. HASKELL:  Our concerns about Article III really
20    come from the associational standing thing and the nature --
21            THE COURT:  But we just had a little conversation
22    about whether or not the individual entity would have standing
23    as well.  And I understood from that that you had some
24    reservations about the individual entity having standing to
25    bring this action or that there was an Article III case or
```

1    controversy presented because you haven't taken any action

2    against GM individually.  You haven't taken any action against

3    FCA or anybody who is not complying.

4           MR. HASKELL:  Truth to tell, I'm not sure if I would

5    personally would think of that as a standing thing or a ripe

6    injury thing.

7           THE COURT:  Well, I think -- I'm sorry.  I think I

8    have to say that these terms, labels, kind of meld together in

9    various sorts of ways.  I just want to get to the idea of do I

10   have authority to deal with these kinds of things?  And

11   standing, mootness, ripeness, those are all prudential

12   doctrines designed to avoid direct confrontation with the

13   fundamental proposition is this a matter that can be resolved

14   under Article III.

15          MR. HASKELL:  Sure.  And so on that, on that, what we

16   would observe, Your Honor, is that, like I said earlier, there

17   is no private right of action for this sort of thing.  Where it

18   comes up, like was the case in *Geier*, like was the case in

19   *Williamson*, it comes up as a defense.

20          And so that signifies, we think, that a private entity

21   and certainly an associational private entity that features

22   distinctions between its members' different situations -- there

23   was plenty of evidence about this last week, about how

24   different OEMs do things differently.  Some have gateways, some

25   don't.  Some use telematics, some don't.

1          THE COURT:  We'll get to that, but for present

2     purposes I'm really asking the question are you simply saying

3     time will tell whether we enforce this?  Is that what it comes

4     to?

5          And of course I'll make my own determination about

6     whether that's credible.  But, you know, the argument that's

7     being made here is, "Hey, what more do you need?  There is an

8     agency that has responsibility for enforcing a law.  Are we

9     supposed to wait until they enforce the law before we can bring

10    this action?"  Because that's the thrust of this aspect of your

11    opposition to any action on my part.

12         MR. HASKELL:  I mean, that's certainly the implication

13    of the Supreme Court's decisions in *Geier* and *Williamson*.  In

14    that case it wasn't a public enforcer.  It was a private right

15    of action that brought those issues up.  But that's certainly

16    the implications of those decisions.

17         THE COURT:  Okay.  So let's just briefly pause on

18    private right of action.  There's nothing to bar right now

19    someone under 93A to bring a private right of action against

20    them, right?

21         MR. HASKELL:  That's right.

22         THE COURT:  So you say just have to wait until there's

23    a defense -- they just have to defend as an affirmative defense

24    under those circumstances?

25         MR. HASKELL:  I think that's the right way to do it,

1    Your Honor.  And one feature of that approach --

2              THE COURT:  Why is that --

3              MR. HASKELL:  One feature of that approach is that, I

4    believe we cited this in our Rule 12 motion papers, there's

5    actually state law to the effect that impossibility may be a

6    defense to a Chapter 93A complaint.  And so I think the benefit

7    of that approach is dealing with impossibility in the context

8    of a consumer protection complaint, "Hey, we aren't doing this

9    because we can't do it," is a very different ball of wax than

10   dealing with it in the context of a pre-enforcement facial

11   preemption challenge that says, "Hey, this law is always

12   unconstitutional all the time."

13             THE COURT:  Well, I don't find helpful the references

14   that have been made to "facial" and "as applied" under these

15   circumstances.  They just mask, from my perspective, the

16   underlying policies.

17             And the underlying policy is this:  What does it take

18   to get a federal court to do something, and do you need some

19   specific jurisdictional grant that says you have a private

20   right of action to sue the Attorney General for these kinds of

21   things?  Or something less.

22             You've taken the position, I think, that they just

23   don't have a private right of action.  They've got to wait

24   until this case comes forward in an enforcement setting, and

25   I'm not sure that that's the proper way to read the

1    responsibilities of the federal court in dealing with the

2    supremacy clause.  I guess that's really what I'm getting at,

3    but I'm not right there on where we do draw those lines.

4         But I will -- I think I should tell you that I draw

5    the conclusion that you would enforce this if you had a chance.

6    Right now you've chosen not to, and that I think changes the

7    dynamic of this aspect of your argument.

8         So you'll think about whether you want to refine what

9    you have to say, but that's a finding of fact that I think I'm

10   going to be making, directing myself to, and I've told you my

11   inclination right now on that finding of fact to deal with this

12   argument that I was pressing the defendant on.

13        MR. HASKELL:  I mean, what I would come back to on

14   that, Your Honor, I suppose is, like I said a moment ago, our

15   office represents the public, and our interest is the public

16   interest, and what we want to see happen here is to come to the

17   right thing.  And so even though we might be authorized to

18   enforce this law doesn't mean that we're necessarily going to,

19   especially with these concerns about, "Hey, we can't do it for

20   model year '22."

21        I want to tread lightly here in part because these are

22   decisions that will be made in consultation with other folks in

23   the office, but as a general principle, that's where we're

24   coming from.

25        THE COURT:  You know, I'm not being -- I hope I'm not

1    being snarky or arch or anything like that on these kinds of

2    things.  But, you know, you want to do the right thing, but you

3    don't want somebody telling you to do the right thing or having

4    an enforceable order that makes you do the right thing,

5    whatever the right thing is, and that's what this comes to:

6    the request to have the federal court get itself involved in

7    directing the Attorney General to do the right thing, which

8    you've always wanted to do anyway.

9         So now I'm just trying to figure out under what

10   circumstances, if any, I can do that or should exercise it, but

11   that's the kind of looming problem from my perspective in this

12   area.  So let me step back.  Is there more that you want to say

13   about this?

14        MR. LINDER:  No, Your Honor.  I think you have it

15   right.  The AG, the first time they said they want to get the

16   right answer, said that if that means threatening enforcement,

17   they'll do it.  I think you have everything you need to make

18   that finding of fact, Your Honor.

19        THE COURT:  We'll see, but I've forewarned on this to

20   shape whatever conversations you have within the office.  I

21   don't view it as inappropriate for the Attorney General to say,

22   "We got a statute and we have to enforce it."  You're put in an

23   odd position -- not odd, but you're put in a difficult position

24   because you're the enforcer, you're the administrator, all of

25   the stuff that's involved in that, and you have special

1    responsibilities to approve the language in certain ways that
2    make it that it's coherent.  But there we are, and here I am to
3    deal with those things.
4          MR. HASKELL:  May I add one point?  This is a slight
5    -- well, it hooks onto something that was said earlier, having
6    to do with NHTSA's role in all of this, and the word
7    "desuetude" was mentioned I think with respect to the state
8    actually, but I think "desuetude" is the right word for what
9    NHTSA has done in this space, that is, issued nonbinding
10   guidance, nothing enforceable, hasn't done really much of
11   anything in the past couple of years.
12         And in our view -- and this goes back to the quality
13   of the United States's statement of interest in this case.  In
14   our view, that's reason for a state like Massachusetts to get
15   involved in this space where NHTSA isn't addressing these
16   issues that, you know, I think a lot of folks, certainly most
17   of the voters in Massachusetts, agree ought to be addressed.
18   Under notions of federalism, this is where a state ought to get
19   involved and frankly put pressure on NHTSA to do what it's
20   going to do or not do what it's going to do.
21         THE COURT:  Another way of looking at it, though, is
22   that this is precisely where there should not be 50 states and
23   a couple of territories making individual judgments.  It's one
24   thing under the Clean Air Act to do that.  It's one thing to
25   essentially under the Clean Air Act subcontract it to

1     California, which is essentially what was done through CARB.

2          This is not the same thing.  This is the potential

3     that New Jersey's going to have something like this and that

4     Indiana is going to have something like this.  And the whole

5     purpose -- not whole purpose but a fundamental purpose of the

6     constitutional compact is to say, "We don't want a bunch of

7     these different states doing different things because it will

8     substantially degrade the ability of a nation to have a place

9     in, well, international commerce.

10         I mean, if you think about what this court is, this

11    particular court, we were called the admiralty court for the

12    first 120 years.  Why were we called the admiralty court?

13    Because that's what we did, international commerce by

14    admiralty.  How did we ever get to have federal courts?  I

15    mean, there's no reason why we have to have inferior federal

16    courts.  The Constitution didn't even ask for them or didn't

17    even provide directly for them.  They said, "It's up to

18    Congress.  They can create inferior courts."

19         Why did they create an inferior court called a

20    district court or then a circuit court?  They did it because

21    they were afraid that every one of these little jurisdictions

22    would be doing something different, and they knew that people

23    wanted to do commerce with the United States -- a united

24    states -- wouldn't want to worry about which venue they were

25    in, and so they created these national courts.  But that's

1   where the national courts came from.  Meaning that the

2   constitutional compact was directed at the idea that we can't

3   have a thousand flowers blooming in this area if it interferes

4   with dominant federal interests.

5          So that's I think part of the reason that saying,

6   "Well, let's have Massachusetts be the actual laboratory for

7   this sort of thing," doesn't work.

8          MR. HASKELL:  Where Congress has enacted an express

9   preemption clause, absolutely.  Where it's occupied the field,

10  absolutely.  Where there are clearly expressed federal

11  objectives that Massachusetts would hinder, absolutely.  But

12  those things aren't the case here.  And where those things

13  aren't the case, I guess the point I'm making is that a state

14  regulation like Massachusetts, or even if New Jersey was to do

15  its thing, would have probably the beneficial effect of

16  requiring NHTSA to get its act together and do what it's going

17  to do on this.

18         THE COURT:  That may be so.  I mean, as a practical

19  matter, shaming them into action.

20         MR. LINDER:  Your Honor, if I may on that point, I

21  don't want to leave the Court with the misimpression that

22  there's desuetude here.

23         When NHTSA ordered the recall in 2015, that was a shot

24  across the bow.  All of the industry -- you heard from the

25  experts -- the industry started taking very seriously

```
 1   cybersecurity.  It is in evidence that the OEMs meet and talk
 2   regularly about cybersecurity with NHTSA.  Mr. Lowe testified
 3   that he was meeting with NHTSA on cybersecurity issues.  They
 4   are very active in this field.  This is not the Maytag
 5   repairman.  They're just doing it well.
 6           THE COURT:  I think, to the contrary, I don't think
 7   it's the Maytag repairman.  On the other hand, I have to say
 8   that, looking at it, there is an industrywide sense that this
 9   isn't one that's going to get them in trouble or at least they
10   don't want to worry about it right now.  So that's what it is.
11   I mean, that's the state of the record here.
12           I listened to the testimony of Mr. Tierney.  I think I
13   understand more now about the automobile industry than I did
14   before, and you know --
15           MR. LINDER:  Us too.
16           THE COURT:  They work in particular ways.  And whether
17   that's determinative or not, it is the case from a governance
18   point of view that NHTSA ought to be dealing with this if they
19   really care about it and dealing with it in specific
20   regulations, if they really care about it, or if they're not
21   going to be taking the position that, "We'll wait and see, and
22   then if somebody bad happens, we'll say 'We're shocked, we're
23   shocked by this, and now we're going to recall,'" which is the
24   worst possible outcome for everybody involved.
25           But it's back to this game of chicken.  That's really
```

1    what I'm concerned about, and there are a variety of different

2    chickens walking across the road.

3         MR. HASKELL:  Your Honor, if I may.  And I would be

4    happy to answer any questions the Court might have on this

5    topic.  A topic that we wanted to address at this hearing today

6    has to do with the possibility of immediate compliance with the

7    law.  So getting past all of the legal hurtles, the notion that

8    a manufacturer like General Motors or FCA has what they need to

9    comply with the law right now or as of December 3, 2020.  And

10   that brings us back to, first, the provision of Section 2 of

11   the law that says you can just get out of the authorization

12   business for access to OBD systems, and then second, with

13   respect to Section 3, the notion of not selling telematically

14   equipped cars.

15        Now, on Section 2, get out of the authorization

16   business, there was plenty of evidence last week to indicate

17   that that's exactly what some manufacturers do right now, in

18   fact what most manufacturers do right now.  That is --

19        THE COURT:  But they're not out in the way that that

20   statute means.  They've got their own people that they like to

21   deal with.  They're friends.  And, you know, it may lead to all

22   kinds of discussions about whether it's manufacturer-related

23   and that sort of thing.  But they're not about to turn it over

24   to some independent third party, whatever that might mean under

25   these circumstances.  Similarly for section 3.  And, you know,

1  I'm trying to be fair to each individual provision of the

2  statute, but they meld together in my mind.

3          MR. HASKELL:  Well, what's significant about Section 2

4  is the first provision about a manufacturer not requiring

5  authorization to access the OBD system, it actually dovetails

6  with the testimony that the Court heard in the affidavit of

7  Greg Potter, and that's precisely why we put in that evidence.

8          THE COURT:  Directly or indirectly, right.

9          MR. HASKELL:  Right.  And the way it works right now

10 is, as the evidence showed, is manufacturers provide what's

11 needed to access the OBD system, the Equipment and Tool

12 Institute.  They then distribute those methods of access to

13 folks who make scan tools.  And then even in a situation like

14 service mode 27, where the repairperson needs some special

15 authorization to execute that function, it's not the OEM that

16 provides the authorization.  It's baked into the tool, and

17 that's okay.  That's the difference --

18         THE COURT:  It's baked into a tool that's authorized

19 by the manufacturer.  I mean, you know, they're keeping control

20 -- of course they don't care about interrupting that process.

21 That seems to work pretty well, and it serves their purposes

22 for the old Right of Repair statute.  They got it worked out.

23 So they maintain their control over who gets access to it.  It

24 has buy and large tried to undercut the potential for the truly

25 independent, the local guy down the street doing it, who is not

1    authorized, wouldn't get the tool, unless they said, "You're

2    authorized to get the tool," or, "You're within the scope of

3    the people who get the tool."

4          MR. HASKELL:  That, Your Honor, I guess goes to this

5    notion of directly or indirectly and the role that the

6    manufacturer plays itself in controlling access, saying, "Yes,

7    you can access that system," or "No, you can't.  You have to

8    get permission from us for this session."

9          That's not the way the system works right now, with

10   the exception, with the very conspicuous exceptions of General

11   Motors and Chrysler, which we heard from the evidence do things

12   differently.  If you want to repair a General Motors vehicle,

13   that tool can't do it for you.  That tool has to go talk to

14   General Motors and get their permission.

15         THE COURT:  Well, I'm not sure that the record is so

16   clear to me with respect to that.  And then I would go to ask

17   the question of where is the evidence that this is a problem

18   within the association.

19         If I think about it this way, that is to say there's a

20   height here of generality which has to do with the ability of

21   everybody to insulate themselves from the process of making

22   this available to anybody.  That's the high level issue.

23         Then there is the lower level issue, which is they all

24   have different ways of doing things, and those different ways

25   of doing things may include, some people are more willing to

1    let more people get involved, which may be part of their

2    business plan, which may be necessary to encourage people to

3    come work with us because we'll work with your guy down the

4    street, that kind of thing.  I don't have any evidence of that,

5    but that may be part of it.

6          But there isn't a suggestion -- and this goes to the

7    question of -- that doesn't appear to be in the evidence here.

8    This goes to this question of associational standing, which is,

9    you know, this kind of lingering stuff in case law that says

10   the courts should be sensitive to the potential for conflicts

11   among members of the association.  I've got no evidence of

12   conflicts about anything.  Nobody is raising hell about this.

13   They all seem to be prepared to be in the same boat so that

14   they can, at the high level, be sure that the federal

15   government doesn't or states or the federal government doesn't

16   interfere, and then at the lower level, each one has their own

17   way -- potentially has their own way of doing things.

18          MR. HASKELL:  Can I push back on that a little, Your

19   Honor?

20          THE COURT:  Sure.

21          MR. HASKELL:  So the evidence is in Greg Potter's

22   affidavit, in Greg Potter's direct testimony where he speaks

23   about the way that most OEMs bake the sequence into the tools

24   so you don't have to go to the OEM, and he specifically

25   identifies OEMs that use one of these gateway, "You have to get

1    our permission first" systems like FCA uses --

2         THE COURT:  I'm sorry.  Why is the tool any different

3    from direct authorization?  I mean, you know, we'll let you do

4    whatever you want.  You do have to have this tool, and guess

5    who authorizes the tool?

6         MR. HASKELL:  Well, it's important, Your Honor,

7    because it doesn't give the OEM the opportunity to say, "No,"

8    or it doesn't give the OEM the opportunity to say, "We're going

9    to make you jump through these extra hoops or buy this

10   subscription or do our thing before we're going to allow you to

11   access the OBD systems on our vehicle."  That's the difference

12   between FCA and the other OEMs.

13        THE COURT:  Well, I'm not sure it's all the other

14   OEMs, but I do recognize that there are some differences, but

15   I'm not sure that they are differences -- they are

16   distinctions, certainly.  I'm not sure they make a difference.

17        MR. HASKELL:  And the reason, I think, the reason Your

18   Honor just spoke about conflict among the OEMs and some jumping

19   up, the ones that are jumping up, General Motors and FCA, are

20   the ones who frankly wouldn't comply with Section 2 right now.

21        The ones who do it this other way, not requiring OEM

22   permission for a diagnostic session, putting the means of

23   access into the tool rather than requiring you to go to the

24   back office, those are the OEMs who haven't said a peep about

25   this law, who haven't stepped forward.  And in our view, that's

```
 1   significant.
 2            THE COURT:  No, that's right.  You join the
 3   association.  The association serves some broad interest that
 4   you have and they leave you alone on the rest.
 5            MR. HASKELL:  Well, I guess this goes back to our
 6   argument about associational standing.
 7            THE COURT:  It does.
 8            MR. HASKELL:  General Motors and FCA really aren't
 9   representative.  And the evidence has shown that they don't
10   stand in the same shoes as all other members --
11            THE COURT:  But they wouldn't be members of the
12   association if they all stood in the same shoes.  That's the
13   whole idea of an association.  It brings together people with
14   somewhat diverse interests, but they may have a shared
15   interest, and that's the one I think I'm focusing on here, so
16   long as there's not an imposition, as the labor union kinds of
17   cases would have created, the kinds of cases that occupy the
18   interest of the Supreme Court in the early '70s, you know, that
19   kind of backsliding on that issue.  But I think I understand
20   that point, although you, I'm sure, understand how I'm
21   responding to it.
22            MR. HASKELL:  Certainly, and I think I've said what I
23   wanted to say in the way of Section 2 being susceptible of
24   immediate compliance.
25            Section 3, immediate compliance, I think we all agree
```

1    comes down to this notion of just turn off your telematics so

2    you're not subject to the law.

3           THE COURT:  But what kind of compliance is that?  It's

4    the compliance of death?  They dispose of what they have, and

5    they're said to be in compliance.  No, it's not that they're in

6    compliance.  It's that they're not in incompliance, which is

7    just a way of playing with words as far as I'm concerned.

8           Here is the law.  The law says here's how we want

9    automobile manufacturers to deal with what they've got.  And

10   you say it's compliance or you argue it's compliance by just

11   withdrawing from the field.  I'm not sure that's compliance.

12   That's just simply saying, "We don't want to play anymore."

13          MR. HASKELL:  Well, that might be the point of

14   departure there about withdrawing from the field.  We don't

15   believe that that is what this disabled telematics proposal

16   represents.

17          So the scope of the law is limited to cars with

18   telematics systems, and so what we see the plaintiff relying on

19   in their brief that they submitted a couple of days ago is

20   this, it was the *Mutual Pharmaceuticals v. Bartlett* case, the

21   notion that just stop selling your product isn't an answer to

22   preemption.  But that's not what we're proposing here.  It's

23   not stop selling your product.  It's remove this one feature

24   from your product.

25          Now, a way to look at this --

1         THE COURT:  Well, I've got a product that I think has

2    got all kinds of value, and what you'd like me to do is face

3    the -- I won't call it impossible choice but face the choice

4    of, do I offer my product the way I want to offer my product,

5    or do I not?  I strip it of features that I think are important

6    to my product.  I think they're important -- if I were thinking

7    commercially, I'd think they're important because I can make

8    people pay money for them in one form or another.  I don't get

9    everybody to pay money for them because they tend to drift off

10   after the first year.  But in any event, I get to monetize that

11   in the same way that the big box people want to monetize this

12   or look for ways to monetize this.  That's what capitalism is

13   all about.  People should be encouraged to use innovation to

14   monetize, and that drives these sort of things, but there is no

15   question that you're taking away from them the ability to offer

16   their product as they see that product.  And it's not just

17   saying you can't have raw lead on your handles because that

18   would hurt little kids.  This is to say you've got a kind of

19   product that you offer that makes people come back and check in

20   with your people for follow-on service kinds of things.  That's

21   fundamental.

22         MR. HASKELL:  Fundamental -- well, that may be another

23   point of departure.  In our view a telematics system on a

24   vehicle is not fundamental.  These things didn't exist before

25   not that long ago, and it's kind of nice to have more than a

```
 1    you-need-to-have feature of the vehicles.

 2          And a way to look at that is, hypothetically, if

 3    Massachusetts were to pass a law that says vehicles sold in

 4    Massachusetts can't have telematics systems, period, full stop,

 5    don't do it in our market, would that be a federal preemption

 6    problem?

 7          THE COURT:  I hate to say let's ask NHTSA, but that is

 8    the question, and I suspect even I can figure out what NHTSA

 9    would say, which is, these have dimensions of safety, and so

10    disabling them would pose a problem.

11          MR. HASKELL:  Your Honor, respectfully, I don't think

12    that's right, and we know that from several sources of evidence

13    that we heard in trial.  One was both of the plaintiff's

14    experts admitting that the things they're worried about, if you

15    turn off telematics, it's going to do this, that and the other

16    thing to the vehicle, everybody was in agreement that that

17    would not create a federal safety problem.  What's more --

18          THE COURT:  The experts were -- we're talking about

19    NHTSA now.  We're talking about the agency that is charged with

20    responsibility for that sort of thing.  I mean, one of the

21    solvents of the hot tub is it wipes away some of the

22    excrescences that people have had applied to them through the

23    theory of the case that the parties have.

24          So these guys say, "You know, is that so bad?  Is that

25    so much of a problem?"  But they still had a dimension of
```

1    safety involved here.  I don't think anybody was walking away
2    from the idea that telematics has safety dimensions to it.  Not
3    as, you know, fulsome perhaps as others, that it was another
4    form of diagnostics for non-safety things, but somebody gets a
5    hold of that stuff, I think it's pretty clear that there's a
6    problem.
7         MR. HASKELL:  Here is the proof in the pudding, Your
8    Honor.  We heard testimony, I believe it was from Mr. Garrie,
9    during the hot tub that not all cars sold in the states right
10   now have a telematics system.  Cars that are sold without a
11   telematics system, are those unsafe?  Mr. Tierney testified
12   that, no, you turn off the telematics in a GM vehicle, it's
13   perfectly safe.  Does NHTSA have a problem with those?  Is
14   NHTSA recalling those?  Is NHTSA saying you need to have a
15   telematics system because you're unsafe without one?  No.
16        THE COURT:  So again, it's a matter of what does NHTSA
17   do, I suppose, in addressing that.  And I would be very
18   surprised if someone from GM says that there are out on the
19   road now a bunch of dangerous cars because some of them don't
20   have telematics.  This is a process of developing models over a
21   period of time in the shadow, I suppose I would say, of
22   something like NHTSA.
23        But I think I understand the argument, and I have read
24   and I'm going to reread obviously the testimony of the experts,
25   the testimony and the development that was provided in the hot

1    tub.

2              MR. HASKELL:  Certainly.  I guess just to kind of sum

3    up our point on this notion of immediate compliance by

4    disabling the telematics is it's perfectly safe, it's perfectly

5    feasible, it's immediate.  It can be done just in Massachusetts

6    because it basically involves going under the hood and

7    switching the system off for each car that's sold in

8    Massachusetts.

9              THE COURT:  And then if I drive into Massachusetts

10    from Albany, I have to disable my telematics?

11              MR. HASKELL:  No.  The law --

12              THE COURT:  If I sell my car from Albany to someone in

13    Holyoke, somebody's got to disable the telematics, one of us?

14              MR. HASKELL:  That was a point that the evidence

15    actually addresses, we addressed in response to an

16    interrogatory, which I believe is in evidence now.  And what we

17    said on that, what the evidence shows is that's certainly not

18    something for which liability would be imputed to the

19    manufacturer.

20              THE COURT:  So aftermarket transactions are not

21    covered?  That's your position as an enforcement matter?

22              MR. HASKELL:  I believe -- I would double-check our

23    interrogatory on this.  I believe our position was a little

24    more nuanced than that.

25              THE COURT:  I'm not asking you, because I mean this to

1    be for all of us to think some more about it, but I'm not sure

2    that I think that the Attorney General has or could properly

3    choose not to enforce against aftermarket modifications, and

4    that means that it falls to the manufacturer to be cognizant of

5    the potential for aftermarket modifications as we find in the

6    context of emission control.

7            MR. HASKELL:  Mr. Toone has just reminded me here that

8    as a matter of Chapter 93A law, private sales aren't covered by

9    Chapter 93A.

10           THE COURT:  Chapter 93A, as we all understand, is not

11   the universe of enforcement of this statute.

12           MR. HASKELL:  And that used car dealers, in our view,

13   are responsible for complying.  But again, that's the

14   responsibility of the aftermarket dealer, not the

15   responsibility --

16           THE COURT:  Under Chapter 93A.

17           MR. HASKELL:  That second point is our view of the

18   enforcement of the statute.

19           THE COURT:  Including by the Attorney General?  And I

20   guess I'm not sure that I know that that's been embodied in a

21   response of what the Attorney General's reading of the statute

22   is.  I don't understand you to have taken that position or be

23   in that position right now.  But if you're saying as a matter

24   of enforcement we do not enforce aftermarket responsibilities

25   of manufacturers, however nuanced that is, and you can be quite

1    nuanced obviously for this matter, it's a different matter.

2    Whether I believe that or not is another matter altogether as

3    well.

4              MR. HASKELL:  Of manufacturers, yes, that's right.

5              THE COURT:  Okay.

6              MR. HASKELL:  So where this possibility of disabling

7    the telematics system is available, it's safe, it's immediate,

8    and it is compliant with the law, you know, under *Mutual*

9    *Pharmaceutical v. Bartlett*, that wouldn't be telling the OEMs

10   to stop selling the product, to get out of the market.  It

11   would be saying you've got to modify your product in a way

12   that's perfectly permissible if you want to comply with Section

13   3 of the law.

14             THE COURT:  Right.  I'm certainly going to try to get

15   my head around the idea that I'll shoot myself in the foot

16   before I do anything like this, which is essentially what that

17   is.  That is to say you're telling the manufacturers to say,

18   "Do away with all of this and you will comply with what appears

19   to be the law of the Commonwealth, which is, we want to make

20   this as broadly available as we possibly can."  I don't know

21   how I could read the structure of the statute, the purpose of

22   the statute as being anything other than we, the people, want

23   access to everything that is available; not that we, the

24   people, would like to have the manufacturers disable this extra

25   dimension to their product, if that's what it is.

1          MR. HASKELL:  Very good point, Your Honor.  And let me

2    speak just briefly to that.  The reason that the hook in

3    Section 3 is you have to have a telematics system before the

4    law requires all these other things, is the concern that a

5    telematics system -- Mr. Lowe testified about this -- the

6    concern that a telematics system could be used as an end run

7    around the existing right Right to Repair law.

8          And so in our view that would be perfectly consistent

9    with the notion that the intention of this law is to guaranty

10   access to diagnostic information.  If an OEM turns off their

11   telematics system, then they've eliminated that loophole.

12   They've eliminated the ability to do an end run around the

13   existing Right to Repair law, and that information would need

14   to flow through the OBD system.

15         THE COURT:  That has a superficial attraction, which I

16   think will probably fade as I think about it more carefully.

17   So I understand what you had to say.

18         MR. HASKELL:  Anything else I can answer?

19         THE COURT:  I mean, I put it out, I put it out, and I

20   do want to get to -- I want to be sure that I haven't missed

21   anything that I want to talk about here and also to invite

22   anything further that the parties might do to refine their

23   positions here.

24         This has all, as I said, been meant to be provacative,

25   and it is being done in two parts to permit this as I work my

1    way through because I think I have a deadline, even if it's

2    only precatory, as I've now learned on the part of the Attorney

3    General, because you're not going to do anything if I don't act

4    by August 1.  I don't think that's true.

5          In any event, that's what I'm obligated to do.  So,

6    are there other things that the parties would like -- I've read

7    the briefs very carefully, and I will read them, reread them as

8    well, but are there any other issues that the parties at this

9    point want to raise with me and focus on?  Anything else?

10          MR. NADOLENCO:  Not from our side, Your Honor.

11          THE COURT:  Okay.  Mr. Haskell?

12          MR. HASKELL:  I guess what we would just say on that

13    is, this may summarize some of the things we've already talked

14    about today, but our view is that the evidence showed that

15    there's really no question that automobile manufacturers can do

16    this.  The question is when can they do this, and then that

17    goes back to the --

18          THE COURT:  When and how many resources, a whole

19    series of things, but I question whether I'm in a position to

20    say.  I mean, I can think about the history of automobiles that

21    I'm learning more and more about in the automobile industry.

22    And if they want to do it, they can do it, and they can do it

23    really fast.  And if they don't want to do it, they don't do

24    it, and they do it so slow that they don't do it at all.  But

25    can I turn to them and say, "You know, your model year

1    development has to be 18 months," or that sort of thing?  Not
2    on this record.  And I'm not even sure that that's what James
3    Madison had in mind for federal judges and Article III.  Pretty
4    sure he didn't.

5         But the question is how to frame this properly to deal
6    with the specific case in controversy presented to me and
7    perhaps to direct to the agencies with the proper competence
8    the conception of responsibility that all of this implies.
9    Because we're dealing with -- we're all in agreement we're
10   dealing with very serious stuff, and it's very serious stuff in
11   ways that we didn't even understand six months ago, I suppose.
12   And there's nothing worse than having a bunch of amateurs in
13   there fooling around with that sort of thing.

14        MR. HASKELL:  May I speak to that, Your Honor?  And
15   then I'm happy to call it done after that.

16        THE COURT:  Right.

17        MR. HASKELL:  The Court is absolutely right that it
18   goes to the nature of the case in controversy and what has been
19   proven here by the plaintiffs.

20        And our view, the point that we'd like to make is that
21   if the Court agrees that the plaintiffs have proven that it is
22   actually impossible for them to do this, but it's only a
23   limited period of time during which it's impossible for them to
24   do this, then the remedy isn't to say, "Hey, you don't have to
25   do this."  The remedy is to say, "Here is the injunction that

1   gives you the time to do this."  And that, in our view, is

2   tailoring the remedy to what's been demonstrated.

3          And to be clear, we don't think there's preemption

4   here.  There are a bunch of legal and factual reasons why we

5   think the analysis should never even get that far, but if we do

6   get that far, and what they've proven is a temporary

7   impossibility of compliance with both state and federal law,

8   then the remedy is temporary in nature in our view.

9          THE COURT:  Okay.

10          MR. HASKELL:  And there's evidence to support what

11   that period of time ought to be.

12          THE COURT:  Okay.  I think I understand the view.  Mr.

13   Nadolenco, did you want to have the last word, even if it's one

14   that has been said repeatedly before?

15          MR. NADOLENCO:  Thank you, Your Honor.  I hope not to

16   repeat myself.  We agree with the Court's instincts that we

17   don't know that on the record before the Court it is able to

18   say compliance -- and it's not compliance, by the way.  It is

19   safe compliance, that would be the task -- compliance is

20   possible by this model year or that other model year.

21          Thus, the more prudent course we believe for the Court

22   is to simply rule on the law as written.  And this law, as

23   written, is impossible to comply with without stripping the

24   cybersecurity protections from the car.  Therefore, it flies in

25   the face of the Safety Act and the EPA, and the Clean Air Act

1   and therefore is preempted.

2          THE COURT:  All right.  So let me then go back to

3   scheduling.  We have something now for July 21st.  I would like

4   to set a date seven days before that for the final proposed

5   findings and conclusions which are tied specifically to the

6   evidence that now is in place.  That will give you a real date

7   for that.

8          There may be supplemental findings or conclusions that

9   you want to include in that.  Feel free to do it.  But just

10  identify it in your markup that does that that says, on

11  reflection, in light of questions that the Court has asked,

12  this is your thought process -- you don't tell me this -- but

13  here are some additional things that we think the evidence

14  supports in this case and legal propositions that we think the

15  Court should adopt as conclusions.  I'm not sure there's a lot,

16  but there may be some.

17         So I get my final findings of fact and conclusions.

18  Obviously I'm going through this at the same time trying to

19  work my way through, but I want to be able to have something I

20  can check before we have a final discussion about it on July

21  21st.  I will entertain argument, written argument.  I'm not

22  looking to make more work for people.  But you've heard me

23  expressing my views, testing different propositions.  You may

24  think I need remedial work.  Focused remedial work on my

25  speculations is welcome here.  I wouldn't write a new brief.

1    These briefs are very good.  I've got the stuff that I need,

2    and I'm working through it, but you may say, "He's wandering

3    down the wrong road.  Let me just give him a couple of pages

4    that says, 'Look at this case, look at this case,'" that kind

5    of thing.

6         I'm not inviting it, or I'm not telling you

7    everybody's got to think of new things to send to me, but if

8    there's something that this conversation has generated, then of

9    course I'd like to have that again by, I guess the 14th is what

10   I'm talking about here.  Beyond that, I'm not sure that there's

11   anything else that I really want here.  I mean, now the ball is

12   in my court on this, but I appreciate all the work and support

13   that I've received.

14        MR. NADOLENCO:  So just a question, Your Honor, having

15   learned a valuable lesson in preparing for today's hearing,

16   what does the court envision for the hearing?

17        THE COURT:  I think right now and I think probably

18   after I look at things on the 14th, I might give a little

19   agenda.  But right now, because they bring together in my mind

20   now -- and there was another standing case today, by the way,

21   by the Supreme Court -- the question of what standing would

22   mean to these other add along after -- as far as I'm concerned

23   really after Count One.  Count Two I think is not likely to be

24   successful on the record here.

25        And then we've got these other counts.  And those

1    ones, it seems to me, can't be decided until something is taken

2    or something is in fact displaced for copyright purposes,

3    whatever.  I just think it's too early to deal with those, or

4    at least I'm thinking in those terms, and so I'm likely to get

5    rid of them on different grounds.  But you'll argue otherwise

6    that they have vitality.

7         Then I think I want to look carefully at the core

8    issues that I'm troubled by, and I'll try to deal with that

9    with an agenda item.  I have to tell you that I am troubled by

10   the idea of unballasted exercise of federal question

11   jurisdiction.  The law is not as clear as I'd like it to be on

12   this, and so I want to think that through.  I think I should

13   have it, that it's not a violation of intent of Article III.

14   But intent is one thing.  It's trying to find the text and

15   understand the case law in this area more fully.  And I agree

16   that the cases that have raised problems on this are

17   distinguishable in their own terms, but I try to, we all do,

18   try to derive the essence of them if we can.

19        Now, I think I've said but I want to restate that I do

20   want to have from the Attorney General a view with respect to

21   what your administrative responsibilities are and how they have

22   to be exercised here.

23        MR. HASKELL:  July 14th?

24        THE COURT:  Yes, yes.  And I'm not sure there's

25   anything else that I want to bring to your attention right now.

1    I mean, there are things that will go through my mind and then

2    pass out, so no reason to bother you with my trenchant views,

3    but I'll try to have things that are specific.  But you're

4    right, this is not your closing argument to say, "Your Honor,

5    this is a case about preemption," and then going on from there.

6              Any other questions about timing or anything like

7    that.

8              MR. NADOLENCO:  The only question about timing, Your

9    Honor, is if they're going to file something about their

10   administrative responsibility, we would potentially like the

11   opportunity to review it ahead of time.

12             THE COURT:  You'll get a chance.  You will get the

13   chance of seeing it on the 14th.  If you want to send me

14   something on it, I will be focused on that as well.  I'm not

15   sure what they're going to say, I mean, because I think this is

16   a kind of knotty question of state administrative law of

17   whether or not you have notice of comment for this kind of

18   exercise of authority.  I don't know that there's any case law

19   out there on that.  I haven't found any, but that just means I

20   haven't found any.

21             There was a former Assistant United States Attorney

22   who, whenever asked questions like, "Is there any case on it,"

23   would say, "I know of no case to the contrary," which was

24   commentary not on the state of the case law but the state of

25   his knowledge of cases generally.

1        And so with that reservation, I welcome any help I can

2   get on that.  But that's a framework that I think I want to

3   look at because, ultimately, I do think that the Attorney

4   General has some role.  You say it's very limited.  I think it

5   may be broader.  But in any event, they have some role in

6   defining the administrative context and what deference, if any,

7   I exercise in dealing with that, particularly in this fashion

8   when they haven't even exercised it yet and I'm asking them to

9   tell me how they think they may exercise it in the future, may

10  not strike you as at the core of the case, but it's something I

11  want to have in my mind before I act on this.  I mean, I now

12  know how NHTSA is going to handle it, which is, wait and see.

13  Okay.  We will be in recess.  Thank you.

14        (Adjourned, 1:08 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter to the best of my skill and ability.

 9                    Dated this 27th day of June, 2021.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```