IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION<br><br>        Plaintiff,<br><br>   vs.<br><br>MAURA HEALEY, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS in her official capacity,<br><br>        Defendant. | C.A. No. 1:20-cv-12090-DPW |

**PLAINTIFF'S OPPOSITION TO ATTORNEY GENERAL'S
<u>MOTION TO REOPEN THE EVIDENCE</u>**

After sitting on the documents for nearly a month, the Attorney General belatedly seeks to reopen the trial record to introduce evidence that establishes nothing new and nothing that Auto Innovators even contested at trial. Auto Innovators and its member companies never claimed that they could not disable (or choose not to enable) telematics systems on new vehicles sold in Massachusetts. Instead, Auto Innovators and its members claimed—and showed—that avoidance is not legal compliance with Section 3 of the Data Access Law, and therefore is irrelevant to the preemption analysis, which turns on whether *compliance* with both statutes is possible. Further, avoidance leads to its own set of issues—for example it precludes an automaker from providing over-the-air updates to safety features or providing automatic crash notification. *E.g.*, Pl.'s Pre-Argument Br. 13-14 (ECF No. 215); Pl.'s Post-Trial Proposed FoF & CoL ¶¶ 17-19, 125-127 (ECF No. 236). The Attorney General's own experts agreed at trial that *compliance* with both Sections 2 and 3 of the Data Access Law is currently impossible. *See* p.10, *infra*. While there is no need to go further, the Attorney General's proposed new documents do not speak at all to the

1

requirements of Section 2 of the Data Access Law, for which neither compliance nor avoidance is possible.

Moreover, the Attorney General's documents face evidentiary hurdles that cannot be overcome. One (Ex. 1 to Tran Affidavit (ECF No. 247-1)) is unauthenticated hearsay that does not even come from an Auto Innovators member. Though others (Exs. 2-4) appear to contain information that originated with Subaru of America, Inc., that entity was not subject to Court-approved discovery in this matter, and the documents are unauthenticated hearsay.

Ultimately, the documents at most help establish what Auto Innovators never contested. Auto Innovators' witnesses agreed that it was possible to disable (or not enable) telematics in new vehicles sold to avoid the penalties associated with Section 3. *See, e.g.*, June 14 Tr. at 57-58 (Tierney). But the Court correctly recognized that, as a legal matter, avoidance of the Data Access Law's requirements is not compliance with those requirements. *See, e.g.*, June 16 Tr. at 33:16-19 (Court) ("Now, when I say 'comply,' I don't mean they can comply by picking up all their toys and disappearing from the telematics market. That's not compliance. That's simply conscious avoidance of it.").

And during the hot tub, the Court asked all the experts whether immediate "compliance" with the Data Access Law's requirements were possible. *See id.* at 41:11-18 ("Does any one of you [experts], and I'll ask each one of you, think that right now or on December 3, 2020 or in the fall of 2020, although I think they overlap, that what is called for by the so-called Data Access Law could be provided by the OEMs? Not that they could take their toys and walk off the field, but could be provided by the OEMs, that they could provide the kinds of platforms that are talked about here."). Every expert answered no. *See* June 16 Tr. at 41:19-42:10. The documents offered by the Attorney General do nothing to change that.

The proposed new evidence only confirms what the Attorney General's own experts already testified to: that immediate *compliance* with Section 3 of the Data Access Law by providing the platforms required by that law is not possible, and that OEMs' only option is *avoidance* by not enabling telematics in the vehicles at issue—by "tak[ing] their toys and walk[ing] off the field." June 16 Tr. at 41:15-16 (Court). There is no need to reopen the evidence to confirm what the experts for both sides admitted at trial and that is not disputed.

In short, the Court would be justified in refusing to consider documents that the Attorney General has sat on for nearly a month before submitting them just before the Court is set to rule. But if the Court does consider them, the Court should conclude that they establish nothing new.

Finally, the Attorney General rehashes a cramped understanding of associational standing. Associational standing does not require complete uniformity among an association's members. It is sufficient for purposes of associational standing that the Data Access Law erects uniform requirements that apply to all OEMs that offer vehicles for sale in Massachusetts. And in any case Auto Innovators' members are united in the position—consistently pressed at trial—that OEMs cannot comply with the Data Access Law's requirements.

## BACKGROUND

The Attorney General seeks to reopen the evidence in this case months after the conclusion of an expedited trial. In correspondence between the parties, counsel for the Attorney General admitted that they first knew of these documents on September 28, 2021, and first obtained them the very next day. *See* Declaration of Laurence A. Schoen, Ex. 1, E-mail Correspondence between J. Nadolenco & E. Haskell (Oct. 22, 2021). Yet the Attorney General waited nearly a month—until October 21, 2021, on the eve of a decision from this Court on Plaintiff's claims—to mention them to Plaintiff's counsel. *See id.*

According to the Attorney General, the genesis of these documents was an August 21, 2021 "unsolicited call from a private citizen inquiring about this lawsuit." Mot. 3. It seems that the citizen was unhappy that the StarLink telematics system in his new 2022 Subaru Outback had been disabled, after being told by an independent Subaru retailer (*i.e.*, a dealer) that it was because of the Data Access Law. *See* Affidavit of Molly Johnson ¶ 3 (ECF No. 246). Thereafter, the Attorney General's Office apparently conducted a clandestine month-long investigation into Massachusetts Subaru retailers and obtained the documents at issue by September 28. *See* Tran Affidavit ¶¶ 2-3 (ECF No. 247).

The first document purports to be a June 2, 2021 memo from the Executive Vice President & General Manager of Subaru of New England (SNE)[1] to all SNE retailers. *See* Ex. 1 to Tran Affidavit (ECF No. 247-1). It mentions the Data Access Law, says that "[v]ehicle manufacturers have indicated they cannot comply with [its] requirements for various reasons," and says that "their trade association, the Alliance for Automotive Innovation, has filed a lawsuit challenging" that law. *Id.* at 1. It then states in a layman's terms that, "to comply with the new Data [Access] Law, [Subaru of America] has determined that it is no longer able to offer STARLINK Safety & Security subscriptions to Massachusetts residents beginning with model year 2022." *Id.* Notably, the author of the document is not an employee of an OEM, and is not an attorney, and thus does not understand the legal nuance between "complying" with a law and "avoiding the application" of a law.

The second document purports to be Frequently Asked Questions (FAQs) regarding StarLink and the Data Access Law. *See* Ex. 2 to Tran Affidavit (ECF No. 247-2). It notes that,

---

[1] Subaru of New England is an independent distributor of Subaru automobiles in Massachusetts and other New England states. Subaru of America, Inc. does not have any ownership interest in Subaru of New England. And Subaru of New England is not a member of Auto Innovators.

4

"[a]s a direct result of the new Data Law, Subaru of America is no longer able to offer STARLINK Safety & Security services to MA residents starting with MY2022 vehicles" and that "any MY2022 and newer Subaru vehicle that has a MA address associated with either the vehicle or the STARLINK account will not be able to subscribe to STARLINK Safety & Security." *Id.* at 1. It then proposes a process to disable or not enable StarLink telematics access for vehicles linked to a Massachusetts address. *Id.* at 2.

The final two documents are window stickers for a 2022 Subaru Outback. *See* Exs. 3-4 to Tran Affidavit (ECF No. 247-3, -4).

## ARGUMENT

The decision whether to reopen the evidence is discretionary. *E.g.*, *Blinzler v. Marriot Intern., Inc.*, 81 F.3d 1148, 1160 (1st Cir. 1996). Courts appropriately take account of unjustified delays. *Id.* And "[t]rial courts as a rule act within their discretion in refusing to reopen a case where the proffered 'new' evidence is insufficiently probative to offset the procedural disruption caused by reopening." *Rivera-Flores v. Puerto Rico Telephone Co.*, 64 F.3d 742, 746 (1st Cir. 1995); *accord Joseph v. Terminix Intern. Co.*, 17 F.3d 1282, 1285 (10th Cir. 1994).

The Court should deny the Attorney General's belated attempt to reopen the evidence to inject new documents into this proceeding. The Attorney General sat on those documents for nearly a month, the documents are replete with evidentiary problems, and most importantly, the documents add nothing of probative value to the evidence already established in this case.

**I.     The Attorney General Delayed In Offering These Documents.**

The Attorney General offers no explanation why she waited nearly a month before bringing the documents at issue to the Plaintiff's and the Court's attention. That alone is reason enough to deny the Attorney General's motion. It is well-established that parties seeking to reopen the

5

evidence in a case cannot simply "stand on the sidelines" while the Court adjudicates a completed proceeding. *In re Kalantzis*, Nos. 99-12517-JMD, 2000 WL 33679396, at *3 (Bankr. D.N.H. Dec. 12, 2000) (denying leave to reopen the evidence where the party delayed bringing the evidence to the Court's attention); *cf. Blintzer*, 81 F.3d at 1160 (affirming decision to reopen where the motion was made *immediately* after the plaintiff rested and the defendant had moved for a directed verdict); *Parker v. Beacon Hill Agr. Comm'n*, 27 Mass. App. Ct. 211, 218 (1989) (declining to reopen for information that was "known or should have been known" sooner).

## II. The Documents Suffer From Several Evidentiary Problems.

The Attorney General's new documents also suffer from several evidentiary problems. For one, they constitute inadmissible hearsay, because they are and/or contain out-of-court statements that the Attorney General offers to prove the truth of the matter asserted (that OEMs can disable their telematics systems for vehicles sold in Massachusetts). Mot. 7-8. *See* Fed. R. Evid. 801 & 802. The Attorney General makes no attempt to identify any applicable hearsay exception.

Next, they are not statements of a party opponent. Subaru of America, Inc. is a member of Auto Innovators, but the dealerships that provided the documents are not, nor are they (or Subaru of New England) owned or otherwise controlled by Subaru of America, Inc. Subaru of America, Inc. was not a participating member in this case subject to Court-approved discovery, and thus even the documents that appear to come from it should not be treated as party admissions. *See, e.g.*, *N.H. Motor Transp. Ass'n v. Rowe*, 324 F. Supp. 231, 236-37 (D. Me. 2004) (in associational-standing case, treating association member as third party for discovery purposes); *Playboy Enters., Inc. v. Public Service Comm'n of P.R.* 906 F.2d 25, 35 (1st Cir. 1990) ("[J]ust because a claim may require proof specific to individual members of an association does not mean the members are required to participate *as parties* in the lawsuit."); *cf. Pierce v. County Orange*, 526 F.3d 1190,

1202 (9th Cir. 2008) (holding, in the class-action context, that absent class members are not typically party opponents for purposes of Rule 801(d)(2)(A)).

The Attorney General also has failed to present evidence to establish the authenticity of these documents. Federal Rule of Evidence 901 requires the proponent "to produce evidence sufficient to support a finding that the item is what the proponent claims it to be." The Attorney General claims she received these documents from two Subaru dealerships, but provides no further information about them. Tran Aff. ¶¶ 10-13. For instance, she presents no evidence as to how, when, or why these documents were created. She has not even provided copies of any correspondence with the dealerships in which the dealers share these materials. Without additional information, these documents should not be admitted into evidence. *See,* Fed. R. Evid. 901 & 902.

Finally, the Attorney General presents quotations from various "dealers" about vehicle safety. Tran Aff. ¶ 14. Besides being statements from non-party opponents outside Rule 802, they are improper opinion testimony under Rule 701 and testimony outside the witness's personal knowledge under Rule 602. The Attorney General failed even to name the dealers or identify who allegedly said what. These appear to be quotes from dealership employees, who are salespeople, and the statements reflect the typical rhetoric of that profession. There is no reason to believe that the persons who provided these statements are qualified to opine on the safety impact of disabling telematics systems. *See, e.g.*, *Freedom Wireless, Inc. v. Boston Commc'ns Grp., Inc.*, 369 F. Supp. 2d 155, 157 (D. Mass. 2005) ("Rule 701 explicitly bars lay witnesses from giving options based on technical or specialized knowledge. Instead, lay opinion is proper only when it involves a witness stat[ing] his conclusions based upon common knowledge or experience.").

### III. The Documents Do Not Offer Anything New.

The Attorney General's documents would add nothing new to this case. Auto Innovators did not dispute that OEMs can disable (or not enable) telematics in new vehicles. Instead, time and again, Auto Innovators argued that the Attorney General's purported "solution" to Section 3—turning off telematics—"would merely avoid compliance with those requirements through the cessation of normal business operations—an obligation that preemption principles do not impose on plaintiffs bringing a preemption challenge." Pl.'s Trial Brief 10 (ECF No. 173); *accord* Pl.'s Pre-Argument Br. 13 (ECF No. 215) ; Pl.'s Post-Trial Proposed FoF & CoL ¶¶ 125-127 (ECF No. 236).[2]  Nothing in the Attorney General's documents changes the nature of that dispute. Accordingly, this Court should deny leave to reopen. *See, e.g.*, *Rivera-Flores*, 64 F.3d at 746 (trial courts can refuse "to reopen a case where the proffered 'new' evidence is insufficiently probative to offset the procedural disruption caused by reopening"); *Joseph*, 17 F.3d at 1285 (10th Cir. 1994) (affirming trial court's denial of motion to reopen because the issues touched upon by the new evidence had already been argued extensively).

**A.** As Plaintiffs pressed at trial, avoidance of statutory requirements is not the same thing as compliance with statutory requirements. The assessment of conflict preemption turns on compliance with a law's substantive requirements, not avoidance of them. It "assume[s] compliance with the state-law duty in question." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 882 (2000) (emphasis omitted); *accord, e.g.*, *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 779 F.3d 34, 40 (1st Cir. 2015) (analyzing conflict preemption claim by looking to whether a party

---

[2] And Auto Innovators pointed out that "disabling telematics systems would introduce a whole host of its own safety concerns—including allowing OEMs to ensure that vehicle software is up to date and depriving Massachusetts vehicle owners of valuable services, such as emergency crash notification, id. at ¶ 101." *Id.*

8

can comply with state requirements). It does not assume avoidance of the law by exiting the relevant market.

The state-law duty in Section 3 is not to disable telematics. That provision targets for regulation any "manufacturer of motor vehicles sold in the Commonwealth . . . that utilizes a telematics system"—and then imposes on that regulated OEM a requirement to create and deploy "an inter-operable, standardized and open access platform across all . . . makes and models" "[c]ommencing in model year 2022." Data Access Law § 3.[3] Nothing in the documents purports to offer an immediate way of complying with those requirements. As even the Attorney General's own witness admitted, turning off telematics does not create an inter-operable, standardized, and open access platform—much less so by model year 2022. *E.g.*, June 15 Tr. at 31:12-15 (Lowe).

In assessing whether state law requirements are preempted, a regulated entity's ability to avoid the state law's requirements by ceasing the business operations that make it a regulated entity under that law in the first place plays no part in the preemption analysis. *See, e.g.*, *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 487-88 (2013) (holding that an "actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability"). "Indeed," the Court observed, "if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be 'all but meaningless.'" *Id.* (citation omitted).

This Court has already repeatedly recognized the distinction between avoiding Section 3 and complying with it. *See, e.g.*, June 16 Tr. at 33:16-19 (Court) ("Now, when I say 'comply,' I don't mean they can comply by picking up all their toys and disappearing from the telematics

---

[3] That platform also must be "[d]irectly accessible by the owner through a mobile-based application" and "[c]apable of securely communicating all mechanical data emanating directly from the motor vehicle via a direct connection to the platform." Data Law § 3. And the "mechanical data" emanating from this platform must be "directly accessible" to an independent repair facility for the time needed to maintain, diagnose, and repair the vehicle, such that users will have "the ability to send commands to in-vehicle components if needed for purposes of maintenance, diagnostics and repair." *Id.*

market. That's not compliance. That's simply conscious avoidance of it."); *id.* at 16:4-19 (Court: "Is there any dispute that this was impossible and is still impossible now, that is, compliance with the words of the statute?" // Haskell: [Answers as to Section 2] // Court: "Okay. But [your view of] 'compliance' means just taking yourself out of the game[?]" // Haskell: "And that goes to section 3, again, our view of prompt compliance, if not immediate compliance, with section 3 is this idea of turning off the telematics. If the question is limited to can you implement this open access standardized interoperable platform, no, we don't dispute.").

During the hot tub, the Court asked each side's experts whether OEMs could provide the inter-operable, standardized access platform required by the Data Access Law.[4] Every expert agreed that OEMs could not. *See* June 16 Tr. at 41:21 (Smith) ("Definitely not right away."); *id.* at 42:1-3 (Romansky) ("I think the elements of a solution are available, but they're not assembled, and that has not been proven to all work together."); June 15 Tr. at 198:24-199:2 (Romansky) ("I'm not aware of any [telematics systems] that fully comply with Section 3, correct."); June 16 Tr. at 42:7-8 (Bort) ("I don't think we can do that right now."); *id.* at 42:10 (Garrie) ("I agree with my colleagues."). Nothing in the documents changes the fact that OEMs cannot immediately *comply* with Section 3's requirements.[5]

---

[4] *See* June 16 Tr. at 41:11-18 ("Does any one of you, and I'll ask each one of you, think that right now or on December 3, 2020 or in the fall of 2020, although I think they overlap, that what is called for by the so-called Data Access Law could be provided by the OEMs? Not that they can take their toys and walk off the field, but could be provided by the OEMs, that they could provide the kinds of platforms that are talked about here?").

[5] To try to gin up probative value for these documents, the Attorney General says that Auto Innovators argued that it would be a "practical impossibility" to disable (or not enable) telematics systems just in Massachusetts. Mot. 1, 7. But the Attorney General omits important context around Auto Innovators' statement. Following the evidence adduced at trial, Auto Innovators said that "[t]here is no reason to believe that disabling telematics systems could be cabined just to Massachusetts, *at least as to aftermarket sales*." Pl.'s Post-Trial FoF & CoL ¶ 129 (ECF No. 236) (citing Tierney Aff. ¶ 111 ("It is a practical impossibility to disable telematics systems for all vehicles *that might one day be resold in the Massachusetts aftermarket*.")) (emphases added). Nothing in the Attorney General's documents addresses aftermarket sales. This is significant because the poorly worded Section 3 of the Data Access Law applies to "a manufacturer of motor vehicles sold in the Commonwealth . . . that utilizes a telematics system," without specifying sold by whom.

The clear distinction between statutory avoidance on the one hand and statutory compliance on the other is even more significant given how the Data Access Law's proponents sold that initiative to Massachusetts voters, who were never told that a vote for the ballot initiative was a vote to get rid of telematics. Pl.'s Post-Trial Proposed FoF & CoL ¶ 127 (ECF No. 236). As Auto Innovators' witnesses discussed in detail at trial, among many other things, telematics systems provide enhanced safety. *E.g.*, June 14 Tr. at 90:22-91:6 (Tierney) (observing, based on his experience working with NHTSA at GM, that the agency strongly recommends and supports firmware over-the-air updates because they dramatically increase compliance with safety updates). And the Attorney General's expert conceded that disabling telematics could have safety consequences because it would cut off those safety updates. June 15 Tr. at 118:14-18 (Smith).

**B.** Finally, the Attorney General's arguments about the new documents are directed entirely to Section 3 of the Data Access Law. They do not suggest any path for avoiding compliance with Section 2 of the Data Access Law, because again, even the Attorney General's own experts concede that it is impossible for OEMs to immediately comply with, or even avoid, Section 2's standardization requirements for MY2018 and newer vehicles.[6] It was undisputed at trial that there currently exists no standardized authorization system for access to vehicle networks and/or their OBD systems, nor is there currently an unaffiliated entity that could run such a standardized authorization system. *See, e.g.*, June 15 Tr. 13:13-15, 24:24-25, 25:9-26:7 (Lowe); *id.* at 96:18-97:3 (Potter); *id.* at 118:11-13 (Smith). This fact, coupled with the fact that under

---

[6] Section 2 requires OEMs to do two things immediately that are completely unrelated to vehicle telematics systems: "standardize[]" access to their on-board diagnostic ("OBD") systems and make them accessible "without authorization by the manufacturer, directly or indirectly" or design and implement an "authorization system for access to vehicle networks and their on-board diagnostic systems" that is "standardized across all makes and models sold in the Commonwealth and . . . administered by an entity unaffiliated with a manufacturer." Data Access Law § 2.

Massachusetts law a ballot initiative is not severable (*see* Pl.'s Post-Trial Proposed FoF & CoL ¶¶ 137-143), is sufficient by itself to invalidate the entire Data Access Law.

## IV. The Attorney General's Documents Have No Bearing on Auto Innovators' Associational Standing.

The Attorney General continues to misstate the purpose of associational standing, which seeks to distinguish cases in which a group's members must participate *as parties* from those in which a representative organization can adequately present the issues. *E.g.*, *Playboy*, 906 F.2d at 35-36. Associational standing does not require complete uniformity among an association's members. *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 306 (1st Cir. 2005).

The Data Access Law requires the same conduct from each OEM and conflicts with the same federal obligations. Auto Innovators has never suggested that disabling telematics would constitute compliance with the Data Access Law. *See, e.g.*, Pl.'s Post-Trial Proposed FoF & CoL ¶ 126 (ECF No. 236). Subaru of America agrees. *See* Decl. of Kenichi Yamamoto ¶¶ 7-9 (ECF No. 45). The Attorney General's argument that an OEM took steps to avoid one section of the law would not change the fact that the relief requested will "inure to the benefit" of all Auto Innovators' members. *See, e.g.*, *Playboy*, 906 F.2d at 35.[7]

## CONCLUSION

For the foregoing reasons, Plaintiff Auto Innovators respectfully requests that the Court DENY the Attorney General's Motion to Reopen the Evidence.

---

[7] The Attorney General's cases (at Mot. 9) do not support her position. *See* Mot. 9. In *Pharmaceutical Care Management Association*, the majority held that the plaintiff had associational standing—reversing the district court—even though, as the district court had found, "some [members] might not be affected" by the law at all. 429 F.3d at 306. And the *National Association of Government Employees v. Mulligan* court rejected associational standing because the challenge involved discrimination claims that turned on individual hiring decisions. 914 F. Supp. 2d 10, 14 (D. Mass. 2012). That type of claim could not allow for "a declaration or injunction applicable to all members equally" such as "prohibiting certain business practices across the board" or "enjoining the enforcement of a criminal statute for certain conduct." *Id.* (internal citations omitted). There is no similar problem here. The Data Access Law erects *uniform* requirements that apply to *all* manufacturers that offer vehicles for sale in Massachusetts.

Dated: October 26, 2011

Respectfully submitted,

ALLIANCE FOR AUTOMOTIVE INNOVATION

By its attorneys,

 */s/ Laurence A. Schoen*
Laurence A. Schoen, BBO # 633002
Elissa Flynn-Poppey, BBO# 647189
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY, AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
lschoen@mintz.com
eflynn-poppey@mintz.com

John Nadolenco (*pro hac vice*)
Jason D. Linder (*pro hac vice*)
Daniel D. Queen (*pro hac vice*)
Erika Z. Jones (*pro hac vice*)
Eric A. White (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3000
jnadolenco@mayerbrown.com
jlinder@mayerbrown.com
dqueen@mayerbrown.com
ejones@mayerbrown.com
eawhite@mayerbrown.com

Charles H. Haake (*pro hac vice*)
Jessica L. Simmons (*pro hac vice*)
ALLIANCE FOR AUTOMOTIVE INNOVATION
1050 K Street, NW
Suite 650
Washington, DC 20001
Tel: (202) 326-5500
chaake@autosinnovate.org
jsimmons@autosinnovate.org

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on October 26, 2021.

/s/ Laurence A. Schoen
Laurence A. Schoen