UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION,<br><br>Plaintiff,<br><br>v.<br><br>MAURA HEALEY, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS, in her official capacity,<br><br>Defendant | CIVIL ACTION<br>NO. 1:20-cv-12090-DPW |

**ATTORNEY GENERAL'S SUPPLEMENTAL BRIEF ON POST-TRIAL EVIDENCE**

Defendant Attorney General Maura Healey submits this supplemental brief in response to the newly discovered evidence in this case that demonstrates the ability of automobile manufacturers Subaru of America ("Subaru") and Kia America Inc. ("Kia") to comply with the Massachusetts Data Access Law. These manufacturers' policies of disabling telematics systems in Model Year 2022 or newer vehicles shows that they can immediately comply with Section 3 of the new state law, without violating either the Motor Vehicle Safety Act ("MVSA"), 49 U.S.C. § 30101, *et seq.*, or the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.* Indeed, Subaru has been selling Model Year 2022 vehicles in Massachusetts pursuant to this policy since June 2021, and Kia has been doing the same since February 2021. This evidence conclusively demonstrates that it is not impossible under any set of circumstances for any manufacturer to comply with the Data Access Law—the standard that the plaintiff Alliance for Automotive Innovation (the "Alliance") must satisfy to prevail on its facial preemption claims. The new evidence also shows that, because manufacturers have already taken a diversity of approaches to

1

comply with the Data Access Law, the Alliance lacks associational standing to assert facial preemption claims on behalf of the entire automotive industry. For these reasons, and for all the reasons presented by the Attorney General in her motion to dismiss and at trial, the Alliance's preemption claims are without merit, its request for injunctive and declaratory relief should be denied, and judgment should enter in the Attorney General's favor.

## BACKGROUND

The plaintiff Alliance for Automotive Innovation filed this case on November 20, 2020, ECF #1, moved for a preliminary injunction on December 1, 2020, ECF #26, and withdrew its motion on December 7, 2020, ECF #51. The Attorney General moved to dismiss all claims on December 18, 2020. ECF #75. On January 27, 2021, the Court denied the motion to dismiss on Counts I and II "without prejudice to development on the merits" and deferred a ruling on dismissing the other claims. ECF ##92-93. The Court held a nonjury trial on Counts I and II, taking evidence on June 14-16 and hearing the parties' arguments on June 25 and July 21. ECF ##205, 207-08, 218, 237.

A key dispute at trial was whether it is impossible for automobile manufacturers ("OEMs") to comply with both federal law and Section 3 of the Massachusetts Data Access Law, which requires a manufacturer of vehicles sold in Massachusetts that "utilize[] a telematics system" to equip those vehicles with an inter-operable, standardized, and open access platform across that OEM's makes and models, beginning with Model Year 2022. G.L. c. 93K, § 2(f).[1]

---

[1] As discussed herein, the post-trial evidence regarding the ability of Subaru and Kia to disable telematics systems in Model Year 2022 vehicles relates to both the Alliance's facial preemption challenge to Section 3 of the Data Access Law and its associational standing. Notwithstanding the Alliance's assertion that this evidence does "not suggest any path for avoiding compliance with Section 2 of the Data Access Law," ECF #250 at 11-12, the evidence at trial showed that there are multiple methods by which OEMs can comply with Section 2 without violating federal law—and, indeed, certain OEMs, which already provide standardized access to their on-board

2

The Attorney General presented expert opinion evidence that identified several methods by which an OEM might comply with both state and federal law. In particular, the Attorney General demonstrated that (i) an OEM can comply with Section 3 of the law within months by using a wireless-equipped "dongle" plugged into the vehicle's J-1962 connector, ECF #235 at FF ¶¶ 209-21; and (ii) an OEM can comply with Section 3 over the longer term by building an interoperable, standardized, and open access platform, *id*. at FF ¶¶ 222-32. Neither of the two "representative" OEMs, GM and FCA, has made any attempt to comply with the Data Access Law along these lines, either after the proposed law was certified for the ballot or approved by the voters. *Id.* at FF ¶¶ 151, 170. To the contrary, good-faith efforts to pursue a compliance solution at GM were halted in late 2020 following a meeting with legal counsel. *See id.* at FF ¶¶ 135-51.

The Attorney General also presented expert evidence at trial showing that even these OEMs can *immediately* comply with both Section 3 and the MVSA and CAA, simply by disabling any telematics system in a Model Year 2022 or newer vehicle. ECF #235 at FF ¶¶ 198-207. The Alliance, purporting to speak for all of its OEM members, disputed that this method of compliance is possible. In particular, it disputed that "[e]xisting telematics systems, including for model year 2022 vehicles, can be disabled by the OEM prior to the sale of the new vehicle," ECF #235 at FF ¶ 201, and argued that it is a "practical impossibility" to do so only for vehicles sold in Massachusetts, ECF #215 at 15 n.18 (Alliance's pre-argument brief). The Alliance further asserted that an OEM's disabling of its telematics systems cannot "be cabined just to Massachusetts," but "would effectively require a nationwide change," ECF #236 at FF

---

diagnostics system and do not require manufacturer authorization, comply with Section 2 now. *See* ECF #235 at FF ¶¶ 172-96, CL ¶¶ 95-97.

¶ 129,[2] and that "[s]aying that manufacturers could 'comply' with Section 3 by removing their telematics systems is no different than saying that manufacturers could do so by deciding not to sell vehicles in the Commonwealth at all," *id.* at FF ¶ 126.

On October 22, 2021, the Attorney General moved to reopen the evidence to introduce new evidence bearing on this issue. ECF #245. Specifically, the Attorney General learned that one of the Alliance's OEM members, Subaru, had decided to disable the telematics systems in its Model Year 2022 vehicles being sold in Massachusetts in order to comply with the new Data Access Law. *Id.* at 1-2. The Court granted the Attorney General's motion on October 28, 2021. ECF #253. On November 3, 2021, the parties informed the Court that they were working toward a stipulation of facts that would address the Subaru-related issues. *See* ECF ##258-59. The Attorney General also attached a set of draft supplemental interrogatories seeking information regarding the disablement or non-enablement of telematics systems in Model Year 2022 vehicles by all of Auto Innovators' OEM members—an issue that the Court had raised at the October 28 hearing. *See* ECF #258 at 2 & Ex. 4 (discussing "Third Set of Interrogatories to Plaintiff Alliance for Automotive Innovation"). The Attorney General served those interrogatories on the Alliance on November 16, 2021.

On November 26, 2021, the parties filed a Joint Stipulation on the new Subaru evidence. According to that Joint Stipulation, Subaru of America, one of the Alliance's member OEMs,

---

[2] The Alliance has since argued that it conditioned this particular claim regarding the impossibility of cabining disabling telematics system to Massachusetts with the phrase "at least as to aftermarket sales." ECF #250 at 10 n.5. To the extent the Alliance now concedes that this issue does not apply to vehicles sold by manufacturers or their franchised dealers, that concession obviously defeats any claim of impossibility preemption. In any event, Section 4 of the Data Access Law indicates that its requirements apply to vehicles sold by both new and used car dealerships, and the Alliance did not present any evidence showing why a used car dealer could not disable the telematics system in a Model Year 2022 vehicle it was reselling (assuming that the vehicle did not otherwise comply with Section 3).

decided that it will not make its telematics system, the STARLINK Safety and Security system, available to Massachusetts residents who purchase or lease its Model Year 2022 vehicles. ECF #262 at ¶ 3. Subaru implemented this policy in or about June 2021, contemporaneously with Model Year 2022 Subaru vehicles first being offered for sale or lease in Massachusetts. *Id.* The policy applies to any Model Year 2022 Subaru vehicle that has a Massachusetts address associated with either the vehicle or the STARLINK account (regardless of the state in which that vehicle was originally purchased or leased); it does not apply to vehicles without such an associated Massachusetts address. *Id.* at ¶¶ 4-5. The Joint Stipulation further provides: "Subaru vehicles that are not enrolled in the STARLINK Safety and Security system are safe. As of the time such vehicles are sold to consumers, they comply with all applicable Federal Motor Vehicle Safety Standards, as well as the Clean Air Act and all applicable regulations promulgated thereunder." *Id.* at ¶ 6.

On January 4, 2022, the Alliance served its responses to the Attorney General's Third Set of Interrogatories. Those responses (attached hereto as Exhibit A) provided that 20 of the Alliance's members have sold or distributed, or currently plan to sell or distribute, Model Year 2022 or newer motor vehicles in Massachusetts. Ex. A at 8.[3] The Alliance further stated that of those 20 members, two have implemented a policy or practice of disabling or not enabling a telematics system. *Id.*[4] In addition to Subaru, whose policy on disabling telematics was

---

[3] The Alliance has previously represented that its members consist of 17 OEMs. *See* ECF #196 (Aff. of Stephen Douglas) at ¶ 2; ECF #1 (Compl.) at ¶ 23. Whatever the basis for the unexplained inconsistency in the number of member OEMs, it is plain that all of the Alliance's members continue to sell Model Year 2022 or new motor vehicles in Massachusetts.

[4] Even though Interrogatory No. 24 asked, for each of the Alliance's members that is selling Model Year 2022 vehicles in Massachusetts, "whether or not" that member has implemented or plans to implement any policy or practice of disabling its telematics system in any of its Model Year 2022 or newer vehicles sold or distributed in Massachusetts, the Alliance did not provide any response for any of its 20 OEM members selling vehicles in Massachusetts other than Kia

addressed by the Joint Stipulation discussed above, the interrogatory responses stated that Kia has also implemented a similar policy disabling or not enabling a telematics system in Model Year 2022 vehicles that are purchased or sold in Massachusetts. *Id.* According to the interrogatory responses, Kia has made its telematics services, currently called Kia Connect, unavailable on Model Year 2022 vehicles that are purchased or sold in Massachusetts. *Id.* This policy became part of Kia Connect's Terms of Service in February 2021, shortly before Kia's Model Year 2022 vehicles were offered for sale. *Id.* at 9. Kia's policy applies to vehicles for which either the seller/lessor or the buyer/lessee of the vehicle is located in Massachusetts when completing the contract for sale or lease, the sale or lease occurred in Massachusetts, the vehicle is delivered to the buyer or lessee in Massachusetts, or the buyer or lessee is required to pay sales tax or use tax in Massachusetts. *Id.*

Even though the Alliance relied on multiple affidavits from Subaru and Kia employees when it sought preliminary injunctive relief from this Court, *see* ECF ##42, 44, 45, 47, 48, the Alliance did not learn that Kia and Subaru had implemented these policies until months after they went into effect. Specifically, the Alliance learned that Subaru implemented its policy on October 21, 2021, and that Kia implemented its policy on September 14, 2021. *Id.* at 10.

---

and Subaru. *See* Ex. A at 6-9. Instead, the Alliance asserted objections "to the extent [the interrogatories] purport to require collection and provision of information related to entities other than FCA and GM that is not already in the possession, custody, or control of Auto Innovators." *See id.* at 5-6, 7-8. As discussed herein, the Alliance's incomplete response is nevertheless sufficient to defeat both its associational standing and its substantive contentions regarding the impossibility of complying with Section 3 of the Data Access Law.

## ARGUMENT

**I.    Subaru's Policy of Disabling Telematics in Model Year 2022 Vehicles Shows that Manufacturers Can Immediately Comply with Section 3 of the Data Access Law.**

The new Subaru evidence, set forth in the parties' Joint Stipulation (ECF #262), refutes key contentions made by the Alliance regarding the ability of OEMs to immediately comply with Section 3 of the Data Access Law and federal law.

**A.    The Subaru Evidence Demonstrates That OEMs Can Immediately Comply with Section 3.**

Even if the Alliance had a private right of action to challenge the Data Access Law as preempted by either the Federal Motor Vehicle Safety Act ("MVSA") or Clean Air Act ("CAA"), *but see* ECF #235 at CL ¶¶ 11-28, to prevail on such a claim the Alliance would have to prove that "no set of circumstances" exists under which the state law would be valid. *NCTA – The Internet & TV Ass'n v. Frey*, 7 F.4th 1, 17 (1st Cir. 2021).  In other words, the Alliance would have to show that it is physically impossible for *any* OEM to comply with the MVSA or CAA, on the one hand, and the Data Access Law on the other, or that compliance with the Data Access Law is an obstacle to the accomplishment of a significant federal objective embodied within the MVSA or CAA in all circumstances.  *Capron v. Office of Att'y Gen'l*, 944 F.3d 9, 13, 21, 26 (1st Cir. 2019) (citation omitted), *cert. denied*, 141 S. Ct. 150 (2020).  The "current design" of the OEMs' vehicles is irrelevant; what matters is whether there is any *possible* future implementation of the Data Access Law that would not violate federal law.  *See CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1275 (9th Cir. 2021).

The Alliance cannot meet that high burden.  At the start of this case, the Attorney General moved to dismiss the Alliance's MVSA and CAA claims (as well as the others) because there is no provision in those laws or any regulation promulgated thereunder that conflicts with the Data Access Law.  No federal law or regulation addresses the cybersecurity of motor vehicles or

7

access to motor vehicle diagnostic data.  The decision of the NHTSA and EPA not to regulate these issues "is fully consistent with an intent to preserve state regulatory authority pending the adoption of specific federal standards," *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002), and the Alliance cannot rely on non-binding agency guidance, "brooding federal interests," or policy as support for its claims, *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (citation omitted).

At trial seven months ago, the Attorney General showed that Section 3 of the Data Access Law offers OEMs multiple methods of compliance.  For an OEM that had opted not to turn off telematics in its vehicles sold in Massachusetts, it could have complied with Section 3 within months by using a wireless-equipped "dongle" plugged into the vehicle's J-1962 connector; over the longer term, an OEM could comply with Section 3 by building an inter-operable, standardized, and open access platform.  ECF #235 at FF ¶¶ 208-32.  The trial evidence established that while OEMs such as GM and FCA are fully capable of installing such a dongle or building such a platform, they have made no effort to do so.  Nevertheless, the Attorney General also presented expert evidence at trial showing that even these OEMs can immediately comply with both Section 3 and the MVSA and CAA, simply by disabling any telematics system in a Model Year 2022 or newer vehicle.  ECF #235 at FF ¶¶ 198-207.  Because Section 3 applies only to motor vehicles that "utiliz[e] a telematics system," any car sold in Massachusetts that does *not* utilize a telematics system will comply with Section 3.  FCA and GM already allow customers to opt out of functioning telematics services when purchasing a new vehicle, *id.* at FF ¶ 202, and testimony at trial established that there are numerous ways OEMs can disable an existing telematics system, *id.* at FF ¶ 203.

At trial, the Alliance disputed that "[e]xisting telematics systems . . . can be disabled by the OEM prior to the sale of the new vehicle," *id.* at FF ¶ 201, and contended that disabling

telematics would "effectively require a nationwide change," ECF #236 at FF ¶ 129, and would be no different than OEMs "deciding not to sell vehicles in the Commonwealth at all," *id.* at FF ¶ 126. We now know that those contentions are incorrect. The parties' Joint Stipulation shows that OEMs can safely disable vehicles' telematics systems and sell those vehicles in Massachusetts, without effecting "a nationwide change." Specifically, Subaru has implemented a policy by which it will not make its STARLINK telematics system available to Massachusetts residents who purchase or lease its Model Year 2022 vehicles. ECF #262 at ¶ 3. The policy is tailored to vehicles that have a Massachusetts address associated with either the vehicle or the STARLINK account, *id.* at ¶ 4; it does not apply to vehicles without such an associated Massachusetts address, *id.* at ¶ 5. The parties further stipulate that the Subaru vehicles that are not enrolled in the STARLINK telematics system are "safe" and fully comply with the MVSA and CAA. *Id.* at ¶ 6.

The Joint Stipulation thus confirms the Attorney General's position that an OEM can achieve immediate compliance with Section 3, consistently with federal law, by disabling the telematics in Model Year 2022 vehicles. Specifically, the parties agree that turning off the telematics in a vehicle does not violate any federal motor vehicle safety standard. The Joint Stipulation also confirms the Attorney General's positions that this approach can be limited to just Massachusetts residents who purchase or lease particular vehicles, and that telematics are not so integral to vehicles' functioning or safety that disabling them would force an OEM like Subaru to abandon the Massachusetts market altogether.

      **B.**    **The Alliance Cannot Rest Its Preemption Claim on the Supreme Court's Rejection of the "Stop-Selling Rationale" in *Bartlett*.**

In the face of this evidence, the Alliance has sought to advance a purported distinction between its members' "avoidance of" versus "compliance with" the Data Access Law. Citing

9

*Mutual Pharmaceutical Co., Inc. v. Bartlett*, 570 U.S. 472, 488-90 (2013), the Alliance contends that "a regulated entity's ability to avoid the state law's requirements by ceasing the business operations that make it a regulated entity under that law in the first place plays no part in the preemption analysis." ECF #250 at 9; *see also* ECF #236 at CL ¶ 84. *Bartlett*, however, does not remotely support the Alliance's position.

In *Bartlett*, New Hampshire's design-defect cause of action effectively required the manufacturer of a particular generic drug to change the drug's labeling to provide stronger warnings. 570 U.S. at 475. But because federal law prohibited generic drug manufacturers from changing their drugs' labels, the New Hampshire law "imposed a duty on [the manufacturer] *not* to comply with federal law." *Id.* On appeal, the First Circuit opined that the manufacturer "should simply have pulled [the drug] from the market in order to comply with both state and federal law," but the Supreme Court rejected that "stop-selling rationale." *Id.* "Our preemption cases presume," the Supreme Court explained, "that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability." *Id.*

Unlike the state cause of action in *Bartlett*, the Data Access Law does not require any OEM to stop selling cars in Massachusetts or otherwise "exit[] the relevant market." *Cf.* ECF #250 at 9. To the contrary, as the evidence at trial showed, OEMs can comply with Section 3 of the law by installing or building an inter-operable, standardized, and open access platform that allows vehicle owners and independent repair shops to receive information needed to repair those vehicles. *See* ECF #235 at FF ¶¶ 208-32. The fact that OEMs like GM and FCA have so far refused to implement these solutions is irrelevant to the test for impossibility preemption—whether it is *possible* for them to do so. *CDK Global*, 16 F.4th at 1275. Moreover, as the Subaru evidence has shown, OEMs can comply with Section 3 *immediately*, simply by disabling

10

the telematics systems in Model Year 2022 vehicles that have them. Because Section 3 applies only to vehicles that utilize a telematics system, it does not impose any duty on vehicles that either do not have such a system or have had it disabled.[5] Disabling telematics does not jeopardize motor vehicle safety or create any conflict with federal law. To the contrary, the parties agree that telematics-disabled Subaru vehicles are safe and comply with all applicable motor vehicle safety standards. ECF #262 at ¶ 6.

Thus, unlike *Bartlett*, there is nothing in the Data Access Law that requires OEMs like Subaru to cease their business operations in Massachusetts. They can continue to sell Model Year 2022 vehicles in Massachusetts, either by installing or building a platform that allows telematics repair data to be shared with those who need it, or by disabling the telematics systems in cars that have them. And OEMs have not, in fact, stopped selling cars in Massachusetts. According to the Alliance's interrogatory responses, 20 of its members have continued to sell or currently plan to sell Model Year 2022 or newer cars in Massachusetts. Ex. A. at 8.

Most important, unlike *Bartlett*, there is nothing in the Data Access Law that requires OEMs selling cars in Massachusetts to violate federal law. There is no federal law or regulation that requires motor vehicles to be equipped with telematics systems. For those vehicles that have such a system, there is no federal law or regulation that prohibits OEMs from either disabling the system before purchase or installing or building a platform that allows telematics repair data to

---

[5] The Alliance contends that the "state-law duty in Section 3 is not to disable telematics," but rather to "create and deploy 'an inter-operable, standardized, and open access platform.'" ECF #250 at 9. But that's incorrect: vehicles that do not utilize a telematics system need not be equipped with the platform. Rather, Section 3 provides only that OEMs that choose to equip and enable telematics systems in their vehicles must make maintenance, diagnostics and repair data available through that system equally accessible to vehicle owners and independent repair shops. OEMs retain the power under Section 3 to choose whether or not their Model Year 2022 vehicles will utilize telematics systems and share repair data; the only thing they cannot do is keep telematics repair data for themselves.

be shared with vehicle owners and independent repair shops. Indeed, the parties have stipulated that telematics-disabled Subaru vehicles comply with both the MVSA and CAA. ECF #262 at ¶ 6. In this respect, the Data Access Law is entirely unlike the New Hampshire's design-defect cause of action that effectively required generic drug manufacturers to change their labels in violation of federal law. *See Bartlett*, 570 U.S. at 475; *see also id.* at 487 ("Thus, federal law prohibited [the manufacturer] from taking the remedial action required to avoid liability under New Hampshire law."). Rather, the Data Access Law gives OEMs a range of options in deciding how to comply with Section 3, none of which is prohibited by federal law or deleterious to vehicle safety.[6]

## II. The Alliance's Responses to the Attorney General's Third Set of Interrogatories Further Show that Manufacturers Can Immediately Comply with Section 3 of the Data Access Law.

While the new Subaru evidence is sufficient on its own to refute key contentions made by the Alliance regarding the ability of OEMs to immediately comply with Section 3 of the Data Access Law and federal law, the Alliance's Responses to the Attorney General's Third Set of Interrogatories further reinforce the Subaru evidence. The Alliance's interrogatory responses

---

[6] The Alliance attempts to finesse the absence of any federal conflict by arguing that, under Section 3, "[m]anufacturers that utilize a telematics system" are the "regulated entities" and that *Bartlett* prohibits consideration of "a regulated entity's ability to avoid the state law's requirements by ceasing the business operations that make it a regulated entity under that law in the first place." ECF #236 at CL ¶ 84. But *Bartlett* applies only where an entity has been forced to cease operations because a state law requires it to *violate federal law*. Here, disabling telematics systems does not require OEMs to violate federal law. Nor do any of the other steps by which OEMs can comply with Section 3. The fact that the Data Access Law imposes on OEMs obligations that they do not have under federal law does not warrant federal preemption. *See Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1678 (2019) ("[W]e have refused to find clear evidence of . . . impossibility where the laws of one sovereign permit an activity that the laws of the other sovereign restrict or even prohibit.") (citations omitted).

identify another OEM, Kia, that has implemented a policy disabling telematics in its Model Year 2022 or newer vehicles sold or distributed in Massachusetts.  Ex. A at 8.  Much like the Subaru evidence, the Alliance's interrogatory responses confirm the Attorney General's position that an OEM can achieve immediate compliance with Section 3, consistent with federal law, by disabling the telematics in Model Year 2022 vehicles.

The Alliance's interrogatory responses also confirm that the Alliance cannot succeed on its facial preemption claim as to Section 3, because, as a factual matter, at least two OEMs have implemented a policy disabling telematics in their Model Year 2022 or newer vehicles sold or distributed in Massachusetts, and have been implementing these policies for months.  Kia and Subaru are examples of two OEMs that have adopted a policy to comply with Section 3 without violating federal law, consistent with the trial evidence showing that telematics systems can be disabled in targeted vehicles without adversely impacting vehicle security.  ECF #235 at ¶¶ 198-207.

The interrogatory responses also state that Kia's policy is limited to vehicles "purchased or sold in Massachusetts," indicating that Kia, like Subaru, has been able to limit its policy disabling its telematics services to Massachusetts, rather than needing to implement a nationwide change.  Ex. A at 8-9.  Notably, Kia has implemented this policy of disabling telematics since February 2021 and, almost a year later, continues to sell Model Year 2022 motor vehicles subject to the policy in Massachusetts.  *Id.*  That Kia has been able to continue selling its cars in the Massachusetts market validates the Attorney General's position that telematics services are not so integral to vehicles' functioning or safety that disabling them would force an OEM to abandon the Massachusetts market altogether.

The Alliance's interrogatory responses demonstrate not only that it cannot meet its factual burden of showing that it is impossible for any OEM to comply with both the Data Access Law and federal law, but also that its facial preemption claim necessarily fails as a matter of law. Because OEMs' technical capabilities, circumstances, and the ease with which they can comply with the Data Access Law vary significantly, the Alliance cannot prove that there is "no set of circumstances" under which any OEM can comply with both state and federal law. *NCTA*, 7 F.4th at 17. Indeed, it is not even clear whether the Alliance has knowledge of the different approaches its OEM members have implemented or are planning to implement to comply with the Data Access Law. As the Alliance acknowledged in its interrogatory responses, Kia had been implementing a policy to disable telematics in its motor vehicles sold or purchased in Massachusetts since February 2021, but the Alliance was not aware of this fact until September 2021, four months after the trial evidence closed. Ex. A at 9-10.

Thus, the interrogatory responses reinforce what the trial evidence established: the Alliance cannot prove that it is impossible for any OEM to comply with the Data Access law and the MVSA and CAA, or that compliance with the Data Access Law always stands as an obstacle to the accomplishment of significant objectives embodied within the MVSA and CAA. And the Alliance's semantic sleight of hand—its purported distinction between "avoiding" the Data Access Law and "complying" with the Data Access Law—does not change that conclusion. Other than the circumstances described in *Bartlett* which, as described, bear no resemblance to this case, there is no legally significant difference between "compliance" and "avoidance" for purposes of conflict preemption analysis. Conflict preemption guards against circumstances in which regulated entities cannot operate in accordance with state law and federal law at the same time. *See, e.g.*, *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J.,

14

concurring in part and concurring in the judgment) (explaining that because, under conflict preemption analysis, "[a]ny conflict must be irreconcilable," the "teaching of this Court's decisions . . . enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists") (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982) and *English v. General Elec. Co.*, 496 U.S. 72, 90 (1990)).  The new Kia and Subaru evidence demonstrates that OEMs face no conflict of that sort at all: they can sell, and are selling, their products in Massachusetts in accordance with the obligations imposed by state and federal law.  The Alliance cannot, accordingly, prevail on its conflict preemption claims.

**III.    The Diversity of Approaches Taken by OEMs to Compliance with Section 3 of the Data Access Law and Federal Law Demonstrates That Associational Standing is Improper.**

The new Subaru and Kia evidence also confirms that the Alliance failed to carry its burden to establish it has associational standing to assert preemption claims on behalf of its members.  *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 306 (1st Cir. 2005) (an association "has the burden to prove it has standing" to bring claims on behalf of its members).  For both factual and legal reasons, the Alliance has not demonstrated that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Associational standing "is inappropriate," the First Circuit has explained, "if adjudicating the merits of an association's claim requires the court to engage in a fact-intensive-individual inquiry." *N. H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 72 (1st Cir. 2006), *aff'd*, 552 U.S. 364 (2008) (internal quotation marks omitted).  As a factual matter, the trial evidence showed, and the Subaru and Kia evidence reinforces, that OEMs can and will take different approaches to complying with Section 3 of the Data Access law and federal law.  To begin, the Alliance

introduced *no* evidence that all OEMs even use telematics; to the contrary, its expert, Daniel Garrie, testified that "it is not necessarily the case today" that "all OEMs are using telematics." Tr. III:73.  OEMs that do *not* equip their cars with telematics systems can obviously comply with Section 3 and the MVSA and CAA right now.  *See* ECF #235 at CL ¶¶ 9, 98.  Among those OEMs that *have* used telematics as part of their vehicle architecture, two—Subaru and Kia—are currently complying with Section 3, as well as the MVSA and CAA, by opting not to "utiliz[e] a telematics system" for Model Year 2022 vehicles sold in Massachusetts.  G.L. c. 93K, § 2(f); *see* ECF #262 at ¶ 6.  Through their policies, these OEMs have demonstrated that it is not a practical impossibility to comply with both state and federal law, nor is compliance with state law an obstacle to the accomplishment of any objective clearly set forth in the MVSA or CAA.  In contrast, other OEMs—like the "representative" OEMs, GM and FCA—may have decided not to disable their telematics systems for all of their Model Year 2022 vehicles sold in Massachusetts, despite admitting at trial that they have the ability to safely disable telematics for their vehicles when requested by a customer.  *See* Ex. A at 6-9; *supra*, note 4; Tr. I:57-58, 90.

The Alliance, which carries the burden to establish its associational standing, *see Pharm. Care Mgmt. Ass'n*, 429 F.3d at 306, has provided no explanation as to why its member OEMs have adopted such a wide range of approaches to compliance with Section 3 and federal law. Indeed, the evidence shows that the Alliance was not even aware of the different approaches being taken by its member OEMs until after the trial concluded.  *See* Ex. A at 8-10 (Subaru implemented its policy disabling telematics in its Model Year 2022 or newer vehicles sold or distributed in Massachusetts in or about June 2021, but the Alliance did not learn that Subaru implemented the policy until October 21, 2021; Kia implemented its policy disabling telematics

in its Model Year 2022 or newer vehicles sold or distributed in Massachusetts in February 2021, but the Alliance did not learn that Kia implemented the policy until September 14, 2021).

Whatever the reasons, the new evidence confirms that there exists "considerable variation in each member [OEM's] particular circumstances" with respect to compliance with Section 3 and federal law, rendering this lawsuit a poor fit for conflict preemption claims pressed by an association instead of by individual OEMs. *Pharm. Care Mgmt. Ass'n*, 429 F.3d at 314 (Boudin, C.J., concurring). And the new evidence likewise disproves the Alliance's assertion that "motor vehicle manufacturers as a whole are similarly situated" because "no OEMs can comply with the Data Access Law." ECF #236 at FF ¶ 5; *see also id.* at CL ¶ 6 (claiming incorrectly that the Alliance's members "are aligned in their inability to comply with both the Data Access Law and federal law"). Rather, the new evidence demonstrates that the impossibility preemption and obstacle preemption analysis will necessarily differ between OEMs because, to the extent they are not dismissed as a matter of law for other reasons, the preemption claims involve "application of law to a series of different factual scenarios." *Nat'l Ass'n of Gov't Employees v. Mulligan*, 914 F. Supp. 2d 10, 14 (D. Mass. 2012); *see also Together Emps. v. Mass Gen. Brigham Inc.*, No. 21-cv-11686-FDS, --- F. Supp. 3d ---, 2021 WL 5234394, at *5 (D. Mass. Nov. 10, 2021) (concluding that association likely lacked standing to challenge hospitals' COVID-19 vaccine requirement because "the claims asserted and relief demanded clearly require the personal participation of each affected employee," each of whom may have their "own unique medical or religious issues").

Citing *Playboy Enterprises v. Public Service Commission of Puerto Rico*, 906 F.2d 25, 35 (1st Cir. 1990), the Alliance has argued that this Court should find associational standing because any injunctive relief in its favor would "inure to the benefit" of all OEMs. *See, e.g.*, ECF #250,

at 12; ECF #236 at CL ¶ 6.  Factually, that is wrong: because some OEMs are complying with Section 3 and federal law, they would not stand to benefit from an injunction in favor of the Alliance with respect to Section 3.  *See N.H. Motor Transp. Ass'n*, 448 F.3d at 72 ("[W]e did not embrace the proposition that, under *Playboy Enters.*, the third *Hunt* factor is always satisfied where an association seeks injunctive relief on behalf of all of its members.").  But in any event, even if equitable relief would inure to the benefit of some of the Alliance's members, that alone is "insufficient to support a conclusion that the [Alliance] meet[s] the third [associational] standing prerequisite," because the inquiry also depends on whether "*the claim asserted*" can be adjudicated without individual members.  *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social & Rehabilitation Servs.*, 958 F.2d 1018, 1022 (10th Cir. 1992) (emphasis in original) (rejecting associational standing for failure to establish that the claim asserted did not require participation of individual members); *accord Rent Stabilization Ass'n of N.Y. v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (same).  And as described, the Subaru and Kia evidence shows that the factual underpinning for the Alliance's conflict preemption claims varies across its member OEMs.

The Subaru and Kia evidence also further highlights the practical risks of an expansive conception of associational standing.  Simply put, this case exemplifies how "the increased use of representational standing . . . makes the defense of suits . . . more difficult" because business organizations, like the Alliance, "contro[l] discovery and access to information."  *N.H. Motor Transp. Ass'n*, 448 F.3d at 73 n.9 ("We do not foreclose the possibility that representational standing may be improper in a particular case because of some hardship imposed on a defendant in conducting discovery.").  At the beginning of discovery, the Alliance designated only two OEMs—GM and FCA—as "representative" for the purposes of all of its members' conflict

preemption claims.  But the new evidence has revealed that, around the same time FCA and GM were designated as "representative," Kia adopted the policy of compliance with Section 3 by disabling telematics for its Model Year 2022 vehicles sold in Massachusetts.  *See supra*, at 12-15.  Obviously, discovery in this case—not to mention the trial that occurred—would have looked very different had the Alliance chosen to designate Kia as a representative OEM.  At the very least, the new Kia evidence—and especially the timing of Kia's February 2021 policy change—casts serious doubt on the rigor of the Alliance's vetting of its members for representativeness and on the ability of the Alliance to represent the interests of all of its members in this litigation.

       Finally, the fact that the Alliance has asserted *facial* preemption challenges to the Data Access Law further undermines its claim of associational standing.  As described, to prevail on its claims, the Alliance must prove that "'no set of circumstances'" exists under which the Data Access Law would be valid.  *NCTA*, 7 F.4th at 17 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Just as the new Subaru and Kia evidence precludes satisfaction of that weighty standard on the merits, *see supra*, at 7-15, it also precludes associational standing.  Where an association cannot demonstrate conflict preemption as to "all of it members," it "cannot make the showing necessary for standing *or* a successful facial challenge . . . because the economic impact of [the state law] will vary depending on the economic circumstances of each of its members." *Georgia Cemetery Ass'n, Inc. v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003) (*per curiam*) (emphasis added) (affirming judgment against association on facial claim because, "[w]hether viewed as a standing argument or a merits argument," at least some of the members could comply with the challenged state law).

## CONCLUSION

The preemption claims of the plaintiff Alliance for Automotive Innovation fail as a matter of law, and the evidence submitted at and after trial has confirmed that OEMs can comply with the Data Access Law without violating the MVSA or the CAA.  Accordingly, the Alliance's request for injunctive and declaratory relief should be denied, and judgment should enter in favor of the Attorney General.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL,

By her attorneys,

January 14, 2022

*/s/ Robert E. Toone*
Robert E. Toone, BBO No. 663249
Eric A. Haskell, BBO No. 665533
Phoebe Fischer-Groban, BBO No. 687068
Julia Kobick, BBO No. 680194
Christine Fimognari, BBO No. 703410
   Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, Mass.  02108
(617) 963-2178
robert.toone@mass.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on January 14, 2022.

*Robert E. Toone*
Robert E. Toone