IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION<br><br>        Plaintiff,<br><br>   vs.<br><br>MAURA HEALEY, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS in her official capacity,<br><br>        Defendant. | C.A. No. 1:20-cv-12090-DPW |

**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING ISSUES RAISED IN THE ATTORNEY GENERAL'S MOTION TO REOPEN TRIAL EVIDENCE AND AT THE OCTOBER 28 HEARING**

      The reopened evidence in this case showing that two of Auto Innovators' members, Subaru of America, Inc., and Kia America, Inc., have decided not to use telematics systems in some of their new vehicles does not change the issues before this Court. The Data Access Law's impossible-to-comply-with requirements already have taken effect, with a limited stay of enforcement by the Attorney General during the pendency of this litigation. Unsurprisingly, different manufacturers have responded to the dynamic situation created here with different risk assessments about what would happen if the law were to be upheld. That two manufacturers have taken an approach of seeking to avoid liability under one aspect of the law by not offering telematics in Massachusetts does not change that all manufacturers are adversely affected by the Data Access Law's requirements the same way and face conflicting federal and state law requirements, such that all would benefit the same way from the relief that Auto Innovators seeks on their collective behalf.

The action taken by these two manufacturers is irrelevant to preemption. For starters, there is no dispute that the reopened evidence does not bear on the impossibility of complying with Section 2 of the Data Access Law. Section 2 does not turn on whether telematics are enabled or disabled. Its requirements concern creating "standardize[d]" access to on-board diagnostic systems and "vehicle networks." Data Access Law § 2. The reopened evidence touted by the Attorney General does not even purport to address that. That should be the end of the matter because the Data Access Law rises or falls as a whole; it is not severable.

Even if the Court considers the reopened evidence's impact on Section 3 of the Data Access Law, it remains meaningless. Auto Innovators never contested that manufacturers could disable (or not enable) telematics in new vehicles set to be sold in Massachusetts, in an attempt to avoid penalties associated with Section 3. *See, e.g.*, June 14 Tr. at 57-58 (Tierney). As this Court has recognized, statutory avoidance is not the same thing as statutory compliance. *See, e.g.*, June 16 Tr. at 33:16-19 (Court) ("[D]isappearing from the telematics market. That's not compliance. That's simply conscious avoidance of it."). The Supreme Court has conclusively held that preemption analysis does not turn on a regulated entity's ability to avoid the application of conflicting state-law requirements by ceasing the activity that made it regulated in the first place—here, selling "vehicles . . . that utilize[] a telematics system," Data Access Law § 3.

Section 3 of the Data Access Law targets vehicles that utilize telematics systems for regulation; it does not ban telematics. That section requires the creation of a new "inter-operable, standardized and open access [telematics] platform across all . . . makes and models" "[c]ommencing in model year 2022," among other things. Data Access Law § 3. It is those state-law requirements that Auto Innovators alleges conflict with manufacturers' federal-law obligations. The reopened evidence only confirms what every expert agreed to at trial—that

immediate compliance with Section 3 of the Data Access Law by providing the telematics platforms required by that law is not possible, and that manufacturers' only option is avoidance by not enabling or by disabling telematics in their vehicles—by "tak[ing] their toys and walk[ing] off the field." June 16 Tr. at 41:15-16 (Court). That a couple of manufacturers have in fact elected that option prior to the resolution of this litigation as a means of risk mitigation does not change the Data Access Law's requirements, nor does it immunize those requirements from constitutional challenge.

Finally, the reopened evidence does not affect Auto Innovators' standing to seek relief on behalf of its auto manufacturer members. The Attorney General does not contest that Auto Innovators still readily meets Article III standing requirements. Under long-settled law, constitutional standing can rest on injury to a single associational member. Thus, even if an attempt by two members to avoid one aspect of a law by ceasing to sell telematics-enabled vehicles in Massachusetts (and incurring the steep economic costs to do so) somehow affected the injury inquiry, other members stand in the same position as before. It is similarly well-settled that the prudential third prong of associational standing does not require uniformity among an association's members in how they react to a challenged law—especially one that has already taken effect and whose enforcement by the Attorney General is stayed only temporarily by this litigation. It is more than sufficient for the purposes of associational standing that the Data Access Law creates uniform requirements across auto manufacturers that offer vehicles for sale in Massachusetts, that Auto Innovators' members are united in the position that they cannot comply with that law's requirements, and that the prospective relief requested would inure to the benefit of all.

## BACKGROUND

On October 22, 2021, the Attorney General moved to reopen the trial evidence in this case. ECF No. 245.  Her basis for doing so was a handful of documents that her office obtained from Subaru of New England—an independent distributor of Subaru automobiles in Massachusetts and other New England states that is not a member of Auto Innovators.  Those documents suggested that, in response to some of the requirements in the Data Access Law, Subaru of America, Inc. ("Subaru") planned to decline to enable telematics systems in new vehicles sold in Massachusetts.

Following an October 27 hearing, the parties stipulated to a limited reopening of discovery on this issue.  The results of that discovery now show that, as of January 4, 2022, twenty of Auto Innovators' members have sold or distributed, or plan to sell or distribute, model year 2022 or newer vehicles in Massachusetts.  Of those twenty members, two—Subaru and Kia America, Inc. ("Kia")—have implemented a policy or practice of either disabling or not enabling a telematics system in some of their model year 2022 or newer vehicles sold or distributed in Massachusetts.

## ARGUMENT

**I.    The Reopened Evidence Says Nothing About Section 2 of the Data Access Law.**

Even if statutory avoidance constituted statutory compliance (and it is does not as a matter of law), the reopened evidence only concerns one part of the Data Access Law.  Nothing in the reopened evidence suggests that it is possible for any manufacturer to comply with or avoid the requirements in Section 2 of the Data Access Law, which does not concern vehicle telematics.  And coupled with the fact that under Massachusetts law a ballot initiative is not severable (*see* Pl.'s Post-Trial Proposed Conclusions of Law ¶¶ 137-143 (ECF No. 236)), Section 2 is sufficient by itself to invalidate the entire Data Access law.

Section 2 requires OEMs to do two things immediately that are completely unrelated to vehicle telematics systems: (1) "standardize[]" access to their on-board diagnostic ("OBD") systems and (2) either make them accessible "without authorization by the manufacturer, directly or indirectly" or design and implement an "authorization system for access to vehicle networks and their on-board diagnostic systems" that is "standardized across all makes and models sold in the Commonwealth and . . . administered by an entity unaffiliated with a manufacturer." Data Access Law § 2.

The Attorney General's witnesses conceded that it is impossible for manufacturers to immediately comply with (or even avoid) Section 2's standardization requirements for model year 2018 and newer vehicles. It was undisputed at trial that there currently exists no standardized authorization system for access to vehicle networks and/or their OBD systems, nor is there currently an unaffiliated entity that could run such a standardized authorization system. *See, e.g.*, June 15 Tr. 13:13-15, 24:24-25, 25:9-26:7 (Lowe); *id.* at 96:18-97:3 (Potter); *id.* at 118:11-13 (Smith).

## II.   The Reopened Evidence Does Not Affect the Court's Preemption Analysis.

Even as to Section 3 of the Data Access Law—which, unlike Section 2, does concern telematics—the reopened evidence in this case has nothing to do with the merits of Auto Innovators' preemption claims. Faced with the prospect of imminent liability for selling vehicles with telematics systems that do not comply with Massachusetts' onerous requirements, two of Auto Innovators' twenty auto-manufacturer members have taken steps now to disable (or not enable) their telematics systems for new vehicles sold in Massachusetts. That a couple of manufacturers have tried to avoid some of the Data Access Law's requirements while that law is

5

temporarily stayed from Attorney General enforcement does not change the fact that the Data Access Law's requirements conflict with federal law.

After all, the assessment of conflict preemption turns on *compliance* with a law's substantive requirements, not *avoidance* of those requirements. It is well-established that preemption analysis "assume[s] compliance with the state-law duty in question." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 882 (2000) (emphasis omitted); *accord, e.g.*, *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 779 F.3d 34, 40 (1st Cir. 2015) (analyzing conflict preemption claim by looking to whether a party can comply with state requirements).

A regulated entity's ability to avoid state-law requirements by ceasing the business operations that make it a regulated entity under that law in the first place cannot defeat a preemption challenge. The Supreme Court made that clear in *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013). In *Mutual Pharmaceutical*, New Hampshire passed a law that imposed a duty on Mutual Pharmaceutical to change the label on its drug, Sulindac, to offer additional warnings or be subject to state defective-warning and defective-design suits. *Id.* at 475. Mutual Pharmaceutical sued, arguing that compliance with the New Hampshire labeling requirement would run afoul of federal law, which does not allow drug manufacturers to modify labels to add additional warnings. *Id.* The First Circuit held that there was no preemption because Mutual Pharmaceutical could "avoid defective warning lawsuits as well as design defect lawsuits [under state law] by not making the drug." *Bartlett v. Mut. Pharm. Co.*, 678 F.3d 30, 38 (1st Cir. 2012).

The Supreme Court reversed the First Circuit's holding. In fact, it squarely rejected the notion that the ability of a manufacturer to cease selling a regulated product precludes conflict preemption. The Court held that an "actor seeking to satisfy both his federal- and state-law

6

obligations is not required to cease acting altogether in order to avoid liability." *Mut. Pharm. Co.*, 570 U.S. at 487-88. "Indeed," the Court observed, "if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be 'all but meaningless.'" *Id.* at 488 (quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621 (2011)); *accord id.* at 489 ("Adopting the First Circuit's stop-selling rationale would mean that . . . the vast majority—if not all—of the cases in which the Court has found impossibility pre-emption[] were wrongly decided."). The Court called out the "incoherence of the stop-selling theory" of non-preemption, by which any "'direct conflict' between federal- and state-law duties could easily have been avoided if the regulated actor had simply ceased acting." *Id.* at 488.

Just like the state law in *Mutual Pharmaceutical* did not purport to require pulling Sulindac from the New Hampshire market, Section 3 of the Data Access Law does not purport to require manufacturers to exit the Massachusetts telematics market. Instead, that provision seeks to regulate the means by which manufacturers offer telematics in Massachusetts. It imposes a series of state-law duties on any "manufacturer of motor vehicles sold in the Commonwealth . . . that utilizes a telematics system":

- to create and deploy "an inter-operable, standardized and open access platform across all . . . makes and models" "[c]ommencing in model year 2022";
- that is "[d]irectly accessible by the owner through a mobile-based application";
- that is "[c]apable of securely communicating all mechanical data emanating directly from the motor vehicle via a direct connection to the platform"; and
- makes any "mechanical data" emanating from this platform "directly accessible" to an independent repair facility for the time needed to maintain, diagnose, and repair the vehicle,

7

such that users will have "the ability to send commands to in-vehicle components if needed for purposes of maintenance, diagnostics and repair." Data Access Law § 3. That is, the state-law duties imposed by Section 3 are not to disable telematics, but to redesign those systems in a way that is inter-operable, standardized, and open access, and that meets a whole host of other new requirements—the very requirements that Auto Innovators has alleged conflict with manufacturers' federal-law obligations. That two manufacturers have decided to disable telematics in an attempt to avoid future potential state-law liability does not alter the conclusion that manufacturers cannot comply with the requirements of federal law and the Data Access Law.

All four expert witnesses in this case concluded that it is impossible to satisfy the Section 3 requirements in the timeline provided by the Data Access Law. The Court asked each expert whether manufacturers could provide the platform required by Section 3. *See* June 16 Tr. at 41:11-18 ("Does any one of you, and I'll ask each one of you, think that right now or on December 3, 2020 or in the fall of 2020, although I think they overlap, that what is called for by the so-called Data Access Law could be provided by the OEMs? Not that they can take their toys and walk off the field, but could be provided by the OEMs, that they could provide the kinds of platforms that are talked about here?"). There was unanimous agreement amongst the experts that manufacturers could not meet the Section 3 requirements. *See* June 16 Tr. at 41:21 (Smith) ("Definitely not right away."); *id.* at 42:1-3 (Romansky) ("I think the elements of a solution are available, but they're not assembled, and that has not been proven to all work together."); June 15 Tr. at 198:24-199:2 (Romansky) ("I'm not aware of any [telematics systems] that fully comply with Section 3, correct."); June 16 Tr. at 42:7-8 (Bort) ("I don't think we can do that right now."); *id.* at 42:10 (Garrie) ("I agree with my colleagues.").

8

Faced with a law whose requirements are impossible to meet on its stated timeline while satisfying federal safety and emissions obligations, the Attorney General has sought to recast compliance with Section 3 as avoidance of Section 3. On her telling, the very telematics systems on which Section 3 hinges can be thought of as merely "one peripheral feature" of a vehicle that can be "disabl[ed]" as an "[a]lternative[]" form of compliance. AG Proposed Conclusions of Law ¶¶ 86, 87 (ECF No. 235). But turning off telematics simply does not create an inter-operable, standardized, and open access platform—let alone by model year 2022.

The Attorney General's own witness—who crafted the Data Access Law—admitted as much. *E.g.*, June 15 Tr. at 31:12-15 (Lowe). And this Court, too, has repeatedly recognized the distinction between avoiding the requirements in Section 3 and complying with those requirements. *See, e.g.*, June 16 Tr. at 33:16-19 (Court) ("Now, when I say 'comply,' I don't mean they can comply by picking up all their toys and disappearing from the telematics market. That's not compliance. That's simply conscious avoidance of it."); *id.* at 16:4-19 (Court: "Is there any dispute that this was impossible and is still impossible now, that is, compliance with the words of the statute?" . . . But 'compliance' means just taking yourself out of the game[?]" // Haskell: And that goes to section 3, again, our view of prompt compliance, if not immediate compliance, with section 3 is this idea of turning off the telematics. If the question is limited to can you implement this open access standardized interoperable platform, no, we don't dispute.").

Further, it would almost certainly come as an unpleasant surprise to the citizens of Massachusetts that what Section 3 really meant all along was no more telematics. The Data Access Law's proponents never told the voters that a vote for the initiative was a vote to get rid of telematics. *E.g.*, Pl.'s Post-Trial Proposed Findings of Fact ¶¶ 126-27 (ECF No. 236); *see, e.g.*, June 15 Tr. 32:9-12 (Lowe) ("Q: Did your side tell Massachusetts voters that a vote for the Data

9

Access Law was a vote against the telematics systems that they signed up for with their auto manufacturer? A: I don't believe so."). Indeed, this entire issue over reopened evidence arose because a Massachusetts citizen contacted the Attorney General to enquire about the Data Access Law, having been stymied in his attempt to connect the telematics system on his new Subaru.[1] Getting rid of telematics is not costless, as it decreases consumer choice, including the choice to purchase or otherwise obtain certain enhanced safety features. *E.g.*, June 14 Tr. at 90:22-91:6 (Tierney) (observing, based on his experience working with NHTSA at GM, that the agency strongly recommends and supports firmware over-the-air updates because they dramatically increase compliance with safety updates); *see also, e.g.*, Pl.'s Pre-Argument Br. 13-14 (ECF No. 215) (discussing firmware over-the-air updates to safety features and automatic crash notification); Pl.'s Post-Trial Proposed Findings of Fact ¶¶ 17-19, 125-127 (ECF No. 236) (same). Even the Attorney General's expert conceded that disabling telematics would cut off those safety updates. June 15 Tr. at 118:14-18 (Smith).

\* \* \*

The reopened evidence does not show that it is possible for any manufacturer to comply with the requirements in Section 3 of the Data Access Law. At most, it shows that when confronted with a state law with which it is impossible to comply, a couple of manufacturers will take the drastic step of ceasing to engage in the regulated activity altogether rather than risk liability.

### III.     The Reopened Evidence Does Not Affect Auto Innovators' Associational Standing.

Associational standing exists precisely for cases like this one—to allow an organization to seek common prospective relief to redress its members' common injury. *E.g.*, *United Food &*

---

[1] Joint Stipulation ¶ 8 (ECF No. 262) ("In August 2021, a private citizen, Kevin Drum, called the Attorney General's office inquiring about the status of the lawsuit concerning the Data Access Law and stating that he was eager to get the STARLINK connected to his newly-purchased Subaru. Mr. Drum indicated that the dealer informed him that the telematics unit could not be activated due to the Data Access Law."

*Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996). Evidence that two members—faced with the impossibility to comply with the Data Access Law—have taken steps to try to avoid liability under part of that law has no bearing on the appropriateness of associational standing.

As an initial matter, the reopened evidence as to two Auto Innovators members does not affect Article III standing. The constitutional component of associational standing only requires an association to allege "that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 34 (1st Cir. 1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); *accord Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 286 (1986) (holding that the first element of the *Hunt* associational standing test is satisfied when "at least some" of the members would have standing to sue on their own).

The Attorney General has never disputed—and, in fact, conceded—that individual manufacturers meet Article III standing requirements to challenge the Data Access Law in their own right. *See, e.g.*, June 25 Trial Tr. at 32:4-9 (The Court: "Is there any question that GM or FCA could bring this action individually or as an entity and would have standing?" // Mr. Haskell: "It would have standing, Your Honor, but of course what they need to prove is impossibility, not impossibility for GM or impossibility for FCA."); *id.* at 33:8-9 (Mr. Haskell: "So would an individual OEM like that have standing? Yes, probably.").

The Attorney General's associational-standing arguments have focused entirely on the third prong of associational standing, which deals with "matters of administrative convenience and efficiency, not . . . elements of a case or controversy within the meaning of the Constitution."

11

*United Food*, 517 U.S. at 557. The Attorney General has continued to misapprehend the purpose of that prong, which seeks to distinguish cases in which a group's members must participate as parties from those in which a representative organization can adequately present the issues. *E.g.*, *Playboy*, 906 F.2d at 35-36. As the First Circuit has held, "just because a claim may require proof specific to individual members of an association does not mean the members are required to participate as parties in the lawsuit." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 306 (1st Cir. 2005).

Associational standing does not require uniformity among an association's members in their response to a challenged law. *E.g.*, *Pharm. Care Mgmt.*, 429 F.3d at 306. Instead, it focuses on the nature of the claim and the relief sought. The Data Access Law requires the same conduct from each manufacturer and conflicts with the same federal obligations. Auto Innovators has never suggested that disabling telematics would constitute compliance with the Data Access Law's regulatory requirements. *See, e.g.*, Pl.'s Post-Trial Proposed Findings of Fact ¶ 126 (ECF No. 236). Both Subaru and Kia agree. *See, e.g.*, Decl. of Lewis Thompson ¶¶ 7-8 (ECF No. 44); Decl. of Kenichi Yamamoto ¶¶ 7-9 (ECF No. 45).[2] And in any event, that two manufacturers took steps to avoid one section of the law would not change the fact that the declaratory and injunctive relief that Auto Innovators seeks would "inure to the benefit" (*Warth v. Seldin*, 422 U.S. 490, 515 (1975)) of all of its members, Subaru and Kia included.[3] *See, e.g.*, *Coll. of Dental Surgeons of Puerto Rico*

---

[2] *See also* Decl. of Orth Hedrick ¶ 7 (ECF No. 47) ("Kia could attempt to disable telematics systems in Kia vehicles sold in Massachusetts, but that too would entail significant manufacturer costs in addition to the cost to Massachusetts consumers of being deprived of the benefit of telematics. Moreover, even if Kia took the drastic step of doing so for all the Kia vehicles provided to Massachusetts dealers to sell in Massachusetts, Kia would not be able to ensure that a vehicle originally intended for sale elsewhere is never sold in Massachusetts in the aftermarket.").

That one third-party document—from an employee of an entity that is not a member of Auto Innovators and who is not a lawyer—colloquially states that telematics was disabled to "comply" with the Data Access Law (Ex. 1 to Tran Affidavit at 1 (ECF No. 247-1)) is irrelevant. As a legal matter, avoidance is not compliance.

[3] *See, e.g.*, Joint Stipulation ¶ 7 (ECF No. 262) ("Should Auto Innovators prevail in this matter, Subaru intends to begin offering STARLINK [telematics] subscriptions on MY 2022 vehicles in Massachusetts. Specifically, if the

*v. Conn. Gen. Life Ins. Co.*, 585 F.3d 33, 41 (1st Cir. 2009) (holding that there was associational standing because the relief, if granted, would inure to the benefit of all members "regardless of [the members'] individual circumstances").

The First Circuit confronted a similar situation in *Playboy Enterprises*. There, a trade association sued to enjoin enforcement of criminal penalties for activities that federal law immunized. 906 F.2d at 27. The court held that the trade association had standing to sue on behalf of its members even though some of those members had altered their behavior in an attempt to avoid prosecution. *Id.* at 34-35. Indeed, the *Playboy* court allowed associational standing even though there, unlike here, "not every member may derive immediate benefit from the injunction." *Id.* at 35; *cf. Pharm. Care Mgmt.*, 429 F.3d at 306 (holding that associational standing was appropriate even though "some [members] might not be affected" by the law at all). Here, every manufacturer would benefit immediately from an injunction of the Data Access Law—because they could continue to offer telematics to Massachusetts customers (in the case of most manufacturers) or re-enable telematics (in the case of two manufacturers) without fear of federal or state liability.

The various cases on which the Attorney General has relied to press her no-associational-standing argument do not support her position. For instance, the court in *National Ass'n of Government Employees v. Mulligan* rejected associational standing because the challenge involved discrimination claims that turned on individual hiring decisions. 914 F. Supp. 2d 10, 14 (D. Mass. 2012). Those types of claim could not allow for "a declaration or injunction applicable to all members equally" such as "prohibiting certain business practices across the board" or "enjoining

---

Data Access Law is invalidated by the Court, Subaru plans to take steps to: (a) inform the then current Massachusetts owners of MY 2022 vehicles that the STARLINK Safety & Security system on their vehicles may now be enabled and how to subscribe, and (b) lift the prohibition on enrollment in the STARLINK Safety & Security system for new vehicles sold in Massachusetts.").

the enforcement of a criminal statute for certain conduct." *Id.* (internal citations omitted).  There is no similar problem here:  The Data Access Law erects *uniform* requirements that apply to *all* manufacturers that offer vehicles for sale in Massachusetts.  Moreover, and in contrast to *National Ass'n of Government Employees*, suits such as this one that seek "prospective relief" have "generally been held particularly suited to group representation."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 261 F. Supp. 3d 99, 110 (D. Mass. 2017) (quoting *Camel Hair & Cashmere Inst. of Am. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986)), *aff'd*, 980 F.3d 157 (1st Cir. 2020)); *accord Coll. of Dental Surgeons*, 585 F.3d at 41.

Nor is this a case where the Attorney General has been stymied in her attempt to conduct relevant discovery because not every auto manufacturer in the country separately filed suit challenging that law.  *Cf., e.g.*, *N.H. Motor Trans. Ass'n v. Rowe*, 448 F.3d 66, 73 n.9 (1st Cir. 2006) ("We do not foreclose the possibility that representational standing may be improper in a particular case because of some hardship imposed on a defendant in conducting discovery.").  The Attorney General had nearly unfettered access to all of the information she wanted from two of the country's largest automakers.  Cases that proceed on associational standing often do so with limited participation by a few representative members.  *E.g.*, *Coll. of Dental Surgeons*, 585 F.3d at 41; *Rowe*, 429 F.3d at 306; *see also, e.g.*, *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 601-02 (7th Cir. 1993) ("We can discern no indication . . . that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association."); *Alliance for an Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 230 (2d Cir. 2011) ("The fact that a limited amount of individualized proof may be necessary does not in itself preclude associational standing"), *aff'd*, 133 S. Ct. 2321 (2013).

Throughout it all, the Attorney General has neglected to explain just how "administrative convenience and efficiency" (*United Food*, 517 U.S. at 557) would be best served by having every manufacturer file its own separate suit challenging Data Access Law requirements that affect the industry as an undifferentiated whole. Preemption is all about maintaining uniformity. That is best achieved by letting the auto industry speak with one voice to pursue its common end when a state law conflicts with manufacturers' uniform federal obligations. *Cf., e.g.*, *N.H. Motor Trans. Ass'n*, 448 F.3d at 72 (observing, in the context of analyzing associational standing, that "[i]f preemption were judged on a carrier-specific basis, the result would be a 'patchwork' of state laws applying to some carriers and not to others, depending on which carriers proceeded to litigation").

## CONCLUSION

For the foregoing reasons, Plaintiff Auto Innovators respectfully requests that the Court (1) find in its favor on Counts I and II of its Complaint; (2) declare that the Data Access Law is unenforceable as preempted by the Safety Act and Clean Air Act; (3) permanently enjoin enforcement of the Data Access Law; and (4) grant any such further relief as the Court deems appropriate.

Dated: January 14, 2022

Respectfully submitted,

ALLIANCE FOR AUTOMOTIVE INNOVATION

By its attorneys,

 */s/ Laurence A. Schoen*
Laurence A. Schoen, BBO # 633002
Elissa Flynn-Poppey, BBO# 647189
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY, AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
lschoen@mintz.com
eflynn-poppey@mintz.com

John Nadolenco (*pro hac vice*)
Jason Linder (*pro hac vice*)
Daniel D. Queen (*pro hac vice*)
Erika Z. Jones (*pro hac vice*)
Eric A. White (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3000
jnadolenco@mayerbrown.com
jlinder@mayerbrown.com
dqueen@mayerbrown.com
ejones@mayerbrown.com
eawhite@mayerbrown.com

Charles H. Haake (*pro hac vice*)
Jessica L. Simmons (*pro hac vice*)
ALLIANCE FOR AUTOMOTIVE INNOVATION
1050 K Street, NW
Suite 650
Washington, DC 20001
Tel: (202) 326-5500
chaake@autosinnovate.org
jsimmons@autosinnovate.org

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on January 14, 2022.

*/s/ Laurence A. Schoen*
Laurence A. Schoen
