IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION<br><br>Plaintiff,<br><br>v.<br><br>MAURA HEALEY, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS in her official capacity,<br><br>Defendant. | C.A. No. 1:20-cv-12090-DPW |

**DEFENDANT ATTORNEY GENERAL MAURA HEALEY'S OPPOSITION
TO PLAINTIFF'S REQUEST FOR POST-TRIAL DISCOVERY
INTO PROPOSED BALLOT INITIATIVE IN MAINE**

Two years after the voters in Massachusetts overwhelmingly approved the Data Access Law, and a year and a half after trial, the plaintiff Alliance for Automotive Innovation ("Alliance") seeks to further delay a decision in this case by reopening the record and obtaining documents and testimony from a proponent of a Maine ballot initiative against which the Alliance is currently campaigning. This Court should deny the Alliance's request because none of the evidence it seeks to discover has any bearing on its facial challenge to the Massachusetts law, and because the resulting delay would undermine the public's interest in prompt resolution of the Alliance's preemption claims.

**I.      The Discovery Sought by the Alliance Is Not Probative.**

Four issues remain to be decided in this case:

(i) Does the Alliance have standing as a trade association to challenge the Data Access Law, where OEMs can and have taken different approaches to complying with

1

the Data Access Law and some already comply with key provisions of that law? *See* ECF No. 232 at CL ¶¶ 1-10; ECF No. 263 at 15-19.

(ii) Does the Alliance have a right of action to challenge the law as preempted by either the Federal Motor Vehicle Safety Act ("MVSA") or Clean Air Act ("CAA"), notwithstanding *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 325-26 (2015)?  *See* ECF No. 232 at CL ¶¶ 11-28.

(iii) Is there any provision in the MVSA or CAA (or any regulation promulgated thereunder) that even potentially conflicts with the Data Access Law, where NHTSA's federal motor vehicle safety standards do not address vehicle cybersecurity and the CAA affirmatively requires OEMs to share information about emissions control diagnostics with anyone who repairs cars?  *See* ECF No. 76 at 4-17; ECF No. 86 at 1-13; ECF No. 232 at CL ¶¶ 71-81, 90-93, 102-09.

(iv) Even if there were a potential conflict, is there no set of circumstances under which any OEM could comply with both state and federal law, where the evidence shows that some OEMs are already securely complying with the Data Access Law and the Alliance's experts acknowledged at trial that other OEMs can comply if they devote the resources and time to make appropriate changes to their cars' architectures?  *See* ECF No. 217 at 2-15; ECF No. 232 at FF ¶¶ 50-74, 171-245, CL ¶¶ 82-89, 94-101.

A finding against the Alliance on any of those issues will require judgment for the Attorney General; the Alliance cannot prevail unless it wins on all four.  Because the Alliance's claims are so clearly defective as a matter of law, the Attorney General moved to dismiss them under Rule 12, *see* ECF No. 75, but the Court denied the motion to dismiss on Counts I and II "without prejudice to development on the merits" and deferred a ruling on dismissing the other claims,

ECF Nos. 92-93.  Following fact and expert discovery, the Court held a nonjury trial on June 14-16, 2021 and heard the parties' arguments on June 25 and July 21, 2021.  ECF Nos. 205, 207-08, 218, 237.

Now, a year and a half later, the Alliance seeks leave to reopen the record and pursue discovery from the Auto Care Association ("ACA") – a trade association that represents businesses in the automotive aftermarket – into all of its "documents and communications" concerning the Maine ballot initiative; the "reasons" for certain statutory language in the Maine proposal; ACA's documents, communications, and analysis regarding "motor vehicle manufacturers' ability or inability to comply with the Data Access Law"; and other issues.  *See* ECF No. 307 Exs. A & B.  The Alliance proposes a deadline of January 12, 2023 for ACA's production of documents, and has scheduled a Rule 30(b)(6) deposition of ACA for January 25, 2023.  *Id.*

While the Alliance initially proceeds as if it need only satisfy the "very low bar for relevance" under the federal rules, *see* ECF No. 307 at 1-2, the standard for reopening the record, taking discovery, and introducing new evidence after the trial record has closed is higher.  "A district court's decision to reopen the record 'turns on flexible and case-specific criteria.'" *Anderson v. Brennan*, 911 F.3d 1, 13 (1st Cir. 2018) (quoting *Davignon v. Hodgson*, 524 F.3d 91, 114 (1st Cir. 2008)).  The criteria include whether "the evidence sought to be introduced is especially important and probative" and whether "reopening will cause no undue prejudice to the non-moving party." *Rivera-Flores v. Puerto Rico Telephone Co.*, 64 F.3d 742, 746 (1st Cir. 1995).  "Trial courts as a rule act within their discretion in refusing to reopen a case where the

proffered 'new' evidence is insufficiently probative to offset the procedural disruption caused by reopening." *Id.*[1]

The evidence that the Alliance seeks is not "especially important and probative" and does not justify further delay in this case. The Alliance wishes to obtain and introduce documents and testimony from ACA regarding what it describes as "curious differences" between the Data Access Law and the proposed ballot initiative in Maine. ECF No. 307 at 1. The Maine proposal was introduced more than a year after trial in August 2022. ECF No. 308 at ¶ 4. While the Alliance appears to view the Maine proposal as also preempted by federal law, *see* ECF No. 307 at 2 (describing measure as "inconsistent with OEMs' federal obligations"), it contends that evidence from ACA concerning differences between the Massachusetts law and Maine proposal would be probative because it goes "to whether, and the extent to which, even the Data Access

---

[1] The Alliance contends that it "should be afforded the same opportunity" as the Attorney General to reopen the record, ECF No. 307 at 9-10, but the evidence introduced regarding Subaru and Kia was far more compelling than what the Alliance seeks here. At trial, the Attorney General showed that OEMs can immediately comply with both Section 3 of the Data Access Law and the MVSA and CAA simply by disabling any telematics system in a Model Year 2022 or newer vehicle. ECF No. 235 at FF ¶¶ 198-207. In response, the Alliance disputed that "[e]xisting telematics systems, including for model year 2022 vehicles, can be disabled by the OEM prior to the sale of the new vehicle," ECF No. 235 at FF ¶ 201; argued that it is a "practical impossibility" to do so only for vehicles sold in Massachusetts, ECF No. 215 at 15 n.18; and asserted that an OEM's disabling of its telematics systems cannot "be cabined just to Massachusetts," but "would effectively require a nationwide change," ECF No. 236 at FF ¶ 129. Evidence then emerged after trial showing that, beginning in early 2021, Subaru and Kia chose to comply with Section 3 by disabling the telematics systems in the Model Year 2022 vehicles they sell in Massachusetts. *See* ECF No. 262 (joint stipulation on new Subaru evidence); ECF No. 263-1 Ex. A (Alliance's responses to interrogatories setting forth new Kia evidence). This evidence confirmed the Attorney General's positions that turning off the telematics in a vehicle does not violate any motor vehicle safety standard or other federal law, this approach to compliance can be limited to just Massachusetts residents who purchase or lease particular vehicles, and telematics are not so integral to vehicles' functioning or safety that disabling them would force an OEM to abandon the Massachusetts market altogether. *See* ECF No. 263 at 7-9, 12-15. By contrast, nothing that the Alliance seeks with respect to the Maine ballot initiative is probative of the issues that remain to be decided in this case.

Law's chief proponents recognize some problems with the scope of some of the requirements in that law." *Id.* at 8. The Alliance even argues that the Court should reject "the position the Attorney General has taken in the present litigation" regarding interpretation of the Data Access Law based on the omission or inclusion of certain terms in the Maine proposal. *Id.* at 2-6.

In reality, what the Maine proposal says, and what the ACA or anyone else thinks about it, are completely irrelevant to the issues that require decision in this case. To the extent the Court need interpret the Data Access Law at all in order to rule on the Alliance's facial preemption claims, *but see Arizona v. United States*, 567 U.S. 387, 415 (2012) (cautioning against interpreting a state law that has not "gone into effect" in a way that "creates a conflict with federal law" in the absence of "a definitive interpretation from the state courts"), such interpretation should be based on the plain text of the law, its purpose and structure, and well-established meanings of technical terms of art. *See* ECF No. 292 (Attorney General's Brief on Textual Interpretation of the Data Access Law). The text of a different measure proposed years later in a different state is irrelevant. *Cf. Raytheon Co. v. Commissioner of Revenue*, 455 Mass. 334, 343-44 (2009) (declining to give interpretive significance to "very similar" statutes from other states and the court decisions interpreting them in deciding the meaning of Massachusetts law, given how SJC had historically interpreted its own law). Furthermore, to the extent "legislative intent" is ever considered in interpreting a law enacted by initiative petition in Massachusetts, courts look to "the wishes of the people" as reflected in "the Information for Voters guide that is prepared by the Secretary of the Commonwealth and sent to each registered voter before the election," not to the intentions of its proponents. *See Barbuto v. Advantage Sales and Mktg., LLC*, 477 Mass. 456, 469 (2017) (citations omitted). There is simply no basis

to interpret the Data Access Law based on the reflections of a particular supporter of the law *after* it has been enacted.[2]

ACA's views regarding the proposed law in Maine have no bearing on whether the Alliance has associational standing in this case; whether it has a right of action; or whether anything in the MVSA or CAA even potentially conflicts with the Data Access Law. Nor do those issues implicate the standard for a facial preemption claim: whether there is "no set of circumstances" under which an OEM can in the future comply with the Data Access Law without violating federal law. *NCTA – The Internet & TV Ass'n v. Frey*, 7 F.4th 1, 17 (1st Cir. 2021); *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1275 (9th Cir. 2021).

Moreover, for each of the provisions of the Data Access Law the Alliance identifies as differing from the Maine ballot initiative, the parties have already submitted their proposed statutory interpretations and relevant evidence. The Alliance's arguments on each of the supposed "key differences" between the Data Access Law and the Maine proposal distort the evidence and issues actually before the Court.

*First*, the Alliance argues that the Maine ballot initiative "omits the problematic phrase 'otherwise related to' from the definition of 'mechanical data,'" and that this is relevant because "[t]he parties dispute both the breadth of that language and the ability of manufacturers to meet the requirement imposed by it." ECF No. 307 at 2-3. But the parties have submitted ample expert evidence and supplemental briefing on the meaning of the term "otherwise related to" in this context. *See* ECF No. 293 at 10-11; ECF No. 292 at 15-16; ECF No. 290 at 13; ECF

---

[2] The Supreme Court has criticized the very idea of post-enactment legislative history, calling it "a contradiction in terms" and "not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). What the Alliance seeks now is even more illegitimate – the subjective views of a third party about language it purportedly believes is "problematic" in a law that has already been enacted. *See* ECF No. 307 at 3.

No. 233 at FF ¶¶ 103, 139; ECF No. 232 at CL ¶¶ 37-39. What's more, the Alliance has taken the position that the Data Access Law would still be preempted even without this supposedly "problematic phrase." *See* ECF No. 293 at 11 ("[E]ven if the 'otherwise related to' language were read out of the statute entirely, access to data necessary for 'diagnosis, repair or maintenance' on the other conditions established in the Data Access Law would itself broadly entail access to potentially every electronic system in the vehicle."). It is illogical for the Alliance to argue that it needs to take additional discovery on the omission of this phrase in the Maine ballot initiative, given its position that omission of this phrase in the Data Access Law would not affect whether the law is preempted. In any event, the reason why a particular phrase does not appear in a proposed law in another state is immaterial to how the Data Access Law should be interpreted or how OEMs can comply with it.

*Second*, the Alliance argues that the fact that the Maine ballot initiative "directs the Maine Attorney General to 'designate an independent entity' to administer the authorization system for access to vehicle on-board diagnostic systems," whereas the Data Access law "does not provide any mechanism to establish that 'unaffiliated,' third-party entity," is relevant because "[t]his issue goes to the heart of OEMs' ability to comply with Section 2 of the Data Access Law." ECF No. 307 at 3-4. In an apparent effort to deflect from the so-called "representative" OEMs' refusal to comply with the Data Access Law, *see* ECF No. 232 at FF ¶¶ 134-51, 169-70; ECF Nos. 296 & 297, the Alliance inaccurately asserts that OEMs cannot be involved in creating Section 2's "unaffiliated entity" without violating "the Data Access Law's prohibition on their direct involvement." ECF No. 307 at 4. In fact, the Data Access Law does not prohibit OEM involvement, but rather requires only that the entity be "unaffiliated" with the OEMs. Undisputed evidence in the record shows that the OEMs can be involved in implementing the

unaffiliated entity, so long as they do not control it.  *See* ECF No. 232 at FF ¶ 192-95; Tr. Ex. 30 at 3-4; Tr. Ex. 31 at 4-5;[3] Tr. II:89.  Contrary to the Alliance's assertion that the "Attorney General acknowledges" that the "unaffiliated" entity cannot be affiliated contractually with OEMs, ECF No. 307 at 4, the Attorney General has consistently maintained that the text of the Data Access Law *would* permit a contractual relationship between OEMs and the unaffiliated entity, so long as the OEMs do not control the third party.  Tr. Ex. 31 at 4-5 ("[I]t is not the position of the Attorney General that, if a manufacturer contracts with a third party to provide access to the authorization system for the manufacturer's on-board diagnostic systems, such a contractual relationship would give the manufacturer a sufficient degree of control over the third party to render that third party 'not unaffiliated' within the meaning of the statute.").[4]

By misrepresenting the Attorney General's position and ignoring the evidence, the Alliance invents the argument that OEMs cannot provide "the standardized access Section 2

---

[3] The Attorney General's response to Plaintiff's Interrogatory No. 8, introduced as Trial Exhibit 31, states in relevant part:

> [T]he mere existence of a contractual relationship between two entities is generally insufficient to establish that one is subject to direct or indirect control by the other.  *Further, the requirement in Section 2 that the authorization system for access be "administered by an entity unaffiliated with a manufacturer" presumes some kind of relationship, contractual or otherwise, between the entity and the manufacturer.*  Accordingly, the Attorney General does not believe that the mere existence of a contractual relationship between a manufacturer and an entity is by itself sufficient to establish that the entity is not "unaffiliated with the manufacturer" for purposes of Section 2.  Rather, a court would likely have to conclude that the entity administering the authorization system for access is subject to the manufacturer's direct or indirect control in order to find that the entity is not "unaffiliated with the manufacturer." (emphasis added).

[4] *See also* ECF No. 290 at 8 ("Attorney General's position: The term 'entity unaffiliated with a manufacturer' means an entity that does not have a formal corporate affiliation with an OEM or is subject to an OEM's direct or indirect control."); ECF No. 232 at CL ¶ 49 ("Because the phrase does not prohibit *any* role by an OEM in the authorization system, [] OEMs may play a role in the governance model that emerges to implement the law.").

requires without their involvement." ECF No. 307 at 4. This argument is contradicted by the plain text of the Data Access Law and the trial evidence. As an initial matter, the text of Section 2 only requires an unaffiliated entity to administer standardized access if an OEM chooses to require authorization for motor vehicle owners' and independent repair facilities' access to vehicle on-board diagnostic systems. And the trial evidence established both that authorization is not required for access to vehicle on-board diagnostic systems, and that not all OEMs employ authorization. ECF No. 232 at FF ¶¶ 172-75, CL ¶ 82; ECF No. 161 Ex. B. at ¶ 56; Tr. II:129 (expert Smith testifying that Toyota does not have a secure gateway and would not have to change cybersecurity to comply); Tr. II:217-18 (expert Romansky testifying that not all current vehicles require an authorization process for vehicle on-board diagnostic systems). Further, for those OEMs that choose to require authorization for access to vehicle on-board diagnostic systems, the "Data Access Law leaves the decision of how to set up the authorization system administered by an unaffiliated entity up to the OEMs, so they are free to work with any unaffiliated entity they choose." ECF No. 232 at FF ¶ 192. The trial evidence established that authorization services "are currently offered by any number of independent vendors," which the OEMs could work with as the unaffiliated entity under Section 2. ECF No. 232 at FF ¶ 194; ECF No. 161 Ex. D at ¶¶ 42-43; Tr. II:229-30. Additionally, the evidence on the Secure Data Release Model ("SDRM") program run by the National Automotive Service Task Force ("NASTF") showed that, in response to state-level regulation, the OEMs have worked among themselves and with other market participants to select an unaffiliated third party to provide independent services. ECF No. 232 at FF ¶ 195; ECF No. 196 at ¶¶ 14-16; Tr. I:11-16.[5] The

---

[5] The trial evidence also showed that two existing entities, the Equipment and Tool Institute ("ETI") or NASTF, could be utilized to serve as the "unaffiliated" entity in Section 2. ECF No. 161 Ex. B at ¶¶ 2-3, 26-34 (ETI is an unaffiliated entity that some OEMs work with as an

record thus establishes that OEMs can comply with Section 2 of the Data Access Law as written, including the unaffiliated entity requirement, and the Alliance's attempt to change the focus to alternative language in the proposed Maine ballot initiative is specious.

*Third*, the Alliance argues that because the initial application version of the proposed Maine ballot initiative (not the approved version of the petition)[6] identifies specific standards that could be adopted for implementing the law, whereas the Data Access Law does not, there is a suggestion that "the law's proponents now recognize that standards are required before compliance can even be contemplated." ECF No. 307 at 5. This position ignores the extensive evidence introduced at trial addressing the existence of established standards that can be used to comply with the law. *See* ECF No. 232 at FF ¶¶ 6, 8, 11, 233-45. More importantly, the reason why some non-final iteration of the Maine proposal identified particular standards as "anticipated" options for implementation has no bearing on the question before this Court – whether any OEM can comply with the Data Access Law without violating federal law. *Cf. Cook v. Patient Edu, LLC*, 465 Mass. 548, 555 n.14 (2013) (fact that proposed amendment to

---

intermediary for aftermarket scan tool companies); Tr. II:68-69 (testimony that there are independent companies that could perform certification for the manufacturers); Tr. II:76-78 (testimony on why NASTF's experience with SDRM shows that it could serve as a suitable unaffiliated entity for purposes of Section 2). Despite the ACA's efforts to create a third-party governance entity that would include the OEMs as key stakeholders, ECF No. 232 at FF ¶ 193, ECF No. 191 at ¶¶ 88-89, the OEMs have refused to work cooperatively with the aftermarket on this, ECF No. 232 at FF ¶¶ 47-49; ECF No. 191 at ¶ 88; *see* ECF Nos. 296 & 297.

[6] Exhibit A to the Declaration of Amy Brink, ECF No. 308-1, which the Alliance cites in support of this argument, is the application for the initiative that was submitted in August 2022. *See* ECF No. 308 at ¶ 5. The approved version of the proposed ballot initiative is attached as Exhibit B to that declaration. *See* ECF No. 308 at ¶ 6. The revised language in the approved version does not include the specific standards the Alliance identify as a "curious difference" between the Maine ballot initiative and the Data Access Law. *Compare* ECF No. 308-1 at 5, *with* ECF No. 308-2 at 2.

statute was not passed by legislature is of "no persuasive significance" in interpreting statute as written) (citation omitted).

*Fourth*, the Alliance argues that "the decision to remove 'open access' from the proposed Maine ballot initiative suggests that proponents recognize problems with that requirement . . . ." ECF No. 307 at 6. But the parties have fully developed the issue of what "open access" means in the context of the Data Access Law through expert evidence, as well as supplemental post-trial briefing on statutory interpretation. ECF No. 232 at FF ¶ 69, CL ¶ 54; ECF No. 192 at ¶¶ 115-17; ECF No. 293 at 11-12; ECF No. 292 at 7, 12-13; Tr. I:55, 110, 123-24, 126, 189; Tr. III:70-71, 75. Speculation about why this term does not appear in another law in another state is irrelevant to understanding what the term means in the Data Access Law or whether it will be impossible for the Massachusetts courts to construe the term in a way that does not create "a conflict with federal law." *Arizona*, 567 U.S. at 415.

In summary, the parties have fully developed their positions on the respective portions of the Data Access Law through trial evidence and post-trial briefing, and nothing meaningful can be added from reopening discovery to explore a third party's views on a proposed law in another state.

## II.   Conducting Discovery on a Proposed Ballot Initiative in Another State Would Improperly Delay Resolution of This Case.

To be sure, while none of the post-trial discovery the Alliance seeks would illuminate the issues that remain for decision in this case, it would undoubtedly assist the Alliance in its ongoing campaign against the Maine proposal. Although the Alliance does not mention the fact in its brief or supporting declaration, *see* ECF Nos. 307-08, it is leading the fight against the ballot initiative in Maine. In October 2022, it released a memorandum for "Interested Parties" attacking the Maine proposal and describing it as, among other things "a monetizable data grab

from national aftermarket part manufacturers and retailers."[7]  Numerous articles about the Maine proposal have identified the Alliance as its primary opponent and quoted criticisms of the measure from the Alliance's representatives.  *See, e.g.*, NBC News Portland, *"Right to Repair" Progresses in Maine, But Automakers Are Pushing Back* (Oct. 20, 2022) (quoting Alliance's Senior Director for State Affairs Wayne Weikel); Spectrum News, *Maine Car Repair Shops Seek Wireless Vehicle Data, But Manufacturers Say They Don't Need It* (Oct. 27, 2022) (quoting Alliance's Vice President of Communications Brian Weiss).[8]  It may not be surprising that the lead opponent of a highly contested ballot initiative might want to interrogate a proponent about "the reasons" for certain statutory language and obtain from it all "documents and communications" about the proposal.  *See* ECF No. 307, Ex. A at 4 (topics for Rule 30(b)(6) deposition), Ex. B. at 5 (document requests).  But that is not an appropriate use of the judicial system or this Court's time and resources, particularly where the Court fully tried the Alliance's preemption claims more than 18 months earlier.

Nothing in the Alliance's discovery request warrants the delay and "procedural disruption" that would result from it.  *Rivera-Flores*, 64 F.3d at 746.[9]  To the contrary, a final

---

[7] This memorandum is available on the Alliance's web site: https://www.autosinnovate.org/about/advocacy/right-to-repair/Maine%20Ballot%20Memo%20to%20Interested%20Parties.pdf (last visited Dec. 6, 2022).

[8] These articles are posted on the Alliance's web site (https://www.autosinnovate.org/RightToRepair) and available, respectively, at https://www.newscentermaine.com/article/news/politics/maine-politics/right-to-repair-progresses-as-automakers-push-back-business/97-a1baaf56-ca60-44f2-9cae-6698f4bdf813 and https://spectrumlocalnews.com/me/maine/news/2022/10/27/car-repair-shops-gathering-signatures-for-2023-ballot-initiative (last visited Dec. 6, 2022).

[9] The Alliance argues that only "slight delay" would occur, ECF No. 307 at 9, but its proposed deposition of ACA is scheduled to take place at the end of January 2023, ECF No. 307 Ex. A at 4, and the Alliance has already made clear that it intends to submit additional briefing thereafter.

ruling on the Alliance's claims is in the public interest. The people of Massachusetts deserve a determination from this Court as to whether they will have the benefit of the law they approved more than two years ago. Consumers and independent repair shops deserve to know whether they will receive access to vehicle repair data in the manner provided by the law. OEMs and dealers need to understand their obligations under the law and take action to achieve compliance.[10] Up to now, the Attorney General has agreed to delay engaging in any action pursuant to her notice and enforcement authority, as provided for by the Data Access Law, Mass. G.L. c. 93K, §§ 2(g) & 6, to allow the Court to bring "this case to an appealable final judgment." ECF No. 243. Allowing the Alliance's request to reopen the record and gather immaterial evidence about a proposed ballot initiative in Maine would undermine the public's interest in the prompt resolution of this case.

## CONCLUSION

For the foregoing reasons, the request of the plaintiff Alliance for Automotive Innovation to reopen the record and take discovery on the proposed ballot initiative in Maine should be denied. Because the Alliance's preemption claims fail as a matter of law, and the evidence submitted at and after trial has confirmed that OEMs can comply with the Data Access Law

---

[10] At the motion to dismiss hearing in January 2021, the Court warned the Alliance's members that "if their business planning is not including thinking about" the Data Access Law "coming into play at some point," they were "whistling by the graveyard on it." ECF No. 94 at 40. Nevertheless, the evidence at trial in June 2021 showed that neither of the two "representative" OEMs, GM and FCA, has attempted to comply with the law. ECF No. 232 at FF ¶¶ 134-51, 169-70. On October 21, 2022, each OEM filed a declaration reiterating its refusal to comply with the law. *See* ECF No. 296 at ¶ 11 (declaration of Kevin Tierney stating that GM "has not implemented" the requirements of the Data Access Law "since last year's trial"); ECF No. 297 at ¶ 4 (declaration of Stephen McKnight stating that Stellantis, the successor to FCA, "has not taken any specific steps to comply with this particular law" since 2021).

without violating the MVSA or the CAA, the Alliance's request for injunctive and declaratory relief should be denied, and judgment should enter in favor of the Attorney General.

                                                   Respectfully submitted,

                                                   MAURA HEALEY
                                                   ATTORNEY GENERAL,

                                                 By her attorneys,

December 6, 2022                          */s/ Robert E. Toone*
                                                 Robert E. Toone, BBO No. 663249
                                                 Eric A. Haskell, BBO No. 665533
                                                 Phoebe Fischer-Groban, BBO No. 687068
                                                 Christine Fimognari, BBO No. 703410
                                                   Assistant Attorneys General
                                                 Office of the Attorney General
                                                 One Ashburton Place
                                                 Boston, Mass.  02108
                                                 (617) 963-2178
                                                 robert.toone@mass.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 6, 2022.

                                                 *Robert E. Toone*
                                                 Robert E. Toone