**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION<br><br>          Plaintiff,<br><br>     vs.<br><br>MAURA HEALEY, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS in her official capacity,<br><br>          Defendant. | C.A. No. 1:20-cv-12090-DPW |

**PLAINTIFF ALLIANCE FOR AUTOMOTIVE INNOVATION'S REPLY BRIEF**
**REGARDING MAINE BALLOT INITIATIVE AND FURTHER DISCOVERY**

The central issue in this case is whether the original equipment manufacturers ("OEMs") are correct that they cannot comply with the Data Access Law's requirements while satisfying their federal safety and emissions obligations. In defense of the Data Access Law, the Attorney General has taken the position that OEMs can do so because that law's terms are non-problematic from a safety and cybersecurity perspective. *See, e.g.*, ECF No. 290 at 7, 12-16. In this ongoing dispute over whether terms in the Data Access Law are problematic, Auto Innovators seeks to discover new evidence suggesting that the drafter of that law—the Auto Care Association ("ACA")—has recently recognized that several terms in the law are problematic and changed them in its latest state initiative effort.

This is not about "the subjective views" of some random "third party." ECF No. 309 ("AG Opp.") at 6 n.2. ACA stands at the center of this case. ACA drafted the Massachusetts ballot initiative that became the Data Access Law. ACA participated extensively at trial, with ACA producing documents and its then-CEO Aaron Lowe serving as one of the Attorney General's two fact witnesses. ACA helped develop and fund the "Right to Repair Committee," which spent $20

million to get the initiative passed, and which sought to participate as amicus here, *see* ECF No. 275. The trial evidence even showed that the committee that ACA helped develop and fund paid the Attorney General $185,000 to aid in defending this case. June 15 Tr. 58:4-7 (Lowe). In short, the Attorney General has not been operating on her own here; she enlisted ACA, and ACA enlisted itself, in the efforts to defend that law's requirements. Auto Innovators only recently learned that ACA has shifted its focus from Massachusetts to Maine, and the handful of changes ACA and its aftermarket supplier colleagues made to its standard "right to repair" script took on new salience when the Attorney General proffered a construction of the Data Access Law that assumed away the problems of several of those very changed terms.

Nothing in the responses from the Attorney General or ACA purports to cabin this Court's discretion to allow the limited discovery that Auto Innovators seeks—namely, discovery about why the Maine ballot initiative omits or modifies key terms that the Attorney General and ACA maintain have little or no effect on OEMs' ability to safely comply with the Data Access Law, as well as what efforts, if any, ACA has made to establish the independent on-board-vehicle-diagnostic-system-access entity required by that law. Auto Innovators satisfies each of the three non-exhaustive factors to warrant reopening the evidence: "the evidence sought to be introduced is especially important and probative," its "explanation for failing to introduce the evidence earlier is bona fide," and "reopening will cause no undue prejudice to the nonmoving party." *Rivera-Flores v. Puerto Rico Tele. Co.*, 64 F.3d 742, 746 (1st Cir. 1995). Moreover, the targeted nature of that discovery would ensure that there is no substantial delay.

The issue of vehicle data access, which ACA has disingenuously marketed to voters as part of the "right to repair," is full of complexities. As this Court observed, such ballot initiatives have gotten "bumper sticker kinds of treatment," presenting voters with "a question of right to repair,

as if that were self-executing or self-explanatory" when "[i]t's not." Sept. 1, 2022 Hr'g Tr. 6:9-11. It is directly relevant to the determination that this Court will soon have to make whether the very party pushing those initiatives at the ballot box has now tacitly recognized the problems with several of the requirements it put into the Massachusetts initiative.

A.   **The Evidence Auto Innovators Seeks Is Important and Probative.**

1. The Attorney General and ACA quibble with just how high a relevancy threshold the Court should set for the new evidence that Auto Innovators seeks to discover. *See* AG Opp. 3; ECF No. 312 ("ACA Opp.") at 3. But that sort of formalism is unfounded. The First Circuit has emphasized that a court's decision to reopen the evidence "turns on flexible and case-specific criteria." *Davignon v. Hodgson*, 524 F.3d 91, 114 (1st Cir. 2008); *accord Rivera-Flores*, 64 F.3d at 746 ("While the particular criteria that guide a trial court's decision to reopen are necessarily flexible and case-specific, it is generally understood that a trial court abuses its discretion if its refusal to reopen works an 'injustice' in the particular circumstances."). The Court has broad discretion to determine whether the new evidence might "aid[] in the truth-seeking process." *Hearts with Haiti, Inc. v. Kendrick*, 2016 WL 3211813, at *4 (D. Me. Jun. 9, 2016) (Woodlock, J.).[1]

The evidence Auto Innovators seeks to explore would aid in the truth-seeking process because it is "especially important and probative" (*Rivera-Flores*, 64 F.3d at 746) of the central issue in this case—whether OEMs can safely (and consistent with their federal law obligations) comply with the Data Access Law's requirements. The Attorney General has repeatedly defended the Data Access Law by suggesting that there is no problem with the very same provisions the

---

[1] In the reopening framework, the required probative value of the new evidence must be weighed against the delay that would be occasioned to develop it. *Rivera-Flores*, 64 F.3d at 746 (discussing how evidence might be insufficiently probative to offset the procedural disruption caused by reopening). As discussed below, here the delay would be quite short—the length of responding to a handful of document requests and attending one deposition.

Maine ballot initiative changes, but the fact that the aftermarket drafters and proponents of both of those efforts felt the need to make changes reasonably suggests otherwise. There is, moreover, no suggestion that the new evidence would be cumulative of evidence already in the record. *E.g.*, *Davignon*, 524 F.3d at 114 (discussing how purely cumulative evidence may not warrant reopening); *Rivera-Flores*, 64 F.3d at 746 (same). It would represent a significant evidentiary about-face if the drafter and chief proponent of the Massachusetts ballot initiative belatedly recognized problems with some of the very terms it defended as unproblematic in this Court.

2. Much of the gap between Auto Innovators and the Attorney General about the probative nature of this new evidence stems from the Attorney General's incorrect or artificially cabined view of the issues before the Court. For instance, the Attorney General repeatedly emphasizes what it views as the significance of the supposedly "facial" nature of the preemption claims here. AG Opp. 1, 5, 6. As a result, the Attorney General says, Auto Innovators must show that there are "'no set of circumstances'" under which a manufacturer "can in the future comply" with the law. *Id.* at 6 (citing Ninth Circuit case law and tacitly acknowledging, just as the Attorney General's experts did, that current compliance is impossible). Even putting aside the Attorney General's attempt to graft a future-compliance exception onto its preferred standard, the First Circuit has cleared away any doubt that the "no set of circumstances" standard is inapplicable to a case like this one. *See Capron v. Office of Attorney Gen. of Mass.*, 944 F.3d 9, 20 (1st Cir. 2019) (agreeing with the plaintiffs "that they need not show that 'no set of circumstances exists' under which the challenged laws would be valid in any application[] [e]ven though the plaintiffs' preemption challenges are facial in nature"). In any event, it is unclear why, even under the Attorney General's preferred standard, evidence going to OEMs' inability to comply safely with the statutory requirements

would not be probative of a preemption claim premised on the National Traffic and Motor Vehicle Safety Act.

Moreover, in its recitation of the issues, the Attorney General ignores the significant equitable component in the Court's task. This preemption case is before the Court on Auto Innovators' request for an injunction which, of course, is a form of equitable relief. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993); *accord Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) ("It goes without saying that an injunction is an equitable remedy."). That procedural posture means not only is the Court tasked with deciding whether the Data Access Law is inconsistent with OEMs' federal safety obligations and therefore preempted, but also whether and how to exercise "an equity court's traditionally broad discretion in deciding appropriate relief." *Romero-Barcelo*, 456 U.S. at 310. That necessarily entails "[f]lexibility rather than rigidity" in considering whether and what kind of relief is warranted. *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). After all, the Supreme Court has observed, the "essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Id.*

That is all the more true here, where the Court has signaled to the parties that it is focused on the equities of this case. *E.g.*, Sept. 1, 2022 Hr'g Tr. 7:20-22 ("[T]he question is, as the parties have recognized, how I exercise my equitable jurisdiction."); *id.* at 10:23-24 ("I talked at various times about the use of equity here from the perspective of stay pending appeal."). Indeed, the Court recognized that even if it were to conclude that there is no preemption, "that does not necessarily end the matter" "if there is potential for harm during the interim." *Id.* at 16:5-7.

The Attorney General appears to misunderstand the point of this new evidence. What else could explain the Attorney General's discussion of case law (AG Opp. 5) for the proposition that

Massachusetts courts do not outsource their statutory construction to other states' courts? Auto Innovators has not suggested the Maine courts have any role in this dispute. Statutory construction of the Data Access Law is a matter for this Court to decide in the first instance based on the plain language of the statute. *Gen. Motors Corp. v. Darling's*, 444 F.3d 98, 108-09 (1st Cir. 2006).

The same goes for the Attorney General's digression into "post-enactment legislative history." AG Opp. 5-6 n.2. Auto Innovators neither suggested that ACA is akin to a legislative body, nor that ACA's statutory construction should govern the Court's construction of the statutory terms. Rather, the issue is that Auto Innovators has maintained throughout this case that it cannot safely comply with the plain-language requirements of the Data Access Law, the Attorney General (with the aid of ACA) has sought to minimize that language and those concerns, and now there is evidence tending to suggest that the group that drafted the Data Access Law might agree with Auto Innovators that some of the terms in that law are problematic from a safety or cybersecurity perspective. Although ACA may deny that is the case, Auto Innovators should be entitled to develop the record on this point, particularly where it can do so expeditiously and in a way that will not result in any meaningful delay in the case.

3.   The Attorney General's discussion of the specific terms ACA and other aftermarket proponents curiously added or dropped between the otherwise nearly identical Massachusetts and Maine right-to-repair initiatives only confirms the centrality of those terms to the matter before the Court and, thus, the probative nature of the discovery Auto Innovators seeks. *See* AG Opp. 6-11; *accord* ACA Opp. 5-9 (making nearly identical arguments about the changes to the Massachusetts and Maine initiatives).

*First*, the Attorney General and ACA say that it is irrelevant that the Data Access Law sweeps broadly to capture any data "*otherwise related to* the diagnosis, repair or maintenance of

the vehicle" (Data Access Law § 1 (emphasis added)) while backers of the Maine initiative dropped the "otherwise related to" language. AG Opp. 6-7; ACA Opp. 5-6. But, as Auto Innovators pointed out in its opening brief, the parties dispute both the breadth of that language and OEMs' ability to meet the requirement imposed by it. Dkt. 307 at 3. The requirement imposed by that term is thus front and center in this case.

Echoing the Attorney General's statutory construction, ACA claims that the "otherwise related to" language is just an inoperative "catchall term," such that "[a]dditional evidence on this point from [it] would add nothing." ACA Opp. 6. But it is not lightly presumed that a statutory term has no effect. In fact, it is "a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quotations omitted). Courts "must give effect to every word of a statute wherever possible." *Ranson v. FIA Card Servs., N.A.*, 562 U.S. 61, 70 (2011) (quotations and brackets omitted). If the term has no significance, why did ACA include it in the Massachusetts ballot initiative but then omit it from the Maine ballot initiative?

Finally, it is no matter that the omission of the "otherwise related to" language alone would not resolve Auto Innovators' complaints about being able to comply with the Data Access Law's requirements while meeting OEMs' federal safety and emissions obligations. *Contra* AG Opp. 7. After all, that is just one of several problematic terms in the Data Access Law that, taken as a whole, stand in the way of safe compliance.

*Second*, the Attorney General and ACA claim that it is irrelevant that the draft Maine ballot initiative, unlike the Data Access Law, directed the Maine Attorney General to "designate an independent entity" to administer the authorization system for access to vehicle on-board

diagnostic systems (ECF No. 307-2, Brink Decl. Ex. A (§ 2)). *See* AG Opp. 7-10; ACA Opp. 6-8. It is hard to imagine how this provision is irrelevant when Auto Innovators has repeatedly emphasized the absence of this threshold requirement during the trial and since. *See, e.g.*, June 14 Tr. 70:15-72:3 (Tierney); *id.* at 219:2-220:17 (Bort); June 15 Tr. 13:13-15 (Lowe); *id.* at 96:18-97:11 (Potter); June 25 Tr. 54:15-55:2; Sept. 1, 2022 Hr'g Tr. 14:12-21; Sept. 21, 2022 Hr'g Tr. 8:1-9:3. The several pages that the Attorney General devotes to discussing its trial evidence on the independent-entity point belies the notion that the issue of an independent entity is irrelevant to this case. *See* AG Opp. 7-9.

Along the way, the Attorney General references "ACA's efforts to create a third-party governance entity that would include OEMs as key stakeholders." AG Opp. 9-10 n.5. Critically, if those efforts extended beyond ACA's pre-Massachusetts ballot musing about the lucrative role it might play, it is material and news to Auto Innovators. Far from showing the irrelevance of the contemplated discovery, ACA's ongoing efforts (or lack thereof) to create a third-party governance entity is precisely one of the issues that Auto Innovators seeks to explore through its document requests and deposition of someone from ACA. ECF No. 307-1 at 5. That ACA planned to shunt the responsibility of creating a third-party governance entity onto the Maine Attorney General in that new ballot initiative (see ECF No. 307-2 (§ 2)) would seem to suggest that it has not been meaningfully engaged in an effort to develop the required entity.

The Attorney General and ACA also rehash the idea that the National Automotive Service Task Force ("NASTF") or the Equipment and Tool Institute ("ETI") could serve as the required independent entity. AG Opp. 9-10; ACA Opp. 7. But even the Attorney General's own witness recognized that NASTF's Secure Data Release Model ("SDRM") is not up to the task of handling secure access to the kind of vehicle data contemplated by Section 2. ECF No. 236 FF ¶ 137; June

15 Tr. 78:5-10 (Lowe) ("Q: And you acknowledge yourself while SDRM resolves a key code issue, that's a more limited set of data than what we're dealing with in this case, right? A: Yeah, you're just talking about a key code. You're not talking about the breadth of diagnostic repair information that would need to be provided under the Data Access Law."). Likewise, as Auto Innovators explained, ETI's Chief Technology Officer conceded that ETI's three-person staff (one of whom was an event planner) had no cybersecurity experience or expertise and could not be expected to fill that role. ECF No. 307 at 6-7; June 15 Tr. 92:3-21, 97:8-11, 98:10-18 (Potter).

Finally, the Attorney General makes the bold claim that Auto Innovators somehow "misrepresent[ed]" the Attorney General's position on how involved manufacturers could be in setting up the independent entity contemplated by Section 2. AG Opp. 8. To do so, the Attorney General plays fast and loose with the concept of what it means to set up an independent entity. The Attorney General cites its interrogatory answer that contracting with a party does not constitute direct or indirect affiliation. *Id.* But the independent entity needs to be created and funded before it can enter into a contract with anyone. ACA could have done that, but they failed to. *See, e.g.*, ECF No. 236 at FoF ¶ 114 (discussing how the Attorney General's witnesses conceded that the third party required to manage authorization does not exist); ACA Opp. 7 ("[T]he independent entity required by the Data Access Law is not yet operational . . . ."). Unlike in the aftermarket's draft Maine ballot initiative, nothing in the Data Access Law requires the Attorney General to do so. If OEMs were to create and fund the entity, it would not be unaffiliated directly or indirectly with the OEMs and therefore would violate the requirements of the Massachusetts law *See* Data Access Law § 2.[2]

---

[2] The Attorney General also reprises her claim that Toyota does not require authorization to access its vehicle on-board diagnostic systems. AG Opp. 9. But as made clear at trial, though Toyota does not employ a secured gateway, it has plenty of other cyber protections and controls that limit access to its vehicle systems; there is no support for the

In short, whether and "how the independent entity is created" is not, as ACA would have it, "a distinction without a difference." ACA Opp. 6. It is at the heart of OEMs' ability to comply with the requirements in Section 2 of the Data Access Law, and it is less fact-intensive than some of the other issues before the Court relating to the impossibility of compliance. Auto Innovators should be able to discover whether the drafters of that law tacitly recognized the problem that the Data Access Law provides no mechanism for the creation of this entity when the drafters changed the language on this critical point for the Maine effort.

*Third*, the Attorney General and ACA claim that the change to the right-to-repair initiative language to include the reference to specific (theoretical) ISO standards for compliance in Maine that are absent in the Data Access Law is likewise irrelevant. AG Opp. 10-11; ACA Opp. 8-9. They complain that those standards were identified only in the "non-final iteration of the Maine proposal" submitted by the proposal's backers, not the version Maine's Secretary of State eventually approved for voters. AG Opp. 10. That misses the point. Auto Innovators is focused on the version that ACA and the Maine initiatives' other backers submitted because Auto Innovators wants to know why ACA felt the need to add them, when it (and the Attorney General) have taken the position that they were not needed in the Data Access Law. Indeed, that Auto Innovators is focused on the language that ACA and its allies put together in Maine rather than the Maine initiative as certified dispels the notion that this discovery request is some sort of collateral attack on the Maine ballot initiative itself. *See* AG Opp. 11-12; ACA Opp. 10.

*Fourth*, the Attorney General and ACA claim that there is nothing to the issue of why the Data Access Law requires manufacturers to create "open access" telematics systems (Data Access Law § 3) while the Maine ballot initiative omits that requirement. AG Opp. 11; ACA Opp. 9.

---

notion that Toyota does "not require any authorization . . . directly or indirectly" (Data Access Law § 2) to access its systems. *See, e.g.*, ECF No. 215 at 7 n.9 (discussing, under seal, some of Toyota's practices).

According to the Attorney General, "the parties fully developed the issue of what 'open access' means in the context of the Data Access Law through expert evidence, as well as supplemental post-trial briefing on statutory interpretation." AG Opp. 11. But the notion that "the parties have fully developed their positions" (*id.*) puts the cart before the horse: The new evidence Auto Innovators seeks to uncover goes directly to the Attorney General's position that the "open access" requirement does not render safe compliance with the Data Access Law impossible.

On the one hand, the Attorney General maintains that "open access" does not really mean "open access." *E.g.*, ECF No. 290 at 12. On the other, the entity responsible for putting an "open access" requirement into the Data Access Law notably dropped that term from its latest initiative effort. Auto Innovators simply wants to know why. If, as the Attorney General suggests, a requirement to provide "open access" is not problematic for OEMs' safe compliance with the Data Access Law—*contra* U.S. Statement of Interest (ECF No. 202) at 7-9 (discussing NHTSA's many concerns with the law's "open access" requirements)—then why did ACA omit that term from the Maine initiative effort?

### B.   Auto Innovators Has a Bona Fide Explanation for Not Introducing This Evidence at Trial.

ACA, but not the Attorney General, claims that Auto Innovators lacks a bona fide reason for failing to introduce the evidence earlier. ACA Opp. 9-10 (discussing *Rivera Flores*, 64 F.3d at 746). But the focus of the inquiry is on whether the party seeking to reopen discovery "presented a bona fide explanation for failing to introduce [that] evidence *before resting at trial*." *Rivera-Flores*, 64 F.3d at 749 (emphasis added). ACA did not pivot to the Maine initiative until after trial in this case. Auto Innovators cannot be faulted for not seeking to develop evidence during trial that did not yet exist. By definition, Auto Innovators has a bona fide reason for not introducing evidence

of ACA's changes between the Massachusetts and Maine "right to repair" initiatives during trial. *See id.*

Tellingly, ACA does not cite a single case suggesting that a failure to move to reopen the evidence after trial immediately when that evidence came to light is a reason to deny leave to reopen. *See* ACA Opp. 9-10. In any event, Auto Innovators raised this issue promptly—within months of the Maine ballot initiative effort, Declaration of Amy Brink ¶ 5, and directly after this issue came to light following the Court's expression of "frustration" that the "record is not fully developed" and the parties' resulting textual-interpretation briefing on October 14, 2022. Sept. 1, 2022 Hr'g Tr. at 5:5-6; *see also id.* at 10:2-3 (Court raising the issue of further developing evidence about the Data Access Law's requirements). In that briefing, the Attorney General's position on the terms at issue here was largely to downplay their significance to OEMs' safe compliance with the Data Access Law. *See, e.g.*, ECF No. 292 at 11-13, 15-16. That stood in marked contrast to what Auto Innovators was by then aware was happening in Maine. As a result, Auto Innovators moved expeditiously to flag for the Court how the party (ACA) that drafted the Data Access Law's language and participated extensively in the trial of this matter has appeared to concede through its efforts in Maine that several of the key terms here are problematic.

## C.   Reopening Would Cause No Undue Prejudice or Delay.

Finally, neither the Attorney General nor ACA seriously contest that they would be prejudiced if Auto Innovators were allowed to develop this new evidence in short order. There is, for instance, no suggestion that the Attorney General or ACA would be sandbagged by Auto Innovators' evidence. *See, e.g.*, *Davignon*, 524 F.3d at 114 (holding that there was no undue prejudice in part because there was an opportunity to challenge the probative value of that evidence). Indeed, the Attorney General has already been able to preview at length its position on

the significance of this evidence. That in and of itself goes a long way to resolving any potential for undue prejudice. *See, e.g.*, *Hearts with Haiti*, 2016 WL 3211813 at *4 (holding that any prejudice from reopening the record to admit new evidence is "mitigated by the fact that [the opposing parties] have now had a full opportunity in their response to explain their view of the significance of [that evidence]").

Instead of pointing to specific cognizable prejudice, the Attorney General complains only about the short delay in the resolution of the case that may be occasioned by reopening. Notably, the Attorney General took a different view of the several months' delay following trial in 2021-2022 that it spent on its own efforts to reopen the record with new evidence. *See, e.g.*, Mot. to Reopen Evidence, ECF No. 245 (Oct. 22, 2021); ECF Nos. 263-64 (Jan. 14, 2022) (briefing on reopened evidence); Hr'g Tr. (Feb. 2, 2022) (discussing reopened evidence). In contrast to that evidence—which merely confirmed that two OEMs did what the participating OEMs had said all along that they could do (disable telematics entirely in an effort to ***avoid*** one aspect of the Data Access Law that they cannot comply with), *see* ECF No. 264 at 2—this would be new evidence. It would address why the drafter of the Data Access Law requirements maintained to this Court that several highly disputed terms in that law were non-problematic while changing them in its latest effort elsewhere.

Much of the Attorney General's undue-prejudice argument has little to do with the additional month and a half contemplated by Auto Innovators' request. Instead, the Attorney General complains generally about how trial was "a year and a half ago" (AG Opp. 1) and how Massachusetts voters voted "more than two years ago," *id.* at 13. But the Attorney General does not (because it cannot) point to anything to suggest that Auto Innovators has delayed resolution of the issues here. Throughout this case, Auto Innovators has acted with all deliberate speed. Auto

Innovators moved expeditiously for a preliminary injunction and completed discovery and multiple rounds of briefing on a very aggressive timeline. Not once did Auto Innovators miss a discovery date. Indeed, in the course of observing that the Court's undertaking here was "to develop as full a record as possible" "balance[d] . . . with a very aggressive schedule for trial," the Court recognized that both "parties, with zealous protection of their clients, adhered to that schedule." Sept. 1, 2022 Hr'g Tr. 4:9-19. While the case remains pending, there is no reason not to take the incremental step of ensuring that the record is fully developed. *Cf. id.* at 10:4-5 ("[T]oo much time has been invested in this case not to do it in the full fashion.").

In any event, reopening the evidence for this limited purpose need not result in anything beyond "minimal delay." *Rivera-Flores*, 64 F.3d at 749 (reopening the record). The Attorney General complains about Auto Innovators' proposal to depose ACA's witness "at the end of January 2023," AG Opp. 12 n.9—*i.e.*, next month. Auto Innovators made that proposal in recognition of the upcoming holidays and other issues that inevitably will limit the parties' schedules over the next few weeks, as well as to ensure that ACA has sufficient time to comply with the document requests and to allow ACA's counsel and witness to prepare for the deposition. There is no reason to believe that a slight delay of a month and a half rises to the level of disrupting the Court's timely resolution of this case; neither the Attorney General nor ACA point to a case suggesting that it does. But if the Attorney General finds the proposed schedule problematic, Auto Innovators is prepared to hold the deposition earlier in January if ACA and the Court prefer that approach, and are glad to meet-and-confer with the Attorney General and ACA on that topic.

For its part, ACA complains about the scope of one of the document requests, averring that it would impose an unnecessary burden on it and impinge on its efforts to support the Maine ballot initiative. *See* ACA Opp. 10-11. But Auto Innovators' request for documents "concerning the

Maine initiative, including the differences between the statutory language proposed by the Maine initiative and the Data Access Law, and the reason for such differences" is a reasonable attempt to home in on the matter at issue here—whether and why ACA deemed some terms in the Data Access Law problematic and chose to drop them from the otherwise nearly identical Maine "right-to-repair" ballot effort. Auto Innovators is not interested in discovering details about ACA's work on the Maine ballot initiative for the purpose of challenging that initiative, which is still in its nascent stages. That is, Auto Innovators has no interest in discovering such things as ACA's "public relations strategies," "communications with supporters," or "financial information pertaining to the Maine initiative." *Id.* at 10. Auto Innovators simply wants to know why ACA dropped some of the more problematic terms from the Data Access Law when it shifted its efforts from Massachusetts to Maine. Its subpoena is targeted at that probative information.

Regardless, Auto Innovators is willing to work with ACA (and the Attorney General) to further refine its document requests if need be. A complaint about the breadth of a particular discovery request is precisely the sort of matter best left to the parties to work out amongst themselves in the first instance. That iterative process could play out in the same manner here that it does every day in similar discovery disputes. *See, e.g.*, *Endurance Am. Specialty Ins. Co. v. Northland Investment Corp.*, 2018 WL 2994405, at *1 (D. Mass. June 14, 2018) (determining that "discovery of the kind plaintiff requests . . . would appear to be appropriate under the circumstances" and directing the parties to "meet and confer" about the specific type of that discovery); *Doble v. Milliken & Co.*, 2013 WL 12218268, at *1 (D. Mass. Oct. 16, 2013) (ordering the parties to "meet and confer about the alleged overbreadth of plaintiff's discovery requests").

## CONCLUSION

For the foregoing reasons, and those in its opening brief, Plaintiff respectfully requests that the Court allow it to take the requested, limited discovery from the Auto Care Association.


Dated: December 13, 2022

Respectfully submitted,

ALLIANCE FOR AUTOMOTIVE INNOVATION

By its attorneys,

*/s/ Laurence A. Schoen*
Laurence A. Schoen, BBO # 633002
Elissa Flynn-Poppey, BBO# 647189
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY, AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
lschoen@mintz.com
eflynn-poppey@mintz.com

John Nadolenco (*pro hac vice*)
Erika Z. Jones (*pro hac vice*)
Jason D. Linder (*pro hac vice*)
Daniel D. Queen (*pro hac vice*)
Eric A. White (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3000
jnadolenco@mayerbrown.com
ejones@mayerbrown.com
jlinder@mayerbrown.com
dqueen@mayerbrown.com
eawhite@mayerbrown.com

Charles H. Haake (*pro hac vice*)
Jessica L. Simmons (*pro hac vice*)
ALLIANCE FOR AUTOMOTIVE INNOVATION
1050 K Street, NW

Suite 650
Washington, DC 20001
Tel: (202) 326-5500
chaake@autosinnovate.org
jsimmons@autosinnovate.org

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on December 13, 2022.

/s/ Laurence A. Schoen
Laurence A. Schoen