# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION,<br><br>    Plaintiff,<br><br>  vs.<br><br>ANDREA JOY CAMPBELL, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS in her official capacity,<br><br>    Defendant. | C.A. No. 1:20-cv-12090-DPW |

**PLAINTIFF ALLIANCE FOR AUTOMOTIVE INNOVATION'S
BRIEF ON THE ADDITIONAL DOCUMENTS AND TESTIMONY
PROVIDED BY AUTO CARE ASSOCIATION AND AARON LOWE**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT ................................................................................................................................ 2

    I.    The Drafters of the Data Access Law Made Critical Changes to the Maine Ballot Initiative Because of the Specific Problems the OEMs Pointed to in This Case ................................................................................................................ 2

        A.    The Drafters Created a Mechanism for Establishing the Independent Entity that Authorizes Access to Vehicle Data ...................... 3

        B.    The Drafters Specified Procedures for Creating Standards to Be Used for Access to Vehicle Data ................................................................. 5

        C.    The Drafters Removed Critical Language from the Data Access Law that Contributed to the Impossibility of Safe Compliance ................ 6

    II.    ACA Has Done Nothing Since the Trial to Make Compliance with the Data Access Law Possible ....................................................................................... 9

CONCLUSION ........................................................................................................................... 10

**INTRODUCTION**

Recognizing the problems with the Massachusetts initiative that they drafted and got passed, the Auto Care Association ("ACA") and other proponents of the Massachusetts Data Access Law have moved onto a new ballot initiative—this time in Maine. Though that initiative shares many of the Data Access Law's problems, the drafters made key revisions to several specific aspects that Auto Innovators have focused on throughout this case—specifically because of our objections. ACA has produced documents and testimony making clear their goal to try to make compliance in Maine more feasible through these changes. ACA's pivot is an implicit concession that safe compliance with the Massachusetts law is not possible.

More particularly, ACA added language to the Maine ballot initiative contemplating that the Maine attorney general would be assigned the challenge of creating the "independent entity" responsible for administering access to vehicle data and adopting standards that would be used for the "standardized" platform. As ACA's former Senior Vice President, Aaron Lowe, explained in his deposition, these provisions were intended to provide a "pathway to compliance"[1]—one that simply does not exist in the case of the Data Access Law. Indeed, Lowe also confirmed that his side has done nothing to create the "unaffiliated" third party that is a prerequisite to compliance with the Data Access Law. And OEMs cannot take the initiative because the law precludes that entity from being affiliated with them. Moreover, also in response to this litigation, the drafters of the Maine ballot initiative removed the Data Access Law's requirement that vehicles include an "open access" platform—a requirement that NHTSA has repeatedly called out as problematic. The drafters also limited the definition of "mechanical data" to exclude data "*otherwise related to* the diagnosis, repair or maintenance of the vehicle" in Maine. These changes do nothing to facilitate

---

[1]   *See* Transcript of March 21, 2023 Deposition of Aaron Lowe ("Lowe Dep."), attached as Exhibit G to the Declaration of Daniel Queen ("Queen Decl."), 48:8-16.

compliance in Massachusetts. Instead, they merely underscore that it is impossible to comply with the Data Access Law as written without compromising vehicles' safety and emissions systems.

## BACKGROUND

On January 11, 2023, Auto Innovators served ACA with subpoenas limited to the scope that the Court specified in the January 5 hearing. *See* ECF Nos. 323-3, 323-4. On January 27, ACA produced various documents in response to Auto Innovators' document subpoena. *See* Queen Decl. ¶ 2. Auto Innovators and ACA stipulated that instead of holding a 30(b)(6) deposition of ACA, Auto Innovators could hold a 30(b)(1) deposition of Aaron Lowe, limited to the four topics that the Court previously permitted. *See* ECF Nos. 327-28. Auto Innovators held the deposition of Mr. Lowe on March 21, 2023. *See* Queen Decl. Ex. G at 1.

## ARGUMENT

**I.     The Drafters of the Data Access Law Made Critical Changes to the Maine Ballot Initiative Because of the Specific Problems the OEMs Pointed to in This Case**

The Massachusetts Right to Repair Committee was established in the summer of 2019 for the purpose of filing the ballot initiative that created the Data Access Law. June 15, 2021 Tr. 15:7-12, 20:1-6. Brian Hickey & Associates ("BHA"), a lobbying firm, coordinated the creation of the Committee, and the Committee's director is Tommy Hickey, a BHA employee. Lowe Dep. 26:22-24, 29:5-9. Lowe was heavily involved in the drafting of the language of the Data Access Law, as well as subsequent efforts to pass the Massachusetts ballot initiative. June 15, 2021 Tr. 13:5-12, 18:24-19:4; *see also* ECF No. 191 ¶¶ 83-84. Other drafters included Brian Hickey—the eponymous founder of BHA—as well as Ray Pohlman, the president of the Coalition for Auto Repair Equality. Lowe Dep. 26:13-16, 29:19-21, 30:21-23.

The Maine ballot initiative is the product of the same individuals with the same gameplan. The Maine Right to Repair Coalition, just like the Massachusetts Right to Repair Committee, is

directed by Tommy Hickey and coordinated by his employer, BHA. Lowe Dep. 29:5-9. Aaron Lowe, acting on behalf of ACA, made a series of major revisions to the draft. *See, e.g.*, Queen Decl. Exs. B-D, F. Brian Hickey and Ray Pohlman, like Lowe, were also involved in the drafting of the Maine ballot initiative—including by making written revisions to the draft and participating on calls in which they discussed the draft. *Id.* 26:6-19, 30:18-20, 33:15-24. Those drafters borrowed the same language that they used in the Massachusetts Data Access Law as the template for the Maine ballot initiative. *Id.* 37:25-38:3, 38:14-17.

But the drafters did not leave the Data Access Law completely unchanged. Though the Maine question remains extremely problematic, its drafters made several significant revisions—and those revisions underscore that it is impossible to comply with the Data Access Law without compromising vehicles' safety and emissions systems, in violation of federal law.

### A.   The Drafters Created a Mechanism for Establishing the Independent Entity that Authorizes Access to Vehicle Data

Section 2 of the Data Access Law requires the "standardized" "authorization system for access to vehicle networks and their on-board diagnostic systems" to be "administered by an entity unaffiliated with a manufacturer." But as even the Attorney General acknowledges, that entity cannot be affiliated in any way—formally, informally, or contractually—with the OEMs. *See* ECF No. 290 at 7-8. There is no way for the OEMs to create and fund this third-party entity without violating the Data Access Law's prohibition on their direct involvement. *See, e.g.*, ECF No. 293 at 15-16. Accordingly, as Lowe conceded in his deposition, the independent entity required by Section 2 of the Data Access Law *still does not exist*. Lowe Dep. 44:14-21, 96:2-6.

One of Lowe's first changes to the draft Maine ballot initiative was to specify that the Maine Attorney General would need to create the relevant entity:

> The Maine attorney general shall designate an independent entity not controlled by one or more of the motor vehicle manufacturers to establish and administer access

3

> to vehicle generated data available through the on-board diagnostic system and/or which is transmitted by the standardized access platform authorized by this law. Such independent entity shall consist of one representative from a cross section of each industry trade group . . . The independent entity shall manage cyber secure access to vehicle generated data, including ensuring on an ongoing basis that access to the on-board diagnostic system and platform is secure based on all applicable US and international standards.

Queen Decl. Ex. C at -74; *see also* ECF No. 308-1 at 4; ECF No. 308-2 at 2. Lowe explained that this provision came from a discussion in which the drafters decided "to provide more guidance to compliance with the law." Lowe Dep. 41:15-17, Queen Decl. Ex. B at -69. According to Lowe, "there had been so many questions that had come up from the manufacturers about how to comply, and so providing more instruction on how to comply with [sic] something that we were thinking about in the Maine law." Lowe Dep. 40:25-41:21.

The drafters' "independent entity" language in the Maine ballot initiative has its own major flaws. For instance, the initiative apparently requires that OEMs' authorization systems be administered by the "independent entity" as soon as the initiative is enacted—even though that "independent entity" will not even exist at the time of enactment. (Lowe testified that he had never discussed that issue with any of the other drafters. *See* Lowe Dep. 90:3-10.) Regardless, the drafters' decision to include this language in Maine that it omitted in Massachusetts highlights what Auto Innovators has said along: that OEMs do not have any means or ability to create such an "independent entity" on their own. *See, e.g.*, Tierney Decl. (ECF No. 296) ¶ 26 (explaining why Attorney General's position that an "unaffiliated entity can readily be created" is "a vast overstatement that ignores reality").[2] Put simply, the key prerequisite to *any* compliance with the Data Access Law—let alone safe compliance—does not exist.

---

[2] Tierney recently was appointed to the Cybersecurity and Infrastructure Security Agency (CISA) Cybersecurity Advisory Committee, which "is comprised of experts on cybersecurity, technology, risk management, privacy, and resilience, who advise the [CISA] Director on policies

4

### B. The Drafters Specified Procedures for Creating Standards to Be Used for Access to Vehicle Data

Similarly, while Section 2 of the Data Access Law requires that authorization systems be "standardized across all makes and models sold in [Massachusetts]," the trial in this matter unequivocally demonstrated that no such standards actually exist. *See, e.g.,* ECF No. 233 ¶¶ 14-16, 104, 114-16 (describing lack of standardized authorization); June 14 Tr. 214:3-9, June 15 Tr. 24:24-26:7, 27:16-18, 97:1-7, 101:8-16 (same); ECF No. 192 ¶¶ 49-51, 125-26, 147-48 (describing use of OEM-specific OBD-II ports and codes and "gap in standardization"); Tr. Ex. 27 at 3 (no standardized authorization exists). Nor can OEMs establish such "standardized" systems, including because the software used to diagnose, maintain, and repair vehicles is vehicle-specific. *See, e.g.*, ECF No. 296 ¶ 22; ECF No. 297 ¶ 7.

When drafting the Maine initiative, rather than remain silent on how such "standardized" systems would be created, Lowe and his ACA colleagues included a specific procedure to be followed. They specified that the "independent entity" created by the Maine attorney general would "[i]dentify and adopt relevant standards required for implementation of the Maine law," "[c]reate policies for compliance with relevant laws, regulations, standards, technologies, and best practices related to access to vehicle data," and "ensur[e] . . . that access to the on-board diagnostic system and platform is secure based on all applicable United States and international standards." Queen Decl. Ex. B at -69, Ex. C at -74 (revisions from Lowe); Ex. F at -897, -900 (further revisions reflecting comments from ACA's "Emerging Technology team"); ECF No. 308-1 at 4-5, ECF No. 308-2 at 2 (as-submitted and as-adopted versions of Maine ballot initiative).

---

and programs related to CISA's mission." CISA, Press Release, *Director Easterly Announces New Members to Join CISA's Cybersecurity Advisory Committee* (Mar. 20, 2023), *available at* https://tinyurl.com/4hawks3h (last accessed April 6, 2023).

5

Lowe explained in this deposition that the purpose of this language was to provide a "pathway to compliance" that they had not included in the Data Access Law:

> Q: . . . So you included this language here in the Maine ballot initiative so that there would be a -- a set of standards that automakers would be able to follow?
>
> A: We put it in there to specifically provide a compliance -- a pathway to compliance to -- to specify it, which we did not do in the Massachusetts law, but would still be -- you could still use that same pathway.
>
> Q: Okay. Do you remember discussing anything else with Mr. Hickey about, you know, the rationale for this additional language?
>
> A: No. I think the main topic of discussion was providing a more -- providing more definition so that, you know, because of the arguments that this couldn't be done, that it could be done. And so we've said if it could be done, how could it be done. And so we -- we put those into the law rather than providing, I guess, not that same guidance to the manufacturers in Massachusetts law.

Lowe Dep. 48:8-49:2.

Putting aside the substantial cybersecurity problems associated with the use of a single, "standardized" platform across all vehicles sold in a particular state,[3] there is no way that manufacturers can retroactively comply with "standards" that will not be "identif[ied] and adopt[ed]" (ECF No. 308-2 at 2) unless and until the Maine ballot initiative actually passes. For now, Lowe's acknowledgment that ACA wanted to create a "pathway to compliance" in the Maine ballot initiative—in contrast to the Data Access Law, which did not provide *any* guidance, much less "th[e] same guidance to the manufacturers" (Lowe Dep. 48:20-49:2)—underscores OEMs' inability to safely comply with the Data Access Law.

### C. The Drafters Removed Critical Language from the Data Access Law that Contributed to the Impossibility of Safe Compliance

Likewise, when revising the Data Access Law to create the Maine ballot initiative, the drafters chose to remove specific language that has helped to make compliance impossible.

---

[3] *See, e.g.*, ECF No. 200 ¶¶ 64-65, ECF No. 199 ¶ 72, ECF No. 197 ¶¶ 92, 108-10 (explaining how standardization across all OEMs' vehicles increases the cybersecurity attack surface and risk).

*First*, the Data Access Law requires that vehicles equipped with telematics systems have an "inter-operable, standardized and *open access* platform . . ." Data Access Law § 3 (emphasis added). For a platform to be "open access," third parties would need to have the ability to write software to the vehicles without the OEMs' authorization or authentication. ECF No. 233, ¶¶ 141-46. The United States confirmed in its Statement of Interest that "the open access mandated by the Data [Access] Law would create a potential vulnerability in vehicle cybersecurity" that "may constitute a defect 'related to motor vehicle safety.'" ECF No. 202 at 9. Not surprisingly, then, the drafters struck and replaced the "open access" language:

> . . . [A] manufacturer of motor vehicles sold in the ~~Commonwealth~~ <u>State of Maine</u>, including <u>commercial and</u> heavy duty vehicles having a gross vehicle weight rating of more than 14,000 pounds, that utilizes a telematics system shall be required to equip such vehicles with an inter-operable, standardized and ~~open~~ **<u>owner-authorized</u> access** platform across all of the manufacturer's makes and models. Such platform shall be capable of securely communicating all mechanical data emanating directly from the motor vehicle via direct data connection to the platform. . . .

*Compare* Data Access Law § 3 *with* ECF No. 308-1 at 6 (as-filed Maine ballot initiative) (emphasis added); *see also* Queen Decl. Ex. D at -19 (attaching draft with "open access" language removed).

*Second*, the Data Access Law defines "mechanical data" to encompass vehicle-specific data that is "used for *or otherwise related to* the diagnosis, repair or maintenance of the vehicle." Data Access Law § 1 (emphasis added). As Auto Innovators pointed out repeatedly at trial, Massachusetts' language requiring car companies to share data "otherwise related to" the diagnosis, repair, or maintenance of a vehicle encompassed broad swaths of sensitive data that is not actually necessary for diagnosis, repair, or maintenance purposes. *See, e.g.*, ECF No. 200 ¶ 77 (explaining that "firmware and configuration for an ECU" and other sensitive data falls within this definition). As a result, OEMs would need to remove critical cybersecurity protections that apply to vehicle components that otherwise would be shielded from third-party intrusions. *See, e.g.*, ECF

7

No. 197 ¶ 106. But in drafting the Maine ballot initiative, the drafters tellingly struck the "otherwise related to" language:

> "Mechanical data" [means] any vehicle-specific data, including telematics system data, generated, stored in or transmitted by a motor vehicle used ~~for or otherwise related to~~ in the diagnosis, repair or maintenance of ~~the~~ a motor vehicle.

*Compare* Data Access Law § 1 *with* ECF No. 308-1 at 4 (emphasis added); *see also* Queen Decl. Ex. D at -17 (email attaching updated draft with "for or otherwise related to" removed).

Granted, Lowe did not personally remove the "open access" or "otherwise related to" language. *See* Queen Decl. Ex. C at -72-73 (Lowe's revised draft maintains prior language); Lowe Dep. 72:4-5 (Lowe "didn't make th[e] decision" to remove "otherwise related to" language); *id.* 73:5-11 (Lowe "was involved in the discussion of whether to take [the 'open access' language] out or not," but "couldn't tell you that . . . it was me specifically"). But Lowe stated that he believed the drafters made these changes in response to this litigation. According to Lowe, the "otherwise related to" language was "something the manufacturers . . . raised in the lawsuit," and the revised definition of "mechanical data" without that language "limit[ed] it to diagnosis, repair, or maintenance . . . of the vehicle. That was what we wanted." *Id.* 71:19-72:5. Similarly, the drafters changed "open access" to "owner-authorized access" "because . . . an issue that didn't need to be raised was continuing to be raised." *Id.* 69:2-18. In making that change, Lowe said the drafters "tried to make it as consistent as possible with the Massachusetts law, but at the same time understanding some of the issues that have been raised by the manufacturer[s]." *Id.* 66:16-21.[4]

---

[4] Though Lowe did not remove this language himself and conceded that he could not "recall originally how 'for or otherwise related to' got in [the Data Access Law] in the first place" (*id.* 71:19-21), he opined in his testimony that neither of these provisions of the Data Access Law had substantively changed. *See, e.g.*, *id.* 71:16-18; *id.* 61:21-25. But Lowe's strained and self-serving reading of these provisions defies the plain text of the Data Access Law, which the Court must construe according to its "ordinary language" and without interpreting any of its words "as superfluous." *Commonwealth v. Daley*, 463 Mass. 620, 624 (2012) (citations omitted); *see also, e.g.*, Pl. Prop. Conclusions of Law (ECF No. 233) ¶¶ 47-49, 51, 75.

In short, although the drafters attempted to remedy two of the more glaring defects in the Data Access Law when drafting the Maine ballot initiative, those revisions do nothing to help manufacturers safely comply with the Data Access Law in Massachusetts. And their changes recognize that OEMs simply cannot safely comply with the Massachusetts law as written.

**II.     ACA Has Done Nothing Since the Trial to Make Compliance with the Data Access Law Possible**

As Auto Innovators explained in response to the Court's inquiries in the fall of 2022, its members have not had any improved ability to comply with the Data Access Law since the trial in this action. *See* ECF No. 296 ¶¶ 11-35; ECF No. 297 ¶¶ 4-7. Beyond the Data Access Law's implicit requirements that manufacturers remove cybersecurity controls, the "standardized" access to vehicle on-board diagnostic systems and the "unaffiliated" third-party entity do not exist; and even once they do exist, it will take years to design, test, and manufacture vehicles with authorization systems that conform to those requirements. ECF No. 296 ¶¶ 14, 16-17; ECF No. 297 ¶ 7.

Yet Lowe's deposition testimony confirmed that ACA has not done anything to facilitate the OEMs' ability to comply with these requirements since the 2021 trial in this action. As noted, Lowe confirmed that the "unaffiliated" entity mandated in Section 2 of the Data Access Law still does not exist. Lowe Dep. 44:14-21, 96:2-6. Though the new Maine ballot initiative contemplates that the Maine attorney general designate the "independent entity" that will administer access to vehicle data (ECF No. 308-1 at 4, ECF No. 308-2 at 2), Lowe testified that he had never asked the Massachusetts Attorney General to create such an entity. Lowe Dep. 43:17-23. And when asked whether he was "aware of anything that would have changed the automakers' ability to comply with the Data Access Law since the trial back in 2021," Lowe responded that he was "not aware of anything that's changed." *Id.* 106:9-16.

9

Instead of facilitating compliance, ACA appears to be repeating in Maine the same strategy it used in Massachusetts, where ACA's CEO emphasized that "[t]iming is [ACA's] ultimate bargaining chip." June 15, 2021 Tr. 51:9-53:3. According to Lowe, the drafters discussed "the fact that the manufacturers said that it was too close to [the] compliance date," but their "main focus was the fact that . . . we needed to provide a time for compliance." Lowe Dep. 87:18-24. Lowe's testimony was consistent with ACA's prior statements to the press, in which ACA candidly acknowledged that it "want[s] to . . . put pressure on the OEMs" so they will "come to the table." ECF No. 308-3 at 3. Although ACA may wish to "place pressure" on Auto Innovators' members, it should not be able to do so by enacting and enforcing ballot initiatives with which OEMs cannot lawfully comply.

Indeed, ACA's tactics and OEMs' ongoing inability to comply with the Data Access Law warrant equitable relief from that law's enforcement. If the Court still requires additional information or otherwise does not expect to issue a final ruling by June 1, 2023, at which point the Attorney General has promised to begin enforcing the Data Access Law (*see* ECF No. 330), Auto Innovators respectfully requests that the Court inform the parties of such timing on or before May 1, 2023 so that Auto Innovators can renew and update its prior motion for a preliminary injunction pending the Court's issuance of a final ruling.

## CONCLUSION

The changes that the Data Access Law's drafters made in the Maine ballot initiative underscore several features of the Data Access Law that make compliance impossible, and the ACA has done nothing to facilitate that compliance since the 2021 trial in this action. Auto Innovators respectfully requests that the Court consider these facts when rendering its judgment deciding whether to award any future equitable relief.

Dated: April 7, 2023

Respectfully submitted,

ALLIANCE FOR AUTOMOTIVE INNOVATION

By its attorneys,

*/s/ Laurence A. Schoen*
Laurence A. Schoen, BBO # 633002
Elissa Flynn-Poppey, BBO# 647189
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY, AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
lschoen@mintz.com
eflynn-poppey@mintz.com

John Nadolenco (*pro hac vice*)
Erika Z. Jones (*pro hac vice*)
Jason D. Linder (*pro hac vice*)
Daniel D. Queen (*pro hac vice*)
Eric A. White (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3000
jnadolenco@mayerbrown.com
ejones@mayerbrown.com
jlinder@mayerbrown.com
dqueen@mayerbrown.com
eawhite@mayerbrown.com

Charles H. Haake (*pro hac vice*)
Jessica L. Simmons (*pro hac vice*)
ALLIANCE FOR AUTOMOTIVE INNOVATION
1050 K Street, NW
Suite 650
Washington, DC 20001
Tel: (202) 326-5500
chaake@autosinnovate.org
jsimmons@autosinnovate.org

**CERTIFICATE OF SERVICE**

    I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on April 7, 2023.

                                                              */s/ Laurence A. Schoen*
                                                              Laurence A. Schoen