UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALLIANCE FOR AUTOMOTIVE INNOVATION, <br><br> Plaintiff, <br><br> v. <br><br> ANDREA JOY CAMPBELL, ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS, in her official capacity, <br><br> Defendant | CIVIL ACTION <br> NO. 1:20-cv-12090-DPW |

**ATTORNEY GENERAL'S BRIEF REGARDING POST-TRIAL DISCOVERY CONCERNING COMMUNICATIONS BETWEEN AUTO CARE ASSOCIATION AND MAINE ATTORNEY GENERAL AND MAINE RIGHT TO REPAIR COMMITTEE**

Defendant Attorney General Andrea Joy Campbell respectfully submits this response to the brief of the plaintiff Alliance for Automotive Innovation ("Alliance") on the "additional documents and testimony provided by the Auto Care Association [("ACA")] and Aaron Lowe."[1]

**A.  The Alliance Still Cannot Identify Any Conflict with Federal Law.**

The remaining claims to be decided in this case are the Alliance's preemption claims under the federal Motor Vehicle Safety Act ("MVSA") and the federal Clean Air Act ("CAA"). See ECF #334. The test for preemption is whether there is "no set of circumstances" under which a party can comply with state law without violating federal law. NCTA – The Internet & TV Ass'n v. Frey, 7 F.4th 1, 17 (1st Cir. 2021); see also CDK Glob. LLC v. Brnovich, 16 F.4th

---

[1] The Alliance has not actually requested that any particular documents or testimony be entered into the trial record as evidence. Any such request should be denied in view of the fact, discussed herein, that the language of another state's proposed ballot initiative (let alone Aaron Lowe's view of it) is utterly irrelevant to the existence of an alleged conflict between the Massachusetts Data Access Law and federal law. See generally Fed. R. Evid. 401.

1

1266, 1275 (9th Cir. 2021) ("[F]or purposes of a facial challenge, the current design of the system is irrelevant – [the plaintiff] must show that no set of circumstances exists under which the [state law] could be valid."). A preemption claim must be "grounded 'in the text and structure of the statute at issue.'" Kan. v. Garcia, 140 S. Ct. 791, 804 (2020) (citation omitted).

    Incredibly, the Alliance's brief mentions neither the MVSA nor the CAA. It instead ruminates on purported "problems" with the Data Access Law and difficulties its members will face in achieving "compliance" with it. E.g., ECF #335 at 1-2.[2] Such concerns—even if they found support in the record, which they do not—fail to not support preemption. Garcia, 140 S. Ct. at 804 ("'Invoking some brooding federal interest or appealing to a judicial policy preference' does not show preemption") (quoting Va. Uranium, Inc. v. Warren, 139 S.Ct. 1894, 1901 (2019) (lead op. of Gorsuch, J.). The Alliance's continuing failure to identify an irreconcilable conflict between state and federal law is fatal to its case.

    In any event, the trial evidence demonstrated that automobile OEMs can securely comply with the Data Access Law, without violating federal law. Some OEMs are already in compliance and, as the Alliance's own experts acknowledged, others can comply with the Data Access Law if they devote the resources and time to make appropriate changes to their vehicles' architectures. See ECF #217 at 2-15; ECF #232 at FF ¶¶ 50-74, 171-245, CL ¶¶ 82-89, 94-101. While the two "representative" OEMs, GM and Stellantis, have steadfastly refused to attempt to comply with the Data Access Law, see ECF #232 at FF ¶¶ 134-51, 169-70; ECF #296 at ¶ 11; ECF #297 at ¶ 4, their refusal does not support preemption and, in fact, counsels against any exercise of this Court's equitable powers.

---

[2] This brief cites pages of the Alliance's brief based on the page number that appears in the footer, not the page of the pdf file.

### B.    Differences in Wording Between the Data Access Law and the Maine Proposal Provide No Support for the Alliance's Preemption Claims.

The Alliance's brief endeavors to draw conclusions from the fact that certain language in the Data Access Law was not included verbatim in the proposed Maine ballot initiative.

At the threshold, the language of the proposed Maine ballot initiative—let alone the opinion of a lay witness (i.e., Aaron Lowe) as to the import of any differences from the Massachusetts Data Access Law—is utterly irrelevant to the issue of whether the Massachusetts Data Access Law conflicts with the MVSA or CAA.  To the extent this Court need interpret the Data Access Law at all, see, e.g., Arizona v. United States, 567 U.S. 387, 415 (2012), ECF #232 CL ¶ 35, such interpretation should be based on the plain text of the law, its purpose and structure, and well-established meanings of technical terms of art.  See ECF #292 (Attorney General's Brief on Textual Interpretation of the Data Access Law).  The text of a measure proposed years later in a different state is irrelevant.

Even if Mr. Lowe's understanding of differences in wording between the proposed Maine ballot initiative and Massachusetts Data Access Law were somehow relevant (it is not), the Alliance cherry-picks Mr. Lowe's testimony and ignores his explanations that those differences were not intended to change any provision's meaning.  For example, the Alliance cites (ECF #335 at 8) Mr. Lowe's testimony that the drafters of the Maine proposal replaced the phrase "open access" in Section 3 of the Data Access Law with "owner-authorized access" in the Maine proposal, but ignores his testimony that the drafters of the Maine proposal: (1) did not consider "open access" to be any different from "owner-authorized access," Lowe Dep. 69:2-12; and (2) made that change only to avoid what they considered to be a "frivolous" criticism by the OEMs.  Id. 69:16-23 ("[W]hy keep it in there if you can say the same thing without it?").  Similarly, the Alliance cites (ECF #335 at 8) Mr. Lowe's testimony regarding the Maine drafters' decision to

3

eliminate the phrase "otherwise related to" in the definition of "mechanical data," but ignores his testimony that there is no difference between the two. Lowe Dep. 71:2-72:23.

In a footnote, the Alliance contends that Mr. Lowe's explanations for the differences are "strained and self-serving." ECF #335 at 8 n.4. But that is true for all of the Alliance's new discovery. Indeed, the Alliance regards the proposed Maine ballot initiative as "extremely problematic" on its own terms, id. at 3, and much of the Alliance's brief reflects a more generalized grievance that the ACA and others have "place[d] pressure" on OEMs "by enacting and enforcing ballot initiatives." Id. at 10. At bottom, nothing involving the Maine proposal has any bearing on the Alliance's preemption claims here: Not the changes in language, not the drafters' reasons for making them, and not the Alliance's attempts to call those reasons into doubt.

### C. OEMs Are Fully Capable of Complying with the Data Access Law.

All that matters to this case is the requirements of the Data Access Law, and whether the MVSA or CAA prevents OEMs from complying with those requirements. On those issues, the Alliance recycles various arguments that the Attorney General has previously rebutted.

#### 1. OEMs can comply with the "unaffiliated" entity requirement in Section 2.

The Alliance attacks the requirement in Section 2 of the Data Access Law that access to vehicle on-board diagnostic systems not require manufacturer authorization unless such authorization is standardized and "administered by an entity unaffiliated with a manufacturer," Mass. G.L. c. 93K, § 2(d)(1), on the ground that the "Attorney General acknowledges" that the "unaffiliated" entity cannot have a contractual relationship with OEMs. See ECF #335 at 3. That is false. The Attorney General has consistently maintained that the Data Access Law does allow a contractual relationship between OEMs and the unaffiliated entity, so long as the OEMs

4

do not control the third party. See ECF #309 at 7-8; Tr. Ex. 31 at 4-5; ECF #232 at CL ¶ 49. The Attorney General has never said that contractual relationships are forbidden. The Alliance's purported inability to comply with this provision of the Data Access Law rests on an outright misrepresentation of the Attorney General's position regarding what it means.

The fact that the drafters of the Maine proposal may have provided "more guidance" to OEMs, see ECF #335 at 4 (discussing Lowe Dep. 40:25-41:21), does not mean that OEMs cannot comply with Section 2 of the Data Access Law as written. Section 2 requires an unaffiliated entity to administer standardized access only if an OEM chooses to require authorization for motor vehicle owners' and independent repair facilities' access to vehicle on-board diagnostic systems. The trial evidence established both that authorization is not required for access to vehicle on-board diagnostic systems, and that not all OEMs employ authorization. ECF #232 at FF ¶¶ 172-75, CL ¶ 82; ECF #161 Ex. B. at ¶ 56; Tr. II:129; Tr. II:217-18. For those OEMs that choose to require authorization for access to vehicle on-board diagnostic systems, the "Data Access Law leaves the decision of how to set up the authorization system administered by an unaffiliated entity up to the OEMs, so they are free to work with any unaffiliated entity they choose." ECF #232 at FF ¶ 192. Authorization services "are currently offered by any number of independent vendors," which the OEMs could work with as the unaffiliated entity under Section 2. ECF #232 at FF ¶ 194; ECF #161 Ex. D at ¶¶ 42-43; Tr. II:229-30. Existing entities like the Equipment and Tool Institute or the National Automotive Service Task Force could serve as the "unaffiliated" entity in Section 2. ECF #161 Ex. B at ¶¶ 2-3, 26-34; Tr. II:68-69; Tr. II:76-78. Despite the ACA's efforts to create a third-party governance entity that would include the OEMs as key stakeholders, ECF #232 at FF ¶ 193, ECF #191 at

¶¶ 88-89, the OEMs have refused to work cooperatively with the ACA on this, ECF #232 at FF ¶¶ 47-49; ECF #191 at ¶ 88; see ECF Nos. 296 & 297.

        **2.**      **The absence of specified standards in the Data Access Law does not prevent OEMs from complying with it.**

The Alliance argues that, because an earlier version of the Maine proposal (i.e., not the one officially approved for submission to the voters) referred to certain "anticipated" standards that might be used to implement the law, see ECF #308-1 (Exhibit A to the Declaration of Amy Brink), OEMs cannot "safely comply with the Data Access Law," which does not specify such standards. ECF #335 at 5-6 (discussing Lowe Dep. 48:8-49:2). This argument makes no sense. The presence or absence of specific standards in a state law has no bearing on whether that law is preempted. Contrary to the Alliance's suggestion, federal law does not require that state laws provide "guidance to the manufacturers" on how they can comply. See id. at 6. Rather, the absence of specified standards in the Data Access Law (and, now, in the Maine proposal as well, see ECF #308-2) gives manufacturers flexibility to develop compliance solutions that are best suited to their operations. Further, extensive trial evidence showed how OEMs can use extant standards to comply with the law. See ECF #232 at FF ¶¶ 6, 8, 11, 233-45.

        **3.**      **OEMs can develop inter-operable, standardized and open access platforms that protect the safety and privacy of consumers.**

The Alliance again argues that inclusion of the term "open access" in Section 3 of the Data Access Law (but not in the Maine proposal) makes it impossible for OEMs to securely comply. ECF #335 at 7. Extensive trial evidence and post-trial briefing shows why the Alliance is wrong. ECF #232 at FF ¶ 69, CL ¶ 54; ECF #192 at ¶¶ 115-17; ECF #293 at 11-12; ECF #292 at 7, 12-13; Tr. I:55, 110, 123-24, 126, 189; Tr. III:70-71, 75. In particular, an open access platform can still use security controls to ensure the safety and privacy of the consumer. ECF #192 ¶¶ 116, 197. In fact, the text of Section 3 requires that access to the platform be limited to

the "secure" communication of mechanical data, authorization of the vehicle owner, and the period of time needed "to complete the repair or for a period of time agreed to by the vehicle owner for the purposes of maintaining, diagnosing, and repairing the motor vehicle." The Alliance refuses to acknowledge that those cybersecurity measures are required by the Data Access Law itself.[3]

### 4.   "Mechanical data" is data related to the diagnosis, repair or maintenance of vehicles.

Lastly, the Alliance argues that the definition of "mechanical data" encompasses "broad swaths of sensitive data that is not actually necessary for diagnosis, repair, or maintenance purposes." ECF #335 at 7. This argument is emblematic of the Alliance's strategy throughout this case: To interpret key provisions in the Data Access Law extremely broadly and then to argue that the law, so interpreted, somehow conflicts with federal law.

But the argument is just wrong. Regardless of what the Maine proposal provides, the definition of "mechanical data" in the Data Access Law encompasses a vehicle's pre-defined diagnostic functions and any data generated, stored, or transmitted by the vehicle and used for vehicle diagnostics, maintenance, or repair—but <u>not</u> data <u>unrelated</u> to diagnostics, maintenance, or repair. ECF #232 at CL ¶¶ 38-40. That understanding is clear from the Data Access Law's structure and purpose, which is focused on ensuring that, "as technology advances, drivers can continue to get their cars repaired where they want." Tr. Ex. 509 at 5. It is also explicitly stated in the statute itself: "Nothing in this chapter shall be construed to require manufacturers or dealers to provide an owner or independent repair facility access to non-diagnostic and repair information provided by a manufacturer to a dealer or by a dealer to a manufacturer pursuant to

---

[3] The Alliance instead invokes the Statement of Interest filed in this case by NHTSA as though it were some sort of talisman. ECF #335 at 7. But, of course, NHTSA has taken "no position . . . regarding whether the Data [Access] Law is preempted." ECF #202 at 1, 4 n.7, 10.

the terms of a franchise agreement." Mass. G.L. c. 93K, § 5. The Alliance simply refuses to acknowledge the Data Access Law's own limiting rule of construction.

## Conclusion

As shown by the foregoing, this entire round of Maine-related discovery is much ado about nothing. The documents and testimony identified by the Alliance add nothing material to the only relevant question in this case, i.e., whether the Data Access Law is preempted by the MVSA or CAA. And the Alliance's recycled arguments offer nothing to avoid the conclusion that the Data Access Law is not preempted.

Respectfully submitted,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL,

By her attorneys,

April 14, 2023

   /s/ Eric Haskell
Robert E. Toone, BBO No. 663249
Eric A. Haskell, BBO No. 665533
Phoebe Fischer-Groban, BBO No. 687068
Christine Fimognari, BBO No. 703410
  Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
(617) 963-2855
eric.haskell@mass.gov

## CERTIFICATE OF SERVICE

I certify that a true copy of this document will be sent electronically by the ECF system to attorneys of record identified on the Notice of Electronic Filing.

April 14, 2023

   /s/ Eric Haskell
Eric A. Haskell
Assistant Attorney General